UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

---------------------------------------------------------------x
                                                               :
*In re:*                                                       :     Chapter 11
                                                               :
**GT ADVANCED TECHNOLOGIES INC.**, *et al.*,                   :     Case No. 14-_____ (____)
                                                               :
Debtors.[1]                                                    :
                                                               :     Joint Administration Requested
---------------------------------------------------------------x

## DECLARATION OF DANIEL W. SQUILLER IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS

I, Daniel W. Squiller, hereby declare under penalty of perjury:

1. I am the Chief Operating Officer of GT Advanced Technologies Inc. ("GT"), a corporation organized under the laws of the State of Delaware with its headquarters located in Merrimack, New Hampshire. GT is the direct and indirect parent of the debtors and debtors in possession in the above-captioned cases (collectively, "GTAT" or the "Debtors") and certain non-debtor affiliates which have not sought chapter 11 relief (together with GTAT, the "GTAT Group"). In that capacity, I am familiar with GTAT's operations, businesses, and financial affairs.

2. I have served as Chief Operating Officer since January 14, 2013. Before joining GT, I served as the chief executive officer at PowerGenix, an innovator in high-power battery technology. At PowerGenix, I led the growth of the company to a successful, global high volume manufacturer with its operations in China. Prior to PowerGenix, I was president of the

---

[1] The Debtors, along with the last four digits of each debtor's tax identification number, as applicable, are: GT Advanced Technologies Inc. (6749), GTAT Corporation (1760), GT Advanced Equipment Holding LLC (8329), GT Equipment Holdings, Inc. (0040), Lindbergh Acquisition Corp. (5073), GT Sapphire Systems Holding LLC (4417), GT Advanced Cz LLC (9815), GT Sapphire Systems Group LLC (5126), and GT Advanced Technologies Limited (1721). The Debtors' corporate headquarters are located at 243 Daniel Webster Highway, Merrimack, NH 03054.

Power Components Division of Invensys, where I managed that Division's global operations. I earned a Bachelor of Science degree in electrical engineering and a Master's degree from Ohio University.

3. I submit this declaration ("Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of (i) GTAT's petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Commencement Date") and (ii) the relief, in the form of motions and applications, that GTAT has requested of the Court (collectively, the "First Day Pleadings").

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of GTAT's senior management and advisors, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning GTAT's operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of GTAT.

## PREPETITION CAPITAL STRUCTURE

5. Headquartered in Merrimack, New Hampshire, GT is a publicly held corporation whose stock is traded on NASDAQ under the ticker symbol "GTAT." GT is the direct or indirect parent of each of the other Debtors and their non-debtor affiliates. GTAT's operating subsidiaries are located in the United States and Hong Kong.

6. A chart showing the GTAT Group's corporate ownership structure is annexed to this Declaration as Exhibit 1.

7. As of June 28, 2014, the GTAT Group's unaudited and consolidated financial statements reflected assets totaling approximately $1.5 billion and liabilities totaling

2

approximately $1.3 billion.  As of September 29, 2014, GTAT had approximately $85 million in cash, approximately $84 million of which is unencumbered.

## 2017 Unsecured Notes

8. On September 28, 2012, GT issued $220 million aggregate principal amount of 3.00% Convertible Senior Notes due 2017 (the "2017 Notes").  The 2017 Notes are senior unsecured obligations of GT, at a rate of 3.00% per annum beginning on April 1, 2013.  The 2017 Notes are governed by an Indenture dated September 28, 2012 with U.S. Bank National Association, as trustee.  In connection with the offering of the 2017 Notes, GT entered into separate convertible note hedging transactions and warrant transactions with multiple counterparties.  The 2017 Notes had a maturity date of October 1, 2017.

