HEARING DATE AND TIME: November 25, 2014 at 2:00 p.m. (Eastern Time)
OBJECTION DEADLINE: November 18, 2014 at 4:00 p.m. (Eastern Time)

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

-------------------------------------------------------------x
                    :

In re:                 :        **Chapter 11**
                    :

**GT ADVANCED TECHNOLOGIES INC.,** *et al.***,:**    **Case No. 14-11916-HJB**
                    :

**Debtors.[1]**      :        **Jointly Administered**
                    :
                    :
                    :
-------------------------------------------------------------x

### DEBTORS' MOTION, PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 363(b), 364, AND 365 AND BANKRUPTCY RULE 9019, FOR ENTRY OF ORDER APPROVING TERMS OF, AND AUTHORIZING DEBTORS TO ENTER INTO, <u>ADEQUATE PROTECTION AND SETTLEMENT AGREEMENT WITH APPLE</u>

GT Advanced Technologies Inc. ("<u>GT</u>") and its affiliated debtors as debtors in possession in the above-captioned chapter 11 cases (collectively, "<u>GTAT</u>" or the "<u>Debtors</u>") hereby submit this Motion (the "<u>Motion</u>"), pursuant to sections 105, 361, 363(b), 364, and 365 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for entry of an order approving the terms of, and authorizing GTAT to enter into, that certain Adequate Protection and Settlement Agreement, dated October 21, 2014 (the "<u>Settlement Agreement</u>"),[2] by and among (i) Apple Inc. ("<u>Apple</u>")

---

[1] The Debtors, along with the last four digits of each debtor's tax identification number, as applicable, are: GT Advanced Technologies Inc. (6749), GTAT Corporation (1760), GT Advanced Equipment Holding LLC (8329), GT Equipment Holdings, Inc. (0040), Lindbergh Acquisition Corp. (5073), GT Sapphire Systems Holding LLC (4417), GT Advanced Cz LLC (9815), GT Sapphire Systems Group LLC (5126), and GT Advanced Technologies Limited (1721).  The Debtors' corporate headquarters are located at 243 Daniel Webster Highway, Merrimack, NH 03054.

[2] The summaries and descriptions of the Settlement Agreement contained in this Motion are qualified in their entirety by the terms of the Settlement Agreement and shall not in any way affect the meaning or interpretation of the Settlement Agreement.  Furthermore, the description of the benefits of the Settlement Agreement assumes that the Effective Date of such agreement will occur.  Capitalized terms used but not otherwise defined in this Motion shall have the meanings set forth in the Settlement Agreement or the 9019 Declaration (as defined below), as applicable.  A copy of the Settlement Agreement (with certain minor redactions described by GTAT's counsel to the Court at the October 21, 2014 hearing) is attached hereto as <u>Exhibit A</u>.

and Platypus Development LLC ("Platypus," and together with Apple, the "Apple Parties") and (ii) GT, GTAT Corporation ("GTAT Corp."), GT Advanced Equipment Holding LLC ("GT Equipment"), and the other Debtors (together with the Apple Parties, the "Parties" and each, individually, a "Party").  In support of the Motion, GTAT respectfully represents:

## PRELIMINARY STATEMENT

1.      After intensive, hard-fought negotiations, GTAT has reached a global settlement with Apple that (a) allows for the consensual unwinding of their business relationship related to the sapphire growth and fabrication project, (b) resolves all disputes arising from the Parties' agreements (collectively, the "Apple Agreements")[3] and their business relationship, (c) preserves GTAT's equity value in its sapphire-growing furnaces located at the facility in Mesa, Arizona (the "Mesa Facility"), (d) facilitates GTAT's efforts to obtain debtor-in-possession and exit financing for all Debtors, and (e) paves the way for GTAT's emergence from chapter 11 as a re-energized company with a renewed focus on its pre-Apple business of selling sapphire-growing furnaces.  In addition, the global settlement with Apple ensures the survival of GTAT with the attendant **preservation of jobs in, among other states, New Hampshire**.

2.      The alternative to the Settlement Agreement would be months, if not years, of costly, time-consuming, and distracting litigation with Apple over a wide range of contested issues, the success of which GTAT could not guarantee.  These contested issues include, without limitation, (a) GTAT's ability to effectively eliminate exclusivity and intellectual property provisions in the Apple Agreements through rejection under the Bankruptcy Code, (b) the enforceability of numerous liquidated damages provisions in the Apple Agreements pursuant to which Apple would likely assert millions, if not billions, of dollars in secured and unsecured

---

[3]      Copies of the Apple Agreements were filed with the Court on October 22, 2014 [Docket No. 250].

claims against certain of the Debtors, (c) the ownership of the sapphire-growing furnaces at the

Mesa Facility as between GT Equipment and GTAT Corp., and (d) the ownership of intellectual

property rights as between GTAT and Apple.  In addition, the estates might have various causes

of action against Apple, including actions rooted in the Bankruptcy Code and breach of contract

claims, that GTAT would be compelled to investigate further and pursue, absent settlement with

Apple.  While GTAT believes that, subject to confirmatory due diligence, it could prevail on

many of these issues, that outcome is by no means certain.  At a minimum, protracted litigation

against one of the largest corporations in the world with over $100 billion of cash would be

challenging and expensive and could significantly delay GTAT's emergence from chapter 11.

Such litigation would also present an enormous distraction for senior management at a time it

needs to focus on rebuilding GTAT's business of selling sapphire-growing furnaces and on

continuing to build its other core businesses.

       3.     The Settlement Agreement puts all of the disputes between GTAT and Apple to

rest while providing numerous tangible benefits to GTAT and its estates.  Among other things:

- GTAT is freed from the exclusivity restrictions in the Apple Agreements, which is a crucial and indispensable step in GTAT's overall reorganization strategy to refocus its resources on selling advanced sapphire crystallization furnaces ("ASF Furnaces"), including to competitors of Apple.

