UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

-------------------------------------------------------------x
                                                     :
*In re:*                                             :      **Chapter 11**
                                                     :
**GT ADVANCED TECHNOLOGIES INC.**, *et al.*,:      **Case No. 14-11916-HJB**
                                                     :
            **Debtors.**[1]                          :
                                                     :      **Jointly Administered**
-------------------------------------------------------------x

**SUPPLEMENTAL DECLARATION OF DANIEL W. SQUILLER IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS**

I, Daniel W. Squiller, hereby declare under penalty of perjury:

1.      I am the Chief Operating Officer of GT Advanced Technologies Inc. ("GT"), a

corporation organized under the laws of the State of Delaware with its headquarters located in

Merrimack, New Hampshire.  GT is the direct and indirect parent of the debtors and debtors in

possession in the above-captioned cases (collectively, "GTAT" or the "Debtors") and certain

non-debtor affiliates which have not sought chapter 11 relief (together with GTAT, the "GTAT

Group").  In that capacity, I am particularly familiar with GTAT's business relationship with

Apple, Inc. ("Apple") and GTAT's operations at a facility in Mesa, Arizona (the "Mesa

Facility") that is owned by an affiliate of Apple.

2.      I have served as Chief Operating Officer since January 14, 2013.  Before joining

GT, I served as the chief executive officer at PowerGenix, an innovator in high-power battery

technology.  At PowerGenix, I led the growth of the company to a successful, global high

---

[1]      The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification
number, as applicable, are: GT Advanced Technologies Inc. (6749), GTAT Corporation (1760), GT
Advanced Equipment Holding LLC (8329), GT Equipment Holdings, Inc. (0040), Lindbergh Acquisition
Corp. (5073), GT Sapphire Systems Holding LLC (4417), GT Advanced Cz LLC (9815), GT Sapphire
Systems Group LLC (5126), and GT Advanced Technologies Limited (1721).  The Debtors' corporate
headquarters are located at 243 Daniel Webster Highway, Merrimack, NH 03054.

volume manufacturer with its operations in China.  Prior to PowerGenix, I was president of the Power Components Division of Invensys, where I managed that Division's global operations.  I earned a Bachelor of Science degree in electrical engineering and a Master's degree from Ohio University.

3.      On October 6, 2014, I submitted a declaration ("Declaration") in support of GTAT's chapter 11 petitions and certain first day motions.  I submit this supplemental declaration ("Supplemental Declaration") to provide further assistance to the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of certain additional relief, in the form of motions and applications, that GTAT has requested of the Court (collectively, the "Additional First Day Pleadings").

4.      Except as otherwise indicated, all facts set forth in this Supplemental Declaration are based upon my personal knowledge, my discussions with other members of GTAT's senior management and advisors, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning GTAT's operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Supplemental Declaration.  I am authorized to submit this Supplemental Declaration on behalf of GTAT.

### SUMMARY OF EVENTS LEADING UP TO CHAPTER 11

5.      The GTAT Group has been a diversified technology company producing advanced materials and equipment for the global consumer electronics, power electronics, solar and light-emitting diode ("LED") industries for many years.  Among other things, the GTAT Group has more than 40 years of experience developing technological innovations in connection with the manufacturing of furnaces to grow sapphire for industrial use.  After diamonds, sapphire is the second hardest substance on Earth.  Sapphire is scratch-resistant and has other properties

2

that make it an ideal material for display applications where those properties provide significant advantages over strengthened glass or other materials used in the consumer electronics field. Sapphire can be fabricated into a variety of shapes and sizes for use in consumer electronics, as well as the military, LED industries, and other industries. In the consumer electronics field, sapphire is currently used in watch crystals, camera lenses, and smartphone displays.

6.      As discussed more fully below, this restructuring was necessitated because GTAT's business relationship with Apple has become unsustainable without Apple taking responsibility for cost overruns and additional expenses caused by Apple as described in this Supplemental Declaration. While operating under the October 31, 2013 manufacturing, supply, loan, and related agreements with Apple (collectively, the "Apple Agreements"), GTAT incurred losses—resulting in the current liquidity crisis—due to Apple's inordinate control over GTAT's liquidity, operations (including control over product specifications), and decision making. Although Apple is, ostensibly, a customer of GTAT, Apple strategically structured the transactions with GTAT so that its role would be more akin to that of a lender than a customer. Thus, unlike most customer-supplier relationships, Apple treats the payments it makes for GTAT's products as a "loan" and has taken liens on assets in GTAT's business to secure repayment of those loans. But, beyond this "lender" relationship, Apple embedded itself in the operations of GTAT at the Mesa Facility in a manner that has forced GTAT to divert an inordinate amount of its cash and corporate resources to its operations at the Mesa Facility, and affected GTAT's continued viability as a whole. Apple also embedded itself in GTAT's facility in Salem, Massachusetts (the "Salem Facility") that took on the function of an experimental research and development center for the Apple project. Consequently, GTAT has been unable to use that facility for other revenue streams.

