TAb    7

APPLE CONFIDENTIAL
#C56-13-03451

## MEMBERSHIP INTEREST PLEDGE AGREEMENT

THIS MEMBERSHIP INTEREST PLEDGE AGREEMENT #C56-13-03451 (this **"Pledge Agreement"**), dated as of October 31, 2013, made by **GT Advanced Equipment Holding LLC** (**"Company"**), a Delaware limited liability company with offices at 243 Daniel Webster Highway, Merrimack, New Hampshire, and **GTAT Corporation**, a Delaware corporation having its principal place of business at 243 Daniel Webster Highway, Merrimack, NH 03054 (**"Grantor"**) in favor of **Apple Inc.**, a California corporation (**"Grantee"**).

### W I T N E S S E T H:

WHEREAS, in order to secure of all of the obligations and liabilities of Grantor to Grantee arising under that certain Prepayment Agreement dated as of the date hereof (as may be amended, modified and supplemented from time to time, the **"Prepayment Agreement"**), that certain Master Development and Supply Agreement, #C56-13-02947, effective October 31, 2013 (as may be amended, modified and supplemented from time to time, the **"MDSA"**), and that certain Statement of Work to MDSA (as may be amended, modified and supplemented from time to time, the **"SOW"**), Grantor wishes to grant to Grantee a security interest in all of Grantor's right, title and interest in the membership interests in Company, a Delaware limited liability company, that Grantor now owns or hereafter acquires.

NOW, THEREFORE, in consideration of the premises of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.  Defined Terms.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Prepayment Agreement. The following terms shall have the following meanings (such meanings being equally applicable to both the singular and plural forms of the terms defined):

**"Collateral"** shall have the meaning assigned to such term in Section 2 of this Pledge Agreement.

**"Company"** shall mean GT Advanced Equipment Holding LLC, a Delaware limited liability company.

**"hereby"**, **"herein"**, **"hereof"**, **"hereunder"** and words of similar import refer to this Pledge Agreement as a whole (including, without limitation, any schedules hereto) and not merely to the specific section, paragraph or clause in which the respective word appears.

**"Pledge Agreement"** shall mean this Pledge Agreement, as the same may from time to time be amended, modified or supplemented and shall refer to this Pledge Agreement as in effect on the date such reference becomes operative.

**"Pledged Interests"** shall mean all membership interests in Company, and any other equity or ownership interest in Company, owned or held by Grantor, hereafter acquired by Grantor or hereafter issued to Grantor.

APPLE CONFIDENTIAL
#C56-13-03451

**"Proceeds"** shall mean "proceeds," as such term is defined in section 9306(1) of the UCC and, in any event, shall include, without limitation, (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Grantor from time to time with respect to any of the Collateral, (ii) any and all payments (in any form whatsoever) made or due and payable to Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau or agency (or any person acting under color of any governmental authority), and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral. In addition, the term Proceeds shall include, without limitation, all accounts, chattel paper, deposit accounts, instruments, equipment, inventory, consumer goods, farm products, documents, general intangibles and other proceeds which arise from the sale, lease, transfer, or other use or disposition of any kind of Collateral or proceeds and all proceeds of any type described above acquired with cash proceeds.

**"Secured Obligations"** shall mean the payment and performance of: (a) all present and future Obligations of Grantor to Grantee under the Prepayment Agreement, MDSA and SOW (the **"Secured Agreements"**), as the same may be amended, modified, supplemented or amended and restated from time to time; and (b) all Obligations of Grantor and rights of Grantee under this Pledge Agreement, as the same may be amended, modified, supplemented or amended and restated from time to time. The word **"Obligations"** is used herein in its most comprehensive sense and includes any and all debts, obligations and liabilities of Grantor, including, without limitation, the obligation to pay damages to Grantee relating to the SOW or the other Secured Agreements, heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, under the agreements, instruments and documents described in the preceding sentence.

**"Trigger Event"** shall have the meaning ascribed to it in the Prepayment Agreement.

**"UCC"** shall mean the Uniform Commercial Code as the same may, from time to time, be in effect in the State of California; provided, however, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of Grantee's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of California, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

2. <u>Grant of Security Interest</u>. As collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Secured Obligations and to induce Grantee to enter into the Secured Agreements, Grantor hereby grants and hypothecates to Grantee a first priority security interest in all of Grantor's right, title and interest in, to and under all of the following (all of which being hereinafter collectively called the **"Collateral"**):

(i) The Pledged Interests.

APPLE CONFIDENTIAL
#C56-13-03451

(ii)    All cash, property, dividends, securities, Proceeds and other property paid or distributed with respect to or received on account of the Pledged Interests.

(iii)    All rights and privileges of Grantor with respect to the foregoing.

Grantor herewith delivers all membership certificates representing the Pledged Interests, together with a membership transfer instrument relating to the Pledged Interests in form and substance satisfactory to Grantee, duly endorsed in blank, to be held by Grantee subject to the terms and conditions of this Pledge Agreement.

3.    <u>Representations and Warranties</u>.    Grantor hereby represents and warrants and covenants that:

(a)    Grantor has full power and authority to execute, deliver and perform this Pledge Agreement and to incur the obligations provided for herein, all of which have been duly authorized by all proper and necessary corporate action.

(b)    This Pledge Agreement constitutes the valid and legally binding obligation of Grantor, enforceable in accordance with its terms.

(c)    The execution, delivery and performance by Grantor of this Pledge Agreement do not (i) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any agreement or instrument binding on Grantor or affecting its properties, (ii) require any approval or consent of any party, company, authority, entity, individual or other person (**"Person"**) under any agreement or instrument binding on the Grantor or affecting its properties, or (iii) result in or require the creation or imposition of any lien on any of the properties of Grantor other than the Pledged Interests.

(f)    The membership interests of Company consist of one certificate, evidenced by Certificate No. 1 dated October 30, 2013, representing 100% of the membership interests in Company.   The outstanding membership interests of Company have been duly and validly authorized and issued and are fully paid and nonassessable.

(h)    Except for the security interest granted to Grantee pursuant to this Pledge Agreement, Grantor is the sole owner of each item of the Collateral in which it purports to grant a security interest hereunder, having good and marketable title thereto, free and clear of any and all liens, claims and encumbrances.

(i)    No effective security agreement, financing statement, equivalent security or lien instrument or continuation statement covering all or any part of the Collateral is on file or of record in any public office, except such as may have been filed by Grantor in favor of Grantee pursuant to this Pledge Agreement or as will be promptly terminated.

(j)    Appropriate financing statements having been appropriately and effectively filed in the Office of the Secretary of State of Delaware, this Pledge Agreement is effective to create a valid and continuing first priority lien on and first priority perfected security interest in the Collateral with respect to which a security interest may be perfected by filing pursuant to the UCC in favor of Grantee, prior to all other liens, and is enforceable as such as against creditors

3

APPLE CONFIDENTIAL
#C56-13-03451

of and purchasers from Grantor.  All action necessary to perfect such security interest in each item of the Collateral has been duly taken.

(k)  Grantor's chief executive office (as that term is used in section 9104 of the UCC) is located at the address listed for it in the preamble of this Pledge Agreement and Grantor will not change such location unless it has taken or will take such action as is necessary to cause the security interest of Grantee in the Collateral to continue to be perfected.  Grantor will not change the location of its chief executive office without giving thirty (30) days' prior written notice thereof to Grantee.

4.  Covenants.  Grantor covenants and agrees with Grantee that from and after the date of this Pledge Agreement and until the Secured Obligations are fully satisfied:

(a)  Payment Over of Certain Distributions.  Except as provided in Section 8 hereof, if Grantor shall, as a result of its ownership of Pledged Interests, become entitled to receive or shall receive any noncash distribution, whether in addition to, in substitution of, as a conversion of or in exchange for such Pledged Interests, or otherwise in respect thereof, Grantor shall accept the same as Grantee's agent, hold the same in trust for Grantee and deliver the same forthwith to Grantee in the exact form received, to be held by Grantee hereunder as additional collateral security for the Secured Obligations.  After the occurrence of a Trigger Event, any sums paid upon or in respect of the Pledged Interests upon the dissolution or winding up of Company shall be paid over to Grantee to be held by it hereunder as additional collateral security for the Secured Obligations, and in case any distribution of capital shall be made on or in respect of the Pledged Interests or any property shall be distributed upon or with respect to the Pledged Interests pursuant to the recapitalization or reclassification of the capital of any such corporation or pursuant to the reorganization thereof, the property so distributed shall be delivered to Grantee to be held by it, subject to the terms hereof, as additional collateral security for the Secured Obligations.  Except as provided in Section 8 hereof, if any sums of money or property so paid or distributed in respect of the Pledged Interests shall be received by Grantor, Grantor shall, until such money or property is paid or delivered to Grantee, hold such money or property in trust for Grantee, segregated from other funds of Grantor, as additional collateral security for the Secured Obligations.  For the avoidance of doubt, this provision does not apply to the repayment of the loan by Grantee to Company by setoff or recoupment.

(b)  Limitation on Certain Actions.  Without the prior written consent of Grantee, Grantor will not (i) vote to enable, or take any other action to permit, Company to issue any equity interest of any nature or to issue any other securities convertible into or granting the right to purchase or exchangeable into any such equity interest or (ii) sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Collateral.

(c)  Further Assurances.  At any time and from time to time, upon the written request of Grantee, and at the sole expense of Grantor, Grantor will promptly and duly execute and deliver any and all such further instruments and documents and take such further action as Grantee may reasonably deem necessary to obtain the full benefits of this Pledge Agreement and of the rights and powers herein granted, and such action to include, without limitation, the filing of any financing or continuation statements under the UCC with respect to the liens granted hereby, and transferring Collateral to Grantee's possession (if a security interest in such

APPLE CONFIDENTIAL
#C56-13-03451

Collateral can be perfected by possession). Grantor also hereby authorizes Grantee to file any such financing or continuation statement without the signature of Grantor to the extent permitted by applicable law. If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any instrument (other than checks representing payments received in the ordinary course of business), such instrument shall be immediately pledged to Grantee hereunder, and shall be duly endorsed in a manner satisfactory to Grantee and delivered to Grantee.

(d) Maintenance of Records. Grantor will keep and maintain, at its own cost and expense, satisfactory and complete records of the Collateral, including, without limitation, a record of all payments received and all credits granted with respect to the Collateral and all other dealings with the Collateral. Grantor will mark its books and records pertaining to the Collateral to evidence this Pledge Agreement and the security interest granted hereby. For Grantee's further security, and at Grantee's request, Grantor agrees that upon the occurrence and during the continuation of any Trigger Event, Grantor shall, at Grantee's request, deliver and turn over any such books and records and other documents to Grantee or to its representatives.

(e) Indemnification. In any suit, proceeding or action brought by Grantee relating to any Collateral, Grantor will save, indemnify and keep Grantee harmless from and against all expense, loss or damage suffered by reason of any defense, setoff, counterclaim, recoupment or reduction of liability whatsoever of the obligor thereunder, arising out of a breach by Grantor of any obligation thereunder.

(f) Payment of Obligations. Grantor will pay promptly when due all federal, state, provincial, county, city, municipal, local, foreign or other governmental taxes and levies, assessments, charges, or claims of any governmental entity imposed upon the Collateral or in respect of its income or profits therefrom and all claims of any kind imposed on the Collateral (including, without limitation, claims for labor, materials and supplies), except as may be subject to good faith contest or as to which a bona fide dispute may arise; provided, however, that adequate reserves in accordance with GAAP or other provision is made to the satisfaction of Grantee for prompt payment thereof in the event that it is found that the same are their obligations.

