Tab 11

#C56-13-03456

## CONDITIONAL ASSIGNMENT

**THIS CONDITIONAL ASSIGNMENT #C56-13-03456,** dated as of October 31, 2013 (as amended, restated, supplemented or otherwise modified from time to time, this **"Assignment"**), by **GTAT CORPORATION,** a Delaware corporation (the **"Assignor"**), in favor of **APPLE INC.,** a California corporation (the **"Assignee"**).

A.      The Assignor and GT Advanced Equipment Holding LLC, a Delaware limited liability company (**"SPE"**), have entered into that certain Loan Agreement dated as of the date hereof (as may be amended, restated, supplemented or otherwise modified from time to time, the **"Loan Agreement"**);

B.      Assignor and Assignee are parties to that certain (i) Prepayment Agreement dated October 31, 2013 (the **"Prepayment Agreement"**); (ii) Master Development and Supply Agreement, #C56-13-02947, effective October 31, 2013 (as may be amended, restated, supplemented or otherwise modified from time to time, the **"MDSA"**) and (iii) Statement of Work to MDSA, effective as of October 31, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the **"SOW"**). Any terms used herein which are not defined herein shall have the meaning ascribed to such terms in the Prepayment Agreement; and

C.      To further induce Assignee to enter into the Prepayment Agreement, SOW and MDSA, Assignor hereby grants to Assignee a present assignment of all of Assignor's rights in, to and under the Loan Agreement, as security for the payment and performance of all present and future Obligations of Assignor to Assignee under the Prepayment Agreement, SOW and MDSA. The word **"Obligations"** is used herein with respect to Assignor in its most comprehensive sense and includes any and all debts, obligations and liabilities including, without limitation, the obligation to pay damages (if any) to Assignee relating to the Prepayment Agreement, SOW or MDSA, or any of them, heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, under the agreements, instruments and documents described in the preceding sentence.

**NOW, THEREFORE,** in consideration of the recitals herein set forth and incorporated herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor agrees as follows:

1.      **Conditional Assignment.** Assignor hereby transfers and assigns to Assignee, all of Assignor's right, title, and interest (but not its obligations) in, to and under the Loan Agreement, including, without limitation, all rights of Assignor to exercise any rights or remedies under the Loan Agreement; effective upon the occurrence of any of the following conditions: (i) a Trigger Event under the Prepayment Agreement (as such term is defined therein); (ii) Assignor's receipt of notice of a material breach of or under the SOW or MDSA; or (iii) an Event of Default under the Loan Agreement (as such term is defined therein).

2.      **Representations and Agreements of Assignor.**      Assignor warrants and represents and agrees as follows as of the date hereof:

#C56-13-03456

    (a)    It has the full right and authority to enter into this Assignment and to assign its rights in, to and under the Loan Agreement;

    (b)    It has not heretofore made any assignment, pledge, alienation, or other transfer of any of its rights in, to or under the Loan Agreement;

    (c)    The Loan Agreement is in full force and effect without amendment or modification and Assignor is not in default of its obligations thereunder; and

    (d)    So long as this Assignment has not been terminated in accordance with Section 6 below, (1) Assignor shall not amend, modify, supplement or waive any term or condition of the Loan Agreement without obtaining the prior written consent of Assignee, and (2) Assignor cannot and shall not assign any of its rights in, to or under the Loan Agreement to any party other than Assignee without obtaining the prior written consent of Assignee.

3.    **Remedies.**  Upon the occurrence of any of the conditions set forth in Section 1, Assignee at its option may (but shall not be obligated to) exercise or enforce any rights and remedies under the Loan Agreement.

4.    **Further Assurances.**  Each party to this Assignment shall execute and deliver to each other party all documents, and shall take all actions, reasonably required by such other party from time to time to confirm or effect the matters set forth in this Assignment, or otherwise to carry out the purposes of this Assignment. Without limiting the foregoing, Assignor hereby authorizes Assignee to file UCC financing statements with respect to the transactions contemplated hereby, together with any amendments relating thereto; provided that Assignor shall be given reasonable opportunity to review such UCC financing statements prior to filing (and any amendments or modifications thereto).

5.    **Transfer and Assignment Absolute.**  To the extent permitted by applicable law, all acts and obligations of Assignor hereunder shall be absolute and unconditional irrespective of:

    (a)    any lack of validity or enforceability of the Obligations or any other agreement or instrument relating thereto;

    (b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the Obligations or any agreement or instrument relating thereto; or

    (c)    any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Obligations.

6.    **Termination.**  Upon all of: (i) the indefeasible payment in full of the Obligations, (ii) termination of all of Assignor's obligations under the Prepayment Agreement, and (iii) termination or expiration of all of Assignor's material obligations to supply goods under the MDSA and SOW, this Assignment shall automatically terminate and be void and of no further force or effect. Upon any such termination, Assignee will execute and deliver to Assignor such

documents as Assignor may reasonably request to evidence such termination, all at the sole cost and expense of Assignor.

7.    **Condition Precedent to Effectiveness.**  This Assignment shall be effective upon (i) receipt by Assignee of this Assignment executed by Assignor and (ii) the Prepayment Agreement becoming effective as provided therein.

8.    **Governing Law.**  This Assignment shall be governed by and construed in accordance with the laws of the State of California without giving effect to any conflict of laws principles to the contrary. The parties hereby consent to jurisdiction and venue in the appropriate state and Federal courts sitting in the Northern District of California in any litigation between them arising out of this Assignment. If any provision of this Assignment is held to be invalid or unenforceable to any extent in any context, it shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Assignment shall not be affected thereby.

9.    **Jurisdiction.**  In the event of a dispute, either party may commence litigation in the state or federal courts in Santa Clara County, California. The parties irrevocably submit to the exclusive jurisdiction of those courts and agree that final judgment in any action or proceeding brought in such courts will be conclusive and may be enforced in any other jurisdiction upon final and conclusive judgment (a certified copy of which will be conclusive evidence of the judgment) or in any other manner provided by law. Each party irrevocably waives to the fullest extent permitted by applicable law (i) any objection it may have to the laying of venue in any court referred to above; (ii) any claim that any such action or proceeding has been brought in an inconvenient forum; and (iii) any immunity that it or its assets may have from any suit, execution, attachment (whether provisional or final, in aid of execution, before judgment or otherwise) or other legal process.

10.    **Severability.**  No provision of this Assignment that is held to be inoperative, unenforceable or invalid shall affect the remaining provisions, and to this end all provisions of this Assignment shall be severable.

11.    **Notices.**  Any notice or demand desired or required to be given hereunder shall be provided as set forth in the "Notices" provision in the MDSA.

