Confidential
#C56-13-03458

**15.6    No Waiver**.  No failure by either party to insist upon the performance of any provision of this Lease or to exercise any right or remedy upon a breach or default thereof, and no acceptance by Landlord of full or partial Rent during the continuance of any such breach or default, shall constitute a waiver of any such breach or default. None of the terms of this Lease to be kept, observed or performed by Landlord or Tenant, and no breach or default thereof, may be waived, altered or modified except by a written instrument executed by Landlord and Tenant.  One or more waivers by either party shall not be construed as a waiver of a subsequent breach or default of the same provision.  No statement on a payment check from Landlord or Tenant or in a letter accompanying a payment check shall be binding on the other party and the payee party may, with or without notice to the payor party, negotiate such check without being bound to the conditions of any such statement.  If Landlord or Tenant pays any amount other than the actual amount due the other party, receipt or collection of such partial payment does not constitute an accord and satisfaction.  The payee party may retain any such partial payment, whether restrictively endorsed or otherwise, without prejudice to the other party's right to collect the balance properly due.  If all or any portion of any payment is dishonored for any reason, payment shall not be deemed made until the entire amount due is actually collected by the party entitled thereto.  The foregoing provisions apply in kind to the receipt or collection of any amount by a lock box agent or other Person on Landlord's behalf.

**15.7    Self-Help Rights**.  In addition to the rights set forth in Section 9.3, if Landlord or Tenant fails to timely pay or perform any of its respective obligations under this Lease, which failure is not cured within all applicable notice, grace and cure periods, then the other party shall have the right but not the obligation to advance any such payment and/or perform any such obligation on the defaulting party's behalf, in which event the amount of any such advance and/or the out-of-pocket cost of any such performance shall (a) bear interest at the Default Rate until paid in full, and (b) together with any accrued interest, be deemed Additional Rent payable by the defaulting party hereunder within fifteen (15) Business Days after delivery by the curing party of an invoice for such amount.

**15.8    Dispute Resolution.** Disputes arising under, or in connection with, this Lease (excluding an action for forcible detainer which shall be litigated in a court of competent jurisdiction, or any other action required under applicable Laws to be litigated in a court of competent jurisdiction) will be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one arbitrator appointed in accordance with the Rules.  The language of the arbitration will be English. The place of the arbitration will be San Francisco, California.  Judgment upon any award(s) rendered by the arbitrator may be entered in any court having jurisdiction thereof.  Notwithstanding the foregoing, either party may seek equitable relief in order to protect its rights, and to cause the other party to perform its obligations, hereunder at any time and in any court having jurisdiction over the parties hereto and/or the subject matter hereof.  The parties hereby waive any bond requirements for obtaining equitable relief.

**15.9    Bankruptcy**.

**15.9.1  Timely Performance**.   Tenant acknowledges that in entering into this Lease, Landlord is relying upon the financial condition and operating experience of Tenant, Tenant's agreement to timely perform its obligations under this Lease, and all defaults under this Lease being cured promptly.  Accordingly, Tenant agrees that if an Insolvency occurs: (a) all obligations that accrue or become due under this Lease (including the obligation to pay Rent), from and after the date that an Insolvency shall be timely performed exactly as provided in this Lease; (b) Rent obligations under this Lease that accrue or become due from and after the date of an Insolvency that are not paid as required by this Lease shall, in the amount of such Rents, constitute administrative expense claims allowable under the Bankruptcy Code with priority of payment at least equal to that of any other actual and necessary expenses incurred after the commencement of the Insolvency; (c) any extension of the time period within which Tenant may assume or reject this Lease without an obligation to cause all obligations accruing or coming due under this Lease from and after the date that an action is commenced to be performed as and when required under this Lease shall be harmful and prejudicial to Landlord; (d) any time period designated as the period within which Tenant must cure all defaults and compensate Landlord for all pecuniary losses which extends beyond the date of assumption of this Lease shall be harmful and prejudicial to Landlord; (e) any

Confidential
#C56-13-03458

assignment of this Lease must result in all terms and conditions of this Lease being assumed by the assignee without alteration or amendment, and any assignment which results in an amendment or alteration of the terms and conditions of this Lease without the express written consent of Landlord shall be harmful and prejudicial to Landlord; (f) any proposed assignment of this Lease to an assignee: (i) that does not possess financial condition adequate to operate in the Premises or operating experience characteristics comparable to Tenant as of the Effective Date, shall be harmful and prejudicial to Landlord; and (ii) the rejection (or deemed rejection) of this Lease for any reason shall constitute cause for immediate relief from the automatic stay provisions of the Bankruptcy Code, and Tenant stipulates that such automatic stay shall be lifted immediately and possession of the Premises will be delivered to Landlord immediately without the necessity of any further action by Landlord.

      **15.9.2   No Waiver.**  No provision of this Lease shall be deemed a waiver of Landlord's rights or remedies under the Bankruptcy Code or applicable law to oppose any assumption and/or assignment of this Lease, to require timely performance of Tenant's obligations under this Lease, or to regain possession of the Premises as a result of the failure of Tenant to comply with the terms and conditions of this Lease or the Bankruptcy Code.

      **15.9.3   Rent.**  Notwithstanding anything in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord under this Lease, whether or not expressly denominated as such, shall constitute "rent" for the purposes of the Bankruptcy Code.

      **15.9.4   Successors.**  For purposes of this Section addressing the rights and obligations of Landlord and Tenant in the event that an action is commenced, the term "Tenant" shall include Tenant's successor in bankruptcy, whether a trustee, Tenant as debtor in possession or other responsible person.

## ARTICLE 16
## CREDITORS; ESTOPPEL CERTIFICATES

      **16.1   Subordination; Non-Disturbance.**  Upon written request of Landlord, or any first mortgagee, lien of indenture holder or first deed of trust beneficiary of Lessor ("**Requesting Entity**"), Tenant shall, within fifteen (15) Business Days after Landlord's reasonable request, in writing, subordinate its rights under this Lease to the lien of any mortgage, lien of indenture or first deed of trust, or to the interest of any lease in which Landlord is lessee, and to all advances made or later to be made thereunder. However, as a condition to Tenant's obligation to sign any subordination agreement, Tenant shall have the right to obtain from the Requesting Entity, a written subordination, non-disturbance and attornment agreement in a form reasonably acceptable to Tenant providing that, such Requesting Entity shall: (a) recognize Tenant's rights under this Lease for the full Term and agrees not to disturb Tenant's quiet possession of the Premises as long as there is no Event of Default by Tenant, and (b) upon succeeding to Landlord's interest in the Premises, become bound to Tenant as Landlord under this Lease. The holder of any security interest may, upon written notice to Tenant, elect to have this Lease prior to its security interest regardless of the time of the granting or recording of such security interest. In any foreclosure sale or transfer in lieu of foreclosure, Tenant shall attorn to the purchaser, transferee or lessor as the case may be, and recognize that party as Landlord under this Lease, provided such party acquires and accepts the Premises subject to all of Tenant's rights under this Lease.