## 2020 Unsecured Notes

9. On December 10, 2013, GT issued $214 million aggregate principal amount of 3.00% Convertible Senior Notes due 2020 (the "2020 Notes").  The 2020 Notes are senior unsecured obligations of GT, at a rate of 3.00% per annum beginning on June 15, 2014.  The 2020 Notes are governed by an Indenture dated December 10, 2013 with U.S. Bank National Association, as trustee.  The 2020 Notes had a maturity date of December 15, 2020.

## Trade Creditors

10. Domestic and international trade creditors hold approximately $145 million in trade claims against GTAT.

## GTAT'S BUSINESS

### Overview

11. The GTAT Group operates as one business enterprise comprised of three business segments: sapphire; polysilicon; and photovoltaic ("PV").  For the six-month period ended June 28, 2014, the GTAT Group's total revenue can be broken down by business segment as follows:

3

- Sapphire segment – 62% of total revenue.
- PV segment – 30% of total revenue.
- Polysilicon – 8% of total revenue.

### Polysilicon and PV Businesses

12.     The GTAT Group has historically been an equipment company serving the solar industry in two areas: (i) providing equipment and services that enable the production of high quality polysilicon; and (ii) producing silicon casting furnaces that produce multicrystalline ingots used in the production of solar cells.  In 2001, the GTAT Group acquired Confluence Solar Inc., which enabled the GTAT Group to expand their technology segment to include "HiCz" growth technology for manufacturing more efficient monocrystalline solar cells.  The GTAT Group's acquisition of certain capital assets and intellectual property of Twin Creeks Technologies, Inc. in 2013 provided the GTAT Group with access to advanced technology for use in the solar PV, sapphire and power electronics markets.

13.     The GTAT Group's PV business is centered on the development and sales of crystallization growth furnaces to produce silicon ingots used in the production of solar wafers, modules, and cells. The GTAT Group's principal product line has been the directional solidification system ("DSS"™) furnaces and related equipment are used to cast multicrystalline and MonoCast™ crystalline silicon ingots, which are used to make PV solar wafers and cells. The company introduced the first DSS furnace, the DSS™240, in 2003.  All of the components and assemblies for DSS furnaces are manufactured by third parties using the GTAT Group's designs.  These components are shipped to the company's consolidation warehouse in Hong Kong where they are crated for ultimate shipment to customers.  GTAT's service personnel focus on final assembly, integration and testing of the DSS furnace at the customer site.  The

4

GTAT Group also provides engineering and product design, quality control, process engineering and engineering services related to the operation of the DSS furnaces.

14. The GTAT Group's polysilicon business is focused on product design, quality control, engineering services, project management and process development related to the production of polysilicon. Polysilicon is a purified form of silicon that is a key raw material used to produce PV and semiconductor wafers. The GTAT Group's polysilicon business offers silicon deposition reactors ("SDR"™), which utilizes the chemical vapor deposition process. In addition, the GTAT Group sells hydrochlorination technology and equipment which is utilized to convert silicon tetrachloride into trichlorosilane, which is used in the manufacture of high purity silicon.

15. All of the components of the GTAT Group's polysilicon products are shipped directly from qualified vendors to the customer installation site. This model results in a highly flexible cost structure, modest working capital and physical plant requirements and a relatively small number of manufacturing employees.

### Sapphire Segment

16. After diamonds, sapphire is the second hardest substance on Earth. It is scratch-resistant and can be produced in highly transparent form. Sapphire has many ideal applications, including watch crystals, camera lenses, and smartphone displays.[2]

17. In 2010, the GTAT Group acquired Crystal Systems Inc., which enabled the GTAT Group to enter the sapphire material and equipment business, with a focus on providing sapphire furnaces for the global LED and certain other industrial markets. GTAT's sapphire business was traditionally based on designing and selling advanced sapphire crystallization

---

[2] For an illustration of how sapphire is manufactured, see https://www.youtube.com/watch?v=vsCER0uwiWI

5

furnaces, which are used to produce sapphire boules. These sapphire boules are used, following certain cutting and polishing processes, to make sapphire wafers, a substrate for manufacturing light emitting diodes, as well as sapphire material for a wide range of other industrial and consumer applications including, medical devices, dental, oil and gas, watch crystals, and specialty optical applications such as low absorption optical sapphire for advanced optics and titanium-doped sapphire material for high power lasers.