- GTAT retains control of its intellectual property and will be able to sell its sapphire growth and fabrication technology without restrictions.

- GTAT continues to own all production, ancillary, and inventory assets located at the Mesa Facility.  By retaining ownership of its 2,036 ASF Furnaces at the Mesa Facility (the "Mesa ASF Furnaces"), GTAT will be able to preserve its substantial equity value in these furnaces (which were originally contributed by GTAT to the sapphire growth and fabrication project at cost).  Moreover, subject to certain limitations, GTAT will control the sales of the Mesa ASF Furnaces for the next four years.

3

- GTAT will be able to continue using the Mesa Facility rent-free for approximately one year to store the Mesa ASF Furnaces.

- Apple releases **all claims** it may have against GTAT, including under the liquidated damages provisions in the Apple Agreements (which Apple has advised GTAT would total in excess of $1 billion), save for a $439 million secured, non-recourse claim against GT Equipment (which claim is recoverable solely from the 2,036 Mesa ASF Furnaces).

- Through its sole remaining claim, Apple will recover its $439 million claim against GTAT over a period of up to four years **without interest**, solely from a specified portion of the proceeds from the sale of GTAT's ASF Furnaces.

- Apple consents, subject to being provided with the adequate protection right set forth in the Settlement Agreement, to GTAT obtaining debtor-in-possession or exit financing that primes Apple's security interest in the Mesa ASF Furnaces in an amount of up to $150 million. Apple's consent will facilitate GTAT's efforts to obtain critical new financing and should reduce the attendant borrowing costs, all for the benefit of GTAT's stakeholders.

- Apple agrees to support, and vote in favor of, any chapter 11 plan proposed by GTAT which provides for the treatment of Apple's $439 million secured claim as set forth in the Settlement Agreement.

4.    The Settlement Agreement also provides another key (albeit unquantifiable) benefit to GTAT's estates: it frees senior management to focus on redeploying GTAT's scarce resources to create the "new post-Apple GT."  Obviously, GTAT's businesses have been severely affected by the chapter 11 filings and, because of the exclusivity provisions in the Apple Agreements, GTAT has been effectively kept out of the business of selling ASF Furnaces (at least in the consumer electronics space) for approximately one year.  GTAT's senior management must re-establish its business contacts and relationships with potential customers, and the Settlement Agreement allows it to focus 100% of its efforts on this and other important tasks.

5.      For these reasons, and as further demonstrated below, the Settlement Agreement should be approved for the benefit of GTAT and all of its stakeholders.

### JURISDICTION, VENUE AND STATUTORY BASES

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory and rule bases for the relief requested herein are sections 105, 361, 363(b), 364, and 365 of the Bankruptcy Code and Bankruptcy Rule 9019.

### BACKGROUND

### Overview of GTAT's Business

8.      GTAT and its non-Debtor affiliates (collectively, the "GTAT Group") are leading manufacturers and suppliers of advanced materials and equipment for the global consumer electronics, power electronics, solar, and light emitting diodes ("LED") industries.  The GTAT Group designs and sells high-quality sapphire production equipment and materials for a wide variety of domestic and international markets, including the consumer electronics market.  In addition, the GTAT Group's historical business is based in the solar industry, where it is a leading provider of key polysilicon and photovoltaic equipment, services and technologies.  The GTAT Group is also in the process of developing and commercializing additional equipment and products, including an ion implantation equipment tool and advanced solar cell metallization and interconnect technology.

### GTAT's Sapphire Segment

9.      In 2010, the GTAT Group acquired Crystal Systems Inc., which enabled the GTAT Group to enter the sapphire material and equipment business, with a focus on providing

sapphire-growing furnaces for the global LED and certain other industrial markets.  GTAT's
sapphire business was traditionally based on designing and selling ASF Furnaces, which are used
to produce sapphire boules.  These sapphire boules are used, following certain cutting and
polishing processes, to make sapphire wafers, a substrate for manufacturing light emitting
diodes, as well as sapphire material for a wide range of other industrial and consumer
applications including, medical devices, dental, oil and gas, watch crystals, and specialty optical
applications such as low absorption optical sapphire for advanced optics and titanium-doped
sapphire material for high power lasers.

### GTAT's Chapter 11 Cases

10.     On October 6, 2014 (the "Petition Date"), GTAT commenced voluntary cases
under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District
of New Hampshire (the "Court").  GTAT continues to operate its business and manage its
properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy
Code.  No request for the appointment of a trustee or examiner has been made in these chapter
11 cases.

11.     These chapter 11 cases have been consolidated for procedural purposes only and
are jointly administered pursuant to Bankruptcy Rule 1015(b).

12.     On October 14, 2014, the Office of the United States Trustee for the District of
New Hampshire appointed an official committee of unsecured creditors (the "Creditors'
Committee") in these chapter 11 cases.

13.     Information regarding GTAT's business, capital structure, and the circumstances
leading to these chapter 11 cases is set forth in the *Declaration of Daniel W. Squiller in Support
of Chapter 11 Petitions and First-Day Motions* [Docket No. 14] (the "First Day Declaration")

6

and the *Declaration of Daniel W. Squiller in Support of Debtors' Motion, Pursuant to Bankruptcy Code Sections 105 and 363(b) and Bankruptcy Rule 9019, for Entry of Order Approving Terms of , and Authorizing Debtors to Enter Into, Settlement Agreement with Apple*, which will be filed separately with the Court (the "9019 Declaration"), which are incorporated herein by reference.

14.     The facts and circumstances relating to GTAT's business relationship with Apple are addressed in the 9019 Declaration.