7.    GTAT's fabrication costs of the sapphire material grown in the Mesa Facility and Salem Facility furnaces are higher than envisioned, largely because the majority of the fabrication equipment (in contrast to "growth equipment," *i.e.,* the furnaces) selected by Apple for sapphire material could not economically produce a product that Apple would accept. Moreover, GTAT was required to obtain Apple's consent before it could make changes to equipment or processes, and Apple, at least initially, was not willing to permit fabrication equipment changes that would economically produce acceptable product. GTAT was unable to negotiate changes to the pricing regime established by Apple in the transaction documents, and, therefore, GTAT was forced to sell every unit of sapphire material at a substantial loss. GTAT's losses would have increased substantially in 2015 when the price for finished sapphire material is scheduled to decrease under the agreements with Apple. To date, GTAT has incurred approximately $900 million in costs in connection with the Apple project, and, at Apple's dictated pricing, GTAT would never realize a profit.

8.    In light of the aggregate effect of all of Apple's actions, as well as Apple's recent pre-petition actions making clear that it was unwilling to negotiate changes to the Apple Agreements necessitated by its own actions and necessary for GTAT to operate profitably, GTAT reluctantly commenced these chapter 11 cases to preserve the value of its business by extracting itself from Apple's control. Among other things, GTAT intends to use the remedies available to it under chapter 11 to reject certain agreements with Apple and expeditiously wind down its Apple-related operations in the Mesa Facility and the Salem Facility. Unfortunately, the winding down of these operations will result in the loss of over 1,300 jobs (including temporary workers). Nevertheless, this step is critical to GTAT's survival as a going concern. Once GTAT has extracted itself from Apple's control, GTAT believes that the completion of its

4

restructuring efforts will allow it to focus its resources on the operation of its core business of selling sapphire furnaces and other products. Reorganized with an appropriate capital structure, GTAT would emerge from chapter 11 in a stronger position and with a sustainable business model that will allow it to compete effectively in the marketplace.

9.      As a result of onerous non-competition provisions in the Apple Agreements, GTAT has been shut out of the global market for its highly valuable sapphire material and equipment. By using the tools available in chapter 11, GTAT believes that it will be able to tap into substantial pent-up demand for sapphire material and equipment in the consumer smartphone and smartwatch markets, segments in which GTAT is currently prohibited from participating.

*Background of Relationship with Apple and Apple's "Bait-and-Switch" Strategy*

10.      With a classic bait-and-switch strategy, Apple presented GTAT with an onerous and massively one-sided deal in the fall of 2013. At the outset of negotiations, Apple had offered GTAT what would have been the company's largest sale ever: an order for 2,600 sapphire growing furnaces. In that scenario, GTAT would operate the furnaces on Apple's behalf, but Apple would own the furnaces. Apple's size and prominence make it the ultimate technology client to land. The deal with Apple was viewed as a potential game-changer for GTAT.

11.      In hindsight, it is unclear whether Apple ever intended to purchase any sapphire furnaces from GTAT. Indeed, after months of extensive negotiations over price and related terms, Apple demanded a fundamentally different deal: Apple no longer wanted to buy furnaces from GTAT; instead, Apple offered an arrangement that required GTAT to borrow money from Apple to purchase furnace components and assemble furnaces that would be used to grow

sapphire for Apple.  The new structure, as a contract matter, shifted all economic risk to GTAT, because Apple would act as a lender and would have no obligation to purchase any sapphire furnaces, nor did it have any obligation to purchase any sapphire material produced by GTAT. At the same time, Apple constrained GTAT from doing business with any other manufacturer in or supplier to the consumer electronics market, subject to extreme penalties—styled as "liquidated damages"—GTAT failed to meet any of Apple's requirements.

12.     Under Apple's new proposal, GTAT was required to acquire 2,036 sapphire furnaces using a prepayment—or "loan"—from Apple of up to $578 million (however, to date Apple has withheld the last $139 million of that "loan").  This structure would enable Apple to purchase sapphire material from GTAT at below market value.  This is due to the fact that Apple's "prepayment" was calculated based on *the cost to GTAT of the furnaces and related equipment* used to produce sapphire material.  GTAT would then manufacture sapphire according to Apple's specifications—which have continually changed and remain in flux to this day—and "repay" the Apple loan using either cash or completed sapphire material as the currency for the repayment.

13.     Even if this business transaction worked exactly as contemplated in the original agreements,[2] GTAT would not earn any income at all unless Apple opted to "buy" sapphire material in excess of loan "repayment" obligations.  By failing to compensate GTAT for losses associated with the development of the technology due to Apple's constant interference over which GTAT had little or no control, including losses caused by Apple's changes in product specifications, GTAT was forced into the role of a "captive" supplier to Apple, bearing all of the risk and all of the cost, including the costs of more than 1,300 temporary and permanent

---

[2]     This assumes that Apple would not have used the fact that it has *no* obligation to buy *any* sapphire as leverage to impose even more onerous and inequitable terms on GTAT.

personnel, utilities, insurance, repairs, and raw materials. Indeed, the total cost incurred by GTAT pursuant to the project with Apple has so far amounted to approximately **$900 million.** Meanwhile, by the time the Apple project would have been completed seven years later, Apple would have obtained a groundbreaking product from GTAT at below-market cost and GTAT would own 2,036 well-used furnaces with limited resale value.