(g) Limitation on Liens on Collateral. Except for the lien created by this Pledge Agreement, Grantor will not create, permit or suffer to exist, and will defend the Collateral against and take such other action as is necessary to remove, any lien on the Collateral, and will defend the right, title and interest of Grantee in and to any of Grantor's rights under the Collateral against the claims and demands of all Persons whomsoever.

(h) Limitations on Disposition. Grantor will not sell, lease, transfer or otherwise dispose of any of the Collateral, or attempt or contract to do so.

(i) Further Identification of Collateral. Grantor will, if so requested by Grantee, furnish to Grantee, as often as Grantee reasonably requests, statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Grantee may reasonably request, all in reasonable detail.

APPLE CONFIDENTIAL
#C56-13-03451

(j)    Notices.  Grantor will advise Grantee promptly, in reasonable detail, (i) of any lien or claim made or asserted against any of the Collateral (other than any Collateral which, individually or in the aggregate, is immaterial), and (ii) of any material change in the composition of the Collateral.

(k)    Right of Inspection.  Upon reasonable notice to Grantor (unless a Trigger Event has occurred and is continuing, in which case no notice is necessary), Grantee shall have full and free access during normal business hours to all the books and records and correspondence of Grantor and Company relating to the Collateral, and Grantee or its representatives may examine the same, take extracts therefrom and make photocopies thereof, and Grantor agrees to render to Grantee, at Grantor's cost and expense, such clerical and other assistance as may be reasonably requested with regard thereto.

(l)    Continuous Perfection.  Grantor will not change its name, identity or membership structure in any manner which might make any financing or continuation statement filed in connection herewith seriously misleading within the meaning of section 9402(7) of the UCC (or any other then applicable provision of the UCC), unless Grantor shall have given Grantee at least thirty (30) days' prior written notice thereof and shall have taken all action (or made arrangements to take such action substantially simultaneously with such change if it is impossible to take such action in advance) necessary or reasonably requested by Grantee to amend such financing statement or continuation statement so that it is not seriously misleading.

5.    Grantee's Appointment as Attorney in Fact.

(a)    Grantor hereby irrevocably constitutes and appoints Grantee and any executive officer of Grantee and any agent designated by such executive officer, with full power of substitution, as its true and lawful attorney-in-fact, with full irrevocable power and authority in the place and stead of Grantor and in the name of Grantor or in its own name, from time to time in Grantee's discretion, only for the purpose of carrying out the terms of this Pledge Agreement, to take any and all appropriate action and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Pledge Agreement and, without limiting the generality of the foregoing, hereby gives Grantee the power and right, on behalf of Grantor, without notice to or assent by Grantor to do any or all of the following:

(i)    To ask, demand, collect, receive and give acquittances and receipts for any and all moneys due and to become due under any Collateral and, in the name of Grantor or its own name or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Collateral and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Grantee for the purpose of collecting any and all such moneys due under any Collateral whenever payable and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Grantee for the purpose of collecting any and all such moneys due under any Collateral whenever payable.

APPLE CONFIDENTIAL
#C56-13-03451

(ii)  To pay or discharge taxes, liens, security interests or other encumbrances levied or placed on or threatened against the Collateral subject to Grantor's right to make reasonable challenges thereto pursuant and in accordance with Section 4(f) hereof.

(iii)  (A) To direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due, and to become due thereunder, directly to Grantee or as Grantee shall direct; (B) to receive payment of and receipt for any and all moneys, claims and other amounts due, and to become due at any time, in respect of or arising out of any Collateral; (C) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with accounts and other documents constituting or relating to the Collateral; (D) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; and (E) generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though Grantee were the absolute owner thereof for all purposes, and to do, at Grantee's option and Grantor's expense, at any time, or from time to time, all acts and things which Grantee reasonably deems necessary to protect, preserve or realize upon the Collateral and Grantee's lien therein, in order to effect the intent of this Pledge Agreement, all as fully and effectively as Grantor might do.

(iv)  After the occurrence of a Trigger Event, to receive any and all distributions paid in respect of the Pledged Interests and to make application thereof to the Secured Obligations, and Grantee or its nominee may exercise (A) all voting, partnership and other rights pertaining to the Pledged Interests and (B) any and all rights, privileges or options pertaining to the Pledged Interests as if it were the absolute owner thereof, all without liability except to account for property actually received by it, but Grantee shall have no duty to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(b)  Grantee agrees that, except upon the occurrence and during the continuation of a Trigger Event, it will forebear from exercising the power-of-attorney or any rights granted to Grantee pursuant to this Section 5.

Grantor hereby ratifies, to the extent permitted by law, all that said attorneys shall lawfully do or cause to be done by virtue hereof. The power-of-attorney granted pursuant to this Section 5 is a power coupled with an interest and shall be irrevocable until the Secured Obligations are indefeasibly paid in full.

(c)  The powers conferred on Grantee hereunder are solely to protect Grantee's interests in the Collateral and shall not impose any duty upon it to exercise any such powers. Grantee shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to Grantor for any act or failure to act, except for its own gross negligence or willful misconduct.

(d)  Grantor also authorizes Grantee, at any time and from time to time upon the occurrence and during the continuation of a Trigger Event, to execute, in connection with the

7

APPLE CONFIDENTIAL
#C56-13-03451

sale provided for in Section 8 hereof, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral.

(e)   Grantee agrees to release promptly to Grantor any cash distributions on the Collateral which it may receive hereunder (and any Proceeds of such cash distributions) during the continuation of any Trigger Event or termination of the SOW by Apple for Cause (as defined in the SOW), to the extent not applied to the Secured Obligations, following the waiver or curing of such Trigger Event or termination of the SOW by Apple for Cause (as defined in the SOW).

6.   <u>Performance by Grantee of Grantor's Obligations.</u>  If Grantor fails to perform or comply with any of its agreements contained herein and Grantee, as provided for by the terms of this Pledge Agreement, shall itself perform or comply, or otherwise cause performance or compliance, with such agreement, Grantor shall reimburse Grantee for the reasonable expenses of Grantee incurred in connection with such performance or compliance, from the date such expenses are incurred until the date Grantee is paid therefor.

7.   <u>Cash Distributions; Voting Rights.</u>  Unless a Trigger Event shall have occurred and be continuing, Grantor shall be permitted to receive all cash distributions paid in respect of its Pledged Interests and to exercise all voting and membership rights with respect to its Pledged Interests; provided, however, that no vote shall be cast or membership right exercised or other action taken which Grantor reasonably could foresee would impair the Collateral or which would be inconsistent with or result in any violation of any provision of this Pledge Agreement or the Secured Agreements, including, without limitation, dissolution. Simultaneously with the execution of this Pledge Agreement, Grantor will execute and deliver to Grantee an irrevocable proxy in respect of the Pledged Interests in the form of <u>Exhibit A</u> annexed hereto.

8.   <u>Remedies.</u>

(a)   If, (i) during the term of the Prepayment Agreement, a Trigger Event has occurred, or (ii) after the term of the Prepayment Agreement, a material breach of the Secured Obligations has occurred and is continuing, in addition to all other rights and remedies granted in this Pledge Agreement and in any other instrument or agreement securing, evidencing or relating to the Secured Obligations, Grantee shall have all rights and remedies of a secured party under the UCC. Without limiting the generality of the foregoing, Grantee, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below), to or upon Grantor or any other Person (all and each of which demands, defenses, advertisement and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, assign, give option or options to purchase or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, in the over-the-counter market, at any exchange, broker's board or office of Grantee or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. Grantee shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in Grantor, which right or equity is hereby waived or released. Grantee shall apply any proceeds

APPLE CONFIDENTIAL
#C56-13-03451

from time to time held by it and the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Grantee hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Secured Obligations, and only after such application and after the payment by Grantee of any other amount required by any provision of law, including, without limitation, section 9504(1)(c) of the UCC, need Grantee account for the surplus, if any, to the person entitled by law to receive such surplus, or Grantor. To the extent permitted by applicable law, Grantor waives all claims, damages and demands it may acquire against Grantee of any of its rights hereunder, except for its gross negligence or willful misconduct. If any notice of a proposed sale or other disposition of the Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten (10) days before such sale or other disposition. Grantor further waives and agrees not to assert any rights or privileges which it may acquire under section 9112 of the UCC.

(b)  The proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be distributed by Grantee in the following order of priority:

First, to Grantee in an amount sufficient to pay in full the expenses of Grantee in connection with such sale, disposition or other realization, including all expenses, liabilities and advances incurred or made by Grantee in connection therewith, including, without limitation, reasonable attorneys' fees.

Second, to Grantee in an amount equal to the aggregate amount of Secured Obligations which are then unpaid.

Finally, upon payment in full of all of the Secured Obligations, to any person entitled by law to receive such amounts, or to Grantor, or their respective representatives or as a court of competent jurisdiction may direct, any surplus then remaining from such proceeds.

(c)  Grantor recognizes that Grantee may be unable to effect a public sale of any or all of the Pledged Interests, and may be compelled to resort to one or more public or private sales thereof. Grantor acknowledges and agrees that any such private sale or restricted public sale may result in prices and other terms less favorable to Grantee than if such sale were an unrestricted public sale and agrees that such circumstances shall not, in and of themselves, result in a determination that such sale was not made in a commercially reasonable manner.

(d)  Expenses payable by Grantor in connection with any disposition under paragraph (a), (c) or (d) above shall include, but shall not be limited to, legal fees, costs of printing and other expenses of transfer and sale. Grantor agrees to pay to Grantee, all of such costs and expenses described above, and all other costs and expenses of enforcing Grantor's obligations and of realizing on the Collateral, including reasonable attorneys' fees and legal expenses.

9.  Limitation on Grantee's Duty in Respect of Collateral. Grantee's sole duty with respect to the custody, safekeeping and preservation of the Collateral in its possession, if any, under section 9207 of the UCC or otherwise, shall be to deal with it in the same manner as

9

APPLE CONFIDENTIAL
#C56-13-03451

Grantee deals with similar securities and property for its own account. Neither Grantee nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of Grantor or otherwise.

10. **Membership Adjustments.** In the event that during the term of this Pledge Agreement any dividend, reclassification, readjustment or other changes are declared or made in the capital structure of the Company or additional membership interests of the Company is issued to Grantor, all new, substituted and additional interests or other securities issued by reason of any such change shall be delivered to and held by Grantee under the terms of this Pledge Agreement in the same manner as the Pledged Interests. In the event of substitution of such securities, Grantor entitled to such interests and Grantee shall cooperate and execute such documents as are reasonable so as to provide for the substitution of such Collateral and, upon such substitution, references to "Pledged Interests" in this Pledge Agreement shall include the substituted membership interests of Grantor as a result thereof.

11. **Warrants and Rights.** In the event that, during the term of this Pledge Agreement, subscription warrants or other rights or options shall be issued in connection with the Pledged Interests, such rights, warrants and options shall be the property of Grantor and, if exercised by Grantor, all new membership interests or other securities so acquired by Grantor as it relates to the Pledged Interests then held by Grantee shall be immediately delivered to Grantee, to be held under the terms of this Pledge Agreement in the same manner as the Pledged Interests.

12. **Further Assurances.** Grantor shall, at any time and from time to time, upon the written request of Grantee, execute and deliver such further documents and do such further acts and things as Grantee may reasonably request in order to effect the purposes of this Pledge Agreement. This Pledge Agreement shall terminate upon occurrence of all of (i) payment in full of the Prepayment Balance, (ii) expiration or termination of the MDSA and SOW, and (iii) payment of all Secured Obligations thereunder. Upon termination of this Pledge Agreement, Grantee shall take such actions as Grantor may reasonably request to release Collateral.

13. **Notices.** Any notice or demand desired or required to be given hereunder shall be provided as set forth in the "Notices" provision in the MDSA.