12.    **Miscellaneous:**

(a)    Section headings in this Assignment are inserted for convenience of reference only and shall not constitute a part hereof.

(b)    This Assignment may be executed in several counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same agreement. Executed copies of the signature pages of this Assignment sent by facsimile or transmitted electronically in either Tagged Image Format Files (**"TIFF"**), Portable Document Format (**"PDF"**), or any similar format, shall be treated as originals, fully binding and with full legal force and effect, and the parties waive any rights they may have to object to such treatment. Any party delivering an executed counterpart of this Assignment by facsimile or transmitted electronically in TIFF, PDF or similar format, also shall deliver a manually executed counterpart

of this Assignment but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability, and binding effect of this Assignment.

(c)    This Assignment may not be amended, supplemented, or otherwise modified except in writing signed by the Assignee and Assignor.

(d)    Any provision of this Assignment that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Assignment in such jurisdiction or affecting the validity or enforceability of any provision in any other jurisdiction.

[Signature page follows]

#C56-13-03456

 **IN WITNESS WHEREOF,** Assignor has caused this Assignment to be duly signed and delivered as of the day and year first above written.

**GTAT CORPORATION**, as Assignor

By:_____
Name:
Its:

Acknowledged and agreed by:

**GT ADVANCED EQUIPMENT HOLDING LLC**

By:_____
Name:
Its:

39223143_2

TAB 12

APPLE CONFIDENTIAL
#C56-13-03453

## SECURITY AGREEMENT

This **SECURITY AGREEMENT #C56-13-03453**, dated as of October 31, 2013 (this **"Agreement"**), is entered into by and between **GTAT CORPORATION**, a Delaware corporation (the **"Grantor"**), as grantor, and **APPLE INC.,** a California corporation (together with its permitted successors and assigns, the **"Secured Party"**), as secured party.

### RECITALS:

**WHEREAS,** Grantor and Secured Party are parties to that certain (i) Prepayment Agreement dated October 31, 2013 (the "Prepayment Agreement"), (ii) Master Development and Supply Agreement, #C56-13-02947, effective October 31, 2013 (as may be amended, modified and supplemented from time to time, the "MDSA") and (iii) Statement of Work to MDSA, effective as of October 31, 2013 (as may be amended, modified and supplemented from time to time, the "SOW").

**WHEREAS,** in consideration of the extensions of credit and other accommodations of the Secured Party as set forth in the Prepayment Agreement, SOW and MDSA, the Grantor has agreed to secure the Grantor's obligations under the Prepayment Agreement, SOW and MDSA as set forth herein.

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, the Grantor and the Secured Party agree as follows:

## SECTION 1.  DEFINITIONS AND INTERPRETATION

### 1.1.  Definitions.

(a)  Terms Defined Herein. The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

**"Agreement"** as defined in the preamble hereto.

**"Collateral"** means, with respect to the Grantor, the Grantor's right, title and interest in, to and under all personal property of the Grantor whether now owned or existing or hereafter acquired or arising and wherever located, including the following: (i) Accounts; (ii) Chattel Paper; (iii) Documents; (iv) General Intangibles; (v) Goods; (vi) Instruments; (vii) Insurance; (viii) Investment Related Property, including Deposit Accounts; (ix) Letter-of-Credit Rights; (x) Money; (xi) Receivables and Receivable Records; (xii) Commercial Tort Claims; (xiii) to the extent not otherwise included above, all other personal property of any kind and all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and (xiv) to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing.  Notwithstanding the foregoing, Collateral shall not include Excluded Assets.

**"Control"** means (i) with respect to any Deposit Account, "control" within the meaning of Section 9104 of the UCC; (ii) with respect to any Securities Account, Security Entitlement, Commodity Contract or Commodity Account, "control" within the meaning of Section 9106 of

APPLE CONFIDENTIAL
#C56-13-03453

the UCC; (iii) with respect to any Uncertificated Security, "control" within the meaning of Section 8106(c) of the UCC; (iv) with respect to any Certificated Security, "control" within the meaning of Section 8106(a) or (b) of the UCC; (v) with respect to Letter-of-Credit Right, "control" within the meaning of Section 9107 of the UCC; (vi) with respect to any Electronic Chattel Paper, "control" within the meaning of Section 9105 of the UCC; and (vii) with respect to any "transferable record" (as that term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction), "control" within the meaning of Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in the jurisdiction relevant to such transferable record.

"**Excluded Assets**" means:  (i) voting equity interests in excess of 65% of the voting equity interests in any subsidiary of the Grantor that is (A) not organized in the United States of America, (B) a Person that is a controlled foreign corporation under Section 957 of the Internal Revenue Code of 1986, as amended (a "**CFC**"), (C) a subsidiary of a CFC or (D) a subsidiary that is treated as a disregarded entity for U.S. federal income tax purposes and that has no material assets other than the equity of one or more CFCs ("**Excluded Equity Interests**"); (ii) any lease, license, contract or agreement to which the Grantor or any of its subsidiaries is a party or any of its rights or interests thereunder if, to the extent and for so long as the grant of such security interest shall constitute or result in a breach of a default under, or to the extent otherwise prohibited or restricted thereby (including any requirement to obtain the consent of any governmental authority or third party), or creates an enforceable right of termination in favor of any party other than the Grantor or any of its subsidiaries to, such lease, license, contract or agreement (other than to the extent that any such term would be rendered ineffective, or is otherwise unenforceable, pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (and/or other applicable law which may render such restriction null and void and ineffective)); provided that, to the extent severable, the security interest granted hereunder shall attach immediately to any portion of such lease, license, contract or agreement that does not result in any such breach, restriction, termination or default, including any proceeds of such lease, license, contract or agreement; (iii) any governmental licenses or state or local franchises, charters and authorizations, to the extent security interests in such licenses, franchises, charters or authorizations are prohibited or restricted thereby (other than to the extent that any such term would be rendered ineffective, or is otherwise unenforceable, pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (and/or other applicable law which may render such restriction null and void and ineffective)); (iv) any asset owned by the Grantor or any of its subsidiaries that is subject to a Permitted Lien, to the extent and for so long as the grant of a Lien thereon hereunder to secure the Secured Obligations constitutes a breach of or a default under, or to the extent otherwise prohibited or restricted thereby (including any requirement to obtain the consent of any governmental authority or third party), or creates a right of termination in favor of any party (other than the Grantor or any of its subsidiaries) to, any agreement pursuant to which such Lien has been created; provided that the Security Interest shall attach immediately to any such asset (x) at the time the provision of such agreement containing such restriction ceases to be in effect and (y) to the extent any such breach, restriction or default is not rendered ineffective by, or is otherwise unenforceable pursuant to the UCC or any other applicable Law; and (v) any asset owned by any the Grantor or any of its subsidiaries if, to the extent and for so long as the grant of such security interest in such asset shall be prohibited by any applicable Law or to the extent

APPLE CONFIDENTIAL
#C56-13-03453

otherwise restricted thereby (including any requirement to obtain the consent of any governmental authority other than any filings, recordings or registrations in order to perfect such security interest) (other than to the extent that any such prohibition or restriction would be rendered ineffective pursuant to the UCC or any other applicable Law); provided that the security interest shall attach immediately to such asset at such time as such prohibition or restriction ceases to be in effect.