      **16.2   Estoppel Certificates.** Upon written request of either Landlord or Tenant, the other party shall execute, acknowledge and deliver to the requesting party a written statement ("**Estoppel Certificate**") in form reasonably satisfactory to the requesting party certifying: (a) that this Lease is unmodified and in full force and effect (or, if there have been any modifications, that the Lease is in full force and effect, as modified, and stating the modifications); (b) that this Lease has not been canceled or terminated; (c) the last date of payment of Rent and the time period covered by such payment; (d) whether there are then existing any breaches or defaults by the requesting party under this Lease known to the certifying party, and, if so, specifying the same; (e) specifying to the certifying party's actual knowledge any existing claims or defenses in favor of the requesting party against the enforcement of this

Confidential
#C56-13-03458

Lease (or of any guaranties); and (f) such other factual statements as the requesting party, any lender, prospective lender, investor or purchaser may reasonably request. The certifying party will deliver the statement to the requesting party within fifteen (15) Business Days after the requesting party's reasonable request. The requesting party may give any such statement provided by the certifying party to any lender, prospective lender, investor or purchaser of all or any part of the Premises and any such party may conclusively rely upon such statement as true and correct.

**16.3     Failure to Deliver.**  Tenant shall deliver any subordination instrument required pursuant to Section 16.1 or any Estoppel Certificate to Landlord within fifteen (15) Business Days following Landlord's initial written request. If Tenant fails to do so, and such failure continues unremedied for an additional five (5) Business Days following a Reminder Notice from Landlord, Landlord and any lender, prospective lender, investor or purchaser may conclusively presume that, except as otherwise represented by Landlord: (a) the terms and provisions of this Lease have not been changed; (b) this Lease has not been canceled or terminated; (c) not more than one month's Rent has been paid in advance; and (d) Landlord is not in default in the performance of any of its obligations under this Lease.

## ARTICLE 17
## TERMINATION OF LEASE

**17.1     Surrender of Premises.**  Tenant will surrender each Phase of the Premises to Landlord at the expiration or earlier termination of this Lease in accordance with Section 5.6, above, and in as good order, condition and repair (subject to any repairs and replacements which Landlord is expressly obligated to make under this Lease) as such Phase was delivered to Tenant on the Applicable Phase Delivery Date, reasonable wear and tear and damage by casualty or condemnation excepted.  On or before the expiration or earlier termination of this Lease, Tenant shall remove from the Premises Tenant's Property (subject to Landlord's (or Landlord's affiliate's) rights under the Collateral Agreements) and any Removal Alterations, but Tenant shall not have any other obligation to remove any Alterations (other than the Removal Alterations) at the expiration or earlier termination of the Term. Tenant will promptly repair any damage to the Premises caused by its or a member of the Tenant Group's removal of the Tenant's Property and Removal Alterations. Upon Tenant's reasonable written request, Landlord shall provide Tenant reasonable access to the Premises for a period of one hundred eighty (180) days following the expiration or earlier termination of this Lease for the removal of Tenant's Property; provided, however, Landlord may determine in its reasonable discretion the days and times during which Tenant may enter the Premises for such purpose, and Tenant shall minimize any interference with Landlord's use of the Premises while Tenant is on the Premises. All property of Tenant or a member of the Tenant Group not removed on or before the last day of the Term shall be deemed abandoned if not removed by Tenant within 180 days after written notice from Landlord. Tenant will indemnify and hold Landlord harmless from, any claims, loss, injury, liability, or damages (including reasonable attorneys' fees) incurred by any Landlord Party as a result of persons or firms entering the Premises on Tenant's behalf to complete to remove Tenant's Property following expiration or earlier termination of this Lease.

**17.2     Holding Over.**  If Tenant possesses the Premises without Landlord's written consent after the Term expires or is otherwise terminated, Tenant shall be deemed to be occupying the Premises as a tenant from month-to-month, subject to all provisions, conditions and obligations of this Lease applicable to a month-to-month tenancy, except that: (a) Base Rent will equal 200% of the Base Rent payable by Tenant in the last year of the Term; and (b) either Landlord or Tenant may terminate the month-to-month tenancy at any time upon thirty (30) days prior written notice to the other party.

## ARTICLE 18
## MISCELLANEOUS PROVISIONS

**18.1     Notices.**  Except as provided in the Phasing Plan: (i) any notice required or permitted hereunder will be in writing, and will be given to the appropriate party at the Tenant Notice Address or Landlord Notice Address, as applicable, or at such other address as the party may hereafter specify in writing; and (ii) such notice will be deemed given: upon personal delivery to the appropriate address; or

Confidential
#C56-13-03458

three (3) Business Days after the date of mailing if sent by certified or registered mail; or one (1) business day after the date of deposit with a commercial courier service offering next business day service with confirmation of delivery.

**18.2     Successors.**  The covenants and agreements contained in this Lease bind and inure to the benefit of Landlord, its successors and assigns, and bind Tenant and its successors and assigns and inure to the benefit of Tenant and its permitted successors and assigns.  The term **"Landlord,"** as used herein, shall mean only the owner of the Premises or of a lease of the Premises, at the time in question, so that in the event of any transfer or transfers of title to the Premises, or of Landlord's interest in a lease of the Premises, the transferor shall be relieved and freed of all obligations of Landlord under this Lease accruing after such transfer, and it shall be deemed, without further agreement, that such transferee has assumed and agreed to perform and observe all obligations of Landlord under this Lease during the period it is the holder of Landlord's interest under this Lease.

**18.3     Captions.**  The section headings in this Lease are for convenience only and are not to be considered in construing or interpreting the Lease.  References to sections, schedules, and exhibits are references to sections of, schedules and exhibits to the Lease, and the word "herein" and words of similar meaning refer to the Lease in its entirety and not to any particular section or provision.  The word "party" means a party to the Lease and the phrase "third party" means any person, partnership, corporation or other entity not a party to the Lease.  The words "will" and "shall" are used in a mandatory, not a permissive, sense, and the word "including" is intended to be exemplary, not exhaustive, and will be deemed followed by "without limitation."  Any requirement to obtain a party's consent is a requirement to obtain such consent in each instance.

**18.4     Relationship of Parties.**  Nothing in this Lease creates a joint venture, partnership, franchise, employment or agency relationship or fiduciary duty of any kind. Neither party will have the power, and will not hold itself out as having the power, to act for or in the name of or to bind the other party.  Except as expressly provided, this Lease is not for the benefit of any third parties.