18. As a result of a series of transactions with a key customer in 2013, the GTAT Group's sapphire business model shifted from being primarily an equipment manufacturer to also being a sapphire materials manufacturer. GTAT also continues to market and sell ASF furnaces to current and new customers for applications not prohibited under the agreements entered into in 2013 with a key customer. All of the components and assemblies for ASF furnaces sold to customers are manufactured by third party vendors using GTAT's designs. These components are shipped to GTAT where they are crated for ultimate shipment to ASF equipment customers. GTAT's service personnel focus on final assembly, integration and testing of the ASF furnace at the customer site.

### Manufacturing and Suppliers

19. The GTAT Group's manufacturing focuses on assembly operations and the production of limited proprietary components. Nearly all of the components of the GTAT Group's polysilicon products are shipped directly from qualified vendors to the customer installation site. As noted above, the majority of components for DSS furnaces and ASF systems are shipped to the GTAT Group's warehouse for ultimate shipment to the customer.

20. The GTAT Group purchases a range of materials and components for use in its equipment products from other manufacturers. Many component parts purchased by the GTAT Group are made to specification and under confidentiality arrangements. Purchased components

represented approximately 85% of the costs of goods sold in the fiscal year ended December 31, 2013. The GTAT Group secured multiple suppliers of component parts to reduce concentration risk and ensure adequate supply, but, in some cases, components and parts are obtained from a single vendor. In addition, the GTAT Group does not use any single supplier to produce all of the components for any single product in order to reduce the risk that a supplier could replicate the GTAT Group's products. The GTAT Group has well-established relationships with various domestic and foreign suppliers of the components used in equipment products and the GTAT Group is generally required to make a series of pre-payments to these vendors, which is funded from working capital.

### Intellectual Property

21.     The GTAT Group protects its proprietary technology through a combination of patents, trademarks, copyrights, know-how and trade secrets, as well as employee and third party confidentiality and assignment of rights agreements. The GTAT Group focuses on developing, identifying and protecting its technology and resulting intellectual property in a manner that supports its overall business and technology objectives. Although the GTAT Group relies on intellectual property that is primarily developed in-house, the GTAT Group also enters into patent and/or technology licenses with other parties when such licenses would advance or complement the GTAT Group's products and technology.

22.     The GTAT Group owns, or has applied for, various patents and patent applications in the United States and other jurisdiction relating to the GTAT Group's products, product uses and manufacturing processes. The patents and patent applications vary in scope and duration. As of January 24, 2014, the GTAT Group owned more than 70 issued patents in the PV, semiconductor, polysilicon, sapphire, and ion implantation fields in the United States and foreign countries, which will expire at various times between 2014 and 2033.

7

**Employees**

23.     In order to support its global operations, the GTAT Group employs approximately 1,100 people domestically and abroad, approximately 1,000 of whom work for the Debtors. The total cost of all wages and benefits payable to these employees amounts to approximately $102 million per year.

24.     None of these employees is covered by a collective bargaining agreement. GTAT considers its relationship with its employees to be good.

## EVENTS LEADING TO CHAPTER 11

25.     GTAT is facing a severe liquidity crisis due to circumstances that will be more fully described at the hearing on the First Day Pleadings.

## SUPPORT FOR RELIEF REQUESTED IN FIRST DAY PLEADINGS

26.     Concurrently with the filing of its chapter 11 petitions, or as soon as practicable thereafter, GTAT has filed (or will file) a number of First Day Pleadings seeking relief that GTAT believes is necessary to enable it to operate with minimal disruption and loss of productivity. The facts set forth in the First Day Pleadings are incorporated by reference in their entirety. GTAT requests that the relief requested in each of the First Day Pleadings be granted as critical elements in ensuring a smooth transition into chapter 11.