### GTAT's Motions to Wind Down Sapphire Manufacturing Operations and Reject Certain Apple Agreements

15.     In light of GTAT's liquidity crisis and the ongoing cash burn from sapphire manufacturing operations, GTAT determined, after a careful evaluation of all alternatives, and in consultation with its advisors, that to preserve the value of its estates it must wind down its sapphire manufacturing operations and refocus its resources on its other business lines, including the sale of ASF Furnaces.  Accordingly, on October 9, 2014, GTAT filed a motion seeking authorization to wind down its sapphire manufacturing operations at the Mesa Facility and Salem Facility, with reductions in associated supporting personnel at GTAT's Merrimack, New Hampshire, offices, as well as approval of a wind down employee incentive plan in connection with the wind down of such operations (such motion, as supplemented by the Supplement filed on October 17, 2014 [Docket No. 189], the "Wind Down Motion").[4]  The Court granted the Wind Down Motion at the October 21, 2014 hearing and entered the corresponding order on October 24, 2014 [Docket No. 286].

---

[4]     The Wind Down Motion was initially submitted to the Court under seal, but was thereafter filed in unredacted form on the docket [Docket No. 97], pursuant to the Court's *Order on Emergency Motion to Seal Under Seal and Authorize Related Hearings to be Conducted in Camera (Doc. 55) Filed by Debtor* [Docket No. 86].  On October 17, 2014, GTAT filed a supplement to the Wind Down Motion [Docket No. 189], making certain modifications to the proposed employee incentive plan.

16.     Concurrently with the filing of the Wind Down Motion, GTAT filed its motion (the "Rejection Motion") to reject certain Apple Agreements that, in GTAT's business judgment, provided no benefit to GTAT's estates, including in light of the wind down of the sapphire manufacturing operations.

17.     On October 14, 2014, Apple submitted its objection to the Rejection Motion (the "Apple Objection").[5]  The Apple Objection did not challenge GTAT's business judgment in seeking to reject certain of the Apple Agreements.  Rather, Apple asserted that (a) GTAT could not reject the Apple Agreements at issue in the Rejection Motion without also rejecting the Mesa Lease and (b) upon rejection of such agreements, GTAT would be in breach of the Mesa Lease and, therefore, in violation of section 365(d)(3) of the Bankruptcy Code, unless GTAT immediately removed its ASF Furnaces from the leased premises or negotiated an agreement with Apple.

18.     On October 20, 2014, GTAT submitted its reply to the Apple Objection, asserting that the Mesa Lease and the Apple Agreements did not constitute a single, integrated agreement that must be rejected (or assumed) together and at the same time.  In addition, GTAT rebutted Apple's assertions that rejection of the SOW would result in GTAT breaching the Mesa Lease and violating section 365(d)(3) of the Bankruptcy Code.  Approval of the Settlement Agreement would render the Rejection Motion moot.

## Settlement Agreement With Apple

19.     Since before the Petition Date, GTAT and the Apple Parties have engaged in significant good faith, arm's-length negotiations regarding a possible consensual resolution to their various disputes with respect to the Apple Agreements and the business relationship

---

[5]     That same day, Apple requested entry of an order authorizing the filing of the Apple Objection under seal [Docket No. 123].

between the parties more generally.  However, until recently, the parties were unable to resolve their differences.

      20.     On October 21, 2014, after intensive and hard-fought negotiations, the Apple Parties and GTAT entered into the Settlement Agreement which allows the Parties to consensually unwind their business relationship.  The key terms of Settlement Agreement can be summarized as follows:

| | |
|---|---|
| **Mesa Equipment, Inventory and Mesa Facility** | GT Equipment will own the Mesa ASF Furnaces free and clear of any claims, liens or interests of the Apple Parties (other than the Apple Security Interest).  GTAT Corp. will own the fabrication and furnace-related equipment and the inventory at the Mesa Facility and all furnaces and equipment at the Salem Facility free and clear of any claims, liens or interests of the Apple Parties.  Platypus will own the Mesa Facility premises and all real or personal property on the premises other than the furnaces and equipment owned by GT Equipment and GTAT Corp. free and clear of any interest or claim of GTAT. |
| **Apple Claim and Security Interest in Mesa ASF Furnaces** | Apple will have an allowed claim against GT Equipment in the amount of $439,000,000 secured by Mesa ASF Furnaces, subject to reduction as provided in the Settlement Agreement (the "Apple Claim"). To secure payment of the Apple Claim, Apple will receive a fully-perfected security interest (the "Apple Security Interest") in the Mesa ASF Furnaces (and adequate protection payments payable to Apple).  The Apple Claim will be a non-recourse claim recoverable solely from the Mesa ASF Furnaces.  To the extent the Apple Claim has not been repaid within 48 months after the date of the Settlement Agreement, Apple may foreclose on any remaining Mesa ASF Furnaces. |
| **Repayment of Apple Claim** | The Apple Claim will be repaid, without interest, fees or other charges, costs or fixed amortization, as follows: for each ASF Furnace GTAT sells, Apple will receive an amount in cash as provided in a schedule attached to the Settlement Agreement (the "Apple Repayment Amount"), it being understood that Apple will receive the Apple Repayment Amount regardless of whether the ASF Furnace is a Mesa ASF Furnace.  If the market price of furnaces that are similar to the ASF Furnaces that GTAT sells drops below the Apple Repayment Amount, the Parties will renegotiate the Apple Repayment Amount in good faith for the ASF Furnaces that remain unsold at such time.  The payment of the Apple Repayment |

Amount out of the proceeds of the sale of ASF Furnaces other than the Mesa ASF Furnaces will be the only form of adequate protection that Apple will receive from GTAT.

**DIP Facility**

Apple consents to the priming of its security interest in the Mesa ASF Furnaces in the principal amount of $150,000,000, plus interest, fees and costs, in connection with debtor-in-possession or exit financing for all Debtors.  Apple's claim is interest free with no fixed amortization and a Maturity Date that is 48 months from the date of the Settlement Agreement.  Apple's sole right at maturity is to foreclose on the remaining Mesa ASF Furnaces.