14.     Moreover, if Apple ever decided that it did not want sapphire material, GTAT would be required to repay the full amount of the "loan" in cash. If that eventuality transpired, GTAT would not have hundreds of millions of dollars in cash needed to repay the loan, and Apple could immediately "foreclose" on the 2,036 furnaces and related equipment. Apple sought to secure these obligations through an artificial structure it believed was "bankruptcy remote" and that existed solely to shield Apple from risk. With the very limited exception for pre-existing orders, Apple also prevented GTAT from marketing its furnaces—and thus finding alternative value-maximizing uses for them—through sales to third party purchasers and suppliers to competitors of Apple. Simply put, Apple constructed a risk-free option to acquire millions of highly-engineered units of sapphire material.

15.     In October 2013, however, GTAT was out of options because it had invested months negotiating a sale contract with Apple while being effectively locked out of pursuing other opportunities with Apple's competitors. While GTAT had initially marketed its sapphire furnaces to other manufacturers of consumer electronics, those alternative avenues were not further pursued by GTAT given Apple's offer of the most significant contract in the company's history. In any event, the extensive and all-consuming nature of negotiations with Apple would have allowed little time to pursue alternatives. Knowing that GTAT had no practical choice at

that stage other than to concede to Apple's terms, Apple forced a set of agreements on GTAT that, in combination with Apple's economic leverage, put Apple in *de facto* control of GTAT.

***Apple Tells GTAT That It Doesn't Negotiate Contracts***

16.     What ensued was anything but an arm's-length negotiation.  Apple simply dictated the terms and conditions of the deal to GTAT.  Apple advised that (a) GTAT's management should "not waste their time" trying to negotiate as would normally occur in commercial transactions because Apple does not negotiate with its suppliers and (b) GTAT had to agree to all of Apple's material terms and the draft agreements prepared by Apple's attorneys, or the deal was off.   Remarkably, Apple's chief legal negotiator on certain key aspects of the transaction was Apple's Senior (Bankruptcy) Restructuring Counsel.  It goes without saying that this speaks volumes about Apple's perspective on the transaction it was about to enter into less than one year ago.

17.     The following terms are illustrative of Apple's approach to the transaction:

- Apple required GTAT to commit to supply millions of units of sapphire material, but Apple has *no obligation to buy* any of that sapphire material.

- Apple required GTAT to form a wholly-owned subsidiary,  Debtor GT Advanced Equipment Holding LLC ("GT Equipment"), in October 2013 to implement a convoluted and artificial structure that serves no economic purpose—other than protecting Apple—such that GTAT Corp. would be obligated to buy and assemble furnaces for Apple, but the cash and furnaces would then be "round-tripped" through  GT Equipment, a so-called "bankruptcy remote entity" using an illusory sale and leaseback between GTAT Corp. and GT Equipment.

- Apple took a security interest in the entity referred to in the documents as the "bankruptcy remote entity," which Apple designed to hold the furnaces.

- GTAT was prohibited, for years to come, from conducting any sapphire business with any conceivable Apple competitor or any direct and indirect supplier to an Apple competitor.

18.    The various agreements Apple presented to GTAT as a condition for a business collaboration with Apple are best described as "adhesion contracts." A "best of" collection of the contractual terms is provided below to explain what Apple, foisted on GTAT:

- If GTAT discloses any aspect of the agreements with Apple, it is liable for breach of confidentiality to Apple for *$50 million per occurrence* as liquidated damages; Apple, on the other hand, is not liable for any liquidated damages if it violates confidentiality.

- GTAT must accept and fulfill any purchase order placed by Apple on the date selected by Apple. If there is any delay, GTAT must either use expedited shipping (*at its own cost*) or purchase substitute goods (*at its own cost*). If GTAT's delivery is late, GTAT must pay **$320,000 per boule of sapphire** (and $77 per millimeter of sapphire material) as liquidated damages to Apple. To put this figure in perspective, a boule has a cost of less than $20,000. Apple, however, has the right, *without compensating GTAT*, to cancel a purchase order in whole or in part at any time and reschedule a delivery date at any time.

- GTAT must pay **$640,000 per boule** that it sells to a third party in violation of the exclusivity restrictions in the contract. Apple has no obligation to buy boules exclusively from GTAT.

- GTAT must pay **$650,000 per month** for any sapphire furnace that is used in violation of GTAT's exclusivity obligations to Apple. To put this figure in perspective, furnaces provided as part of the transactions with Apple were provided at a one-time total cost of approximately $200,000 per furnace. Apple has no exclusivity obligations to GTAT.

- GTAT is prohibited from modifying any equipment, specifications, manufacturing process or materials without Apple's prior consent. Apple, on the other hand, can modify any of these terms at any time and GTAT must immediately implement Apple's modifications.