14. **Severability.** Any provision of this Pledge Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

15. **No Waiver; Cumulative Remedies.** Grantee shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies hereunder, and no waiver shall be valid unless in writing, signed by Grantee, and then only to the extent therein set forth. A waiver by Grantee of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Grantee would otherwise have had on any future occasion. No failure to exercise nor any delay in exercising on the part of Grantee, any right, power or privilege hereunder, shall operate as a waiver thereof, nor shall any single or partial

APPLE CONFIDENTIAL
#C56-13-03451

exercise of any right, power or privilege hereunder preclude any other or future exercise thereof or the exercise of any other right, power or privilege. The rights and remedies hereunder provided are cumulative and may be exercised singly or concurrently, and are in addition to any rights and remedies provided by law. None of the terms or provisions of this Pledge Agreement may be waived, altered, modified or amended except by an instrument in writing, duly executed by Grantee and, where applicable by Grantor.

16. <u>Successors and Assigns</u>. This Pledge Agreement and all obligations of Grantor hereunder shall be binding upon the successors and assigns of Grantor, and shall, together with the rights and remedies of Grantee hereunder, inure to the benefit of Grantee, all assignees to which Grantee assigns the MDSA in whole or in part, and their respective successors and assigns. No sales of participations, other sales, assignments, transfers or other dispositions of any agreement governing the Secured Obligations or any portion thereof shall in any manner affect the security interest granted to Grantee hereunder.

17. <u>Governing Law and Consent to Jurisdiction</u>. The validity, construction and effect of this Pledge Agreement shall be governed by the laws of the State of California, without regard to its laws regarding choice of applicable law. All judicial proceedings brought against Grantor with respect to this Pledge Agreement may be brought in any state or federal court of competent jurisdiction in Santa Clara County, California, and Grantor accepts for itself and its assets and properties, generally and unconditionally, the nonexclusive jurisdiction of the aforesaid courts. Grantor waives, to the fullest extent permitted by applicable law, any objection (including, without limitation, any objection to the laying of venue or based on the grounds of forum non conveniens) which it may now or hereafter have to the bringing of any such action or proceeding in such jurisdiction.

18. <u>Counterparts</u>. This Pledge Agreement may be executed in any number of counterparts each of which shall be an original with the same effect as if the signatures thereof and hereto were upon the same instrument.

19. <u>Headings</u>. Captions, headings and the table of contents in this Pledge Agreement are for convenience only, and are not to be deemed part of this Pledge Agreement.

APPLE CONFIDENTIAL
#C56-13-03451

IN WITNESS WHEREOF, each of the parties hereto has caused this Pledge Agreement to be executed and delivered by its duly authorized officer on the date first set forth above.

GTAT CORPORATION

By: _____

Title: _____

APPLE INC.

By: Peter Oppenheimer
Title:  Senior Vice President, Chief Financial Officer

12

APPLE CONFIDENTIAL
#C56-13-03451

EXHIBIT A

IRREVOCABLE PROXY

KNOW ALL MEN BY THESE PRESENTS that the undersigned does hereby make, constitute and appoint APPLE INC., a California corporation ("**Apple**"), its true and lawful attorney, for it and in its name, place and stead, to act as its proxy in respect of _____ membership interests in GT Advanced Equipment Holding LLC, a Delaware limited liability Company (hereinafter referred to as the "**Company**"), which it now owns or holds and which are, contemporaneously herewith, being pledged to Apple pursuant to the terms of a certain Pledge Agreement of even date herewith between the undersigned and Apple (the "**Pledge Agreement**"), including, without limitation, the right on its behalf to demand the call by any proper officer of the Company, pursuant to the provisions of its Membership Agreement and as permitted by law, of a meeting of its shareholders and at any such meeting of shareholders, annual, general or special, to vote for the transaction of any and all business that may come before such meeting, or at any adjournment thereof, including, without limitation, the right to grant waivers of notice and to vote for the removal of directors and to nominate and elect successor directors and/or vote for the sale of all or any part of the assets of the Company and/or the liquidation and dissolution of the Company; giving and granting to its said attorney full power and authority to do and perform each and every act and thing whether necessary or desirable to be done in and about the premises, as fully as it might or could do with full power of substitution, appointment and revocation, hereby ratifying and confirming all that its said attorney shall do or cause to be done by virtue hereof.

This Proxy is given to Apple in consideration of Apple's execution of a Prepayment Agreement of even date herewith by and among Apple, the undersigned and other parties, and in order to carry out the covenant of the undersigned contained in the Pledge Agreement and THIS PROXY SHALL NOT BE REVOCABLE OR REVOKED BY THE UNDERSIGNED, shall be binding upon its heirs, legal representatives, successors and assigns and may be exercised only after a Trigger Event (as defined in the Pledge Agreement) or termination of the SOW (as defined in the Pledge Agreement) by Apple for Cause (as defined in the SOW).

IN WITNESS WHEREOF, the undersigned has executed and delivered this Irrevocable Proxy as of the _____ day of _____, 20___.

GTAT CORPORATION
a Delaware corporation

By _____

Its _____

13

Tab 8

# APPLE INC.
## MASTER EQUIPMENT PURCHASE AGREEMENT

This Master Equipment Purchase Agreement ("Agreement") # C56-13-02494, effective as of October 31, 2013 (the "Effective Date"), is by and between **Apple Inc.**, a California corporation, having its principal place of business at 1 Infinite Loop, Cupertino, California 95014 ("Apple"), on the one hand, and **GTAT Corporation**, a Delaware corporation, having its principal place of business at 243 Daniel Webster Highway, Merrimack, NH 03054 ("GTAT") and **GT Advanced Technologies Limited**, a company organized under the laws of Hong Kong (together with GTAT, "Supplier"), on the other hand. Apple and Supplier are individually referred to herein as a "Party" and collectively as the "Parties."

## PURPOSE

Apple desires to engage Supplier to supply Equipment and related Software, Documentation, and Services (all as defined herein) for use in designing, developing, and/or manufacturing Apple products. Specifically, Supplier agrees to supply any Furnaces and Similar Furnaces, as those terms as defined in Statement of Work #1 (the "SOW") under the Master Development and Supply Agreement #C56-13-02947 between Apple and GTAT (the "MDSA"), that Apple wishes to purchase, as well as Annealers, Intego inspection tools and any other equipment the parties mutually agree may be purchased under this Agreement. The Parties may sign statements of work that reference this Agreement to set forth terms and conditions specific to particular Equipment and related Software, Documentation, and Services. The terms and conditions of this Agreement also apply if the Parties have not signed a statement of work, unless the purchase of Equipment and related Software, Documentation, or Services is governed by a separate written agreement signed by the Parties.

## 1. PRICING; BILLING

1.1. **Prices.** The Parties may state the prices that Authorized Purchasers will pay for Products and Services in a Purchase Order or SOW. Such prices for Products and Services are the entire remuneration for the Products and Services purchased under this Agreement, and Authorized Purchasers will not reimburse Supplier for any other charges or expenses under this Agreement without an express prior written approval by an authorized Apple representative.

1.2. **Most Favored Customer Pricing.** Supplier represents and warrants that the Apple Price, as of the effective date of any Authorized Purchaser's order under this Agreement, will not exceed Supplier's Lowest Offered Price. If at any time the Supplier's Lowest Offered Price falls below the Apple Price, Supplier will notify Apple and the Apple Price will decrease to match the Lowest Offered Price. "Apple Price" means Supplier's prices for Products or Services ordered by Authorized Purchasers under this Agreement. "Lowest Offered Price" means Supplier's lowest price offered to any other customer after the Effective Date for similar products or services, net of any rebates and discounts, and regardless of the amount of products or services.

1.3. **Invoicing and Payment.** If Apple specifies electronic invoicing, Supplier will comply with Apple's written instructions for submitting electronic invoices and will bear any related expenses. If Apple does not specify electronic invoicing, Supplier will send invoices for Products and Services to the address specified on the Purchase Order or in an applicable SOW. Supplier's invoices must include the purchase order number and identify the Products, Services, and applicable quantities and prices. Supplier must separately itemize all applicable taxes. Authorized Purchasers may pay the invoices in U.S. Dollars, and payments will be due net 45 days from the latest of (i) receipt of a correct invoice; (ii) acceptance of deliverables; or (iii) satisfactory completion of services. The Authorized Purchaser may discount any payment by 3% of the invoiced amount if it

*Apple Confidential*

makes payment within 15 days from the original invoice date, or, in the case of disputed invoices, from the date of a corrected invoice. Authorized Purchasers may adjust invoiced amounts for errors, shortages, and defects.

1.4. **Billing Dispute.** An Authorized Purchaser may dispute an invoice, by notifying Supplier in writing of the nature of the billing dispute. Supplier must provide supporting documentation to the Authorized Purchaser for any disputed invoice within 10 days after receiving any such notice. If a correction is warranted, the Authorized Purchaser will pay the corrected amount. The Authorized Purchaser may withhold payment while the parties work to resolve good-faith billing pursuant to this Section.

1.5. **Audit.** Apple has the right during the term of this Agreement and for a period of 3 years after expiration or termination of the Agreement to audit Supplier's records relating to Supplier's obligations under this Agreement. Supplier will maintain all such records for at least 3 years after the expiration or termination of this Agreement. If any audit discloses any overcharges, Supplier will, on demand, pay Apple the amount of the overcharges, together with interest on such overcharges at the rate of 10% per annum, or the maximum amount allowed by law, whichever is less, from the date of each such overcharge, until reimbursed to Apple and reimburse Apple for Apple's reasonable costs and expenses actually incurred in connection with such audit.

2. **ORDERING; DELIVERY; INSTALLATION; ACCEPTANCE**

2.1. **Ordering.** BY ITS EXECUTION OF THIS AGREEMENT, SUPPLIER EXPRESSLY ACKNOWLEDGES AND AGREES THAT IT WILL NOT PROVIDE ANY PRODUCT OR SERVICES HEREUNDER UNLESS AND UNTIL SUPPLIER HAS BEEN ISSUED A PURCHASE ORDER FOR THE SERVICES BY AN AUTHORIZED PURCHASER. Apple will have no obligation under any Purchase Order issued by any Authorized Purchaser other than Apple Inc. All Purchase Orders issued under this Agreement will be sent to Supplier at the above address or as otherwise agreed by the Parties in writing. Supplier will accept and fill all Purchase Orders issued by Authorized Purchasers under and in accordance with this Agreement. Purchase Orders may include blanket orders of Product for subsequent shipment. Supplier will provide Product or Services only in quantities specified in the Purchase Order and may not impose any minimum order requirements on Authorized Purchasers. Supplier may not substitute goods or alter configurations without the applicable Authorized Purchaser's prior written consent, which may be withheld in Authorized Purchaser's sole discretion. Supplier will not be obligated to sell Products to any entities that compete with Supplier. All entities to whom Supplier is obligated to sell Products will enter into a mutually agreeable confidentiality agreement with Supplier prior to any delivery of Products, which agreement will be on the same terms as the confidentiality agreement between GTAT and Apple dated August 24, 2012.

2.2. **Packaging.** Supplier will package all Equipment in suitable containers to permit safe transportation and handling. Each delivered container must be labeled and marked to identify contents without opening and all boxes and packages must contain packing sheets listing contents. The Authorized Purchaser's Purchase Order number must appear on all shipping containers, packing sheets, delivery tickets, and bills of lading. Supplier will clearly identify the country of origin of all items delivered.

2.3. **Terms of Sale.** Supplier will deliver all Equipment DAP (destination specified in the Purchase Order) (as defined in Incoterms 2010), by the delivery date set forth in the Purchase Order.