"**Grantor**" as defined in the preamble hereto.

"**Insurance**" means all insurance policies covering any or all of the Collateral (regardless of whether the Secured Party is the loss payee thereof).

"**Investment Accounts**" means the Securities Accounts, Commodities Accounts and Deposit Accounts.

"**Investment Related Property**" means all Investment Property (as defined in Section 1.1(b)), together with all of the following (regardless of whether classified as Investment Property): all Pledged Equity Interests, Pledged Debt, the Investment Accounts and certificates of deposit.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

"**Permitted Lien**" means any of the following:

(a)     Liens for taxes or governmental charges not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP;

(b)     (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA and (ii) Liens in respect of unearned premiums on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(c)     deposits to secure the performance of bids, trade contracts and leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(d)     Liens securing judgments for the payment of money (i) in an amount not in excess of $5,000,000 individually or (ii) otherwise covered by insurance;

(e)     All of the following types of liens granted by the Grantor in the ordinary course of its business, in an aggregate amount for this subsection not exceeding $350,000 at any time: purchase money liens, liens securing leases of equipment, and liens arising out of a conditional sale, title retention, consignment or similar arrangement for the sale of goods;

APPLE CONFIDENTIAL
#C56-13-03453

(f)   (i) leases, licenses, subleases or sublicenses granted to other Persons in the ordinary course of business (including with respect to intellectual property and software) which do not (A) interfere in any material respect with the business of the Grantor and its subsidiaries, or (B) secure any Indebtedness for borrowed money or (ii) the rights reserved or vested in any Person by the terms of any lease, license, franchise, grant or permit held by the Grantor or any of its subsidiaries or by a statutory provision, to terminate any such lease, license, franchise, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(g)   Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(h)   Liens (i) of a collection bank arising under Section 4-210 of the UCC on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business or (iii) in favor of a banking institution or securities intermediary arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(i)   any interest or title of a lessor, sublessor, licensor or sublicensor under any leases, subleases, licenses or sublicenses entered into by the Grantor or any of its subsidiaries in the ordinary course of business;

(j)   Liens deemed to exist in connection with investments in repurchase agreements;

(k)   Ground leases in respect of real property on which facilities owned or leased by the Grantor or any of its subsidiaries are located;

(l)   Liens on cash or cash equivalents to cash collateralize the letters of credit in the ordinary course of business so long as the amount of such cash collateral does not exceed 110% of the face amount of such letters of credit;

(m)   UCC financing statements (or similar filings under other applicable Law) in connection with clauses (a) through (l) and Liens arising from precautionary UCC financing statement filings (or similar filings under other applicable Law).

**"Person"** means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental authorities.

**"Pledge Agreement"** means that certain Membership Interest Pledge Agreement dated as of October 31, 2013, by the Grantor, as grantor thereunder, and SPE, in favor of the Secured Party, as grantee thereunder.

**"Pledged Debt"** means all indebtedness for borrowed money owed to the Grantor, regardless of whether evidenced by any Instrument, issued by the obligors named therein, the

APPLE CONFIDENTIAL
#C56-13-03453

instruments, if any, evidencing any of the foregoing, and all interest, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing.

"**Pledged Equity Interests**" means all Pledged Stock, Pledged LLC Interests, Pledged Partnership Interests and any other participation or interests in any equity or profits of any business entity including any trust.

"**Pledged LLC Interests**" means all interests in any limited liability company and each series thereof, and the certificates, if any, representing such limited liability company interests and any interest of the Grantor on the books and records of such limited liability company or on the books and records of any securities intermediary pertaining to such interest and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such limited liability company interests.

"**Pledged Stock**" means all equity interests owned by the Grantor, and the certificates, if any, representing such shares and any interest of the Grantor in the entries on the books of the issuer of such shares or on the books of any securities intermediary pertaining to such shares, and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares.

"**Prepayment Agreement**" as defined in the recitals hereto.

"**Receivables**" means all rights to payment, regardless of whether earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, including all such rights constituting or evidenced by any Account, Chattel Paper, Instrument, General Intangible or Investment Related Property, together with all of the Grantor's rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Receivables Records.

"**Receivables Records**" means (i) all original copies of all documents, instruments or other writings or electronic records or other Records evidencing the Receivables, (ii) all books, correspondence, credit or other files, Records, ledger sheets or cards, invoices, and other papers relating to Receivables, including all tapes, cards, computer tapes, computer discs, computer runs, record keeping systems and other papers and documents relating to the Receivables, whether in the possession or under the control of the Grantor or any computer bureau or agent from time to time acting for the Grantor or otherwise, (iii) all evidences of the filing of financing statements and the registration of other instruments in connection therewith, and amendments, supplements or other modifications thereto, notices to other creditors, secured parties or agents thereof, and certificates, acknowledgments, or other writings, including lien search reports, from filing or other registration officers, (iv) all credit information, reports and memoranda relating thereto and (v) all other written or non-written forms of information related in any way to the foregoing or any Receivable.

APPLE CONFIDENTIAL
#C56-13-03453

"**SPE Loan Agreement**" means that certain Loan Agreement dated as of October 31, 2013, by and between the Grantor and GT Advanced Equipment Holding LLC ("**SPE**").

"**Secured Obligations**" means the prompt and complete payment or performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 USC §362(a) (and any successor provision thereof)) of all of the Grantor's obligations to the Secured Party under the Prepayment Agreement, the SOW and the MDSA.

"**Secured Party**" as defined in the preamble hereto.

"**Securities**" shall mean any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Trigger Event**" as defined in the Prepayment Agreement.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of California (including any successor provisions under any subsequent version or amendment to any Division of the UCC); _provided_, in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of, or remedies with respect to, any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of California, the term "UCC" means the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions hereof relating to such perfection, priority or remedies.