**18.5     Entire Agreement; Amendment.**  The parties agree that this Lease, including the exhibits, addenda and schedules attached to the Lease, the Collateral Agreements (to the extent referenced herein), constitute the complete and exclusive agreement between them superseding all contemporaneous and prior agreements (written and oral) and all other communications between them relating to its subject matter.  Except as expressly provided herein, the Lease may not be amended or modified except by a written amendment specifically referencing the Lease, signed by authorized signatories of both parties. The parties expressly acknowledge that they have received and are in possession of a copy of any referenced item not physically attached to the Lease and any such item will be treated as if attached.

**18.6     Severability.**  If a court of competent jurisdiction finds any provision of this Lease unlawful or unenforceable, that provision will be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of the Lease will continue in full force and effect

**18.7     Landlord's Limited Liability.**  Tenant shall look solely to Landlord's interest in the Premises and the rents and profits therefrom for recovering any judgment or collecting any obligation from Landlord or any other Landlord Party with respect to any breach of this Lease.

**18.8     Survival.** All obligations under this Lease (together with interest on payment obligations at the Default Rate) accruing prior to expiration or other termination of this Lease survive the expiration or other termination of this Lease.  Further, all of Landlord's and Tenant's releases and indemnification, defense and hold harmless obligations under this Lease survive the expiration or other termination of this Lease for the duration of the application statute of limitations, unless otherwise expressly provided in this Lease.

Confidential
#C56-13-03458

**18.9    Attorneys' Fees.**  If either Landlord or Tenant commences any litigation or judicial action to determine or enforce any of the provisions of this Lease, the prevailing party in any such litigation or judicial action is entitled to recover all of its costs and expenses (including, but not limited to, reasonable attorneys' fees, costs and expenditures) from the non-prevailing party.

**18.10    Brokers.**  Landlord and Tenant each represents and warrants to the other that it has not had any dealings with any realtors, brokers, finders or agents in connection with this Lease and each releases and agrees, to the fullest extent allowable under the Laws, to indemnify, defend and hold the other harmless from and against any Claims based on the failure or alleged failure to pay any realtors, brokers, finders or and from any cost, expense or liability for any compensation, commission or changes claimed by any realtors, brokers, finders or agents claiming by, through or on behalf of it with respect to this Lease or the negotiation of this Lease.

**18.11    Governing Law.**  This Lease is governed by, and shall be interpreted under, the internal laws of the State without giving effect to conflicts of law principles.

**18.12    Time is of the Essence.**  Time is of the essence with respect to the performance of every provision of this Lease in which time of performance is a factor.

**18.13    Landlord's Authority.**  Landlord and each individual signing this Lease on behalf of Landlord represents and warrants that they are duly authorized to sign on behalf of and to bind Landlord and that this Lease is a duly authorized, binding and enforceable obligation of Landlord. Landlord has been duly organized or formed, is validly existing and in good standing under the laws of its state of formation and is qualified as a foreign limited liability company to do business in the State. The authorization, execution, delivery, and performance of this Lease will not result in any breach of or default under any document, instrument or agreement to which Landlord is a party or by which Landlord is bound.

**18.14    Tenant's Authority.**  Tenant and each individual signing this Lease on behalf of Tenant represents and warrants that they are duly authorized to sign on behalf of and to bind Tenant and that this Lease is a duly authorized, binding and enforceable obligation of Tenant. Tenant has been duly organized or formed, is validly existing and in good standing under the laws of its state of formation and is qualified as a foreign corporation to do business in the State. The authorization, execution, delivery, and performance of this Lease will not result in any breach of or default under any document, instrument or agreement to which Tenant is a party or by which Tenant or the Premises are bound.

**18.15    No Merger.**  There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of the Premises by reason of the fact that the same Person may acquire or hold or own, directly or indirectly: (a) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate; and (b) the fee estate or ownership of the Premises or any interest in such fee estate or ownership.  No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in: (i) this Lease or the leasehold estate created by this Lease; and (ii) the fee estate in or ownership of the Premises or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

**18.16    Provisions are Covenants and Conditions.**  All provisions of this Lease, whether covenants or conditions, are deemed both covenants and conditions.

**18.17    Force Majeure.**  Neither party will be liable for any failure to perform under this Lease (excluding, however, the payment of money) caused by circumstances beyond its reasonable control, including, but not limited to, acts of God, earthquakes, hurricanes, floods, tornados, fires, acts of war, hostilities, invasions, terrorism, civil disorder, riots, labor actions (other than actions by personnel or contractors of the party invoking force majeure), major upheavals, government action, government restrictions, blockade, embargo, utility disruptions, including power and water, or accident ("**Force**

Confidential
#C56-13-03458

Majeure Event"), provided: (a) it promptly notifies the other party and uses reasonable efforts to correct its failure to perform; and (b) it has taken such commercially reasonable efforts to protect against and mitigate the impact of the Force Majeure Event if such Force Majeure Event was reasonably foreseeable or was of a kind for which such precautionary measures are customarily taken in the applicable industry. For the avoidance of doubt, any circumstance caused primarily by one or more Furnaces or any other of Tenant's Property, will not constitute a Force Majeure Event, and the provisions of this Section 18.17 will not apply.

18.18   **Non-Subordinated Lease.**   This is a nonsubordinated lease. Landlord shall not be obligated to subordinate its rights in the Premises to any loan or money encumbrance that Tenant shall place against Tenant's leasehold estate in the Premises.

18.19   **Quiet Enjoyment**.  Landlord covenants and agrees that Tenant shall have the right to peaceful and quiet enjoyment and occupancy of the Premises during the Term, subject to the terms and conditions of this Lease free from molestation or hindrance by Landlord or any Person claiming by, through or under Landlord, if Tenant pays all Rent as and when due and keeps, observes and fully performs all other covenants, obligations and agreements of Tenant under this Lease within all applicable notice, grace and cure periods.

18.20   **Counterparts**.  This Lease may be executed in one or more counterparts, each of which shall be deemed an original but all of which will constitute one and the same instrument.  Signature and acknowledgment pages may be detached from individual counterparts and attached to a single or multiple original(s) in order to form a single or multiple original(s) of this document.