27.     I have reviewed each of the First Day Pleadings, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors. The relief sought in each of the First Day Pleadings is necessary to enable GTAT to continue operations with minimal disruption and constitutes a critical element in the successful implementation of GTAT's effort to maximize the recovery of its creditors. To this end, GTAT has filed the following First Day Pleadings:

8

a. **Debtors' Emergency *Ex Parte* Motion, Pursuant to Bankruptcy Rule 1015, for Entry of Order Directing Joint Administration of Related Chapter 11 Cases;**

b. **Debtors' Emergency *Ex Parte* Motion for Entry of Order, Pursuant to Bankruptcy Code Sections 105(a), 345(b), 363(c)(1), 364(a), 364(b), and 503(b)(1), Bankruptcy Rules 6003 and 6004, (A) Authorizing Debtors to Use Existing Cash Management System, (B) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers, (C) Authorizing Continued Use of Intercompany Transactions, (D) Waiving Requirements of Section 345(b) of Bankruptcy Code and (E) Authorizing Debtors to Use Existing Bank Accounts and Existing Business Forms;**

c. **Debtors' Emergency *Ex Parte* Motion, Pursuant to Bankruptcy Code Sections 105(a), 363(b), 503(b), 507(a)(4), and 507(a)(8), and Bankruptcy Rules 6003 and 6004, for Entry of Order (A) Authorizing Debtors To (I) Pay Certain Employee Compensation And Benefits and (II) Maintain and Continue Such Benefits and Other Employee-Related Programs and (B) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations;**

d. **Debtors' Emergency *Ex Parte* Motion, Pursuant to Bankruptcy Code Sections 105(a), 362(d), 363(b)(1), and 503(b) and Bankruptcy Rules 6003 and 6004, for Entry of Order (a) Authorizing Debtors to (I) Continue Workers' Compensation Program and Liability, Property, and Other Insurance Programs, and (II) Pay All Obligations in Respect Thereof, and (B) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations;**

e. **Debtors' Emergency *Ex Parte* Motion, Pursuant to Bankruptcy Code Sections 105(a), 363(b), 541, and 507(a)(8) and Bankruptcy Rules 6003 and 6004, for Entry of Order (A) Authorizing Debtors to Pay Prepetition Taxes and Fees and (B) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations;**

f. **Debtors' Emergency *Ex Parte* Motion, Pursuant to Bankruptcy Code Sections 105(a) and 363(b) and Bankruptcy Rules 6003 and 6004, for Entry of Interim and Final Orders (A) Authorizing Debtors' Payment of (I) Certain Prepetition Shipping and Delivery Charges and (II) Mechanic's Lien Charges, and (B) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations;**

g. **Debtors' Emergency *Ex Parte* Motion, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, for Entry of Interim and Final Orders (A) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (B) Approving Debtors' Proposed Form of Adequate Assurance, and (C) Determining Adequate Assurance of Payment for Future Utility Services;**

h. **Debtors' Emergency *Ex Parte* Motion, Pursuant To Bankruptcy Code Sections 105(a) and 521, Bankruptcy Rule 1007 and LBR 1007-1(J), for Entry of Order Extending Time to File Schedules and Statements of Financial Affairs;**

i. **Debtors' Emergency *Ex Parte* Motion for Entry of Order Enforcing Sections 362 and 525 of the Bankruptcy Code;**

j. **Debtors' Emergency *Ex Parte* Motion, Pursuant to Bankruptcy Code Sections 105(a), 362 and 541, for Entry of Interim and Final Orders, Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Claims Against and Equity Interests in the Debtors *Nunc Pro Tunc* to the Petition Date;**