**Adequate Protection**

Apple will receive the Apple Repayment Amount as adequate protection for the priming of its security interest, which priming will allow for the funding of the operations of all Debtors.  This will be the only form of adequate protection granted to Apple.  For each ASF Furnace that is not a Mesa ASF Furnace for which Apple receives the Apple Repayment Amount, Apple's security interest in a Mesa ASF Furnace will be released, thereby making such Mesa ASF Furnaces available to satisfy the claims of all other creditors.

**Exclusivity and GTAT Corp. Intellectual Property**

The Apple Contracts (including all exclusivity provisions in the Apple Contracts) will be deemed terminated as of the Effective Date, other than the Mesa Lease (as amended by the Settlement Agreement) and the Confidentiality Agreements.  Apple will have no rights to the GTAT Parties' intellectual property pursuant to section 365(n) of the Bankruptcy Code or otherwise.  GTAT will retain ownership of all intellectual property except intellectual property rights relating to annealing.  Any intellectual property rights acquired by Apple with respect to Project Work Product (as defined in the MDSA) will revert to GTAT.  If and when Apple acquires ASF Furnaces from a GTAT Party, such GTAT Party will grant Apple or its affiliates, partners, suppliers or manufacturers a perpetual, non-exclusive use license with respect to such furnaces, provided that such use is limited to products sold by Apple under a brand owned by Apple or its affiliates.

**Mutual Release of Claims**

As of the Effective Date of the Settlement Agreement, GTAT and the Apple Parties release each other from all claims relating to the Apple Contracts or the business relationship between Apple and GTAT.

**Public Communications and Non-Disparagement**

GTAT and the Apple Parties will cooperate with respect to public communications regarding the Settlement Agreement and the subject matter thereof and will not voluntarily disparage one another or one another's officers, directors, employees, products, services, methods,

procedures or operations.

| | |
|---|---|
| **Use of Mesa Facility; ASF Furnaces** | GTAT will have the right to use the Mesa Facility for the sole purpose of winding down its Mesa operations and selling the Mesa ASF Furnaces and related equipment at the Mesa Facility. Platypus will have the right to terminate the Mesa Lease on 90-days' written notice, provided that Platypus may not deliver such notice prior to June 15, 2015. Therefore, GTAT can use the Mesa Facility rent-free until at least September 13, 2015. |
| **Annealing Furnaces** | GTAT Corp. will immediately discontinue the development of any annealing furnaces for Apple, with no further obligation or liability. Any such annealing furnaces in the GTAT Parties' possession will belong solely to such GTAT Parties to be used or disposed of in such GTAT Parties' sole discretion. Any annealing furnaces and associated components not in the GTAT Parties' possession will belong solely to the Apple Parties to be used or disposed of in such Apple Parties' sole discretion. |
| **Bankruptcy** | Apple agrees not to object or support any objection to any plan of reorganization, waives any right to make an election under section 1111(b) of the Bankruptcy Code, and will vote, if solicited, to accept any such plan. |
| **Supplemental Squiller Declaration** | Upon the execution of the Settlement Agreement, GTAT shall file an emergency motion to withdraw and strike from the docket and record of the chapter 11 cases the *Supplemental Declaration of Daniel W. Squiller in Support of Chapter 11 Petitions and First-Day Motions* (the "Supplemental Squiller Declaration").[6] It is a condition to the occurrence of the Effective Date of the Settlement Agreement that (i) Supplemental Squiller Declaration remain under seal until the Bankruptcy Court enters an order withdrawing and striking the Supplemental Squiller Declaration from the docket and (ii) the Bankruptcy Court enters such order, which also directs any party that received the Supplemental Squiller Declaration to destroy it immediately. |
| **Effectiveness** | The Settlement Agreement is conditioned upon entry of an order of the Bankruptcy Court approving the Settlement Agreement (the "Approval Order"), the Approval Order becoming final and no longer subject to any appeal, and the order expunging the Supplemental Squiller Declaration becoming final and no longer |

---

[6]     Pursuant to the *Order on Emergency Motion to Seal Under Seal and Authorize Related Hearings to be Conducted in Camera (Doc. 55) Filed by Debtor* [Docket No. 86], the Supplemental Squiller Declaration was filed under seal [Docket No. 110].

subject to appeal.

21.     As contemplated by the Settlement Agreement, on October 21, 2014, GTAT, the Creditors' Committee and Apple filed their joint motion (the "Joint Motion") seeking (a) entry of an order (the "Sealing Order") maintaining the Supplemental Squiller Declaration and the Apple Objection under seal pending the approval hearing on the Settlement Agreement  and (b) upon approval of the Settlement Agreement, entry of an order (the "Withdrawal Order") allowing withdrawal of the Supplemental Squiller Declaration and the Apple Objection and directing removal of the Supplemental Squiller Declaration and the Apple Objection from the Court's docket and destruction thereof [Docket No. 245].  The hearing on the request for entry of the Sealing Order is scheduled for October 30, 2014.  The hearing on the request to strike certain documents from the record is scheduled contemporaneously with the hearing on the approval of the Settlement Agreement on November 25, 2014.

## RELIEF REQUESTED

22.     GTAT seeks entry of an order, substantially in the form attached hereto as Exhibit B, approving the terms of, and authorizing GTAT to enter into, the Settlement Agreement, and granting such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF REQUESTED

### The Settlement Agreement Should Be Approved

23.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

24.     Settlements are an important and routine part of the bankruptcy process and are favored over litigation.  *See LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 212 F.3d 632, 635 (1st Cir.2000) (quoting *Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45, 50 n.5 (1st Cir. 1998)); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson ("TMT Trailer Ferry")*, 390 U.S. 414, 424 (1968) ("Compromises are a normal part of the process of reorganization.") (internal quotations omitted)); *City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 91 (1st Cir. 2011) ("[S]ettlements are looked upon with favor in bankruptcy proceedings."); *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) ("To minimize litigation and expedite the administration of a bankruptcy estate, 'compromises are favored in bankruptcy.'"). "Settlements are favored because they serve to minimize litigation, provide a means for efficient resolution of disputes, and help to expedite the administration of the bankruptcy estate."  *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 619 (Bankr. D. Del. 2001) (internal citations omitted).