- If Apple exercises a Termination Event, and becomes a "lessee" of the furnaces and related equipment in the Mesa Facility, the rental amount Apple would pay to GT Equipment is **$50 per month**, as compared with the $9.9 million monthly rent payment that GTAT Corp. is "deemed" to pay to GT Equipment under its "lease" with GT Equipment.

- Apple enjoys an "exclusive right of negotiation," which is basically a provision that forces GTAT to negotiate exclusively with Apple for thirty days if it seeks to sell substantially all assets *or* its sapphire business *or* it receives an expression of interest from a third party. If GTAT violates this provision it must pay Apple **$1 billion**. Of course, Apple has no such corresponding obligation to GTAT.

- Apple cannot be liable to GTAT for any design defects or consequential damages from product flaws occurring at the Mesa Facility, which Apple owns, unless GTAT proves that the causes of those defects or flaws were *solely* Apple's fault.

- Apple drafted and structured 14 separate agreements purporting to reflect separate transactions among GTAT Corp., and its subsidiary, GT Equipment. But all of these agreements have cross-termination provisions that clearly show how Apple exercised control over the operations and assets related to this transaction.

- GTAT sends the sapphire material it produces to two of Apple's "captive" vendors in Asia. Those vendors further process the sapphire material into an end product. If there is a question about whether the sapphire product GTAT ships to Asia is defective, a "committee" of three parties, comprised of GTAT, Apple and one of the two "captive" vendor in Asia, answer that question, with each party getting one vote on whether GTAT was at fault or not. It is not difficult to see what the outcome of this vote would be.

- If Apple terminates the SOW (as defined herein) for cause, then GT Equipment must immediately repay the intercompany loan from GTAT Corp. By contrast, if GTAT Corp. terminates the SOW for cause, there is no acceleration of the loan obligations.

19.     When GTAT's management expressed obvious concerns to Apple regarding the deal terms during the contract negotiations, Apple responded that similar terms are required for other Apple suppliers and that GTAT should: "Put on your big boy pants and accept the agreement." At the same time, however, Apple expressed its commitment to sapphire technology and its intention to work collaboratively with GTAT to bring the technology to fruition in a manner that would have allowed GTAT to produce sapphire materials consistent with the terms and conditions of the agreements in an economically viable manner.

20.     At the closing of the Apple transaction, GTAT also took on substantial new debt. Specifically, on or about October 30, 2013—the day before the agreements with Apple were signed—GTAT terminated its revolving credit agreement with Bank of America and paid off all outstanding debt owed to Bank of America at that time. This was necessary to permit Apple to take a lien on all of the assets of both GTAT Corp. and GT Equipment—yet another deal term that Apple demanded.

21.    As permitted by the Apple agreements, GTAT borrowed an additional $214 million by issuing additional convertible notes in 2013 and raised $71 million through a concurrent common stock sale.

*Once Apple Agreements are Signed, Apple Dictates*
*Sapphire Growth and Fabrication Processes*

22.    From day one, Apple was intimately involved in (and, in many instances, controlled) key aspects of the sapphire growth and fabrication processes.

23.    A specialized facility is required to house over 2,000 sapphire furnaces and the related fabrication equipment.  In addition, due to the nature of sapphire growth, a stable and uninterrupted power infrastructure and supply of process cooling and emergency water is required because interruptions in power or cooling water can render the sapphire-growth material unusable, causing millions of dollars in losses.

24.    Apple selected the Mesa Facility and negotiated all power and construction contracts to design and build out the facility with third parties.  In fact, GTAT was prohibited from having direct communications with the Apple subcontractors that were building out the Mesa Facility.  Ultimately, the first phase of the Mesa Facility was not operational until December 2013—which was only 6 months before GTAT was expected to be operating at full capacity in order to meet its "Minimum Supply Commitments" (as defined in the SOW).

25.    Additional unplanned delays continued to surface, because the Mesa Facility required a significant amount of reconstruction, including reconstruction of floors roughly the size of multiple football fields.  The build-out of the Mesa Facility, delays in available power, and power interruptions, further delayed the ramp-up of sapphire growth and fabrication by approximately three months.  This was critical lost time during which GTAT could not begin

manufacturing sapphire for sale to Apple and recoup its massive investment in furnaces for Apple.

26.     Further complicating GTAT's build-out of sapphire-growth furnace and fabrication areas, there were over 1,200 construction workers engaged in the build-out of the Mesa Facility—an impossible situation given the need to be producing at full capacity by Summer 2014. This ongoing construction project also meant that GTAT was operating in a highly contaminated environment that adversely affected the quality of sapphire material.