2.4. **Delivery.** TIME IS OF THE ESSENCE as to the delivery of Product and performance of Services under this Agreement. Supplier will only be deemed to have met a delivery date specified in a Purchase Order if the relevant Products and Services meet all applicable specifications. If Supplier

Apple-GTAT MEPA
#C56-13-02494

cannot meet a delivery date specified in the Purchase Order, Supplier will promptly notify the Authorized Purchaser in writing and propose a revised date and the Authorized Purchaser may, at its option: (i) cancel all or any portion of a Purchase Order without liability to Supplier and Supplier will promptly refund any amounts paid for such cancelled Purchase Order or portion by the Authorized Purchaser; (ii) require Supplier to deliver Product using priority freight delivery with incremental freight charges at Supplier's expense; and/or (iii) exercise all other available remedies. The Authorized Purchaser is not obligated to accept early or partial delivery of Product unless otherwise agreed to by the Parties in the applicable Purchase Order. The foregoing notwithstanding, as necessary, Supplier will be permitted to deliver Product components to Authorized Purchaser for final assembly at the specified facility, and such component delivery will not constitute partial delivery.

2.5. **Requirements and Quality.** Supplier will comply with the quality, safety and regulatory requirements as set forth in the document(s), if any, referenced in the applicable SOW or Purchase Order, and with good commercial practice and applicable law.

2.6. **Testing Requirements.** Supplier will test the Products in accordance with the testing requirements set forth or referenced in the applicable SOW or Purchase Order, or in the absence of such testing requirements, in a manner sufficient to confirm conformance with all applicable specifications. Upon Apple's request, Supplier will provide and ship Products to Apple to be used for testing on terms to be mutually agreed.

2.7. **Installation.** Supplier will install, process, tune, and verify stability of the Products. Supplier will perform all baseline tuning and process optimization as may be reasonably specified by Apple.

2.8. **Acceptance.** Authorized Purchaser may examine, test and determine if Products or Services, as applicable, are acceptable, complete, and meet the Product specifications stated or referenced in the applicable SOW or Purchase Order, or any documents, standards, exhibits, attachments, or requirements referenced therein. Upon Authorized Purchaser's request, Supplier will, without charge, assist with such inspection. Unless stated otherwise in the applicable SOW, "Purchaser's Acceptance" occurs upon the execution of a written acknowledgement by Authorized Purchaser that the Products, as delivered, tested, and installed, meet all applicable requirements and qualifications as specified in the applicable SOW or Purchase Order.

2.9. **Rejection.** Authorized Purchaser will notify Supplier in writing if Authorized Purchaser rejects the Products (due to such Products not meeting required specifications) or Services (due to such Services not being performed in accordance with agreed upon standards) ("Rejection Notice"). Supplier will correct and re-deliver the rejected Products or re-perform the rejected Services within 10 business days after receipt of the Rejection Notice. Authorized Purchaser will not be obligated to accept or pay for any Products or Services until Supplier has corrected them such that the Products satisfy agreed upon specifications and Services are in accordance with agreed upon standards. Supplier will promptly refund the full amount prepaid for any rejected Products or Services that have not been corrected.

2.10. **Supply Constraint.** If Supplier's ability to supply any Furnaces or Similar Furnaces is constrained for any reason, Supplier will: (i) fill Authorized Purchasers' requirements prior to fulfilling orders for other customers that are ordering goods that require use of the constrained resource; (ii) immediately escalate the issue to Apple's management for the purpose of resolving the supply constraint; and (iii) promptly provide daily reports to Apple showing the number of Products available during the constrained period.

3. **SUPPORT SERVICES**

*Apple Confidential*

Apple-GTAT MEPA
#C56-13-02494

3.1. **Services.** Supplier will provide the Services listed in Attachment 1 to this Agreement and any Services described in an applicable SOW, irrespective of the amount of Products purchased by Authorized Purchaser and at no additional cost to Authorized Purchaser.

3.2. **Supplier Personnel.** Supplier personnel will observe Apple's security and safety rules and procedures while working on Authorized Purchaser's premises. At Apple's reasonable request, Supplier will immediately remove and promptly replace any Supplier Personnel.

3.3. **Subcontractors.** Supplier will not subcontract, delegate, assign or otherwise engage the services of any subcontractor to perform any portion of the Services under this Agreement without Apple's express prior written consent, which will not be unreasonably withheld. Supplier will not be relieved of any obligations under this Agreement by virtue of performance of any Services by a subcontractor.

## 4. SOFTWARE AND EQUIPMENT USE LICENSE

4.1. **Software and Equipment Use License.** Supplier hereby grants and conveys to Apple a fully paid-up, royalty-free, worldwide, non-assignable (except to any of Apple's Related Entities, as that term is defined in the MDSA), non-sublicensable, nonexclusive, irrevocable, perpetual license under any Intellectual Property Rights owned, controlled or licensable by Supplier or its Related Entities to use, have used, operate, have operated, maintain and have maintained (i) any Furnaces or Similar Furnaces (and all Software and Documentation related thereto) that are purchased pursuant to this Agreement for the purpose of producing sapphire boules and (ii) any other Equipment (and all Software and Documentation related thereto) that is purchased pursuant to this Agreement.

4.2. **Open Source Software.** Supplier will not, without Apple's express prior written consent, (i) incorporate, combine, or distribute with any Product, any software that contains, or is derived in whole or in part from any software distributed publicly as Source Code or commonly referred to as open source software, including software licensed under the GNU General Public License, or Lesser/Library GPL (all of the foregoing, "Public Software"); or (ii) use Public Software in the development of any Product, in such a way that would cause the Product, or any derivative thereof, to be subject to all or part of the license obligations or other intellectual property-related terms with respect to such Public Software, including the obligations that the Product, or any derivative thereof be disclosed or distributed as Source Code, be licensed for the purpose of making derivatives of such software, or be redistributed free of charge. "Source Code" means the human readable form of computer programming code and related system level documentation including any comments, programmers' notes, source code repositories, and procedural code.

4.3. **Development.** From time to time, Supplier may be asked to develop new Products and Technology. Supplier agrees that all such development activities and any resulting Technology or Intellectual Property Rights, will be governed by the development terms set forth in Attachment 2; except that development of Furnaces and Similar Furnaces will be governed by the terms of Section 10 of the SOW. The terms in Attachment 2 take precedence over any conflicting term found elsewhere in this Agreement.

## 5. TERM; TERMINATION

5.1. **Term of Agreement.** This Agreement will commence on the Effective Date and continue until terminated.

5.2. **Termination.** Apple may terminate this Agreement for any reason by providing written notice to Supplier. Supplier may terminate this Agreement if Apple materially breaches this Agreement and

*Apple Confidential*

Apple-GTAT MEPA
#C56-13-02494

fails to cure the breach within 30 days after receipt of written notice from Supplier of the breach.

5.3. **Effect of Termination.** Following termination of this Agreement, each Party will return the disclosing Party's Confidential Information (excluding Software and Documentation). Termination will not relieve Supplier or Apple from any liability arising from any breach of this Agreement. If Supplier is not in material breach of the Agreement, Apple's sole monetary obligation upon any termination will be to pay any outstanding and undisputed invoices for Products or Services that were previously issued by Supplier prior to notice of termination.

5.4. **Survival.** The provisions of Sections 1.4, 1.5, 3, 4.1, 5.3, 5.4, 6, 7, 8, 9, and Attachments 1, 2 and 3 of this Agreement will survive the expiration or termination of this Agreement.

## 6. WARRANTIES

6.1. **Warranties.** Supplier warrants that: (i) the Products and Services do not and will not infringe any Intellectual Property Rights of others; (ii) Supplier has full power to enter into this Agreement; to carry out its obligations under this Agreement and to grant the rights granted to Apple herein; (iii) the Products and components thereof will be new and comprised of new materials; (iv) the Products will be safe for any use consistent with the Documentation; (v) the Services will be completed in a professional, workmanlike manner, with the degree of skill and care that is required by good, and sound professional procedures; and (vi) for a period of 12 months from Purchaser's Acceptance of Product or thirteen (13) months from delivery of such Product, whichever is earlier ("Warranty Period"), the Products, excluding any consumables and except for normal wear and tear for such Equipment, will materially conform to all applicable specifications. The foregoing notwithstanding, Supplier's warranty obligations will only be applicable to the extent that Apple or any Authorized Purchasers operate and use the Products in accordance with written instructions and documentation provided by Supplier, including operating the Equipment in a facility that adheres to any required facility specifications provided by Supplier. In no event will Supplier have any warranty obligations if Apple or an Authorized Purchaser (a) disassembles or uses the Product other than in accordance with the documentation provided in writing by Supplier; (b) combines a Product with any other product other than in accordance with the documentation provided in writing by Supplier; or (c) uses the Equipment in a facility that does not satisfy Supplier's facility specifications expressly provided in writing by Supplier. At Apple's option, the Warranty Period for any Furnace or Similar Furnace can be extended by an additional 24 months at a cost of $16,000 per Furnace or Similar Furnace.

6.2. **Repairs/Return.** For any defective or non-conforming Products or Services covered by the foregoing warranty and reported to Supplier during the Warranty Period, Supplier will, at Supplier's option and at no cost to Authorized Purchaser, promptly undertake best efforts to: (i) re-perform the Services; (ii) repair or replace the Products; or (iii) accept the return of (and credit Authorized Purchaser for) the defective or nonconforming Products or Services, as applicable, with no restocking charges; provided, however that if a repair is not successfully completed within a commercially reasonable time period, then Authorized Purchaser may elect (i), (ii) or (iii) above. Except as otherwise specified in the applicable SOW, Supplier will, after the Warranty Period, commence assessment, repair or replacement of the Products at Authorized Purchaser's cost, within 24 hours of Authorized Purchaser's request and otherwise on terms to be agreed.

6.3. **Service Period.** During the Warranty Period and for two years after the Warranty Period ("Service Period"), Supplier will make at least 2 site visits per year to Authorized Purchaser locations where the Products are in use. The intent of these visits is to evaluate Product performance and maintenance programs as well as to provide operator training (or refresher courses) to Authorized Purchaser's staff. Supplier will report all findings to Apple. Supplier will, at Apple request, make

Apple-GTAT MEPA
#C56-13-02494

additional evaluation visits to Apple's affiliates for up to 4 years following the Service Period. Supplier will report the findings to Apple and may charge a per site fee for such visits outside of the Service Period as determined between the Parties.

6.4.  **Spare Parts.**  Supplier will accept and fulfill Purchase Orders for spare parts for the Equipment for at least 7 years after the end of the Warranty Period.  Authorized Purchasers have no obligation to place minimum order quantities for spare parts.

6.5.  **Apple and Authorized Purchaser Warranties.**  Apple and Authorized Purchasers warrant that they; will not attempt to reproduce, disassemble, decompile or analyze the Equipment to determine the structural, physical or chemical components thereof, or otherwise attempt to discover or reproduce any technology or other intellectual property included in the Equipment, Documentation or other Supplier Confidential Information, including the source code for any Software, for the purpose of copying the Equipment or Software.