(b)    UCC Definitions. In this Agreement, each of the following terms shall have the meaning assigned thereto in the UCC: "Account"; "Account Debtor"; "As-Extracted Collateral"; "Bank"; "Certificated Security"; "Chattel Paper"; "Commercial Tort Claims"; "Commodity Account"; "Commodity Contract"; "Commodity Intermediary"; "Consignee"; "Consignment"; "Consignor"; "Deposit Account"; "Document"; "Electronic Chattel Paper"; "Entitlement Order"; "Equipment"; "Farm Products"; "Fixtures"; "General Intangibles"; "Goods"; "Health Care Insurance Receivable"; "Instrument"; "Inventory"; "Investment Property"; "Letter-of-Credit Right"; "Manufactured Home"; "Money"; "Payment Intangible"; "Proceeds"; "Record"; "Securities Account"; "Securities Intermediary"; "Security Certificate"; "Security Entitlement"; "Supporting Obligations"; "Tangible Chattel Paper"; and "Uncertificated Security".

1.2.    **Interpretation.** The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."

APPLE CONFIDENTIAL
#C56-13-03453

The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections and Schedules shall be construed to refer to Sections of, and Schedules to, this Agreement, (e) any reference to any Law herein shall, unless otherwise specified, refer to such Law as amended, modified or supplemented from time to time, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Securities, accounts and contract rights.

## SECTION 2.   SECURITY FOR OBLIGATIONS.

2.1.   **Grant of Security.** As collateral security for the Secured Obligations, the Grantor hereby grants to the Secured Party a security interest in and continuing lien on all of the Grantor's right, title and interest in, to and under the Collateral.

2.2.   **Continuing Security Interest.** This Agreement (a) creates a continuing security interest in the Collateral and shall remain in full force and effect until GT Advanced Technologies Inc. issues convertible notes, or undertakes any debt or equity financing and loans the Advance Tranche (as defined in the Prepayment Agreement) to GT Advanced Equipment Holding LLC, (b) is binding upon the Grantor and its successors and assigns, and (c) inures, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party and its successors, transferees and assigns.

2.3.   **Grantor Remains Liable.** Notwithstanding anything herein to the contrary:

(a)      Grantor shall remain liable for all obligations under the Collateral and nothing contained herein is intended or shall be a delegation of duties to the Secured Party;

(b)      Grantor shall remain liable under each of the agreements included in the Collateral, including any agreements relating to Pledged Partnership Interests or Pledged LLC Interests, to perform all of the obligations undertaken by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, and the Secured Party does not have any obligation or liability under any of such agreements by reason of or arising out of this Agreement or any other document related thereto nor shall the Secured Party have any obligation to make any inquiry as to the nature or sufficiency of any payment received by it or have any obligation to take any action to collect or enforce any rights under any agreement included in the Collateral, including any agreements relating to Pledged Partnership Interests or Pledged LLC Interests; and

(c)      the exercise by the Secured Party of any of its rights hereunder shall not release the Grantor from any of its duties or obligations under any contract or agreement that is included in the Collateral.

APPLE CONFIDENTIAL
#C56-13-03453

## SECTION 3.  REPRESENTATIONS AND WARRANTIES.

In order to induce the Secured Party to enter into this Agreement, the Grantor represents and warrants to the Secured Party that the following statements are true and correct:

### 3.1.  Grantor Information, Etc.

(a)  <u>Grantor Information</u>. As of the date hereof, the Grantor is a Delaware corporation.

(b)  <u>Name Changes, Etc.</u> As of the date hereof, except as provided on Schedule 3.1, the Grantor has not changed its name, jurisdiction of organization, chief executive office or sole place of business or its corporate structure in any way (e.g., by merger, consolidation, change in corporate form or otherwise) and has not done business under any other name, in each case, within the past five (5) years.

(c)  <u>Current Locations</u>. Grantor shall deliver to Secured Party a revised Schedule 3.1 setting forth with respect to the Grantor (i) all locations where the Grantor owns or leases any real property where Collateral is kept, (ii) except for Inventory that is in transit or Equipment that is being repaired, each in the ordinary course of the Grantor's business, all locations where the Grantor keeps any Inventory and Equipment included in the Collateral, and (iii) all locations in which the Grantor maintains any books or records relating to any of the Collateral.

### 3.2.  Collateral Identification, Etc.

Grantor shall deliver to Secured Party a Schedule 3.2 setting forth with respect to the Grantor a description of the following (if any): (a) Deposit Accounts; (b) Pledged Equity Interests; (c) Pledged Debt; (d) Securities Accounts; (e) Commodity Contracts and Commodity Accounts; (f) Letter-of-Credit Rights; and (g) the name and address of any warehouseman, bailee or other third party in possession of any of the Grantor's Inventory, Equipment or other tangible personal property.

### 3.3.  Ownership of Collateral, Etc.

(a)  <u>Ownership</u>. The Grantor owns the material Collateral purported to be owned by it or otherwise has the rights it purports to have in each material item of Collateral, in each case free and clear of any and all Liens, rights or claims of all other Persons other than Permitted Liens.

(b)  <u>Financing Statements, Etc.</u> Other than any financing statement filed in favor of the Secured Party, no effective financing statement, fixture filing or other instrument similar in effect under any applicable law covering all or any material part of the Collateral is on file in any filing or recording office except for financing statements for which duly authorized proper termination statements have or will be filed.

(c)  <u>Control</u>. Except in connection with Permitted Liens, other than the Secured Party and any automatic Control in favor of a Bank, Securities Intermediary or

APPLE CONFIDENTIAL
#C56-13-03453

Commodity Intermediary maintaining a Deposit Account, Securities Account or Commodity Contract, as applicable, no Person is in Control of any material Collateral.

3.4.    **Status of Security Interest.**

(a)    First Priority Lien. The security interest of the Secured Party in the Collateral constitutes in all material respects a valid, perfected, first priority security interest in and continuing lien on all of the Grantor's right, title and interest in, to and under the Collateral, subject to Permitted Liens and permitted non-perfection pursuant to Section 4.1.

(b)    No Authorization, Consent, Approval, Etc. No authorization, consent, approval or other action by, and no notice to or filing with, any governmental authority or any other Person is required for either (i) the pledge or grant by the Grantor of the Liens purported to be created in favor of the Secured Party hereunder or (ii) the exercise by the Secured Party of any rights or remedies in respect of any Collateral (whether specifically granted or created hereunder or created or provided for by applicable law), except as may be required, in connection with the disposition of any Investment Related Property, by Laws generally affecting the offering and sale of Securities.

3.5.    **Receivables.** To the extent Section 9-406 or 9-408 of the UCC is applicable thereto, no Receivable requires the consent of the Account Debtor in respect thereof in connection with the security interest hereunder, except any consent which has been obtained.

3.6.    **Pledged Equity Interests.**

(a)    Record and Beneficial Owner. The Grantor is the record and beneficial owner of the Pledged Equity Interests free of all Liens, rights or claims of other Persons except for Permitted Liens.