18.21   **Nondisclosure of Lease Terms.**  The terms and conditions of this Lease constitute proprietary information of Landlord and Tenant. Accordingly, Landlord and Tenant shall not, without mutual consent (which consent either party may grant or withhold in its sole and absolute discretion), directly or indirectly disclose the terms and conditions of this Lease to any other Person other than Landlord's and Tenant's employees, professional consultants and agents who have a legitimate need to know such information (and who shall also keep the same in confidence) or to Landlord's prospective purchasers or lenders or Tenant's prospective assignees or subtenants, who in each case shall have agreed in writing to keep the same in confidence, or pursuant to a court or governmental subpoena or order, or to the extent otherwise required by law, provided that if either party receives such a subpoena or order or is required by law to disclose the other party's proprietary information, it shall give timely notice to the other, and takes reasonable steps to obtain protective treatment of the proprietary information.  In the event either party is expressly permitted to disclose any proprietary information of the other party (or such other party's applicable affiliate) pursuant to the terms of the Collateral Agreements, then, provided such disclosing party complies (or causes its applicable affiliate to comply) fully with such relevant terms of the Collateral Agreements, such disclosure shall not be deemed a violation under this Section 18.21.

18.22   **Construction of the Terms.** The terms and provisions of this Lease represent the results of negotiations between Landlord and Tenant, each of which are sophisticated parties and each of which has been represented or been given the opportunity to be represented by counsel of its own choosing, and neither of which has acted under any duress or compulsion, whether legal, economic or otherwise.  Consequently, the terms and provisions of this Lease shall be interpreted and construed in accordance with their usual and customary meanings, and Landlord and Tenant each waive the application of any rule of law that ambiguous or conflicting terms or provisions contained in this Lease are to be interpreted or construed against the party who prepared the executed Lease or any earlier draft of the same.  Whenever required by the context of this Lease, the singular includes the plural and the plural includes the singular.  This Lease shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party.

Confidential
#C56-13-03458

Landlord and Tenant each caused this Lease to be executed and delivered by their duly authorized representatives to be effective as of the Effective Date.

**LANDLORD:**

Date executed by Landlord:       **Platypus Development LLC,**
a Delaware limited liability company

_____    By:    Platypus Holdings LLC,
a Delaware limited liability company, its Member

By_____
Name:  Stephen Smith
Title:    Manager

**TENANT:**

Date executed by Tenant:       **GTAT CORPORATION,**
a Delaware corporation

_____

By_____
Name:_____
Title:_____

[Signature page to Facility Lease]

39333078_1

Confidential
#C56-13-03458

EXHIBIT "A"

GLOSSARY

"**Access Agreements**" shall have the meaning set forth in Section 1.1.3.

"**Additional Rent**" means any charge, fee or expense (other than Base Rent) payable by Tenant under this Lease, however denoted.

"**Alteration**" means any change, alteration, modification, addition, decoration, improvement or any other work to the Premises that would directly or indirectly involve the penetration or removal (whether permanent or temporary) of, or require access through, in, under, or above any floor, wall or ceiling, or surface or covering thereof in the Premises.

"**Alternate Service Providers**" shall have the meaning set forth in Section 6.1.

"**Anti-Corruption Laws**" shall have the meaning set forth in Section 4.6.

"**Applicable Phase Delivery Date**" means with respect to each Phase, the date on which Landlord delivers possession of such Phase of the Premises to Tenant with each of the Delivery Conditions satisfied and Tenant executes the Handover and Acceptance Certificate with respect to such Phase of the Premises; provided that, failure by Tenant to execute the Handover and Acceptance Certificate with respect to a Phase (other than due to a rejection of handover and acceptance of such Phase in accordance with Section 1.5, of which Tenant has given Landlord prior written notice) shall not affect the Applicable Phase Delivery Date of such Phase.  The Applicable Phase Delivery Date for the Phase 1 Premises shall also be the Commencement Date.

"**Applicable Phase Landlord Work**" shall have the meaning set forth in Section 1.2.2.

"**Applicable Phase Purpose**" shall have the meaning set forth in Section 1.2.2.

"**Approved Construction Documents**" means the Base Building Plans and Specifications that have been approved by Tenant in accordance with the terms of Section 1.2.3, as the same may be modified pursuant to Sections 1.2.4.1 and 1.2.4.2.

"**Authorized Purchasers**" shall have the meaning set forth in the MDSA.

"**Bankruptcy Code**" means the United States Bankruptcy Code as the same now exists and as the same may be amended, including any and all rules and regulations issued pursuant to or in connection with the United States Bankruptcy Code now in force or in effect after the Effective Date.

"**Base Building Plans and Specifications**" means the plans and specifications for the Landlord Work prepared by Landlord's architects and engineers in accordance with the terms and provisions of Section 1.2.3 hereof.

"**Base Rent**" means the base rent payable by Tenant under this Lease, in the amount specified in Section 2.1.

"**Building**" shall have the meaning set forth in Section 1.1.

"**Building Systems**" means the base Building mechanical, life safety, electrical, plumbing and HVAC systems of the Building.

"**Business Days**" means any day other than Saturday, Sunday or a federal or State holiday.

39333078_1

Confidential
#C56-13-03458

"**Buyer Agent**" shall have the meaning set forth in Section 1.1.1.

"**Casualty Termination Notice**" shall have the meaning set forth in Section 12.3.3.

"**Cause**" shall have the meaning set forth in Article 13 of the MDSA SOW.

"**Change of Control**" shall have the meaning set forth in the MDSA SOW.

"**Change Order Documents**" shall have the meaning set forth in Section 1.2.4.

"**Claims**" means all claims, actions, proceedings, demands, liabilities, settlements, damages, costs, fines, penalties, forfeitures, losses or expenses, including, without limitation, reasonable attorneys' fees and the costs and expenses of enforcing any indemnification, defense or hold harmless obligation under the Lease.

"**Collateral Agreements**" means, collectively: (a) the MDSA; (b) the MDSA SOW; (c) the Prepayment Agreement between Apple Inc. and Tenant, dated as of October 31, 2013, and all exhibits and attachments thereto; (d) the Membership Interest Pledge Agreement between Apple Inc. and Tenant, dated as of October 31, 2013, and all exhibits and attachments thereto; (e) the Intellectual Property Agreement among Apple Inc., Tenant, GT Advanced Technologies Limited, GT Sapphire Systems Holding LLC and GT Sapphire Systems Group LLC, dated as of October 31, 2013, and all exhibits and attachments thereto.

"**Commencement Date**" shall have the meaning set forth in Section 1.7.

"**Condemnation**" shall have the meaning set forth in Section 13.1.

"**Condemning Authority**" means any Person with a statutory or other power of eminent domain.

"**Construction Defect**" means a failure of the Landlord Work to materially comply with the Approved Construction Documents, any requirement of Law or Section 1.2.2 of this Lease, which adversely affects Tenant's use of the Premises for the Permitted Use; provided that, if either party disputes whether a specific failure of the Landlord Work to comply with the Approved Construction Documents is material, either party may immediately submit the dispute to Expedited Arbitration.