k. **Debtors' Emergency *Ex Parte* Motion, Pursuant to Bankruptcy Code Sections 363(b), 503(b)(9), and 105(a) and Bankruptcy Rules 6003 and 6004, for Entry of Interim and Final Orders Authorizing (A) Debtors to Pay the Prepetition Claims of Certain Critical Domestic and Foreign Vendors and Administrative Claim holders, and (B) Financial Institutions to Honor and Process Prepetition Checks and Transfers to Certain Critical Vendors;**

l. **Debtors' Emergency *Ex Parte* Motion for Entry of Order, Pursuant to Bankruptcy Code Sections 105(a), 362, 363(b), 503(b)(1), 1107(a), and 1108 and Bankruptcy Rules 6003 and 6004, Authorizing (A) Debtors to Continue Customer Programs and Practices in the Ordinary Course of Business and (B) Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations;**

m. **Debtors' Emergency *Ex Parte* Emergency *Ex Parte* Motion for Entry of Order, Pursuant to Bankruptcy Code Section 105(a) and Bankruptcy Rule 1015(c) and 9007, Implementing Certain Notice and Case Management Procedures; and**

n. **Debtors' Emergency *Ex Parte* Motion for Entry of Order Establishing Procedures for the Assertion, Resolution, and Satisfaction of Reclamation Claims.**

28. In addition to the foregoing First Day Pleadings, GTAT is requesting relief pursuant to certain second day motions and applications to retain professionals, including, without limitation, the motions and applications listed below. I have reviewed each of these motions and applications, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors. The relief sought in each of the following motions and applications is necessary to enable GTAT to continue operations with minimal disruption and conduct efficient and orderly chapter 11 cases. To this end, GTAT has filed (or will file) the following motions and applications:

a. **Debtors' Motion, Pursuant to Bankruptcy Code Sections 105(a), 365(a), and 554 and Bankruptcy Rule 6004, for Entry of Order Authorizing Debtors to Reject Certain Unexpired Leases of Non-Residential Real Property,** *Nunc Pro Tunc* **to Petition Date;**

b. **Debtors' Motion, Pursuant to Sections 105(a), 365(a) and 554 of the Bankruptcy Code, for Entry of Interim and Final Orders Authorizing and Approving Expedited Procedures for Assumption, Assumption and Assignment, and Rejection of Contracts and Leases of Personal and Non-Residential Real Property and Abandonment of Related Personal Property.**

c. **Debtors' Motion, Pursuant to Bankruptcy Code Sections 105(a), 501, 502(b)(9), and 503, Bankruptcy Rules 2002(l) and 3003(c)(3), and LBR 3001-1(b), for Entry of Order (A) Establishing Bar Date for Filing of Proofs of Claim, (B) Designating Form and Manner of Notice Thereof, and (C) Granting Related Relief;**

d. **Debtors' Motion, Pursuant to Bankruptcy Code Sections 105(a), 327 and 331, Bankruptcy Rule 2016, and LBR 2016-1, for Entry of Order Authorizing Procedures for Interim Compensation and Reimbursement of Expenses of Debtors and Committee Professionals; and**

e. **Application of the Debtors, Pursuant to 28 U.S.C. § 156(c), Sections 105(a) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 2002, and LBR 3001-1, for Entry of Order Authorizing Debtors to Employ and Retain Kurtzman Carson Consultants LLC as Notice, Claims, and Balloting Agent to Debtors, Effective** *Nunc Pro Tunc* **to Petition Date**.

## **CONCLUSION**

29. I believe approval of the relief requested in the First Day Pleadings is in the best interests of all stakeholders.

*[remainder of page intentionally left blank]*

Case: 14-11916-HJB  Doc #: 14  Filed: 10/06/14  Desc: Main Document    Page 12 of 15

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: October 6, 2014

On behalf of GTAT

By: /s/ Daniel W. Squiller
Name: Daniel W. Squiller
Title: Chief Operating Officer

**EXHIBIT 1**

**CAPITAL STRUCTURE CHART**

GT Advanced Technologies Inc.
Organizational Chart