25.     The approval of a settlement is within the sound discretion of the bankruptcy judge.  *Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995).  Importantly, "the responsibility of the bankruptcy judge . . . is not to decide the numerous questions of law and fact raised . . . but rather to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45, 51 (1st Cir. 1998) (quoting *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir.1983)) (internal citations omitted); *see also In re Am. Cartage*, 656 F.3d 82, 91 (1st Cir. 2011); *ARS Brook, LLC v. Jalbert (In re ServiSense.com, Inc.)*, 382 F.3d 68, 71-72 (1st Cir. 2004); *In re Integrated Health Servs., Inc*., No. 00-389, 2001 WL 1820426, at *2 (Bankr. D. Del.

Jan. 3, 2001); *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). Thus, the court should defer to the debtor's determination and not substitute its own judgment for that of the debtor. *Healthco Int'l*, 136 F.3d at 50 n.5. The examination of a settlement does not require a "mini-trial" of the claims being settled or a full, independent investigation. *See Drexel Burnham*, 134 B.R. at 505; *see also W.T. Grant*, 699 F.2d at 608.

26.     A settlement should be approved if it is fair, equitable and in the best interests of the estate. *TMT Trailer Ferry*, 390 U.S. at 424; *Jeremiah v. Richardson*, 148 F.3d 17, 23 (1st Cir. 1998); *Drexel Burnham*, 134 B.R. at 505 . In deciding whether to approve a settlement, courts should consider the following factors: (a) the probability of success in litigation being compromised; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premise. *See Jeremiah*, 148 F.3d at 23 (citing *Jeffrey v. Desmond*, 70 F.3d at 185)); *see also In re Martin*, 91 F.3d at 393.

27.     As demonstrated below, these factors weigh heavily in favor of approving the proposed compromise with Apple and authorizing GTAT to enter into the Settlement Agreement.[7]

A.     **The Settlement Agreement Allows GTAT to Consensually Unwind Its Business Relationship with Apple and Free Itself From the Apple Agreements Without the Costs, Delay, and Uncertainty Associated With Litigation With Apple**

28.     The Settlement Agreement allows GTAT to consensually unwind its business relationship with Apple and free itself from the restrictions of the Apple Agreements, including all exclusivity provisions in the Apple Agreements, without the substantial costs, delay, and

---

[7]     The second factor—the likely difficulties in collection—is obviously not an issue with respect to Apple, which is reported to have more than $100 billion in cash.

uncertainty associated with litigation with Apple.  Eliminating the exclusivity provisions—including those purporting to prohibit GTAT from selling ASF Furnaces to Apple competitors or suppliers to Apple competitors—is a crucial and indispensable step in GTAT's overall reorganization strategy to refocus its resources on the operation of its pre-October 2013 businesses, including the selling of ASF Furnaces.

29.     While GTAT believes that, absent the Settlement Agreement, it would ultimately succeed in eliminating these exclusivity restrictions by rejecting the Apple Agreements under section 365 of the Bankruptcy Code, it is almost certain that Apple would vigorously challenge GTAT's attempts to do so.  GTAT expects that Apple would argue that, among other things, the combined effect of the exclusivity and intellectual property provisions in the Apple Agreements preclude GTAT from being fully free to sell ASF Furnaces.

30.     GTAT believes that it would ultimately prevail if the foregoing exclusivity and intellectual property matters were litigated.  However, there can be no assurance that GTAT would succeed—especially given the complexity of the subject matter, conflicting contractual provisions, and novel questions of law, including novel questions involving section 365(n) of the Bankruptcy Code.  And even if GTAT were successful, litigation with Apple (including any appeals from a ruling of this Court) would impose substantial costs on the estates and significantly delay GTAT's emergence from chapter 11.

31.     Moreover, and regardless of the success of such litigation, Apple has advised GTAT that it would assert liquidated damages claims for in excess of $1 billion against GTAT arising from the rejection of the Apple Agreements.  These claims (if allowed) could be general unsecured claims against GTAT Corp., but could be *secured* claims against GT Equipment under the Secured Guaranty.  If allowed and not subordinated, these claims would substantially dilute

recoveries to GTAT's other stakeholders as well as reduce (if not eliminate) GTAT's equity in the Mesa ASF Furnaces.  While GTAT would challenge the enforceability of the liquidated damages provisions in the Apple Agreements and/or seek to equitably subordinate or disallow these claims, the outcome of such litigation cannot be guaranteed.  By contrast, under the Settlement Agreement, all exclusivity restrictions are eliminated and Apple releases ***all its claims*** against GTAT—other than a secured, non-recourse claim of $439 million against GT Equipment.

**B.**     **The Settlement Agreement Avoids the Substantial Costs and Delay of Litigation With Apple Over Estate Causes of Action**

32.     Without a global settlement with Apple, GTAT would not only have to defend against substantial liquidated damages claims by Apple, but it would also be compelled to investigate and eventually assert causes of action against Apple relating to the Apple Agreements and the business relationship with Apple.  These causes of action[8] would include actions rooted in the Bankruptcy Code, breach of contract claims, and litigation over which of GTAT Corp. or GT Equipment owns the Mesa ASF Furnaces.