27.     The quality and reliability of the power infrastructure, as noted earlier, is critical to the sapphire growth process. Prior to entering into the Apple Agreements, GTAT advised Apple that the implementation of uninterruptable power systems and generators was essential, particularly in an operation with 2,036 furnaces. GTAT advised Apple that even a brief interruption of power could result in a loss of potentially more than $30 million to GTAT. After much discussion, Apple determined that implementing power back-up for the furnaces was too expensive and, therefore, "non-essential." After the Mesa Facility was finally operational, GTAT's concerns about the reliability of the power supply were realized. On at least three occasions, power interruptions occurred, leading to significant delays and losses of whole production runs of sapphire boules. GTAT's losses to date resulting from power outages at the Mesa Facility exceed $10 million. These power interruptions also adversely affected GTAT's ability to develop and optimize the process for growing sapphire material to Apple's changing specifications because GTAT lost important data every time a boule was damaged by a furnace run affected by interruptions of power or water.

28.     In addition, Apple sent a significant number of employees to the Mesa Facility and the Salem Facility, including supply chain, manufacturing, and quality engineers—most of

them having no prior experience in sapphire growth or fabrication.  These Apple employees were involved on a full-time basis in GTAT's sapphire growth and fabrication processes, taking up as much as 30% of GTAT's R&D and manufacturing team's time.  These employees also assumed a level of authority in the Mesa Facility and Salem Facility that was disruptive and prevented GTAT from managing its operations as it saw fit.  On multiple occasions, GTAT had to remind the onsite Apple team that they were not to give directions to GTAT employees.

29.     Many of the processes associated with cutting, polishing, and shaping sapphire (this is the "fabrication process", in contrast to the "growth process" that takes place in the furnaces) were new, given the unprecedented volume of sapphire being grown at the Mesa Facility.  It was Apple, however, that dictated to GTAT what tools to use and what fabrication processes to implement at the Mesa Facility.  Apple also worked directly with suppliers of cutting and polishing equipment to specify and in some cases develop such tools, but, prior to contract signing, explicitly prohibited GTAT from having direct contact with these suppliers.

30.     The fabrication methods specified by Apple prevented GTAT from achieving its planned fabrication cost and production targets because many of the tools did not meet their performance and reliability specifications by a wide margin.  For example, the diamond wire tool intended to cut sapphire boules was specified to perform this task in 3.6 hours; however, the tool selected by Apple had significant operating issues resulting in a process that took more than 20 hours.  Ultimately, that tool was unsuitable for the task and had to be replaced by a different tool.  In fact, a majority of the fabrication tools dictated by Apple had to be replaced with alternative tools, resulting in additional capital investment and operating costs to GTAT and months of lost time in production.  The fabrication cost is approximately 30% higher than planned, requiring nearly 350 additional employees and significantly higher consumption of diamond wire and

other wear items than originally planned.  A few weeks before the Petition Date, Apple made clear that it refused to accept any financial responsibility for these issues, making it clear that it expected GTAT to absorb these additional costs in spite of the fact that Apple dictated the selection of all of the tools that created the problems.

31.    Next, Apple withheld the final prepayment of **$139 million**.  In August 2014, Apple acknowledged that it would make the final prepayment if GTAT were to grow sapphire boules in accordance with certain revised specifications.  Shortly after that acknowledgement, however, Apple reversed course, requiring that GTAT satisfy the original specifications—which Apple knew GTAT could not meet under the circumstances.

32.    When GTAT initially entered into negotiations to sell sapphire furnaces to Apple, it had no sense that this relationship would become a "heads I win, tails you lose" proposition for Apple.  But, having borrowed hundreds of millions of dollars to pay for the components of more than 2,036 sapphire furnaces, GTAT was essentially powerless to stop Apple's control, regardless of whether Apple had a contractual right to exercise control or not.

33.    Unfortunately, these chapter 11 cases are not just a dispute between two parties— otherwise GTAT might have been able to redress this matter through litigation with Apple.  At bottom, all of GTAT's stakeholders are the victims of Apple's inequitable conduct.  GTAT has numerous creditors at various levels of its corporate structure.  Notably, GT (GTAT's parent company) is obligor under more than $430 million in convertible notes, a significant portion of which Apple required to be used to finance GTAT's consummation of the Apple transactions.  Moreover, trade creditors hold approximately $145 million in claims against certain GTAT entities.  Finally, GT's public shareholders have borne the brunt of Apple's "bait and switch

strategy" and have seen their investment in what appeared to be a promising technology venture thwarted by Apple.

34.    In many ways, Apple, through its unrelenting control of material aspects of sapphire growth and fabrication has converted GTAT from a supplier/seller of furnaces into an experimental research and development venture for Apple funded substantially by GTAT's other stakeholders.

35.    In light of the interests of these creditors and other stakeholders, and given the severity of the losses incurred as a result of the transactions with Apple, GTAT had little choice but to commence these chapter 11 cases.

36.    Despite Apple's very recent protestations to the contrary, Apple was aware, at all relevant times, of the financial condition of GTAT and of the fact that GTAT was losing substantial amounts on each sale of sapphire product to Apple.  Moreover, as recently as a few weeks ago, GTAT senior management made a detailed presentation to Apple senior management in charge of the sapphire growth project and advised them very clearly that GTAT was losing substantial amounts and that it was projected to run out of cash in a few weeks.