## 7.  INDEMNIFICATION

7.1.  **General Indemnity.**  Supplier will indemnify, hold harmless and, upon Apple's request, defend Apple and Authorized Purchasers, and their respective subsidiaries, directors, officers, employees and agents (collectively, the "Apple Parties"), from and against all claims, liabilities, actions, demands, settlements, damages, costs, fees and losses, including reasonable attorneys' and professionals' fees and costs, to the extent resulting from: (i) any willful misconduct on the part of Supplier or Supplier Personnel in the performance of this Agreement (ii) any negligent act or omission by or on the part of Supplier or Supplier Personnel in the performance of this Agreement which results in bodily injury, personal injury, death or property damage; (iii) Supplier's or Supplier Personnel's failure to comply with its obligations under any applicable national, state or local law; (iii) any bodily injury, personal injury, death or property damage caused by the Products or Services; or (iv) any allegation that Supplier Personnel are entitled to participate in or receive benefits under any Apple employee benefit plan, program or policy, or is, in any way, an employee of Apple. The indemnity obligations of Supplier stated in this Section 7.1 and Section 7.2 below will only be applicable to the extent that the Apple Parties operate and use the Products in accordance with Supplier's express written instructions and documentation, including operating the Equipment in a facility that adheres to any facility specifications expressly provided in writing by Supplier.  In no event will Supplier be obligated to indemnify any Apple Parties or otherwise be liable for any damages or losses if: (a) an Apple Party disassembles or uses the Product other than in accordance with the documentation provided in writing by Supplier; (b) combines a Product with any other product other than in accordance with the documentation provided in writing by Supplier; or (c) uses the Equipment in a facility that does not satisfy Supplier's facility specifications expressly provided in writing by Supplier.

7.2.  **IP Infringement Indemnity.**  Supplier will indemnify, hold harmless and, upon Apple's request, defend the Apple Parties from and against all claims, liabilities, actions, demands, settlements, damages, costs, fees and losses of any type, including reasonable attorneys' and professionals' fees and costs, arising from an allegation that any Products or Services produced, performed, or provided by Supplier under this Agreement ("Deliverables"), or any portion thereof, on their own, or when used, misappropriate, violate or infringe any third party's Intellectual Property Rights.  If a third party claims that the Deliverables themselves, or when used, misappropriated, violated or infringed a third party's intellectual property right, Supplier will, in addition to its obligations under this Section, promptly notify Apple in writing about the claim and, at its own expense, exercise the first of the following remedies that is practicable, as determined by Apple: (i) obtain for Authorized Purchasers the right to continue to use and provide the Deliverables consistent with this Agreement; (ii) modify the Deliverables so they are non-infringing and in compliance with this Agreement; (iii)

Apple-GTAT MEPA
#C56-13-02494

replace the Deliverables with non-infringing ones that comply with this Agreement; or (iv) at Apple's request, cease providing the infringing Deliverables, accept the return of infringing Products, refund any amounts paid by Authorized Purchasers therefor, and relieve Authorized Purchasers of any obligation to pay any amounts incurred but not yet paid.

7.3. **Apple Indemnity.** Apple will indemnify, hold harmless and, upon Supplier's request, defend Supplier and its respective subsidiaries, directors, officers, employees and agents (collectively, the "Supplier Parties"), from and against all claims, liabilities, actions, demands, settlements, damages, costs, fees and losses, including reasonable attorneys' and professionals' fees and costs, to the extent resulting from: (i) any willful misconduct on the part of an Apple Party in the performance of this Agreement (ii) any negligent act or omission by on the part of an Apple Party in the performance of this Agreement which results in bodily injury, personal injury, death or property damage; or (ii) an Apple Party's failure to comply with its obligations under any applicable national, state or local law.

7.4. **Additional Obligations.** The party seeking indemnification (the "Indemnitee") will promptly notify the party required to provide indemnification hereunder (the "Indemnitor") in writing about the claim or action for which it seeks indemnification and provide Indemnitor with reasonable information and assistance (at Indemnitor's expense) to enable the Indemnitor to defend such claim or action. The Indemnitor will not settle any indemnified claim or disclose the terms of any such settlement, without the Indemnitee's prior written consent, which may not be unreasonably withheld.

8. **CONFIDENTIALITY**

All disclosures of Confidential Information arising out of or related to this Agreement are governed by the terms of the Parties' existing Confidentiality Agreement, dated August 24, 2012. "Confidential Information" is defined in the Parties' Confidentiality Agreement.

9. **MISCELLANEOUS**

9.1. **Related Documents; Precedence.** The terms and conditions of any Purchase Order and the terms and conditions of any schedules, exhibits, attachments and other documents referenced herein or therein are incorporated into the terms and conditions of this Agreement. In the event of any conflict in the documents which constitute this Agreement, the order of precedence will be (i) Attachment 2, if applicable; (ii) the quantity, price, payment and delivery terms of the applicable Purchase Order; (iii) the applicable SOW; (iv) this Agreement; and (v) any other schedules, exhibits, attachments and other documents referenced and incorporated herein and therein.

9.2. **General Terms.** The general terms and conditions in Attachment 3 to this Agreement are incorporated herein by this reference.

9.3. **Definitions.** Capitalized terms not defined elsewhere in this Agreement have the following meanings:

9.3.1. "*Authorized Purchasers*" means Apple or any entity authorized by Apple to procure Products or Services under the Agreement.

9.3.2. "*Documentation*" means hard-copy and electronic documents, in English, including specifications, manuals, guides, instructions, schedules, Source Code for any Software, and other documentation relating to the Equipment and Software. The Documentation may be specified further in the applicable SOW or Purchase Order.

*Apple Confidential*

Apple-GTAT MEPA
#C56-13-02494

9.3.3. "*Equipment*" means equipment purchased from Supplier by Authorized Purchasers pursuant to the terms of this Agreement, or under any SOW or Purchase Order governed by this Agreement.

9.3.4. "*Intellectual Property Rights*" means the rights in and to all (i) U.S. and foreign patents and patent applications claiming any inventions or discoveries made, developed, conceived, or reduced to practice, including all divisions, substitutions, continuations, continuation-in-part applications, and reissues, re-examinations and extensions thereof; (ii) copyrights; (iii) unpatented information, trade secrets, data, or materials; (iv) mask work rights; and (v) any other intellectual or other proprietary rights of any kind now known or hereafter recognized in any jurisdiction.

9.3.5. "*Products*" means any Equipment, Software, and Documentation purchased pursuant to this Agreement.

9.3.6. "*Purchase Order*" means an order in either electronic or hardcopy form, issued by an Authorized Purchaser authorizing Supplier to provide and ship Products or Services, as applicable, under this Agreement.

9.3.7. "*Services*" means the services listed in Attachment 1, Development Services, any services identified in an applicable SOW or Purchase Order, and all installation, training, support, repair, validation, optimization, testing, and other services necessary to enable Authorized Purchasers to use the Equipment and Software.

9.3.8. "*Software*" means software purchased or licensed from Supplier by Authorized Purchasers and includes any computer program, operating system, applications system, firmware or software code of any nature, required for daily operation, process tuning and optimization or troubleshooting of the Equipment. The Software may be specified further in the applicable SOW or Purchase Order.

9.3.9. "*Statement of Work*" and "*SOW*" mean a written statement of work or plan of record, signed by Apple and Supplier, that references this Agreement and that describes the terms and conditions specific to Equipment and related Software, Documentation, and Services.

9.3.10. "*Technology*" means all ideas, creations, works, processes, designs, software, and methods that are patentable, copyrightable, registrable as a mask work, protectable as a trade secret or otherwise protectable by an Intellectual Property Right.

*[Signature page follows]*

*Apple Confidential*

Apple-GTAT MEPA
#C56-13-02494

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives:

**APPLE INC.**

By: _____
Signature

Name: Duco Pasmooij

Title: Vice President, Operations

Date: 10/31/2013

**GTAT CORPORATION**

By: _____
(Signature)

Name: _____
Printed Name

Title: VICE PRESIDENT & General Counsel

Date: _____

Telephone No.: _____

Taxpayer ID No.: _____


**GT ADVANCED TECHNOLOGIES LIMITED**

By: _____
Signature

Name: _____
Printed Name

Title: DIRECTOR

Date: _____

Telephone No.: _____

Taxpayer ID No.: _____

*Apple Confidential*

Apple-GTAT MEPA
#C56-13-02494

## ATTACHMENT 1

### Services

### 1. Installation

    1. Supplier will install the Equipment at sites specified by the Authorized Purchaser so that the Product is ready for production by the date specified in the Purchase Order or a SOW.

    2. Supplier will assist Authorized Purchaser to optimize and validate the Equipment and Software to meet the needs of the production environment prior to and during the delivery and installation of any Equipment or Software.

### 2. Training

    1. Supplier will provide training to Authorized Purchaser regarding the proper and safe operation and maintenance of the Equipment and Software in Authorized Purchaser's production environment.

    2. Supplier will provide training to operate, maintain, and do minor repairs and modification to the Equipment.

    3. Supplier will consult with Authorized Purchaser prior to delivery of any new Equipment and will assist Authorized Purchaser in optimizing its use of the Equipment.

### 3. General Support

    1. Supplier will provide all maintenance, spare parts, and repair during the Warranty Period at no cost to Authorized Purchaser.

    2. If Authorized Purchaser requests a modification to the Equipment, Authorized Purchaser will pay for the cost of parts associated with such modification only if the Parties agree in advance in writing and Supplier will provide all other support related to Equipment modification at no cost to Authorized Purchaser.

    3. Supplier will provide Software fixes, updates, error corrections, and revisions to Authorized Purchasers to address changes in Authorized Purchaser's requirements or any system updates created by Supplier.

    4. Upon Authorized Purchaser's request, Supplier will develop and deliver custom Software that meets Authorized Purchaser's requirements and Supplier will provide updates to the Software to address changes in the requirements for use of the Equipment.

    5. willProvide regional on-site support for the roll-out, validation, and implementation of Software on new Equipment and major revisions to the Software, and/or major changes to, or the location of, existing Equipment or use thereof, and/or major changes to the Apple product for which the Software and Equipment is being used. This required level of support is independent of, and unaffected by, the quantity of Equipment ordered, or to be ordered, by Authorized Purchasers.

    6. In addition to installation support, make site visits to Authorized Purchasers that are utilizing Supplier-furnished Equipment, a minimum of once per annum. The intent of such visits is to evaluate Equipment performance and Authorized Purchaser maintenance programs as well

*Apple Confidential*

Apple-GTAT MEPA
#C56-13-02494

as to provide operator training (or refresher courses) to Authorized Purchaser staff members. Supplier will report all findings to Apple.

7. Supplier will provide onsite equipment tuning, adjustment, and troubleshooting in the event of any Software or Equipment malfunctions.

8. Provide field service support 24 hours per day and 7 days per week during a period of 5 months beginning on a date of the Authorized Purchaser's choosing (and not necessarily immediately after installation).

9. Apple periodically moves Equipment between sites. If Apple or an Authorized Purchaser decides to move Equipment, Apple may request the Supplier's assistance in decommissioning and packaging the Equipment for transportation. Supplier will not be responsible for arranging transportation. Supplier will be responsible for and will assist in the re-installation of the equipment at the new site for up to two moves per year, per piece of Equipment.

10. During the Warranty Period, Supplier will maintain a dedicated inventory of spare parts and components for the Equipment. Supplier will deliver spare parts and components to Product sites within 24 hours of the initial service request. This inventory will serve to minimize Product downtime due to component breakage (of those components known to wear out or break) and other critical components.

11. During the Warranty Period, Supplier will provide Supplier personnel to repair the Product within 2 hours of the initial request (7 days/week). In the event of a critical "machine down" situation after the Warranty Period, Supplier will make a commercially reasonable effort to provide the services of a qualified field service engineer within 2 hours (7 days/week) of contact from Apple or Authorized Purchaser.

12. During the Warranty Period, Supplier will, free of charge, participate in a quality review at Authorized Purchaser's locations where the Product is in use, once per year. The intent of such visits is to participate in a quality review and evaluate Product performance and Authorized Purchaser's maintenance programs.

13. Upon request Supplier will provide Apple with advance notification of Product shipments and a summary of planned versus actual shipments against the Delivery Schedule set forth above.

14. During the Warranty Period, Supplier will promptly provide and install Software bug fixes, updates, revisions, error corrections, and other upgrades at no charge to Authorized Purchasers.