(b)    Consents. No consent of any Person, including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary in connection with the creation, perfection or first priority status of the security interest of the Secured Party in any Pledged Equity Interests or the exercise by the Secured Party of the voting or other rights provided for in this Agreement or the exercise of remedies in respect thereof, except such as have been obtained.

(c)    Status as "Securities". None of the Pledged LLC Interests or Pledged Partnership Interests represent interests (i) that are dealt in or traded on securities exchanges or markets, or (ii) in an issuer that is a "registered investment company" as such term is defined in the Investment Company Act of 1940, as amended.

3.7.    [Reserved]

**SECTION 4.   COVENANTS AND AGREEMENTS.**

The Grantor covenants and agrees that so long as the security interest created hereunder has not been terminated in accordance with Section 2.2(a), the Grantor shall perform all covenants and agreements in this Section 4. The Secured Party shall be entitled to not pay any

APPLE CONFIDENTIAL
#C56-13-03453

Milestone Payment (as defined in the Prepayment Agreement) if the Grantor does not take any reasonable action requested by the Secured Party that the Secured Party deems necessary to perfect and continue the security interests granted to the Secured Party under this agreement and such lack of cooperation prevents or precludes the Secured Party from being able to perfect or continue such security interest.

### 4.1.    Perfection and Certain Other Actions.

(a)    Timing Generally. Grantor shall comply with the requirements of this Section 4.1, (i) with respect to any material Collateral in existence on date hereof, and (ii) with respect to any material Collateral in which the Grantor acquires rights after date hereof, within three Business Days of the date of the acquisition thereof (except as otherwise provided below).

(b)    UCC Financing Statements. The Grantor hereby authorizes the Secured Party to file a financing statement naming the Grantor as "debtor" and the Secured Party as "secured party" and describing the Collateral in the filing offices set forth opposite the Grantor's name on Schedule 3.1 (as such schedule may be amended or supplemented from time to time), which financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner as the Secured Party may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted to the Secured Party herein, including describing such property as "all assets" or "all personal property, whether now owned or hereafter acquired."

(c)    Certificated Securities, Etc. The Grantor shall deliver to the Secured Party the Security Certificates evidencing any Certificated Securities included in the Collateral duly endorsed by an effective endorsement (within the meaning of Section 8107 of the UCC), or accompanied by share transfer powers or other instruments of transfer duly endorsed by such an effective endorsement, in each case, to the Secured Party or in blank. The Grantor shall also cause any certificates evidencing any Pledged Equity Interests, including any Pledged Partnership Interests or Pledged LLC Interests, to be similarly delivered to the Secured Party, regardless of whether such Pledged Equity Interests constitute Certificated Securities, in the case of any such uncertificated interests in existence on the date hereof, as soon as reasonably practicable after the date hereof.

(d)    Uncertificated Securities. The Grantor shall ensure that the Secured Party has Control with respect to any Uncertificated Security included in the Collateral by causing the issuer of such Uncertificated Security to either (i) register the Secured Party as the registered owner thereof on the books and records of the issuer or (ii) execute an agreement in form and substance reasonably satisfactory to the Secured Party, pursuant to which such issuer agrees to comply with the Secured Party's instructions with respect to such Uncertificated Security without further consent by the Grantor.

(e)    Securities Accounts and Securities Entitlements. The Grantor shall use best efforts to ensure that the Secured Party has Control with respect to any Securities Accounts or Securities Entitlements included in the Collateral by causing the Securities Intermediary maintaining such Securities Account or Security Entitlement to enter into an agreement in form

APPLE CONFIDENTIAL
#C56-13-03453

and substance reasonably satisfactory to the Secured Party, pursuant to which the applicable Securities Intermediary shall agree to comply with the Secured Party's Entitlement Orders without further consent by the Grantor.

(f) Deposit Accounts. The Grantor shall use best efforts to ensure that the Secured Party has Control with respect to any Deposit Accounts included in the Collateral by causing the depositary institution maintaining such account to enter into an agreement in form and substance reasonably satisfactory to the Secured Party, pursuant to which the applicable Bank shall agree to comply with the Secured Party's instructions with respect to disposition of funds in the Deposit Account without further consent by the Grantor.

(g) Commodity Accounts and Commodity Contracts. Upon the written request of Secured Party, the Grantor shall use best efforts to ensure that the Secured Party has Control with respect to any Commodity Accounts or Commodity Contracts included in the Collateral in a manner reasonably acceptable to the Secured Party.

(h) Instruments and Tangible Chattel Paper. Upon the written request of Secured Party, the Grantor shall deliver to the Secured Party all Instruments and Tangible Chattel Paper included in the Collateral to the Secured Party duly indorsed in blank.

(i) Letter-of-Credit Rights. Upon the written request of Secured Party 14, the Grantor shall ensure that the Secured Party has Control with respect to any Letter-of-Credit Rights included in the Collateral (other than any Letter-of-Credit Rights constituting a Supporting Obligation for a Receivable in which the Secured Party has a valid and perfected security interest) by obtaining the written consent of each issuer of each related letter of credit to the assignment of the proceeds of such letter of credit to the Secured Party.

(j) Electronic Chattel Paper, Etc. Upon the written request of Secured Party, the Grantor shall ensure that the Secured Party has Control with respect to any Electronic Chattel Paper or "transferable record" (as that term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction) included in the Collateral in a manner reasonably acceptable to the Secured Party.

(k) Consents Regarding Investment Related Property. The Grantor consents to the transfer of any Pledged Partnership Interest and any Pledged LLC Interest to the Secured Party or its designee, including but not limited to under the Pledge Agreement, following a Trigger Event and following foreclosure under the UCC to the substitution of the Secured Party or its designee as a partner in any partnership or as a member in any limited liability company with all the rights and powers related thereto.

Notwithstanding the foregoing in this Section 4.1, the Grantor shall not be required to take any actions in any jurisdiction other than the United States to perfect security interests in any Collateral.

4.2. **Grantor Information and Status.** The Grantor shall not change the Grantor's name, identity, corporate structure (e.g. by merger, consolidation, change in corporate form or

APPLE CONFIDENTIAL
#C56-13-03453

otherwise), chief executive office, type of organization or jurisdiction of organization or establish any trade names unless it has (a) notified the Secured Party in writing at least thirty days prior to any such change or establishment, identifying such new proposed name, identity, corporate structure, sole place of business, chief executive office, jurisdiction of organization or trade name and providing such other information in connection therewith as the Secured Party may reasonably request, and (b) taken all actions necessary to maintain the continuous validity, perfection and the same or better priority of the Secured Party's security interest in the Collateral granted or intended to be granted and agreed to hereby.