"**Cost and Delay Liability**" shall have the meaning set forth in Section 1.2.4.2.

"**County**" means Maricopa County, Arizona.

"**Covered Transaction**" shall have the meaning set forth in the MDSA SOW.

"**Default Rate**" means interest at a rate equal to the lesser of: (a) the greater of: (i) 8% per annum; or (ii) an annual rate equal to two (2) percentage points above the prime annual interest rate published from time to time by The Wall Street Journal under the masthead "Money Rates" as the Prime Rate in effect at the due date (and thereafter adjusted quarterly) (provided, if for any reason The Wall Street Journal does not publish a Prime Rate, the Prime Rate shall be the prime rate announced by a reasonably equivalent responsible financial periodical reasonably selected by the party to whom interest at the Default Rate is owed); or (b) the maximum interest rate permitted by law.

"**Delivery Conditions**" shall have the meaning set forth in Section 1.2.2.

"**Development Services**" shall have the meaning set forth in the MDSA SOW.

A-2

Confidential
#C56-13-03458

"**Due Diligence Reports**" means the following third party produced reports and surveys relating specifically to the Premises undertaken by Landlord or Buyer Agent on or before the closing of Landlord's Acquisition: (a) environmental; (b) soils/geotechnical; (c) building assessment; (d) ALTA survey; and (e) the Title Commitment (including the underlying documents referenced in the Title Commitment).

"**Electrical Costs**" shall have the meaning set forth in Section 6.1.

"**Electrical Substation**" means any electrical substations located on or adjacent to the Land that provide electrical service to the Premises, and any conduit or other infrastructure connecting such electrical substations to the Building and the Improvements.

"**Estoppel Certificate**" shall have the meaning set forth in Section 16.2.

"**Environmental Laws**" shall have the meaning set forth in Section 5.2.

"**Event of Default**" means the occurrence of any of the events specified in Section 15.1 of the Lease, or the occurrence of any other event which this Lease expressly labels as an "Event of Default".

"**Evidence of Completion**" means, collectively, the following documents relating to the applicable Phase: (a) a certificate of occupancy for the applicable Phase for the Applicable Phase Purpose; (b) any and all other permits which Landlord is obligated to obtain to deliver the Applicable Phase Landlord Work in compliance with the Phasing Plan, and which are necessary for the occupancy and operation of the Phase for the Applicable Phase Purpose (provided that, Tenant is responsible for any and all permits required to operate the Premises for the Permitted Use in accordance with Section 4.2); and (c) a certificate from Landlord's architect stating that the Landlord Work for such Phase has been completed in accordance with the requirements of Section 1.2.2 of the Lease, subject to Landlord's completion of the Punch List items.

"**Excluded Infrastructure**" means the following, whether existing as of the Effective Date or subsequently installed: (a) the Electrical Substation; (b) the Fuel Cell; (c) the Roof Solar Array; (d) the Solar Basin; and (e) any conduit or other infrastructure connecting the fuel cell or Roof Solar Array to the Building and the Improvements.

"**Excluded Liability**" shall have the meaning set forth in Section 11.1.1.

"**Expiration Date**" shall have the meaning set forth in Section 1.7.

"**Expedited Arbitration**" means an arbitration proceeding in accordance with the terms of Section 15.8; provided that: (a) the arbitral proceedings, including the formation of the tribunal, will be expedited in order to permit the tribunal to render a final decision fully resolving the dispute before it within thirty (30) days from the date it receives the file from the ICC; (b) the ICC may only propose arbitrators whose schedule will permit them to resolve any disputes in conformity with a 30-day schedule; and (c) the parties agree that the only issue for determination in the arbitration is: (i) with respect to a party's right to seek an Expedited Arbitration pursuant to Section 1.2.3.2, whether an inconsistency between the Base Building Plans and Specifications and the Phasing Plan is material; or (ii) with respect to a party's right to seek Expedited Arbitration to resolve a dispute regarding a Construction Defect, whether a specific failure of the Landlord Work to comply with the Approved Construction Documents is material.

"**Exterior Areas**" means the paved areas, parking areas, driveways, concrete walkways, service areas, loading docks, landscaped areas, turf, plazas, and other areas of the Premises outside the interior of the Building.

"**Force Majeure Event**" shall have the meaning set forth in Section 18.17.

39333078_1

Confidential
#C56-13-03458

"**FTZ Application**" shall have the meaning set forth in Section 4.7.

"**Fuel Cell**" shall have the meanings set forth in Section 9.4.

"**Furnace(s)**" shall have the meaning set forth in the MDSA SOW.

"**Governmental Authority(ies)**" means all governmental and quasi-governmental departments, agencies and authorities.

"**GTAT**" shall have the meaning set forth in Section 14.1.

"**GTAT Equipment**" means GT Advanced Equipment Holding LLC, a Delaware limited liability company.

"**Handover and Acceptance Certificate**" shall have the meaning set forth in Section 1.5.

"**Hazardous Materials**" shall have the meaning set forth in Section 5.2.

"**ICC**" means the Rules of Arbitration of the International Chamber of Commerce.

"**Impositions**" means all taxes (excluding Property Taxes and Rent Tax, but including personal property taxes for which Tenant is responsible pursuant to clause (b) of Section 3.2, transaction privilege taxes and possessory interest taxes, if any), any assessments hereinafter imposed in accordance with applicable Laws for public improvements or benefits (including, if applicable, improvement districts and community facilities districts), water, sewer, electrical, natural gas, telephone, television, communication and other fees, rates and charges, whether foreseen or unforeseen, together with any interest or penalties imposed upon the late payment thereof, and all other charges which at any time during or in respect of the Term of this Lease may be assessed, levied, confirmed or imposed upon or in respect of, or be a lien upon: (a) the Premises; (b) any Base Rent or Additional Rent payable by Tenant hereunder; (c) this Lease and the leasehold estate hereby created; or (d) the possession or use of the Premises, in each case as the result of the use or occupancy of the Premises by Tenant.  Impositions shall not include any costs or expenses attributable to (i) the Excluded Infrastructure (other than use charges attributable to the consumption electrical service at the Premises), or (ii) installation of the Landlord Work.

"**Improvements**" shall have the meaning set forth in Section 1.1.

"**Initial Disclosure Certificate**" shall have the meaning set forth in Section 5.1.

"**Insolvency**" shall have the meaning set forth in Section 15.1.4.

"**Land**" shall have the meaning set forth in Section 1.1.

"**Landlord**" shall have the meaning set forth in Section 18.2.

"**Landlord Notice Address**" means c/o Greenberg Traurig, 2375 East Camelback Road□Suite 700□Phoenix, AZ 85016, Attention: Rebecca Burnham.