33.     For example, GTAT, subject to confirmatory due diligence, may have avoidance action claims arising out of the Apple Agreements or the implementation thereof.  The allegations supporting any such claim would necessarily involve the allegation that GTAT was insolvent at certain times during the sapphire growth and fabrication project.  GTAT expects that Apple would vigorously oppose any such claims, including on the ground that GTAT was solvent at all relevant times (relying, among other things, on GT's significant market capitalization at various times after October 2013).

---

[8]     The description of the potential causes of actions herein is illustrative and not intended to limit in any way the type of claims GTAT would pursue against Apple but for consummation of the Settlement Agreement.

34.     Further, GTAT may also have claims for equitable subordination and disallowance of Apple's claims against the estates, if it could demonstrate that Apple engaged in the requisite inequitable conduct and the misconduct resulted in an injury to creditors or conferred an unfair advantage on Apple.   GTAT expects that Apple would vigorously oppose any attempt to equitably subordinate or disallow its claims on the basis that it dealt with GTAT at all relevant times on an arm's-length basis.

35.     Another dispute between Apple and GTAT concerns the question of whether GTAT or GT Equipment owns the Mesa ASF Furnaces.  This issue is critical because Apple's security interest is limited to the assets of GT Equipment (and GTAT Corp.'s membership interest in GT Equipment) and does not include assets owned by GTAT Corp.  In such litigation, GTAT might assert that, for a variety of reasons, ownership of the Mesa ASF Furnaces was never transferred from GTAT Corp. to GT Equipment.  However, Apple would likely counter, among other things, that GTAT is estopped from arguing that GT Equipment is not the owner of the Mesa ASF Furnaces, because GT, the ultimate parent of both GTAT Corp. and GT Equipment, reflected the Mesa ASF Furnaces (to the extent of $439 million worth of such Mesa ASF Furnaces) as assets of GT Equipment in its public SEC filings.

36.     GTAT believes that, subject to confirmatory due diligence, these and perhaps other estate causes of action against Apple may have merit.  Nonetheless, further investigating the merits of any such claims and eventually pursuing such litigation would necessarily involve extensive forensic investigation and consume substantial resources of these estates, significantly delay GTAT's emergence from chapter 11, and present a major distraction to GTAT's management at a time when it must focus its attention on the restructuring of GTAT's operations and refocus GTAT's operations on selling ASF Furnaces.  In fact, GTAT currently has budgeted

$5.8 million per month solely for the professional fees that would be incurred in connection with litigating claims against Apple.  That amount does not include the fees and expenses that the Creditors' Committee's professionals would incur, which these estates also would bear.

**C.**   **The Settlement Agreement Allows GTAT to Retain Ownership of the Mesa ASF Furnaces and Continue Using the Mesa Facility For Another Year to Implement an Orderly Wind Down and Preserve Any Equity Value in the Furnaces**

37.     Another critical aspect of the Settlement Agreement is that GTAT retains ownership of the 2,036 Mesa ASF Furnaces and will, subject to certain limitations, have four years to sell them.  In addition, GTAT will continue to use the Mesa Facility rent-free for approximately another year, so as to implement an orderly wind down.  This extended timeframe will allow GTAT to maximize the value of its furnaces and thereby preserve GTAT's equity value in the Mesa ASF Furnaces (which, were contributed to the sapphire growth project, at GTAT's cost).  At the same time, the Mesa ASF Furnaces will serve as future inventory for reorganized GTAT's business.

38.     By contrast, without the Settlement Agreement, GTAT would likely be forced to sell the ASF Furnaces on a much shorter timeframe and/or confronted with efforts by Apple to foreclose on the furnaces.  In fact, Apple opposed GTAT's attempt to reject some of the Apple Agreements without also rejecting the Mesa Lease, asserting that, upon rejection of such agreements, GTAT would be in breach of the Mesa Lease and, therefore, in violation of section 365(d)(3) of the Bankruptcy Code, unless GTAT immediately removed its furnaces from the leased premises or negotiated an agreement with Apple.  In any event, selling the furnaces in the context of a forced sale, would likely result in depressed prices and reduce, if not eliminate, GTAT's equity value in the furnaces.

39.     These risks are eliminated under the Settlement Agreement, which permits GTAT to use the Mesa Facility to wind down its sapphire manufacturing operations there and sell the

Mesa ASF Furnaces.  At the same time, Apple agrees that the Apple Contracts (other than the

Mesa Lease and two confidentiality agreements) are terminated.

**D.**     **Apple Releases GTAT From All Its Claims Other Than a Secured Non-Recourse Claim Against GT Equipment**

40.       Under the Settlement Agreement, Apple releases any and all claims it may have

against GTAT, including for liquidated damages, except for a $439 million secured claim against

GT Equipment.  This release of claims will substantially improve recoveries of other

stakeholders.  While, as noted above, GTAT would challenge the enforceability of liquidated

damages provisions (or the allowance and/or ranking of such claims), there can be no guarantee

that GTAT would ultimately prevail on this issue.  Moreover, Apple's sole remaining claim—

*i.e.*, the $439 million secured claim against GT Equipment—would be a non-recourse claim

recoverable solely against the value of the Mesa ASF Furnaces.  This claim would be repaid over

the course of the next four years, without interest, fees or other charges, costs or fixed

amortization, other than certain specified repayment amounts to be paid by GTAT if and when it

sells ASF Furnaces.  To the extent the Apple Claim has not been repaid by the Maturity Date

four years from now, Apple's sole remedy is to foreclose on any remaining Mesa ASF Furnaces.

Thus, GTAT would never have a repayment obligation to Apple other than to the extent it

actually sells ASF Furnaces, in which case it must pay Apple the Apple Repayment Amount.