**Sapphire Segment**

37.    In 2010, the GTAT Group acquired Crystal Systems Inc., which enabled the GTAT Group to enter the sapphire material and equipment business, with a focus on providing sapphire furnaces for the global LED and certain other industrial markets.  GTAT's sapphire business was traditionally based on designing and selling advanced sapphire crystallization furnaces ("ASF"®), which are used to produce sapphire boules.  These sapphire boules are used, following certain cutting and polishing processes, to make sapphire wafers, a substrate for manufacturing light emitting diodes, as well as sapphire material for a wide range of other

industrial and consumer applications including, medical devices, dental, oil and gas, watch

crystals, and specialty optical applications such as low absorption optical sapphire for advanced

optics and titanium-doped sapphire material for high power lasers.

38.     Sapphire is one of the hardest substances on Earth.  It is scratch-resistant, and can

be produced in highly transparent form.  Given its strength and make-up, sapphire is an ideal

material to replace the glass screens currently used in today's most popular consumer electronic

products, such as smartphones, which are prone to cracking and scratching.  Virtually every

consumer has, at some time, experienced the frustration of a scratched or cracked smartphone

screen.  The market has been intensely interested in sapphire as a remedy for these common

problems.  Sapphire is also believed to use less power than common glass screens, making it an

even more ideal replacement for glass screens used in portable consumer electronic products like

smartphones.[3]

### Business Relationship with Apple[4]

39.     On October 31, 2013, GTAT entered into the Apple Agreements with Apple.  The

Apple Agreements shifted the GTAT Group's sapphire business model from being primarily an

equipment manufacturer to also being a sapphire materials manufacturer.

---

[3]     For an illustration of how sapphire is manufactured, see
https://www.youtube.com/watch?v=vsCER0uwiWI

[4]     As a result of the transactions entered into between GTAT and Apple, GTAT Corp. is subject to numerous
confidentiality obligations under agreements with Apple (collectively, the "Confidentiality Obligations").
The Confidentiality Obligations broadly preclude GTAT Corp. from disclosing information concerning the
nature of GTAT Corp.'s business relationship with Apple and other nonpublic information related thereto.
These agreements further provide that each breach of the Confidentiality Obligations will require GTAT
Corp. to pay liquidated damages to Apple in an amount of **$50 million per occurrence**.  However, these
agreements permit GTAT Corp. to disclose confidential information "to the extent required by law,"
provided GTAT Corp. makes reasonable efforts to give Apple notice of such requirement prior to any such
disclosure and take reasonable steps to obtain protective treatment of the confidential information.
Concurrently, herewith GTAT has filed a motion seeking either (a) entry of an order authorizing GTAT to
file an unredacted version of the Supplemental First Day Declaration under seal or (b) entry of an order
directing GTAT to file an unredacted Supplemental First Day Declaration on the Court's docket.

40.     Under the Apple Agreements, Apple agreed to advance approximately $578 million, essentially as a loan to GTAT Corporation ("GTAT Corp.") to enable GTAT Corp. to build 2,036 ASF furnaces in the Mesa Facility.  Apple structured the deal to ensure that GTAT could only supply sapphire to Apple—and none of Apple's competitors.  Apple, acting like a lender rather than a customer, also required GTAT Corp. (a) to form a special purpose subsidiary which was to hold title to the ASF furnaces and related equipment and (b) to pledge its interest in that subsidiary as collateral to secure repayment of the $578 million advance.  The most relevant Apple Agreements are summarized below.

41.     MDSA and Statement of Work.  On October 31, 2013, GTAT Corp. and Apple entered into a Master Development and Supply Agreement and related Statement of Work ("SOW"), pursuant to which the GTAT Group agreed to supply sapphire material to Apple.  While the MDSA specifies the GTAT Group's minimum and maximum supply commitments, Apple has no purchase requirements under the terms of the MDSA, despite the fact that GTAT had to acquire and install 2,036 furnaces worth millions of dollars at the Mesa Facility.

42.     Prepayment Agreement.  Also on October 31, 2013, GTAT Corp. entered into a Prepayment Agreement with Apple pursuant to which the GTAT Corp. was eligible to receive $578 million in four separate installments, as a loan to pay for the purchase of sapphire furnaces and other equipment required under the MDSA and related SOW.  GTAT Corp. is required to repay this amount ratably over a five year period commencing in 2015 and ending in January 2020, either as a credit against amounts due from Apple purchases of sapphire material under the MDSA or as a direct cash payment. No interest accrues on the loan from Apple under the Prepayment Agreement.  The installment payments received by GTAT Corp. were to be used exclusively by GTAT Corp. to fund the purchase of components necessary to manufacture 2,036

ASF furnaces and related processing and manufacturing equipment at the Mesa Facility, which is owned by an affiliate of Apple and leased to GTAT Corp.

43.     The first three installments under the Prepayment Agreement of $225 million, $111 million, and $103 million were received on November 15, 2013, January 23, 2014, and April 4, 2014, respectively.  As of the Petition Date, the fourth and final installment payment, in the amount of $139 million, has not been received by GTAT Corp., even though GTAT had completed installation of 2,036 furnaces at the Mesa Facility.