15. During the Warranty Period, Supplier will provide maintenance services at no charge to Authorized Purchasers.

*Apple Confidential*

Apple-GTAT MEPA
#C56-13-02494

### ATTACHMENT 2

#### Development Terms

1. **Scope and Standards of Work.**

   1.  During the term of the Agreement, any services conducted by the Supplier in connection with the development of new Products or other technology will be *"Development Services"* for the purpose of this Attachment 2. The Parties may describe the Development Services in a Statement of Work.

   2.  Supplier will conduct all Development Services in accordance with all applicable Apple and generally accepted standards for Development Services of the type to be performed, as may be more fully provided in the Statement of Work (the *"Applicable Standards"*). Supplier will at all times be responsible to remain current and updated as to all changes in the Applicable Standards.

   3.  Apple may request reasonable changes to any Statement of Work prior to completion. No such proposed changes, including without limitation any associated changes in the price, payment schedules, and projected completion dates, will be effective unless accepted in writing by authorized representatives of both Supplier and Apple.

   4.  Supplier warrants that its employees, agents, and approved subcontractors, if any, involved in performance of the Development Services will have the experience and expertise necessary to perform such Development Services and will at all times be bound by appropriate agreements to vest in Supplier all of their right, title and interest in any Project Work Product (as defined below), and all Intellectual Property Rights therein or thereto, that are to be property of Apple or otherwise protected pursuant to Sections 2, 3 or 4 of this Attachment 2.

   5.  Supplier represents and warrants that Supplier is not under any obligation in conflict or in any way inconsistent with the provisions of the Agreement or its provision of the Development Services. Supplier represents and warrants that Supplier's performance of the Development Services and the Agreement will not breach any agreement to keep in confidence proprietary information acquired by Supplier in confidence or in trust. Supplier warrants that it will not, in the performance of any Development Services or in preparing to do so, violate any applicable law or infringe or misappropriate any intellectual properties of any third party, except to the extent due directly to Supplier's following instructions given to it by Apple.

   6.  Supplier agrees to notify Apple promptly if Supplier knows or has reason to believe that the Statement of Work or any instructions from Apple would, if followed by Supplier, violate any applicable law or infringe or misappropriate any intellectual properties of any third party or be inconsistent with the Applicable Standards.

   7.  Supplier agrees that while performing the Development Services for Apple, and for 3 years following the date that Supplier ceases to perform the Development Services for Apple, it will not to the best of its knowledge, after conducting reasonable due diligence, perform the same or similar Development Services in the Consumer Electronic Products Field for any other person or party, nor will Supplier assist, enable or in any way facilitate any other person or party in its provision of the same or similar Development Services for any other person or party. *"Consumer Electronic Products"* means personal computers (portable and

*Apple Confidential*

desktop); tablet or slate style computing devices; handheld electronic and/or communication devices (e.g., smartphones, digital music players, multi-function devices, etc.); any device whose function includes the creation, storage, or consumption of digital media; any component or sub-component in any Consumer Electronic Product; and any accessory that is the same or similar (in Apple's sole discretion) to an accessory made or sold by or on behalf of Apple (regardless of when Apple sold or started to sell such accessory, including after the date of the Agreement) that is suitable for use with any Consumer Electronic Product. *"Consumer Electronic Products Field"* means the design, modification, enhancement, manufacture, marketing, offering for sale, maintenance, repair and support of technologies, goods and services suitable for use in Consumer Electronics Products.

2. Apple Project Materials.

    1. Apple may provide items and materials, as specified in an SOW (the *"Project Materials"*). Supplier agrees that all such Project Materials will be and remain the sole and exclusive property of Apple. Project Materials provided by Apple will be used by Supplier only for the purpose described in the Statement of Work and will not be transferred to any third party without first obtaining written authorization from Apple in each instance. Upon completion of the Development Services, any unused Project Materials will be returned to Apple or destroyed at the sole discretion of Apple.

    2. Supplier agrees that it will not, without Apple's express prior written authorization in each instance, analyze, disassemble, decompile, or otherwise reverse engineer any Project Materials, except to the extent the Statement of Work explicitly directs Supplier to do so.

3. **Communication, Visits, Results, and Reports.**

    1. All results, reports, findings, conclusions, work papers, notebooks, electronic records, samples, prototypes, deliverables, and any other information or materials in any form or format arising out of performance of the Development Services or for Supplier except Supplier Background Technology (defined below) (the *"Project Work Product"*) will be the sole property of Apple and will become part of the Confidential Information to be protected under the Agreement. *"Supplier Background Technology"* means Supplier's inventions, data, improvements, discoveries, ideas, processes, methodologies, formulas, techniques, works of authorship, trade secrets and know-how, whether patentable or not, conceived, reduced to practice, authored, or otherwise created or developed by or for Supplier either (i) prior to the date of the Agreement or (ii) subsequent to the date of the Agreement if conceived, reduced to practice, authored, or otherwise created or developed by Supplier separately and independently of its provision of any Development Services, and all Intellectual Property Rights therein or thereto. Supplier Background Technology is and will be owned by Supplier and is not being transferred or assigned to Apple under the Agreement.

    2. Supplier will retain and preserve all Project Work Product in accordance with the Applicable Standards and as set forth in the Statement of Work. No Project Work Product will be destroyed or otherwise disposed of by Supplier without authorization in writing in advance from Apple in each instance. Supplier will, upon Apple's request from time to time, promptly deliver any and all Project Work Product and any work-in-process to Apple.

    3. Supplier will provide Apple with a written monthly report summarizing the progress of the Development Services and any new Project Work Product developed since the last written report. In addition, Supplier will prepare and provide one or more draft and final report(s) at

the intervals, and upon completion of the Development Services, as more fully described in the Statement of Work. All reports will be formatted and delivered to Apple in accordance with the Statement of Work.

4. Apple will be solely responsible, at its discretion in accordance with applicable law, for any reporting to appropriate government agencies any Project Work Product generated during performance of the Development Services.

5. Supplier will permit Apple's representatives to visit Supplier facilities during normal working hours and with reasonable frequency to perform quality assurance audits, observe progress of the Development Services, to discuss the Development Services with appropriate officials and other personnel of Supplier, and to inspect records and data relevant to the Development Services. Facility visits will also be permitted during the data retention period specified in the Statement of Work.

4. **Intellectual Properties.**

1. No right or license to Apple's Intellectual Property Rights is granted or implied as a result of the Agreement or the Development Services, except that Apple hereby grants to Supplier a limited, non-exclusive, worldwide, royalty-free license to use Apple's Intellectual Property Rights solely to the extent necessary to perform Development Services under the Agreement. The transfer or license of Project Materials or Supplier Background Technology provided herein does not constitute a public disclosure.

2. All right, title and interest in all Project Work Product created or developed by or for Supplier in the course of performing any Development Services or otherwise arising therefrom, and all Intellectual Property Rights therein or thereto, will be the property of Apple, and Supplier hereby transfers and assigns the same to Apple. Supplier will communicate to Apple any of the same promptly and fully upon its creation or development. Supplier will execute all papers and take all actions that Apple reasonably deems necessary or advisable for the filing and prosecution of patent applications or copyright or other registrations and, if appropriate, maintenance of patents or other rights or properties that may issue therefrom, including without limitation execution of any assignments or other agreements further evidencing Apple's ownership of Project Work Product and all Intellectual Property Rights therein or thereto. Inventorship will be determined under principles of U.S. patent law and practice.

3. Except as set forth in an SOW, or as otherwise documented in writing and provided to Apple prior to performing any Development Services, Supplier represents and warrants that all Intellectual Property Rights not owned by Supplier and that are necessary for Apple's use or exploitation of the Project Work Product are the subject of valid license or other agreements that grant to Supplier all necessary rights to sublicense or otherwise permit Apple's use or exploitation of the Project Work Product, including in Apple products. If any Intellectual Property Rights that are owned or controlled by Supplier are required for any use or exploitation by Apple of the Project Work Product, Supplier hereby grants to Apple a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license under such Supplier Intellectual Property Rights to make, have made, use, sell, offer for sale and import Apple products.

*Apple Confidential*

Apple-GTAT MEPA
#C56-13-02494

## ATTACHMENT 3

### General Terms and Conditions

1. **Press Releases and Publicity.** Neither Apple nor Supplier will issue press releases or other publicity regarding the Agreement or its subject matter without the prior written approval of the other.

2. **Compliance with Laws.** Supplier agrees that it will fully comply with all applicable laws and regulations in performing its obligations under the Agreement. Supplier agrees that it will not export, re-export, sell, resell or transfer any customer data or any export-controlled commodity, technical data or software (i) in violation of any law, regulation, order, policy or other limitation imposed by the United States (including the United States Export Administration regulations) or any other government authority with jurisdiction; or (ii) to any country for which an export license or other governmental approval is required at the time of export, without first obtaining all necessary licenses or equivalent.

3. **Right to Offset.** Apple may, from time to time, set-off any debt Apple owes Supplier (regardless when payment is due) and recoup any amounts credited or paid to Supplier against any debt, credit or other obligation or liability payable by Supplier to Apple (regardless whether such debt, credit or other obligation or liability arose out of or relates to this Agreement). Apple must give Supplier notice at least three business days before any such set-off or recoupment. Supplier agrees that notice given will be effective even if a receiver, custodian, trustee, examiner, liquidator or similar official has been appointed for Supplier or any substantial portion of its assets. As used in this Section, the terms "Apple" and "Supplier" include, in addition to the definition of these terms above, any Related Entities. The rights described in this Section are in addition to any other rights and remedies available under this Agreement or applicable law, including the right to deduct damages from the price payable to Supplier.

4. **Supplier Code of Conduct.** Apple is committed to ensuring that working conditions in Apple's supply chain are safe, that workers are treated with respect and dignity, and that manufacturing processes are environmentally responsible. To this end, Apple has developed the Apple Supplier Code of Conduct ("Supplier Code of Conduct"), a copy of which is available upon request and at http://www.apple.com/supplierresponsibility/. Supplier acknowledges the Supplier Code of Conduct and agrees to comply with, and implement, its requirements, as reasonably amended from time-to-time by Apple. Notwithstanding anything to the contrary in the Agreement, Supplier agrees to: (i) allow Apple or a third party auditor appointed by Apple, who has signed a confidentiality or nondisclosure agreement, to visit and inspect Supplier's facilities, review Supplier's relevant records, and interview Supplier's personnel, without disruption or monitoring, to confirm Supplier's compliance with the Supplier Code of Conduct; (ii) provide access to Supplier's applicable records, facilities, and personnel in connection with such visit and inspection; (iii) allow Apple or the auditor to review working conditions, remuneration, on-site living conditions, and environmental practices, as appropriate; (iv) not request or encourage, directly or indirectly, any Supplier personnel to furnish false or incomplete information in connection with any visit or inspection; (v) not take retaliatory action against any Supplier personnel interviewed; and (vi) immediately implement corrective action to remedy any material non-conformance with the Supplier Code of Conduct. Notwithstanding any provision in this Agreement or any other agreement between Apple and Supplier, Supplier agrees to hold the results of any such review, audit, or inspection of any of its facilities, including any findings of non-compliance, in the strictest confidence and such results will be deemed to be Apple Confidential Information and not the Confidential Information of Supplier. Supplier's failure to remedy any material violation of the Supplier Code of Conduct after a reasonable amount of time will be deemed to be a material breach of the Agreement.