4.3. **Maintenance of Security Interest.** The Grantor shall (a) maintain the security interest of the Secured Party hereunder in all material Collateral as valid, perfected, first priority Liens subject to Permitted Liens and permitted non-perfection pursuant to Section 4.1, and (b) use commercially reasonable efforts to defend all material Collateral against all Persons at any time claiming any interest therein.

4.4. **Further Assurances.** The Grantor agrees that from time to time, at the expense of the Grantor, that it shall promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary under U.S. law, or that the Secured Party may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral.

## SECTION 5. SECURED PARTY APPOINTED ATTORNEY-IN-FACT.

5.1. **Power of Attorney.** Following a Trigger Event, the Grantor hereby irrevocably appoints the Secured Party (such appointment being coupled with an interest) as the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor, the Secured Party or otherwise, from time to time in the Secured Party's discretion to take any action and to execute any instrument that the Secured Party may deem reasonably necessary or advisable to accomplish the purposes of this Agreement.

5.2. **No Duty.** The powers conferred on the Secured Party pursuant to Section 5.1 are solely to protect its interest in the Collateral and shall not impose any duty upon the Secured Party to exercise any such powers. The Secured Party shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to the Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

## SECTION 6. REMEDIES.

6.1. **Rights and Remedies.**

(a) <u>Generally</u>. If a Trigger Event has occurred and is then continuing, the Secured Party may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it at law or in equity, all the rights and remedies of the Secured Party upon default under the UCC (regardless of whether the UCC applies to the affected Collateral) to collect, enforce or satisfy any Secured Obligations then

APPLE CONFIDENTIAL
#C56-13-03453

owing, whether by acceleration or otherwise, and also may pursue any of the following separately, successively or simultaneously: (i) require the Grantor to, and the Grantor hereby agrees that it shall at its expense and promptly upon request of the Secured Party forthwith, assemble all or part of the Collateral as directed by the Secured Party and make it available to the Secured Party at a place to be designated by the Secured Party that is reasonably convenient to both parties; (ii) enter onto the property where any Collateral is located and take possession thereof with or without judicial process; (iii) prior to the disposition of the Collateral, store, process, repair or recondition the Collateral or otherwise prepare the Collateral for disposition in any manner to the extent the Secured Party deems appropriate; and (iv) without notice except as specified below or under the UCC, sell, assign, lease, license (on an exclusive or nonexclusive basis) or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Secured Party's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as the Secured Party may deem commercially reasonable.

(b)  Public and Private Sales. The Secured Party may be the purchaser of any or all of the Collateral at any public or private (to the extent to the portion of the Collateral being privately sold is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations) sale in accordance with the UCC and the Secured Party shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale made in accordance with the UCC, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any Collateral payable by the Secured Party at such sale. Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of the Grantor, and the Grantor hereby waives (to the extent permitted by applicable law) all rights of redemption, stay and/or appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. The Grantor agrees that, to the extent notice of sale shall be required by law, at least ten days notice to the Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Secured Party shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. The Grantor agrees that it would not be commercially unreasonable for the Secured Party to dispose of the Collateral or any portion thereof by using Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets. The Grantor hereby waives any claims against the Secured Party arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if the Secured Party accepts the first offer received and does not offer such Collateral to more than one offeree. If Secured Party sells any of the Collateral upon credit, Grantor will be credited only with payments actually made by purchaser and received by Secured Party and applied to indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Secured Party may resell the Collateral and Grantor shall be credited with proceeds of the sale. The Secured Party may sell the Collateral without giving any warranties as to the Collateral. The Secured Party may specifically disclaim or modify any warranties of title or the like, and such disclaimer shall not be considered to adversely affect the commercial reasonableness of any sale

APPLE CONFIDENTIAL
#C56-13-03453

of the Collateral. If the proceeds of any sale or other disposition of the Collateral are insufficient to pay all the Secured Obligations, Grantor shall be liable for the deficiency and the fees of any attorneys employed by the Secured Party to collect such deficiency.

6.2. **Investment Related Property.** The Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws, the Secured Party may be compelled, with respect to any sale of all or any part of the Investment Related Property conducted without prior registration or qualification of such Investment Related Property under the Securities Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Investment Related Property for their own account, for investment and not with a view to the distribution or resale thereof. The Grantor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the Securities Act) and, notwithstanding such circumstances, the Grantor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Secured Party has no obligation to engage in public sales and no obligation to delay the sale of any Investment Related Property for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it. If the Secured Party determines to exercise its right to sell any or all of the Investment Related Property, upon written request, the Grantor shall and shall cause each issuer of any Pledged Stock to be sold hereunder, each partnership and each limited liability company from time to time to furnish to the Secured Party all such information as the Secured Party may request in order to determine the number and nature of interest, shares or other instruments included in the Investment Related Property which may be sold by the Secured Party in exempt transactions under the Securities Act and the rules and regulations of the Securities and Exchange Commission thereunder, as the same are from time to time in effect.

6.3. [Reserved]

6.4. **Marshalling.** The Secured Party shall not be under any obligation to marshal any assets in favor of the Grantor or any other Person or against or in payment of any or all of the Secured Obligations.

## SECTION 7.  TERMINATION AND RELEASE.

Upon the transfer in full of the Advance Tranche pursuant to the SPE Loan Agreement, the security interest granted hereby shall terminate hereunder and of record and all rights as specified in and to the Collateral shall revert to Grantor, except as may be provided in and under other grants of security between the parties or as agreed, including without limitation under the Pledge Agreement. Upon any such termination, the Secured Party shall, at Grantor's expense, execute and deliver to Grantor or otherwise authorize the filing of such documents as Grantor shall reasonably request, including financing statement amendments to evidence such termination. Upon any disposition of property permitted by the Prepayment Agreement, the Liens granted herein shall be deemed to be automatically released and such property shall automatically revert to the Grantor with no further action on the part of any Person. The Secured Party shall, at Grantor's expense, execute and deliver or otherwise authorize the filing of such

APPLE CONFIDENTIAL
#C56-13-03453

documents as Grantor shall reasonably request, in form and substance reasonably satisfactory to the Secured Party, including financing statement amendments to evidence such release.

## SECTION 8.   MISCELLANEOUS.

**8.1.**   **Notices.**   Any notice or demand desired or required to be given hereunder shall be provided as set forth in the "Notices" provision in the MDSA.