"**Landlord Party(ies)**" means Landlord, any ground lessor, and any property manager retained by Landlord, and their respective officers, directors, partners, shareholders, members, and employees.

"**Landlord Work**" shall have the meaning set forth in Section 1.2.2.

"**Landlord's Agents**" means, collectively: (i) Landlord's agents, advisors, employees, partners, shareholders, directors, officers, members, invitees and independent contractors, and (ii) Landlord's affiliates.

A-4

Confidential
#C56-13-03458

"**Landlord's Restoration Estimate**" shall have the meaning set forth in Section 12.3.1.

"**Laws**" means any law, regulation, rule, order, statute or ordinance of any governmental or private entity in effect on or after the Effective Date and applicable to the Premises or the use or occupancy of the Premises, including, without limitation, Environmental Laws and Private Restrictions.

"**Lease**" means this Facility Lease Agreement, as the same may be amended or modified after the Effective Date in accordance with the terms of the Lease.

"**Lease Year**" shall have the meaning set forth in Section 2.1

"**Liens**" shall have the meaning set forth in Section 8.4.

"**Logistics Plan**" shall have the meaning set forth in Section 1.6.

"**Master Developer**" means DMB Mesa Proving Grounds LLC.

"**MDSA**" means that certain Master Development and Supply Agreement, between Apple Inc. and Tenant, dated as of October 31, 2013.

"**MDSA SOW**" means that certain Statement of Work #1 incorporated in the MDSA.

"**Migratory Release**" shall have the meaning set forth in Section 5.3.

"**Notices**" means all notices, demands, requests or consents that may be or are required to be given, demanded or requested by either party to the other as provided in the Lease.

"**Occupant**" means any sublessee, licensee, concessionaire, franchisee or user of all or any portion of the Premises under a sublease, license, concession or franchise or similar agreement approved by Landlord in its sole discretion (unless otherwise permitted herein), whether with the Tenant or any other Person.

"**OFAC**" shall have the meaning set forth in Section 4.5.

"**Outside Delivery Date**" means for each Phase of the Premises, the date set forth on the attached **Exhibit C**, by which the Applicable Delivery Date for such Phase shall have occurred, which date shall be extended one (1) day for each day of Tenant Delay and/or delay by a Force Majeure Event.

"**Outside Closing Date**" means December 30, 2013.

"**P&S**" shall have the meaning set forth in Section 1.1.1.

"**P&S Party**" shall have the meaning set forth in Section 1.1.2.

"**Permitted Use**" means, collectively, the uses of the Premises that are permitted pursuant to Section 4.1.

"**Person**" means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, governmental authority or any other form of entity.

"**Phase**" shall have the meaning set forth in Section 1.2.1.

"**Phasing Plan**" means the document attached as **Exhibit C**, and all schedules attached thereto.

A-5

39333078_1

Confidential
#C56-13-03458

"**Premises**" shall have the meaning set forth in Section 1.1.

"**Private Restrictions**" means all recorded covenants, conditions and restrictions affecting the Land now in force or which may hereafter be in force with Tenant's consent, which consent shall not be unreasonably withheld, conditioned or delayed; provided that, if it is reasonably necessary to subject the Premises to a covenant, condition, restriction or other encumbrance in order for Landlord to deliver the Premises to Tenant with the Landlord Work completed, Landlord shall notify Tenant of such encumbrance but Tenant shall have no consent right with respect to such encumbrance unless such encumbrance would have a material adverse effect on Tenant's ability to manufacture the Goods at the Premises in accordance with the delivery schedule set forth in the MDSA SOW, or would cause Tenant to incur substantial costs to comply with such encumbrance.

"**Progress Plans**" shall have the meaning set forth in Section 1.2.3.1.

"**Property Taxes**" means any general real property tax, personal property tax, government property lease excise tax, improvement tax, assessment, special assessment, reassessment, in lieu tax, levy, charge, penalty or similar imposition imposed by any authority having the direct or indirect power to tax, including but not limited to: (a) any city, county, state or federal entity; (b) any school, agricultural, lighting, drainage or other improvement or special assessment district; (c) any governmental agency; or (d) any Person having the authority to assess the Premises under any of the Private Restrictions.

"**Punch List**" shall have the meaning set forth in Section 1.3.

"**Punch List Inspections**" shall have the meaning set forth in Section 1.3.

"**Re-entry Costs**" means all costs and expenses Landlord incurs re-entering or reletting all or any part of the Premises, including, without limitation, all costs and expenses Landlord incurs: (a) maintaining or preserving the Premises after an Event of Default; (b) recovering possession of the Premises, removing persons and property from the Premises and storing such property (including court costs and reasonable attorneys' fees); (c) reletting, renovating or altering the Premises; and (d) real estate commissions, advertising expenses and similar expenses paid or payable in connection with reletting all or any part of the Premises.

"**Reminder Notice**" means a written notice from meeting the requirements for notice set forth in this Lease and reminding a party of a specific consent, approval or other action to be taken by such party that was not provided, acted upon or taken by a specified date set forth in this Lease.

"**Removal Alterations**" shall have the meaning set forth in Section 8.3.  The Removal Alterations shall not include any of the Landlord Work.

"**Rent**" means, collectively, Base Rent and Additional Rent.

"**Rent Payment Address**" means the Landlord Notice Address, or such other address designated by Landlord in writing.

"**Rent Tax**" means any tax or excise on rent or on other sums or charges required to be paid by Tenant under this Lease, and gross receipts tax, transaction privilege tax or other tax, however described, which is levied or assessed by the United States of America, the state in which the Building is located or any city, municipality or political subdivision thereof, against Landlord in respect to the Base Rent, Additional Rent or other charges payable under this Lease or as a result of Landlord's receipt of such rents or other charges accruing under this Lease.

"**Requesting Entity**" shall have the meaning set forth in Section 16.1.

A-6

Confidential
#C56-13-03458

"Roof Solar Array" means that certain solar module system which is connected to the roof of the Building, but which is excluded from the Premises and is reserved for the sole and exclusive use by Landlord.

"Seller" shall have the meaning set forth in Section 1.1.1.

"Solar Basin" means the exterior solar basin existing on the Land as of the Effective Date.

"State" means the State of Arizona.

"Structural Alterations" means any Alterations made by or at the request of Tenant involving either: (a) the Structural Elements; or (b) any hardscaped portion of the Premises outside of the interior of the Building.

"Structural Elements" shall have the meaning set forth in Section 7.1.

"Studies" shall have the meaning set forth in Section 1.1.2.

"System Alterations" means any Alterations that materially affect any of the Building Systems.

"Tenant" means the tenant identified in the Lease and such tenant's permitted successors and assigns.