**E.**     **Apple Consents to Priming of Its Secured Claim to Allow GTAT to Obtain Critical Debtor-in-Possession and Exit Financing**

41.       Under the Settlement Agreement, Apple consents to debtor-in-possession or exit

financing for all Debtors that primes Apple's security interest in the Mesa ASF Furnaces in an

amount of up to $150 million.  Apple's consent to be primed will facilitate GTAT's efforts to

obtain critical debtor-in-possession and exit financing.  Without new postpetition financing,

GTAT's current liquidity crisis would continue, placing its entire reorganization strategy in

jeopardy.  GTAT would also likely be forced to explore a sale of part, or substantially all, of its assets in order to generate the cash it would need to fund the litigation against Apple.

42.     Without the Settlement Agreement, GTAT would have to seek priming debtor-in-possession financing over Apple's objection, likely resulting in a costly and lengthy priming battle over, among other things, the value of Apple's collateral (*i.e.*, the Mesa ASF Furnaces) and the question of which GTAT entity owns the furnaces at the Mesa Facility.  In addition, absent the Settlement Agreement, Apple would likely argue that the chapter 11 case of GT Equipment (an entity with Apple intended to be "bankruptcy remote") should be dismissed or that GT Equipment should not be allowed to enter into a debtor-in-possession facility.  To be clear, GTAT believes that it would ultimately be able to secure, and obtain this Court's approval of, such financing over Apple's objection.  Nonetheless, litigation over this issue would add uncertainty over a key aspect of these chapter 11 cases, which could be detrimental to the reorganization efforts.  Even if GTAT succeeded in this priming fight, the postpetition financing would almost certainly be at higher borrowing costs than debtor-in-possession financing on a consensual basis.  Ordinarily, "money center" banks do not extend debtor-in-possession financing unless it is on a consensual basis—and will especially refuse to do so where the non-consenting creditor is as powerful and prominent as Apple.  This would leave GTAT having to seek debtor-in-possession financing from high-cost "lenders of last resort."  It should also be noted that the nature of Apple's remaining claim against GT Equipment under the Settlement Agreement (*i.e.*, a non-recourse claim against the furnaces owned by GT Equipment) enhances GTAT's creditworthiness, thereby further reducing borrowing costs.

**F.**     **Apple Agrees to Support Chapter 11 Plan**

43.     The Settlement Agreement also eliminates the risk of a costly and time-consuming plan confirmation battle with Apple.  A contested confirmation hearing with Apple would be highly likely because Apple would assert rights as a secured creditor with millions of dollars in liquidated damages claims secured by GT Equipment.  While GTAT believes that confirmation of a plan over Apple's objection is possible, the outcome of confirmation-related litigation would be uncertain and delay GTAT's emergence from chapter 11.  By contrast, under the Settlement Agreement, Apple agrees (a) not to object to *any* chapter 11 plan filed by GTAT that provides for the treatment of the Apple Claims as set forth in the Settlement Agreement, and (b) to vote, if solicited, to accept any such a plan.  The Settlement Agreement thus greatly facilitates and simplifies the framework and process of confirming a chapter 11 plan, thereby paving the way for a speedy emergence from chapter 11.

**The Limited Adequate Protection Provided to Apple
Under the Settlement Agreement Should Be Approved**

44.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed or such parties consent.  *See* 11 U.S.C. § 364(d)(1)(B).  At this point, GTAT is not seeking approval of any debtor-in-possession financing but expects to do so in several weeks.  However, as noted above, Apple consents to the priming of its security interest in the Mesa ASF Furnaces in connection with any debtor-in-possession financing for all Debtors in an amount of up to $150 million.

45.     Apple consented to such priming on the basis of the limited adequate protection set forth in the Settlement Agreement which it will receive.  Section 361 of the Bankruptcy Code

describes certain forms of adequate protection, such as periodic cash payments, additional liens, replacement liens and other forms of relief.  11 U.S.C. § 361.

46.     Here, as part of the Settlement Agreement, Apple will receive the Apple Repayment Amount as adequate protection for the priming of its security interest in connection with up to $150 million in debtor-in-possession financing, which priming will allow for the funding of the operations of ***all Debtors***.  It is for this reason that all Debtors (other than GT HK) agree to pay Apple the Apple Repayment Amount, even if a non-Mesa ASF Furnace is sold.  Importantly, if a non-Mesa ASF Furnace is sold, an equivalent Mesa ASF Furnace is removed from Apple's collateral package and becomes available to satisfy the claims of all creditors other than Apple.

47.     This form of limited adequate protection to Apple is appropriate.   A typical form of adequate protection might have involved monthly or quarterly fixed payments.  However, the Settlement Agreement does not require such payments.  Instead, GTAT provides only limited adequate protection in the form of the Apple Repayment Amount.  It is important to note that all GTAT estates benefit from this limited form of adequate protection because it will facilitate the funding of debtor-in-possession financing to ***all Debtors***.  Moreover, as noted above, GTAT has no obligation to sell ASF Furnaces at any time.  While GTAT must use commercially reasonable best efforts to sell the ASF Furnaces for cash, there is no absolute obligation to sell ASF Furnaces.  For these reasons, the Court should approve the adequate protection set forth in the Settlement Agreement.

### Assumption of Mesa Lease (as Modified by Settlement Agreement) and Confidentiality Agreements Should Be Approved

48.     As noted above, the Mesa Lease (as amended by the Settlement Agreement, including Exhibit C thereto) and the Confidentiality Agreement between Apple and GTAT Corp.

dated August 24, 2012 and the Confidentiality Agreement dated October 31, 2013, between

Apple and GT Equipment (collectively, the "Confidentiality Agreements") will not be

terminated; instead, they will be assumed by GTAT.