44.     Formation and Pledge of Special Purpose Entity.  As part of the Prepayment Agreement, GTAT Corp. was also required to form a Delaware limited liability company as a wholly-owned subsidiary, which Apple attempted to design to be "bankruptcy remote." Accordingly, GTAT Corp. formed GT Equipment in October 2013.  As collateral for its obligations under the Prepayment Agreement, the MDSA and the SOW, GTAT Corp. entered into a Membership Interest Pledge Agreement, dated October 31, 2013 (the "Pledge Agreement"), under which it pledged its membership interest in GT Equipment to Apple.  GT Equipment is one of the Debtors in these chapter 11 cases.

45.     Intercompany Loan Agreement.  To the extent GTAT Corp. received funds under the Prepayment Agreement, GTAT Corp. was obligated to make an intercompany loan to GT Equipment in the amount of the payment from Apple pursuant to that certain Loan Agreement, dated October 31, 2013 between GTAT Corp. and GT Equipment (the "Intercompany Loan Agreement").  The Intercompany Loan, like the loans under the Prepayment Agreement, has a 0% interest rate.  GT Equipment is required to repay the loan over five years in 58 equal monthly installments of $9,965,517.24.  In addition, GT Equipment's obligations under the Intercompany Loan Agreement are not contractually subordinated to GT Equipment's obligations to Apple.

18

46.     GT Equipment was supposed to use the funds loaned by GTAT Corp. to purchase component parts to construct the 2,036 furnaces at the Mesa Facility, related equipment, supplies or other operational expenditures related to Apple (the "Mesa Equipment"). In practice, however, GT Equipment did <u>nothing</u>. GTAT Corp. ordered all furnace parts and paid all third party and related suppliers of the furnace components, and GT Corp. installed all 2,036 furnaces at the Mesa Facility. Moreover, the transfers between GTAT Corp. and GT Equipment were completely circuitous because every dollar transferred by GTAT Corp. to GT Equipment was round-tripped back to GTAT Corp. Therefore, when the dust settled, Apple loaned funds to GTAT Corp., GTAT Corp. loaned funds to GT Equipment, and GT Equipment returned the money right back to GTAT Corp.

47.     Apple and GTAT Corp. also entered into a Conditional Assignment, dated October 31, 2013 (the "Conditional Assignment"), under which GTAT Corp. assigned to Apple all its right, title and interest (but not its obligations) in the Intercompany Loan Agreement. However, and importantly, this assignment is not effective until the occurrence of (i) a Trigger Event (as defined below) under the Prepayment Agreement, (ii) GTAT Corp.'s receipt of a notice of default under the SOW or the MDSA, or (iii) an event of default under the Intercompany Loan Agreement. None of these Trigger Events occurred prior to the Petition Date.

48.     <u>Equipment Lease Agreements</u>. As purported owner of the Mesa Equipment, GT Equipment entered into a Lease Agreement with GTAT Corp., dated October 31, 2013 (the "<u>GT Equipment Lease</u>"), under which GT Equipment leased the Mesa Equipment to GTAT Corp.[5]

---

[5]    The GTAT Equipment Lease would terminate upon, among other things, a termination of the SOW by Apple for cause or the occurrence of so-called "Trigger Events" under the Prepayment Agreement which allow Apple to, among other things, accelerate repayment of amounts advanced to GTAT Corp. under the Prepayment Agreement. No Trigger Event occurred prior to the Petition Date.

The rent under GT Equipment Lease is equal to the amount of the Intercompany Loan Repayment that GT Equipment owed to GTAT Corp. under the Intercompany Loan Agreement. Consequently, GTAT Corp. offsets its rental obligations against GT Equipment's obligations under the Intercompany Loan Agreement and no cash is exchanged. The practical effect of this aspect of the agreement is that GT Equipment "repays" the loan to GTAT Corp., at no cost, by offsetting rent payments under the GT Equipment Lease.

49.     GT Equipment and Apple also entered into a "contingent" lease agreement, dated October 31, 2013 (the "Contingent Lease Agreement") for the Mesa Equipment. The Contingent Lease Agreement purports to be effective from the date GT Equipment purchases the Mesa Equipment until the earlier of (a) termination of the Contingent Lease Agreement, (b) the Mesa Equipment is no longer property of GT Equipment, (c) expiration or termination of either the MDSA or the SOW. However, Apple is not entitled to take possession of the Mesa Equipment unless and until the GT Equipment Lease is terminated. If Apple took possession of the Mesa Equipment, the rental amount would be **$50 per month**, as compared with the **$9.9 million** deemed monthly rent payment that GTAT Corp. pays to GT Equipment. The GT Equipment Lease had not terminated as of the Petition Date.

50.     GT Equipment Secured Guaranty. On October 31, 2013, GT Equipment issued a secured guaranty in favor of Apple guaranteeing all of GTAT Corp.'s obligations under the Prepayment Agreement, the MDSA, or the SOW (the "Secured Guaranty"). GT Equipment granted Apple a first-priority security interest in all of its assets. GT Equipment's obligations under the Secured Guaranty become due when either (i) Apple terminates the SOW for cause or (ii) a Trigger Event occurs under the Prepayment Agreement.