5. **Insurance and Loss Prevention.**

                    *Apple Confidential*

Apple-GTAT MEPA
#C56-13-02494

1.  Supplier will, at no cost to Apple or any other Authorized Purchaser, maintain the following minimum insurance in full force and effect throughout the term of the Agreement: (i) commercial general liability, including premises/products/completed operations and personal injury coverage, with coverage of not less than $1,000,000 USD combined single limit per occurrence and $2,000,000 USD annual aggregate; (ii) umbrella liability, including products/completed operations, with limits of not less than $5,000,000 USD each occurrence; (iii) automobile liability with limits of not less than $1,000,000 USD each accident, bodily injury and property damage combined; (iv) workers' compensation and employer's liability in compliance with all statutory regulations in any state or country where any of the Products are provided, manufactured or delivered; (v) electronics errors and omissions coverage that covers claims arising out of design specifications provided by Supplier; and (vi) property insurance, all-risk, subject to standard exclusions that covers Apple property while in Supplier's care, custody or control.

2.  All insurance coverage that Supplier is obligated to carry pursuant to this Section will (i) (excepting workers' compensation and employer's liability) name Apple, and any other party which Apple may reasonably designate, as an additional insured; and (ii) provide a 30-day notice period for cancellation or reduction in coverage or limits.

3.  Supplier will deliver to Apple's Procurement Department (1 Infinite Loop, M/S 35-PO, Cupertino, California 95014) one or more certificates of insurance showing evidence of the coverage required above. Supplier agrees to comply with the insurance and loss prevention requirements set forth in the document(s), if any, referenced in the Apple Requirements Document. Apple reserves the right to perform risk evaluations of Supplier's facilities and Supplier agrees to work with Apple to upgrade any facility that does not comply with such requirements.

6.  **Relationship of Parties.** Nothing in the Agreement creates a joint venture, partnership, franchise, employment or agency relationship or fiduciary duty of any kind. Neither Party will have the power, and will not hold itself out as having the power, to act for or in the name of or to bind the other Party. Except as expressly provided, the Agreement is not for the benefit of any third parties.

7.  **Assignment.** Supplier will not assign, delegate or transfer this Agreement, any Purchase Order, any SOW, or any of its rights or obligations thereunder (whether voluntarily, by operation of law, or otherwise) without Apple's prior written consent. Any attempted assignment, transfer, subcontracting or other delegation without such consent will be void and will constitute a breach of this Agreement. For purposes of this Section, a Change of Control will be considered an assignment of this Agreement. "Change of Control" means (i) any sale or exchange of the capital stock by the shareholders of the Supplier in one transaction or series of related transactions where more than 50% of the outstanding voting power of the Supplier is acquired by a person or entity or group of related persons or entities; (ii) any reorganization, consolidation or merger of the Supplier where the outstanding voting securities of the Supplier immediately before the transaction represent or are converted into less than fifty percent 50% of the outstanding voting power of the surviving entity (or its parent corporation) immediately after the transaction; or (iii) the consummation of any transaction or series of related transactions that results in the sale of all or substantially all of the assets of the Supplier, other than where the entity acquiring shares or assets, or the surviving entity with respect to clause (ii) above, is an affiliate of Supplier and for the purposes of this provision an affiliate is an entity that, directly or indirectly, controls is controlled by or is under common control with Supplier. The Agreement will be binding upon, and inure to the benefit of, the successors, representatives, and administrators of the parties.

*Apple Confidential*

Apple-GTAT MEPA
#C56-13-02494

8. **No Waiver.**  No delay or failure to act in the event of a breach of the Agreement will be deemed a waiver of that or any subsequent breach of any provision of the Agreement.  Any remedies at law or equity not specifically disclaimed or modified by the Agreement remain available to both Parties.

9. **Governing Law.** The Agreement and the rights and obligations of the Parties will be governed by and construed and enforced in accordance with the laws of the State of California as applied to agreements entered into and to be performed entirely within California between California residents, without regard to conflicts of law principles.  The Parties expressly agree that the provisions of the United Nations Convention on Contracts for the International Sale of Goods will not apply to the Agreement or to their relationship.

10. **Binding Arbitration.**  Disputes arising under, or in connection with, this Agreement will be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one arbitrator appointed in accordance with the Rules.  The language of the arbitration will be English. The place of the arbitration will be San Francisco, CA.  Judgment upon any award(s) rendered by the arbitrator may be entered in any court having jurisdiction thereof.

11. **Equitable Relief.** Notwithstanding the requirements of Section 10, above, either party may seek equitable relief in order to protect its rights, and to cause the other party to perform its obligations, hereunder at any time and in any court having jurisdiction over the parties hereto and/or the subject matter hereof.  The parties hereby waive any bond requirements for obtaining equitable relief.  Without limitation of the foregoing, the confidentiality provisions of the Agreement will be enforceable under the provisions of the California Uniform Trade Secrets Act, California Civil Code Section 3426, as amended.

12. **Attorneys' Fees.**  If any action or proceeding, whether regulatory, administrative, at law or in equity is commenced or instituted to enforce or interpret any of the terms or provisions of this Agreement (excluding any mediation required under this Agreement), the prevailing Party in any such action or proceeding will be entitled to recover its reasonable attorneys' fees, expert witness fees, costs of suit and expenses, in addition to any other relief to which such prevailing Party may be entitled.  As used herein, "prevailing Party" includes without limitation, a Party who dismisses an action for recovery hereunder in exchange for payment of the sums allegedly due, performance of covenants allegedly breached, or consideration substantially equal to the relief sought in the action.

13. **Notices.**  Any notice required or permitted hereunder will be in writing, and will be given to the appropriate Party at the address first set forth above, or at such other address as the Party may hereafter specify in writing.  Any notices to Apple will be sent to the attention of Apple's Corporate Procurement Department.  Such notice will be deemed given: upon personal delivery to the appropriate address; or three (3) business days after the date of mailing if sent by certified or registered mail; or one (1) business day after the date of deposit with a commercial courier service offering next business day service with confirmation of delivery.

14. **Construction.**  The section headings in the Agreement are for convenience only and are not to be considered in construing or interpreting the Agreement.  References to sections, schedules, SOWs, and Purchase Orders are references to sections of, and SOWs, schedules and Purchase Orders to, the Agreement, and the word "herein" and words of similar meaning refer to the Agreement in its entirety and not to any particular section or provision.  The word "Party" means a party to the Agreement and the phrase "third party" means any person, partnership, corporation or other entity not a party to the Agreement.  The words "will" and "will" are used in a mandatory, not a permissive, sense, and the word "including" is intended to be exemplary, not exhaustive, and will be deemed followed by "without limitation."  Any requirement to obtain a Party's consent is a requirement to obtain such consent in each instance.

*Apple Confidential*

Apple-GTAT MEPA
#C56-13-02494

15. **Severability.** If a court of competent jurisdiction finds any provision of the Agreement unlawful or unenforceable, that provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of the Agreement will continue in full force and effect.

16. **Counterparts.** The Agreement may be executed in one or more counterparts, each of which will be deemed an original, but which collectively will constitute one and the same instrument.

17. **Complete Agreement.** The Parties agree that the Agreement constitutes the complete and exclusive agreement between them superseding all contemporaneous and prior agreements (written and oral) and all other communications between them relating to its subject matter, excluding the confidentiality agreement referenced herein. Except as expressly provided herein, the Agreement may not be amended or modified except by a written amendment specifically referencing the Agreement, signed by authorized signatories of both Parties. The Parties expressly acknowledge that they have received and are in possession of a copy of any referenced item not physically attached to the Agreement and any such item will be treated as if attached.

18. **Force Majeure.** Neither Party will be liable for any failure to perform caused by circumstances beyond its reasonable control including, but not limited to, acts of God, earthquakes, hurricanes, floods, tornados, fires, acts of war, hostilities, invasions, terrorism, civil disorder, riots, labor actions (other than those of the party invoking force majeure), major upheavals, government action, government restrictions, blockade, embargo, utility disruptions, including power and water, or accident, provided: (a) it promptly notifies the other party and uses reasonable efforts to correct its failure to perform; and (b) it has taken such commercially reasonable efforts to protect against and mitigate the impact of the force majeure event if such event was reasonably foreseeable or was of a kind for which such precautionary measures are customarily taken in the applicable industry. For the avoidance of doubt, any circumstance caused primarily by one or more Furnaces or any other Equipment provided by Supplier, will not constitute a Force Majeure event, and the provisions of this Section will not apply.

*Apple Confidential*

TAb 9

APPLE CONFIDENTIAL
#C56-13-03455

## EQUIPMENT LEASE

This Equipment Lease #C56-13-03455 ("Lease") is made and effective this 31st day of October, 2013, by and between GT Advanced Equipment Holding LLC ("Lessor"), a Delaware limited liability company with offices at 243 Daniel Webster Highway, Merrimack, New Hampshire, and Apple Inc. ("Lessee"), a California corporation having its principal place of business at 1 Infinite Loop, Cupertino, California 95014, United States, with reference to the following facts:

A. Lessor owns or will own components (the "Furnace Components") necessary for the manufacture of 2,036 sapphire growing furnaces (the "Mesa Furnaces") and related processing and manufacturing equipment (the Furnace Components, Mesa Furnaces and related processing and manufacturing equipment, the "Equipment").

B. Lessor and GTAT Corporation ("GTAT"), a Delaware corporation with offices at 20 Trafalgar Square, Nashua, NH 03063, have entered into that certain Equipment Lease dated as of the date hereof (the "GTAT Lease") pursuant to which GTAT rents the Equipment from Lessor.

C. Apple and GTAT are parties to a Master Development and Supply Agreement, #C56-13-02947, effective October 31, 2013 (such agreement, as the same may be amended, modified and supplemented from time to time, the "MDSA") and a Statement of Work to MDSA (such statement of work, as the same may be amended, modified and supplemented from time to time, the "SOW"). Lessee and GTAT are party to that certain Prepayment Agreement, dated as of the date hereof (the "Prepayment Agreement").

D. Lessor desires to lease to Lessee and Lessee desires to rent from Lessor the Equipment by the terms and conditions contained herein.

THEREFORE, for valuable consideration, the parties hereto agree as follows:

1. **Lease and Lease Period.**

   a. Lessor leases to Lessee and Lessee rents from Lessor the Equipment.

   b. The Lease shall commence on the date of the purchase of the Equipment (or any portion thereof) by Lessor, and continue on a month-to-month basis until the earlier of (a) terminated by Lessee, (b) the Equipment ceases to be property of Lessor, or (c) expiration or termination of the SOW and the MDSA by their terms and the cessation of supply by GTAT to Lessee thereunder, provided that the SOW has not been terminated by Lessee for Cause (as defined in the SOW) and no Trigger Event (as defined in the Prepayment Agreement) has occurred and is continuing (the "Term").

   c. Notwithstanding commencement of the Term, Lessor shall not give possession, and Lessee may not take possession or make use, of the Equipment unless and until the GTAT

APPLE CONFIDENTIAL
#C56-13-03455

Lease is terminated pursuant to Sections 1.b.(ii) or 1.b.(iii) thereof. During the portion of the Term that Lessee does not have possession of the Equipment, Lessor waives performance or payment (as applicable) of any and all obligations of Lessee under this Lease, and Lessee waives performance of Lessor's obligations under section 7 below.

     d.     In the event that Lessee takes possession of the Equipment pursuant to Section 1.c above, the rent owed by Lessee to Lessor ("Rent") shall be equal to $50 per month, payable quarterly in arrears on the first business day of the subsequent calendar quarter, subject to proration for any partial month.

## 2.  Ownership and Taxes.

     a.     The Equipment shall at all times remain the property of Lessor.

     b.     Lessee will at all times protect and defend, at its own cost and expense, the ownership of Lessor against all claims, liens, encumbrances, levies and legal processes of creditors of Lessee and other persons, and keep the Equipment free and clear from all such claims, liens, encumbrances, levies and processes.

     c.     Lessee shall pay, when due, all charges and taxes local, state, and federal, which may now or hereafter be imposed upon the ownership, leasing, rental, sale, purchase, possession, or use of the Equipment.