**8.2.**   **Indemnity, Expenses, Etc.**

(a)   The Grantor shall indemnify the Secured Party and each affiliate and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of the Secured Party and of its affiliates (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee) incurred by any Indemnitee or asserted against any Indemnitee by any Person other than such Indemnitee and its Related Parties arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, the Prepayment Agreement or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby or (ii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Grantor, and regardless of whether any Indemnitee is a party thereto; provided, such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, or (y) result from a claim brought by the Grantor against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under the Prepayment Agreement, if the Grantor has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(b)   In connection with the enforcement of its rights in connection with this Agreement and the Prepayment Agreement, including its rights under this Section, the Grantor shall pay all reasonable out of pocket expenses incurred by the Secured Party (including the reasonable fees, charges and disbursements of counsel for the Secured Party).

(c)   To the fullest extent permitted by applicable law, no party hereto shall assert, and each party hereto hereby waives, any claim against any Indemnitee or any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, the Prepayment Agreement or any agreement or instrument contemplated hereby or the transactions contemplated hereby or thereby.

(d)   All amounts due under this Section 8.2 shall be payable promptly after demand therefor.

- 15 -

APPLE CONFIDENTIAL
#C56-13-03453

(e)     Each party's obligations under this Section 8.2 shall survive the termination of this Agreement and payment of the Secured Obligations.

8.3.    **Amendments and Waivers.** Any amendment, modification, termination or waiver of this Agreement shall be effective only if executed by the parties hereto.

8.4.    **Successors and Assigns.** This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of the Secured Party. The Grantor's rights or obligations hereunder or any interest therein may not be assigned or delegated by the Grantor without the prior written consent of the Secured Party. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby) any legal or equitable right, remedy or claim under or by reason of this Agreement.

8.5.    **Independence of Covenants.** All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Trigger Event if such action is taken or condition exists.

8.6.    **Survival of Representations, Warranties and Agreements.** All representations, warranties and agreements made herein shall survive the execution and delivery hereof.

8.7.    **No Waiver; Remedies Cumulative.** No failure or delay on the part of the Secured Party in the exercise of any power, right or privilege hereunder or under the Prepayment Agreement shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. The rights, powers and remedies given to the Secured Party hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in the Prepayment Agreement. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

8.8.    **Severability.** In case any provision in or obligation hereunder shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

8.9.    **Headings.** Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

8.10.   **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of California without giving effect to any conflict of laws

APPLE CONFIDENTIAL
#C56-13-03453

principles to the contrary. If any provision of this Agreement is held to be invalid or unenforceable to any extent in any context, it shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected thereby.

**8.11.  Consent To Jurisdiction.** In the event of a dispute, either party may commence litigation in the state or federal courts in Santa Clara County, California. The parties irrevocably submit to the exclusive jurisdiction of those courts and agree that final judgment in any action or proceeding brought in such courts will be conclusive and may be enforced in any other jurisdiction upon final and conclusive judgment (a certified copy of which will be conclusive evidence of the judgment) or in any other manner provided by law. Each party irrevocably waives to the fullest extent permitted by applicable law (i) any objection it may have to the laying of venue in any court referred to above; (ii) any claim that any such action or proceeding has been brought in an inconvenient forum; and (iii) any immunity that it or its assets may have from any suit, execution, attachment (whether provisional or final, in aid of execution, before judgment or otherwise) or other legal process.

**8.12.  WAIVER OF JURY TRIAL.** THE GRANTOR AND THE SECURED PARTY HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED HEREWITH OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

**8.13.  Counterparts.** This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (*i.e.*, "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

**8.14.  No Strict Construction.** The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

[Signature Page Follows]

APPLE CONFIDENTIAL
#C56-13-03453

IN WITNESS WHEREOF, the Grantor and the Secured Party have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

GTAT CORPORATION,
as the Grantor

By: _____
Name:
Title:

APPLE INC., as Secured Party

By: _____
Name: Peter Oppenheimer
Title: Senior Vice President, Chief Financial Officer

APPLE CONFIDENTIAL
#C56-13-03453

SCHEDULE 3.1
TO SECURITY AGREEMENT

## GENERAL INFORMATION AND STATUS

(a)    Grantor Information

    (i)    Full legal name, type of organization, jurisdiction or organization and organizational identification number, if any:

| Full Legal Name | Type of Organization | Jurisdiction of Organization | Organizational ID No. |
|---|---|---|---|
| GTAT Corporation | DE Corp | DE | 02-0471760 |

    (ii)   Other names (including trade names or fictitious business name) under which the Grantor currently conducts business, if any:

| Other Names (including trade names or fictitious business name) |
|---|
| GT Advanced Technologies, GT Crystal Systems, Crystal Systems, GT Solar, GT Solar Equipment, GT, Confluence Solar |

    (iii)  Chief executive office or the sole place of business of the Grantor:

| Chief Executive Office or the Sole Place of Business |
|---|
| 243 Daniel Webster Highway, Merrimack, NH 03054 |

(b)    Changes in name, jurisdiction of organization, chief executive office or sole place of business and its corporate      structure:

| Date of Change | Description of Change |
|---|---|
| 8/4/2011 | Name Change from GT Solar Incorporated |
| 10/30/13 | Merge GT Crystal Systems LLC into GTAT Corporation |

(c)    All locations where the Grantor owns or leases any real property, including all locations where the Grantor keeps any Inventory and Equipment included in the Collateral and maintains any books or records relating to any of the Collateral:

APPLE CONFIDENTIAL
#C56-13-03453

| Address | County | Record Owner of Property | Collateral Located at the Property[1] |
|---|---|---|---|
| See Schedule 3.2(a)(vii) and 3.2(b) below | | | |

(d)     Agreements pursuant to which the Grantor is bound as a debtor within past five years:

| Description of Agreement |
|---|
| Credit Agreement Dated January 31, 2012 (and as amended) with Bank of America, NA and other lenders. |
| Credit Agreement Dated December 13, 2010 (and as amended) with Credit Suisse AG and other lenders |
| Credit Agreement Dated July 29, 2008 (and as amended) with Bank of America, NA and other lenders |

---

[1] Describe Collateral located at the property as "Equipment", "Inventory" or "Books & Records".