"Tenant Delay" means any delay of Landlord's completion of the Landlord Work to the extent such delay is: (a) caused by any act or default on the part of the Tenant or the Tenant's Agents that results in any material interference with the performance by Landlord or Landlord's Agents of the Landlord Work; (b) due to changes requested by Tenant to be made to the Phasing Plan, Base Building Plans and Specifications or the Approved Construction Documents (except to the extent of a request by Tenant to change the Approved Construction Documents to resolve: (i) a failure of the Approved Construction Documents to comply with Law, or (ii) a material inconsistency with the Phasing Plan as agreed to by the parties or pursuant to a final decision in accordance with an Expedited Arbitration); or (c) due to delays by Tenant in approving or objecting to any change proposed by Landlord under, and in accordance with, Section 1.2.4.1 hereof.

"Tenant Feedback" shall have the meaning set forth in Section 1.2.3.1.

"Tenant Group" means, collectively, all of the following Persons: (a) Tenant; (b) each Occupant; (c) each affiliate of Tenant (including GTAT Equipment) or any Occupant; and (d) any other Person claiming by, through or under Tenant or any Occupant.

"Tenant Notice Address" means GTAT Corporation, 243 Daniel Webster Highway, Merrimack, New Hampshire 03054.

"Tenant Party(ies)" means Tenant and its officers, directors, partners, shareholders, members employees.

"Tenant's Agents" means Tenant's agents, advisors, employees, partners, shareholders, directors, officers, members, members of the Tenant Group, invitees and independent contractors.

"Tenant's Property" means, collectively, all of the following, as now or may hereafter exist at the Premises: (a) all trade fixtures of any member of the Tenant Group; (b) all furniture, furnishings, equipment (including equipment having the characteristics of leasehold improvements) and other personal property of any member of the Tenant Group, which includes, without limitation, each of the following, even if it is bolted or otherwise affixed to the floors, walls or other structural portions of the Building, or would otherwise constitute fixtures under applicable law: inventory, racking, shelving,

Confidential
#C56-13-03458

conveyer equipment, material handling equipment, lifts, cabling, antennae, machinery, air compressors, communication equipment, data cabinets, hoist equipment, plug-in light fixtures, propane tanks, storage racks, trash compactors, signs, desks, tables, movable partitions, vending machines, computer stations, printers, computer software and hardware, and forklifts, and (c) the Furnaces and all related equipment.

"**Term**" shall have the meaning set forth in Section 1.7.

"**Title Commitment**" means the Title Insurance Commitment from First American Title Insurance Company to Buyer's Agent, No. NCS-632146-PHX1, dated September 30, 2013.

"**Transfer**" means to assign, delegate or otherwise transfer this Lease or any rights or obligations under this Lease, or to sublet the Premises or any part thereof, or permit the use of the Premises or any part thereof by any persons other than GTAT or its employees, agent and invitees, whether in conjunction with a change in ownership, merger, acquisition, the sale or transfer of all, or substantially all or any part of, GTAT's business or assets, or otherwise, voluntarily, by operation of law, reverse triangular merger or otherwise.

"**Transferrable Warranties**" means to the extent assignable, those warranties, if any, in favor of Landlord relating to the Building and Improvements.

"**Updated Disclosure Certificate**" shall have the meaning set forth in Section 5.1.

"**Utilities**" shall have the meaning set forth in Section 6.1.

"**Utility Service Providers**" shall have the meaning set forth in Section 6.1.

A-8

39333078_1

Confidential
#C56-13-03458

**EXHIBIT B**
**LEGAL DESCRIPTION OF LAND**

Parcel No. 2, according to MINOR LAND DIVISION FOR "FIRST SOLAR" recorded in Book 1162 of Maps, page 45, official records of Maricopa County, Arizona.

B-1

39333078_1

Confidential
#C56-13-03458

**EXHIBIT B-1**

**SITE PLAN OF BUILDING AND LAND**



39333078_1

Confidential
#C56-13-03458

**EXHIBIT C**

**PHASING PLAN**

[to be attached]

C-1

39333078_1

Confidential
#C56-13-03458

**EXHIBIT D**

**FORM OF INITIAL HANDOVER AND ACCEPTANCE CERTIFICATE**

THIS HANDOVER AND ACCEPTANCE CERTIFICATE is made as of _____, 201__, by PLATYPUS DEVELOPMENT LLC, a Delaware limited liability company ("Landlord"), and GTAT CORPORATION, a Delaware corporation ("Tenant"), who agree as follows:

1.      Landlord and Tenant entered into a Lease Agreement dated _____, 2013, in which Landlord leased to Tenant and Tenant leased from Landlord certain Premises described therein in the building located at 3740 South Signal Butte Road, Mesa, Arizona (the "Building").  All capitalized terms herein are as defined in the Lease.

2.      Pursuant to the Lease, Landlord and Tenant agreed to and do hereby confirm the following matters as of the date hereof:

        a.      the Commencement Date of the Lease is _____, 201__;

        b.      the Expiration Date of the Lease is _____, 20__; (if known)

3.      Tenant confirms that as of the date hereof:

        a.      Tenant accepts possession of the following Phase(s) of the Premises: _____;

        b.      the number of rentable square feet of the Current Demised Premises is _____.

        c.      Other than Punch List items, Landlord is not required by the Lease to perform any work or furnish any improvements to the Phases of the Premises set forth in Section 3.a.;

        d.      Landlord has fulfilled all of its obligations under the Lease with respect to the Current Demised Premises as of the date hereof; and

        e.      the Lease is in full force and effect and has not been modified, altered, or amended, except as follows: _____.

The confirmations of Tenant set forth in Section 3.c and Section 3.d are based solely on Tenant's Punch List Inspection, and nothing in this Handover and Acceptance Certificate shall be deemed to release Landlord from its obligations under the Lease with respect to Construction Defects.  The provisions of this Handover and Acceptance Certificate shall inure to the benefit of, or bind, as the case may require, the parties and their respective successors and assigns, and to all mortgagees of the Building, subject to the restrictions on assignment and subleasing contained in the Lease, and are hereby attached to and made a part of the Lease.