49.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "may

assume or reject any executory contract or unexpired lease of the debtor" subject to the court's

approval. 11 U.S.C. § 365(a).  When considering a debtor's request to assume an executory contract

under § 365, "the only issue properly before a court is whether the assumption or rejection of the

subject contract is based upon a debtor's business judgment." *Eagle Ins. Co. v. BankVest Capital*

*Corp. (In re BankVest Capital Corp.)*, 290 B.R. 443, 447 (BAP 1st Cir. 2003); *see also Sharon Steel*

*Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989); *Orion Pictures Corp. v.*

*Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

50.    Here, GTAT submits that assumption of the Mesa Lease (on a rent-free basis) and the

Confidentiality Agreement is in the best interest of their estates, as these agreements are critical to

receiving the benefits under the Settlement Agreement.  Specifically, as noted above, GTAT's

continued use of the Mesa Facility is critical for the successful implementation of the orderly wind

down of its sapphire manufacturing operations.  Also, GTAT is not in default under any of these

agreements and, accordingly, is not required to make any cure payments under the Mesa Lease or the

Confidentiality Agreements.  GTAT submits that the Court should approve the assumption of the

Mesa Lease (as modified by the Settlement Agreement) and the Confidentiality Agreements.

* * *

51.    For these reasons, the Settlement Agreement is in the best interests of GTAT and

its stakeholders and should be approved under sections 105, 361, 363(b), 364, and 365 of the

Bankruptcy Code and Bankruptcy Rule 9019.

## SEALING ORDER AND WITHDRAWAL ORDER

52.     As noted above, on October 21, 2014, GTAT, the Creditors' Committee, Apple filed the Joint Motion which seeks (a) entry of the Sealing Order pending the approval hearing on the Settlement Agreement and (b) upon approval of the Settlement Agreement, entry of the Withdrawal Order.  The Joint Motion thus bifurcates the relief requested in the Joint Motion into two hearings: (a) the hearing on the Sealing Order, which is scheduled for October 30, 2014; and (b) the hearing on the Withdrawal Order, which is scheduled for November 25, 2014, *i.e.*, contemporaneously with the hearing on the approval of the Settlement Agreement.

53.     The entry of the Withdrawal Order (which is part of the Settlement Agreement approval order) is a condition precedent to the consummation of the Settlement Agreement.  It is therefore critical that the Court enter the Sealing Order at the October 30 hearing and keep the Supplemental Squiller Declaration under seal pending the November 25 hearing so as to allow the Debtors to demonstrate at the November 25 hearing the benefits of the Settlement Agreement to GTAT and its estates.

54.     Most, if not all, of the concerns raised by the objections to the Joint Motion are now moot.  For one, on October 22, 2014, GTAT has filed copies of the Apple Agreements with the Court [Docket No. 250], with only minimal redactions.

55.     Moreover, upon consummation of the settlement, the Supplemental Squiller Declaration would be of no relevance to these cases for at least two reasons.  First, it is irrelevant because GTAT and Apple have agreed to settle their disputes.  Second, and perhaps more importantly, it is irrelevant because the 9019 Declaration contains the all the relevant parts set forth in the Supplemental Squiller Declaration.  By contrast, failure to obtain the entry of the

Withdrawal Order could deprive GTAT of an advantageous settlement and force the parties to pursue costly and time-consuming litigation.

56.     In addition, since the filing of the Joint Motion on October 21, 2014, and notwithstanding the terms of the Settlement Agreement, GTAT and Apple have agreed to limit the relief sought in the Withdrawal Order to (a) striking the Supplemental Squiller Declaration from the record, (b) each of Apple and GTAT retaining one copy of the Supplemental Squiller Declaration and being directed not to share such copy with any third parties without a subsequent order of this Court, or as required by law, and (c) the Creditors' Committee and its advisors destroying all copies of the Supplemental Squiller Declaration (to which destruction the Creditors' Committee consents).  The relief requested in the Withdrawal Order, as modified, has been incorporated into the proposed order attached hereto as Exhibit B.  Accordingly, it is not necessary for the Court to enter the separate Withdrawal Order.

### NOTICE

57.     Notice of this Application has been provided by email, facsimile, or overnight courier to: (a) the Office of the United States Trustee for Region 1, 1000 Elm Street, Suite 605 Manchester, NH 03101, Attn: Geraldine L. Karonis; (b) Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178, Attn: James S. Carr, Esq., counsel to the Creditors' Committee; (c) the Internal Revenue Service, 1000 Elm St., 9th Floor Manchester, NH 03101, Attn: District and Regional Directors; (d) U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549; (e) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153-0119, Attn: Gary T. Holtzer, Esq. and Michael F. Walsh, Esq., counsel to Apple Inc.; and (f) those parties who have formally filed requests for notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.

## NO PRIOR REQUEST

58.     No previous request for the relief sought herein has been made by GTAT to this

or any other court.

## WAIVER OF MEMORANDUM OF LAW

59.     GTAT requests that the Court waive and dispense with the requirement set forth

in Local Rule 7102(b)(2) that any motion filed shall have an accompanying memorandum of

law.  The legal authorities upon which GTAT relies are set forth in the Motion.  Accordingly,

GTAT submits that a waiver of the Local Rule 7102(b)(2) requirement is appropriate under these

circumstances.

*[remainder of page intentionally left blank]*

WHEREFORE, GTAT respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit B, granting the relief requested herein and granting GTAT such other and further relief as the Court deems just and proper.

Dated: October 27, 2014
      Manchester, NH

/s/ James T. Grogan
Luc A. Despins, Esq.
Andrew V. Tenzer, Esq.
James T. Grogan, Esq. (BNH07394)
PAUL HASTINGS LLP
Park Avenue Tower
75 East 55th Street, First Floor
New York, New York 10022
Telephone: (212) 318-6000
Facsimile: (212) 319-4090

- and –

Daniel W. Sklar, Esq.
Holly J. Barcroft, Esq.
NIXON PEABODY LLP
900 Elm Street
Manchester, NH 03101-2031
Telephone: (603) 628-4000
Facsimile: (603) 628-4040

*Proposed Co-Counsel for the Debtors and Debtors in Possession*