51.   Security Agreement.  Apple and GTAT Corp. also entered into a Security Agreement, dated October 31, 2013 (the "Security Agreement") pursuant to which GTAT Corp. granted Apple a security interest and lien on certain of GTAT Corp.'s assets.  However, Apple's lien and security interest were extinguished pursuant to the Security Agreement when GT issued the convertible notes described below and contributed proceeds of the note issuance to GT Equipment.  Therefore, as of the Petition Date, the only asset of GTAT Corp. which constitutes collateral of Apple is the LLC membership interest in GT Equipment.  This means that Apple does not have a so-called "back-up" security interest against the assets of GTAT Corp.,[6] which lenders to special purpose entities generally insist on in the event the special-purpose-entity structure is disregarded, or if the assets supposedly owned by the special purpose entity are found to be the property of its parent.[7]

52.   Mesa Facility Lease.  GTAT Corp., not GT Equipment, entered into a lease for the Mesa Facility on October 31, 2013.  The landlord at the Mesa Facility is Platypus Development LLC, an affiliate of Apple ("Platypus").  GTAT Corp. pays $100 per year as rent to Platypus for use of the Mesa Facility. Consequently, when furnaces were delivered to, and assembled at, the Mesa Facility, they were delivered to GTAT Corp., not GT Equipment.

**SUPPORT FOR RELIEF REQUESTED IN ADDITIONAL FIRST DAY PLEADINGS**

53.   Concurrently with the filing of Supplemental Declaration, or as soon as practicable thereafter, GTAT has filed (or will file) a number of Additional First Day Pleadings

---

[6]   This could become relevant because, despite the numerous agreements which attempt to document the relationship between Apple and GTAT,  Apple never insisted on, and it does not appear that there are any, purchase agreements or bills of sales executed between GT Corp. and GT Equipment to reflect the "purchase" by GT Equipment from GT Corp. of the furnaces.  GT Corp., and not GT Equipment, ordered the furnace parts from the third party vendors and paid such third party vendors for all the parts for the furnaces GT Corp. installed in the Mesa Facility, and the furnaces were installed in a location where GT Corp., not GT Equipment, was the tenant.  In the interest of full disclosure, GT, the ultimate parent of both GT Corp. and GT Equipment, reflected the furnaces located at the Mesa Facility as assets of GT Equipment in its public filings.

seeking relief that GTAT believes is necessary to enable it to operate with minimal disruption and loss of productivity.  The facts set forth in the Additional First Day Pleadings are incorporated by reference in their entirety.  GTAT requests that the relief requested in each of the Additional First Day Pleadings be granted as critical elements in ensuring a smooth transition into chapter 11.

54.    I have reviewed each of the Additional First Day Pleadings, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors.  The relief sought in each of the Additional First Day Pleadings is necessary to enable GTAT to continue operations with minimal disruption and constitutes a critical element in the successful implementation of GTAT's effort to maximize the recovery of its creditors.  To this end, GTAT has filed the following Additional First Day Pleadings:

a.    **Debtors' Emergency Motion for (A) Entry of Order, Pursuant to Bankruptcy Code Section 107(b) and Bankruptcy Rule 9018, Authorizing Filing Under Seal of Unredacted Versions of Supplemental First Day Declaration and Motion to Reject, or (B) Alternatively, Entry of Order, Pursuant to Bankruptcy Code Sections 105(a) and 107(a) Directing Debtors to File Unredacted Versions Thereof;**

b.    **Debtors' Emergency Motion for Entry of Order, Pursuant to Bankruptcy Code Section 107(b) and Bankruptcy Rule 9018, Authorizing Filing of Motion to Seal Under Seal;**

c.    **Debtors' Emergency Motion Pursuant to Bankruptcy Code Sections 105(a) and 365(a) for Entry of Order Authorizing Debtors to Reject Certain Executory Contracts and Unexpired Leases *Nunc Pro Tunc* to the Petition Date;**

d.    **Debtors' Emergency Motion, Pursuant to Bankruptcy Code Sections 105(a) and 363(b), for Entry of Order (I) Authorizing Debtors to Wind Down Operations at Sapphire Manufacturing Facilities and (II) Approving Wind Down Employee Incentive Plan in Connection with Wind Down of Such Operations; and**

e.    **Debtors' Emergency Motion for Expedited Hearing on Debtors' (I) Motion to Wind Down Operations, (II) Reject Certain Executory**

**Contracts and Unexpired Leases in Connection with Such Wind Down, (III) Motion to Seal Foregoing Motions and Supplemental First Day Declaration, and (IV) Motion to Seal the Sealing Motion.**

## CONCLUSION

55.     I believe approval of the relief requested in the Additional First Day Pleadings is in the best interests of all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: October 8, 2014

On behalf of GTAT

By: _____

Name:    Daniel W. Squiller

Title:    Chief Operating Officer