## 3.  Use and Maintenance.

     a.     Lessee at its expense, during the Term, shall: (i) properly maintain the Equipment and use it in a careful manner, (ii) comply with government statutes, ordinances, regulations, and all laws relating to its installation, possession, use or maintenance and obtain all permits and licenses, and (iii) keep the Equipment in good repair and furnish all parts, mechanisms and devices required therefor. Lessee shall be liable for all costs and losses to Lessor arising out of Lessee's failure to maintain the Equipment in good condition or make such repairs or replace such parts as may be necessary to maintain the Equipment in good condition.

     b.     Lessee shall bear the entire risk of loss, theft, damage or destruction of the Equipment from any cause whatsoever, during the Term. No loss, theft, damage or destruction of the Equipment or delay, deficiency or absence of insurance proceeds, and no unavailability, delay or failure of supplies, parts, mechanisms, devices or services for the Equipment or failure of the Equipment to function for any cause shall relieve Lessee of the obligation to pay Rent or of any other obligation hereunder.

     c.     In the event of damage to any item of Equipment, Lessee shall immediately place the same in good repair.

APPLE CONFIDENTIAL
#C56-13-03455

4. **Insurance.**

    a.    Lessee shall, during the Term, purchase and maintain insurance covering loss, theft, damage or destruction of the Equipment in an amount equal to the cost of replacement of all Equipment and with a suitably financially rated and reputable insurance company. The proceeds under this insurance shall be payable loss to Lessor under the terms and provisions of Lessor's Loss Payable Endorsement, in a form acceptable to Lessor. Lessee shall be named as additional insured and loss payee.

    b.    Upon the signing of this Lease, Lessee shall instruct its insurance agent, broker or company to confirm to Lessor in writing that the necessary insurance has been bound, and inform Lessor of the name of the insurance company binding this insurance, the amount of insurance and the full description of the coverage; and, within thirty (30) days after the date of this Lease, forward to Lessor a copy of the endorsement naming Lessor as additional insured and loss payee. Lessor may apply the proceeds of said insurance to replace or repair the equipment and/or to satisfy Lessee's obligation hereunder.

5. **Assignment.**

    a.    Without Lessor's prior written consent, Lessee shall not (i) assign, transfer, pledge, hypothecate or otherwise dispose of this Lease or any interest therein, or (ii) sublease or loan the Equipment or permit it to be used by anyone other than Lessee or Lessee's qualified employees or agents.

    b.    Subject to the foregoing, this Lease inures to the benefit of and is binding upon the successors and assigns of the parties hereto.

6. **General Indemnity**

    Lessee shall indemnify Lessor against, and hold Lessor harmless from, any and all claims, actions, proceedings, expenses, damages or liabilities, including attorneys' fees, arising in connection with the Equipment, including, without limitation, its manufacture, selection, purchase, delivery, possession, use, operation or return and the recovery of claims under insurance policies thereon.

7. **Assignment of Manufacturers' Warranties, etc.**

    a.    Lessor hereby assigns, transfers and conveys to Lessee all of Lessor's right, title and interest, if any, in and to all claims now or hereafter arising in respect of the Equipment against any manufacturer, vendor or supplier thereof, including all claims from time to time arising under any warranty or indemnity provision of any contract with any such manufacturer, vendor or supplier relating to the manufacture or sale of the Equipment; provided that the foregoing assignment shall terminate upon the end of the Term

    b.    Lessor hereby agrees to do all such acts and things, including the giving of any required notices to manufacturers, vendors or suppliers, as may be reasonably requested by the

APPLE CONFIDENTIAL
#C56-13-03455

Lessee, in order to give effect to the foregoing assignment, transfer and conveyance to Lessee.

8.  **Governing Law.**

    This Lease is made in and shall be governed by and construed in accordance with the laws of the State of California as applied to contracts entered into in 2013.

9.  **Miscellaneous.**

    a.   This Lease constitutes the entire agreement between Lessor and Lessee with respect to the subject matter hereof.

    b.   The Lease shall not be amended, altered or changed except by written agreement signed by the parties hereto.

    c.   Without limitation on the effect of section 1(c) above, waiver by Lessor of any provision hereof in one instance shall not constitute a waiver as to any other instance.

[SIGNATURE PAGE FOLLOWS]

APPLE CONFIDENTIAL
#C56-13-03455

The parties hereto have executed this Lease effective as of the date first stated above.

GT ADVANCED EQUPMENT HOLDING LLC

By: _____

Title: _____

APPLE INC.

By _____

Title:

Vice President

10 / 31 / 2013

-5-

TAB 10

#C56-13-03388

## Intellectual Property Agreement

### Between Apple and GTAT

This Intellectual Property Agreement #C56-13-03388 (this "*IPA*") is entered into by and among Apple Inc. a California corporation having its principal place of business at 1 Infinite Loop, Cupertino, California 95014, United States ("*Apple*"), GTAT Corporation, a company organized under the laws of Delaware, having its principal place of business at 243 Daniel Webster Highway, Merrimack, NH 03054 ("*GTAT Corporation*") and the undersigned subsidiary companies of GTAT Corporation (each, a "*GTAT Company*" and collectively, the "*GTAT Companies*"), effective as of October 31, 2013, (the "*Effective Date*").

### Background and Purpose

Concurrently with the execution of this IPA, Apple and GTAT Corporation are entering into (i) a Master Development and Supply Agreement, #C56-13-02947, effective October 31, 2013 (the "*MDSA*"), (ii) a Statement of Work, #C56-13-02947, effective October 31, 2013 (the "*SOW*"), (iii) a Prepayment Agreement, and (iv) the rest of the Collateral Agreements (as such term is defined in the SOW);

Apple, GTAT Corporation and the GTAT Companies desire to enter into this IPA to ensure that Apple receives the benefit of any transfer, assignment, license, covenant not to sue or other grant of rights to Apple regardless of whether such rights are owned or controlled by GTAT Corporation or any of the GTAT Companies; and

Apple would not be willing to enter into the Collateral Agreements or the SOW if GTAT Corporation and the GTAT Companies did not execute this IPA.

### Agreement

The terms and conditions of the MDSA and SOW, and any exhibits and attachments thereto are incorporated herein by reference. Capitalized terms used herein, but not defined in this IPA will have the meanings set forth in the SOW, and if not defined in the SOW, then the meanings set forth in the MDSA.

1.    **Project Work Product**

1.1.    The GTAT Companies hereby agree to be bound by all provisions of the MDSA and SOW related to the Project Work Product, including Section 4.2 of Attachment 2 to the MDSA, which provides that:

"[a]ll right, title and interest in all Project Work Product, and all Intellectual Property Rights therein or thereto, is solely owned by Apple, and GTAT hereby transfers and assigns all of GTAT's right, title and interest in all Project Work Product and all Intellectual Property Rights therein or thereto, to Apple. GTAT will communicate to Apple any of the same promptly and fully upon its creation or development. GTAT will execute all papers and take all actions that Apple reasonably deems necessary or advisable for the filing and prosecution of patent applications or copyright or other registrations and, if appropriate, maintenance of patents or other rights or properties that may issue therefrom, including without limitation execution of any assignments or other agreements further evidencing, perfecting, or recording Apple's ownership of Project Work Product and all Intellectual Property Rights therein or thereto. Inventorship will be determined under principles of U.S. patent law and practice."

#C56-13-03388

1.2.    Specifically, if any Project Work Product is created by or for any of the GTAT Companies, separately or jointly with Apple or a third party, then all right, title and interest in such Project Work Product, and all Intellectual Property Rights therein or thereto, is solely owned by Apple, and the applicable GTAT Companies hereby transfer and assign all of their rights, title and interest in all Project Work Product and all Intellectual Property Rights therein or thereto, to Apple.

## 2.    Intellectual Property

2.1.    The GTAT Companies agree to be bound by all of: (a) Section 9 of the SOW, (b) Section 10 of the SOW (including any representations, warranties, covenants, licenses or grants of other rights) and (c) Section 13.2 of the SOW.

2.2.    Specifically, if, pursuant to the MDSA, the SOW or the Prepayment Agreement, GTAT Corporation has agreed to transfer, assign, license, covenant not to sue, or otherwise grant rights to Apple in any Technology or Intellectual Property Rights and such Technology or Intellectual Property Rights are held by one or more of the GTAT Companies, then such GTAT Companies hereby, as applicable, transfer, assign, license, covenant not to sue, or otherwise grant such rights to Apple.

2.3.    For the avoidance of doubt, any and all license grants, conditional license grants, covenants not to sue, or other rights granted to Apple in or to any Intellectual Property Rights of GTAT Corporation and Related Entities in the MDSA, the SOW and the Prepayment Agreement are intended to, and hereby do, extend to all such Intellectual Property Rights owned, held or controlled by the GTAT Companies, and each of them, equally and to the same scope and extent as set forth in the MDSA, SOW and Prepayment Agreement.

## 3.    Consideration

Apple's contribution to the Development Services, if any, Apple's investment in the Mesa Facility and Apple's payments to GTAT Corporation under the terms of the Prepayment Agreement, comprise the total consideration paid to GTAT Corporation, parent of the GTAT Companies, for the rights granted in this IPA and no additional payment will be made to GTAT Corporation, the GTAT Companies or any other party by Apple. The GTAT Companies acknowledge and agree that the terms, conditions, covenants and promises in the MDSA, SOW and Prepayment Agreement, constitute full and valid consideration of the GTAT Companies, and each of them, to enter into this IPA.

## 4.    Term

4.1.    Term and Termination. This IPA will commence on the Effective Date and continue until the termination or expiration of the SOW, subject to the survival provisions therein. Neither Party may terminate this IPA without written consent of the other Party.

## 5.    General Terms

5.1.    Complete Agreement. This IPA, together with the MDSA, SOW, Collateral Agreements, and other documents executed in connection with the foregoing, constitutes the entire agreement and understanding of the parties and supersedes all prior agreements and understandings relating to its subject matter.

5.2.    Execution in Counterparts. This IPA may be executed in any number of counterparts, each of which, when executed and delivered, will be deemed to be an original and which taken together will constitute one and the same agreement.

#C56-13-03388

5.3.   Precedence.  In the event of any conflicting terms, the order of precedence will be terms of (i) the Prepayment Agreement, (ii) the Pledge Agreement, (iii) this Intellectual Property Agreement, (iv) the SOW, (v) the MDSA and (vi) the Mesa Facility Lease Agreement.

5.4.   General Terms.  All General Terms and Conditions set forth in Attachment 1 of the MDSA will apply to this IPA.

*[Signature page follows]*

#C56-13-03388

Acknowledged and agreed by their duly authorized representatives.

**Apple Inc.**

By: _____

Name:  Duco Pasmooij

Title:  Vice President, Operations

Date: _____10/31/ 2013_____ .

**GTAT Corporation**
243 Daniel Webster Highway
Merrimack, NH 03054

By: _____

Name:  Hoil Kim_____

Title:  Vice President and General
Counsel

Date: _____

**GT Advanced Technologies Limited**
13/F, Tower 2, The Gateway, Harbour City
25 Canton Road, Tsimshatsui, Kowloon, Hong Kong

By: _____

Name:  Hoil Kim_____

Title:  Director_____

Date: _____

**GT Sapphire Systems Holding LLC**
243 Daniel Webster Highway
Merrimack, NH 03054

By: _____

Name:  Hoil Kim_____

Title:  Vice President and General Counsel

Date: _____

**GT Sapphire Systems Group LLC**
243 Daniel Webster Highway
Merrimack, NH 03054

By: _____

Name:  Hoil Kim_____

Title:  Vice President and General Counsel

Date: _____