SCHEDULE 3.2
TO PLEDGE AND SECURITY AGREEMENT

## COLLATERAL IDENTIFICATION

(a)     Collateral Identification

    (i)     Deposit Accounts

| Name & Address of Depositary Bank | Type of Account | Account No. |
|---|---|---|
| Bank of America 100 West 33rd St. New York, NY 10001 | DDA account | 4622423294 |
| Bank of America 100 West 33rd St. New York, NY 10001 | BOFA Money Market Reserves 4238 | 5X001A08/417316 |
| Bank of America 100 West 33rd St. New York, NY 10001 | Dreyfus Instl Cash Advantage 099 | 5X001A08/417316 |
| Bank of America 100 West 33rd St. New York, NY 10001 | Fidelity Prime MoneyMarket 2014 | 5X001A08/417316 |
| Bank of America 100 West 33rd St. New York, NY 10001 | Goldman FSQ Govt 0465 | 5X001A08/417316 |
| Bank of America 100 West 33rd St. New York, NY 10001 | JP Morgan Prime MMMF 3605 | 5X001A08/417316 |
| Citizens Bank One Citizens Drive Riverside, RI 02915 | DDA account | 3313077449 |
| Sovereign Bank 75 State Street Boston, MA 02109 | Money market account | 7675008960 |
| Sovereign Bank | DDA account | 7677683924 |
| Bank of America 100 West 33rd St. New York, NY 10001 | Lindbergh DDA account | 4638148343 |
| Bank of America 100 West 33rd St. New York, NY 10001 | EUR DDA account | 568712715002 |
| Bank of America 100 West 33rd St. New York, NY 10001 | Cz MO DDA account | 354003895023 |
| Bank of America 100 West 33rd St. New York, NY 10001 | Crystal Systems DDA account | 4634431546 |
| Bank of America 100 West 33rd St. New York, NY 10001 | DDA Account | 4640433253 |
| Wells Fargo Bank One Front Street San Francisco, CA | Operating Account | 2093212633 |
| Bank of America 100 West 33rd St. New York, NY 10001 | DDA account *Acct closing in process | 4640449784 |

39201998_2

(ii)     Pledged Equity Interests

| Issuer | Type of Organization | No of Shares / Units Owned | Total Shares Outstanding | % of Grantor's Interest Pledged | Certificate No. (if uncertificated, please indicate so) | Par Value |
|---|---|---|---|---|---|---|
| GT Equipment Holdings, Inc. | DE Corp | 1000 | 100% | 100% | C-2 | No Par Value |
| Lindberg Acquisition Corp | DE Corp | 100 | 100% | 100% | C-2 | $.01 par value |
| GT Advanced Technologies Limited | Hong Kong Corp | 7,285,200 | 100% | 65% | C-8 | HK $1.00 par value |
| GT Sapphire System Holding LLC | CA LLC | 100% | 100% | 100% | C-001 | No par value |
| GT Advanced Equipment Holding LLC | DE LLC | 100% | 100% | 100% | C-001 | No par value |

(iii)    Pledged Debt

| Issuer | Issue Date | Maturity Date | Original Principal Amount | Outstanding Principal Balance |
|---|---|---|---|---|
| None | | | | |

(iv)     Securities Accounts

| Name & Address of Securities Intermediary | Type of Account | Account No. |
|---|---|---|
| See above with Deposit | | |

| Name & Address of Securities Intermediary | Type of Account | Account No. |
|---|---|---|
| Accounts | | |

(v)    Commodity Contracts and Commodity Accounts

| Description of Commodity Contracts |
|---|
| NONE |

| Name & Address of Commodities Intermediary | Type of Account | Account No. |
|---|---|---|
| None | | |

(vi)    Letter of Credit Rights

| Account Party | Issuing Bank | L/C No. | Face Amount |
|---|---|---|---|
| None | | | |
| | | | |
| | | | |

(vii)    Name and address of any warehouseman, bailee or other third party in possession of any of the Grantor's Inventory, Equipment or other tangible personal property

| Description of Collateral | Name & Address of Third Party |
|---|---|
| Inventory | Expeditors International 21318 64th Ave, Kent WA |
| Inventory | Expeditors International 2530 North Marine Ave Portland OR |
| Inventory/Equipment | Expeditors International 12200 Arrow Route |

| Description of Collateral | Name & Address of Third Party |
|---|---|
|  | Rancho Cucamonga, CA |

## General Information

| Address | Record Owner of Property | Lessee | Collateral located at Property |
|---|---|---|---|
| **CALIFORNIA** | | | |
| 1911 Airport Boulevard, Santa Rosa, CA 95403 | The 5330 Skylane Partnership | GT Sapphire Systems Group LLC | Equipment, Inventory, Books & Records |
| 3681 Laughlin Road Santa Rosa, CA 95403 | Cornerstone Properties, LLC | GT Sapphire Systems Group LLC | Inventory |
| 2526 Qume Drive, Suite 23, San Jose, CA | MPS LLC | GTAT Corporation | Equipment |
| 807 Aldo Avenue, Suite 103, Santa Clara, CA | Prodigy Surface Tech, Inc. | GTAT Corporation | Equipment |
| **MASSACHUSETTS** | | | |
| 27 Congress Street Salem, MA 01970 | Shetland Harbor Trust | GT Crystal Systems, LLC (successor by merger to Crystal Systems, Inc.) | Equipment, Inventory, Books & Records |
| 35 Congress Street Salem, MA 01970 | Shetland Harbor Trust | GT Crystal Systems, LLC (successor by merger to Crystal Systems, Inc.) | Equipment, Inventory |
| Shetland Park, 2nd Floor Bldg. 2, Salem, MA 01970 | Shetland Harbor Trust | GT Crystal Systems, LLC | Equipment, Inventory |
| Shetland Park, 1st Floor, Bldg. 4, Salem, MA 01970 | Shetland Trust | GT Crystal Systems, LLC | Equipment, Inventory |
| One Industrial Drive Danvers, MA | One Industrial Drive, LLC | GTAT Corporation | Equipment |
| **MISSOURI** | | | |
| Suite 2 1600 Park 370 Blvd Hazelwood, Missouri 63042 | Westcore Properties | GT Advanced Cz LLC (formerly Confluence Solar, Inc.) | Equipment |
| **MONTANA** | | | |
| First Interstate Business Center, 4th Floor 101 East Front Street | N47, LLC | GTAT Corporation | Books and Records |

| | | | |
|---|---|---|---|
| Missoula, MT 59802 | | | |
| 6900 Kestrel Drive Suites 9 and 10 Missoula, MT 59803 | Sheridan Montana Ventures L.L.C. | GTAT Corporation | Equipment |
| 6900 Kestrel Drive Suite 8 Missoula, MT 59803 | Sheridan Montana Ventures L.L.C. | GTAT Corporation | Equipment |
| 6900 Kestrel Drive Suite 11 Missoula, MT 59803 | Sheridan Montana Ventures L.L.C. | GTAT Corporation | Equipment |
| NEW HAMPSHIRE | See Footnote (1) | | |
| 20 Trafalgar Square, Suite 100, Nashua, NH 03063 | TNK Associates, LLC | GTAT Corporation | Books and Records |
| 197 Loudon Road Concord, NH 03301 | Hodges Development Corporation | GT Sapphire Systems Group LLC | Equipment/Inventory |
| 243 Daniel Webster Highway | GTAT Corporation | Owned | Equipment/Inventory Books & Records |

39201998_2