[Signatures appear on next page]

D-1

39333078_1

Confidential
#C56-13-03458

LANDLORD:

PLATYPUS DEVELOPMENT LLC,
a Delaware limited liability company

By:      PLATYPUS HOLDINGS LLC,
         a Delaware limited liability company, its Member

         By:   _____
         Name:  Stephen Smith
         Title:   Manager


TENANT:

GTAT CORPORATION,
a Delaware corporation


By:      _____
Name:    _____
Title:   _____


D-2

39333078_1

Confidential
#C56-13-03458

EXHIBIT D-1

**FORM OF HANDOVER AND ACCEPTANCE CERTIFICATE**

THIS HANDOVER AND ACCEPTANCE CERTIFICATE is made as of _____, 201__, by PLATYPUS DEVELOPMENT LLC, a Delaware limited liability company ("Landlord"), and GTAT CORPORATION ("Tenant"), who agree as follows:

1.  Landlord and Tenant entered into a Lease Agreement dated _____, 2013, in which Landlord leased to Tenant and Tenant leased from Landlord certain Premises described therein in the building located at 3740 South Signal Butte Road, Mesa, Arizona (the "Building").  All capitalized terms herein are as defined in the Lease.

2.  Tenant confirms that as of the date hereof:

    a.  the Expiration Date of the Lease is _____, 20__; (if known)

    b.  Tenant accepts possession of the following Phase(s) of the Premises: _____;

    c.  the number of rentable square feet of the Current Demised Premises is _____;

    d.  Other than Punch List items, Landlord is not required by the Lease to perform any work or furnish any improvements to the Phases of the Premises set forth in 2.b., above;

    e.  Landlord has fulfilled all of its obligations under the Lease with respect to the Current Demised Premises as of the date hereof; and

    f.  the Lease is in full force and effect and has not been modified, altered, or amended, except as follows: _____.

The confirmations of Tenant set forth in Section 2.d and Section 2.e are based solely on Tenant's Punch List Inspection, and nothing in this Handover and Acceptance Certificate shall be deemed to release Landlord from its obligations under the Lease with respect to Construction Defects. The provisions of this Handover and Acceptance Certificate shall inure to the benefit of, or bind, as the case may require, the parties and their respective successors and assigns, and to all mortgagees of the Building, subject to the restrictions on assignment and subleasing contained in the Lease, and are hereby attached to and made a part of the Lease.

[Signatures appear on next page]

D-1-1

Confidential
#C56-13-03458

LANDLORD:

PLATYPUS DEVELOPMENT LLC,
a Delaware limited liability company

By:    PLATYPUS HOLDINGS LLC,
       a Delaware limited liability company, its Member

       By:    _____
       Name:  Stephen Smith
       Title:   Manager


TENANT:

GTAT CORPORATION,
a Delaware corporation


By:   _____
Name:  _____
Title:   _____

D-1-2

39333078_1

Confidential
#C56-13-03458

EXHIBIT E

HAZARDOUS MATERIALS DISCLOSURE CERTIFICATE

Your cooperation in this matter is appreciated.  Initially, the information provided by you in this Hazardous Materials Disclosure Certificate is necessary for Landlord to evaluate your proposed uses of the premises (the "**Premises**") and to determine whether to enter into a lease agreement with you as tenant.  If a lease agreement is signed by you and Landlord (the "**Lease**"), on an annual basis in accordance with the provisions of Section 5.1 of the Lease, you are to provide an update to the information initially provided by you in this certificate.  Any questions regarding this certificate should be directed to, and when completed, the certificate should be delivered to:

Landlord: _____

_____

_____

Attention:_____

Phone:  (___) _____

Name of (Prospective) Tenant: _____

Mailing Address: _____

Contact Person, Title and Telephone Number(s): _____

Contact Person for Hazardous Waste Materials Management and Manifests and Telephone Number(s): _____

Address of (Prospective) Premises: _____

Length of (Prospective) Initial Term: _____

_____

1.      GENERAL INFORMATION:

Describe the proposed operations to take place in, on, or about the Premises, including, without limitation, principal products processed, manufactured or assembled, and services and activities to be provided or otherwise conducted.  Existing tenants should describe any proposed changes to on-going operations.

_____

_____

Confidential
#C56-13-03458

2.    USE, STORAGE AND DISPOSAL OF HAZARDOUS MATERIALS

2.1    Will any Hazardous Materials (as hereinafter defined) be used, generated, treated, stored or disposed of in, on or about the Premises?   Existing tenants should describe any Hazardous Materials, which continue to be used, generated, treated, stored or disposed of in, on or about the Premises.

Wastes                              Yes ☐              No ☐

Chemical Products                   Yes ☐              No ☐

Other                               Yes ☐              No ☐

If Yes is marked, please explain:  _____

_____

2.2    If Yes is marked in Section 2.1, attach a list of any Hazardous Materials to be used, generated, treated, stored or disposed of in, on or about the Premises, including the applicable hazard class and an estimate of the quantities of such Hazardous Materials to be present on or about the Premises at any given time; estimated annual throughput; the proposed location(s) and method of storage (excluding nominal amounts of ordinary household cleaners and janitorial supplies which are not regulated by any Environmental Laws, as hereinafter defined); and the proposed location(s) and method(s) of treatment or disposal for each Hazardous Material, including the estimated frequency, and the proposed contractors or subcontractors.  Existing tenants should attach a list setting forth the information requested above and such list should include actual data from on-going operations and the identification of any variations in such information from the prior year's certificate.

3.    STORAGE TANKS AND SUMPS

3.3    Is any above or below ground storage or treatment of gasoline, diesel, petroleum, or other Hazardous Materials in tanks or sumps proposed in, on or about the Premises? Existing tenants should describe any such actual or proposed activities.

Yes ☐                    No ☐

If yes, please explain: _____

_____

4.    WASTE MANAGEMENT

4.4    Has your company been issued an EPA Hazardous Waste Generator I.D. Number? Existing tenants should describe any additional identification numbers issued since the previous certificate.

Yes ☐                    No ☐

Confidential
#C56-13-03458

4.5   Has your company filed a biennial or quarterly reports as a hazardous waste generator? Existing tenants should describe any new reports filed.

Yes ☐                    No ☐

If yes, attach a copy of the most recent report filed.

5.   WASTEWATER TREATMENT AND DISCHARGE

5.6   Will your company discharge wastewater or other wastes to:

_____ storm drain?            _____ sewer?

_____ surface water?          _____ no wastewater or other wastes discharged.

Existing tenants should indicate any actual discharges.  If so, describe the nature of any proposed or actual discharge(s).

_____
_____

5.7   Will any such wastewater or waste be treated before discharge?

Yes ☐                    No ☐

If yes, describe the type of treatment proposed to be conducted.  Existing tenants should describe the actual treatment conducted.

_____
_____

6.   AIR DISCHARGES

6.8   Do you plan for any air filtration systems or stacks to be used in your company's operations in, on or about the Premises that will discharge into the air; and will such air emissions be monitored?  Existing tenants should indicate whether or not there are any such air filtration systems or stacks in use in, on or about the Premises which discharge into the air and whether such air emissions are being monitored.

Yes ☐                    No ☐

If yes, please describe: _____
_____
_____