Section 34. Effectiveness.

Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the time of the filing of the Certificate of Formation with the Office of the Delaware Secretary of State.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement as of the 30th day of October, 2013.

MEMBER:

GTAT CORPORATION

By: ______________________
Name: Hoil Kim
Title: Vice President and Secretary

INDEPENDENT MANAGERS AND SPECIAL MEMBERS:

______________________
Name: Michelle A. Dreyer

______________________
Name: Julia A. McCullough

Section 34. Effectiveness.

Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the time of the filing of the Certificate of Formation with the Office of the Delaware Secretary of State.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement as of the 30th day of October, 2013.

MEMBER:

GTAT CORPORATION

By: ______________________
Name: Hoil Kim
Title: Vice President and Secretary

INDEPENDENT MANAGERS AND SPECIAL MEMBERS:

Name: Michelle A. Dreyer

Name: Julia A. McCullough

SCHEDULE A

Definitions

A. Definitions

When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

"Act" has the meaning set forth in the preamble to this Agreement.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such Person.

"Agreement" means this Limited Liability Company Agreement of the Company, together with the schedules attached hereto, as amended, restated or supplemented or otherwise modified from time to time.

"Apple Inc." means Apple Inc. Inc., a California corporation.

"Apple Inc. Equipment Lease" means the equipment lease between Company and Apple Inc., pursuant to which Company leases the Equipment to Apple Inc.

"Bankruptcy" means, with respect to any Person, (A) if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, or (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (B) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

"Basic Documents" means the Loan Agreement, Equipment Lease, Apple Inc. Equipment Lease, Security Agreement, Management Agreement, and all documents and certificates contemplated thereby or delivered in connection therewith.

"Board" or "Board of Managers" means the Board of Managers of the Company.

"Certificate of Formation" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware, as amended or amended and restated from time to time.

"Company" means GT Advanced Equipment Holding LLC, a Delaware limited liability company.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings. Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, a majority of the ownership interests.

"Covered Persons" has the meaning set forth in Section 20(a).

"Equipment" means the 2,036 sapphire growing furnaces located at the manufacturing facility located in Mesa, AZ that Member leases, the components necessary for the manufacture of those furnaces, and the related processing and manufacturing equipment.

"Equipment Lease" means the equipment lease between Member and Company, pursuant to which Member leases the Equipment from Company.

"Independent Manager" means a natural person who, for the five-year period prior to his or her appointment as Independent Manager has not been, and during the continuation of his or her service as Independent Manager: (i) is not a member or stockholder (whether direct, indirect or beneficial), customer or supplier of the Company or the Member or any of their Affiliates (other than his or her service as a Special Member or similar capacity of the Company or any of its Affiliates); (ii) is not a director, officer, employee, Affiliate or associate of the Company or the Member or any of their Affiliates (other than his or her service as an Independent Manager or similar capacity of the Company or any of its Affiliates); (iii) is not a person related to any person referred to in clauses (i) or (ii); and (iv) is not a trustee, conservator or receiver for any Affiliates of the Company or the Member.

"Loan Agreement" means that certain Secured Loan Agreement dated October 30, 2013, entered into by Member and Company, in which Member agrees to loan Company up to Five Hundred Seventy Eight Million U.S. Dollars (US$578,000,000) for the purchase of the Equipment.

"Management Agreement" means the agreement of the Managers in the form attached hereto as Schedule C. The Management Agreement shall be deemed incorporated into, and a part of, this Agreement.

"Managers" means the Persons elected to the Board of Managers from time to time by the Member, including the Independent Managers, in their capacity as managers of the Company. A Manager is hereby designated as a "manager" of the Company within the meaning of Section 18-101(10) of the Act.

"Material Action" means to consolidate or merge the Company with or into any Person, or sell all or substantially all of the assets of the Company, acquire all or substantially all of the assets or capital stock any Person, or to institute proceedings to have the Company be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company or file a voluntary bankruptcy petition or any other petition seeking, or consent to, reorganization or relief with respect to the Company under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property, or make any assignment for the benefit of creditors of the Company, or admit in writing the Company's inability to pay its debts generally as they become due, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate the Company.

"Member" means GTAT Corporation, as the initial member of the Company, and includes any Person admitted as an additional member of the Company or a substitute member of the Company pursuant to the provisions of this Agreement, each in its capacity as a member of the Company; provided, however, the term "Member" shall not include the Special Members.

"Member Change of Control" means, (i) any sale or exchange of the capital stock by the shareholders of Member in one transaction or a series of related transactions where more than 50% of the outstanding voting power of Member is acquired by a person or entity or group of related persons or entities; (ii) any reorganization, consolidation or merger of Member where the outstanding voting securities of Member immediately before the transaction represent or are converted into less than fifty percent 50% of the outstanding voting power of the surviving entity (or its parent corporation) immediately after the transaction; or (iii) the consummation of any transaction or series of related transactions that results in the sale of all or substantially all of the assets of Member, other than where the entity acquiring shares or assets, or the surviving entity with respect to clause (ii) above, is Member, or a wholly owned subsidiary of Member.

"Obligation" means obligations of Member under the MDSA, SOW and the Prepayment Agreement (as each is defined in the Loan Agreement) until such obligations either terminate or expire in accordance with such MDSA, SOW and the Prepayment Agreement.

"Officer" means an officer of the Company described in Section 11.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"Security Agreement" means the Security Agreement (as the same may be amended, restated, supplemented or otherwise modified from time to time) between the Company and Member, pursuant to which the Company grants a security interest in all of its assets to secure its obligations to Member under the Loan Agreement and the other agreements executed and delivered in connection with the Loan Agreement.

"Special Member" means, upon such person's admission to the Company as a member of the Company pursuant to Section 5(c), a person acting as Independent Manager, in such person's capacity as a member of the Company. A Special Member shall only have the rights and duties expressly set forth in this Agreement.

B. Rules of Construction

Definitions in this Agreement apply equally to both the singular and plural forms of the defined terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation." The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, paragraph or subdivision. The Section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement. All Section, paragraph, clause, Exhibit or Schedule references not attributed to a particular document shall be references to such parts of this Agreement.

# SCHEDULE B

## Member

| Name | Mailing Address | Agreed Value of Capital Contribution | Limited Liability Company Interest |
|---|---|---|---|
| GTAT Corporation | 243 Daniel Webster Highway, Merrimack, NH 03054 | Value Conferred Pursuant to Basic Documents | 100% |

B-1

RLFI 3590050v. 4
TAMP_1759418.4704839942v1

39310513_2

SCHEDULE C

Management Agreement

October 30, 2013

[____________________

____________________

____________________]

Re: Management Agreement – GT Advanced Equipment Holding LLC

Ladies and Gentlemen:

For good and valuable consideration, each of the undersigned Persons, who have been designated as managers of GT Advanced Equipment Holding LLC, a Delaware limited liability company (the "Company"), in accordance with the Limited Liability Company Agreement of the Company, dated as of October 30, 2013, as it may be amended or restated from time to time (the "LLC Agreement"), hereby agree as follows:

1. Each of the undersigned accepts such Person's rights and authority as a Manager under the LLC Agreement and agrees to perform and discharge such Person's duties and obligations as a Manager under the LLC Agreement, and further agrees that such rights, authorities, duties and obligations under the LLC Agreement shall continue until such Person's successor as a Manager is designated or until such Person's resignation or removal as a Manager in accordance with the LLC Agreement. Each of the undersigned agrees and acknowledges that it has been designated as a "manager" of the Company within the meaning of the Delaware Limited Liability Company Act.

2. So long as any Obligation is outstanding, each of the undersigned agrees, solely in its capacity as a creditor of the Company on account of any indemnification or other payment owing to the undersigned by the Company, not to acquiesce, petition or otherwise invoke or cause the Company to invoke the process of any court or governmental authority for the purpose of commencing or sustaining an involuntary case against the Company under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Company or any substantial part of the property of the Company, or ordering the winding up or liquidation of the affairs of the Company.

3. THIS MANAGEMENT AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, AND ALL RIGHTS AND REMEDIES SHALL BE GOVERNED BY SUCH LAWS WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

Initially capitalized terms used and not otherwise defined herein have the meanings set forth in the LLC Agreement.

This Management Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Management Agreement and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned have executed this Management Agreement as of the day and year first above written.

______________________________
Michelle A. Dreyer

______________________________
Julia A. McCullough

______________________________
Thomas Gutierrez

______________________________
Hoil Kim

______________________________
Michele Rayos

# SCHEDULE D

## MANAGERS

1. Michelle A. Dreyer
2. Julia A. McCullough
3. Thomas Gutierrez
4. Hoil Kim
5. Michele Rayos

# SCHEDULE E

| OFFICERS | TITLE |
| --- | --- |
| Thomas Gutierrez | President |
| Michele Rayos | Treasurer |
| Douglas Barry | Secretary |

EXHIBIT A

[FORM OF MEMBERSHIP INTERESTS CERTIFICATE]

**MEMBERSHIP CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN GT ADVANCED EQUIPMENT HOLDING LLC**

**THIS MEMBERSHIP CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS MEMBERSHIP CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT PURPOSES ONLY AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS MEMBERSHIP CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).**

Certificate Number 001

100% Percentage Interest

**GT ADVANCED EQUIPMENT HOLDING LLC**, a Delaware limited liability company (the "**Company**"), hereby certifies that **GTAT Corporation**, a Delaware corporation (together with any assignee of this Membership Certificate, the "**Holder**") is the registered owner of one hundred percent (100%) of the limited liability company interests in the Company. The rights, powers, preferences, restrictions and limitations of the limited liability company interests in the Company are set forth in, and this Membership Certificate and the limited liability company interests in the Company represented hereby are issued and shall in all respects be subject to the terms and provisions of, that certain Limited Liability Company Agreement of the Company, dated as of October ___, 2013 (as the same may have been and may hereafter be amended or restated from time to time, the "**LLC Agreement**"). By acceptance of this Membership Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the limited liability company interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the LLC Agreement. The Company will furnish a copy of the LLC Agreement to the Holder without charge upon written request to the Company at its principal place of business. Transfer of any or all of the limited liability company interests in the Company evidenced by this Membership Certificate is subject to certain restrictions contained in the LLC Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Company of the Membership Certificate, accompanied by an assignment in the form appearing on the second page of this Certificate, duly completed and executed by and on behalf of the transferor in such transfer.

Each limited liability company interest in the Company shall constitute and shall remain a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code as in effect from time to time in the State of Delaware (the "**UCC**"), including Section 8-102(a)(15) thereof, and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction (and each limited liability company interest in the Company shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 9 of the UCC (and under Article 9 of each other applicable Uniform Commercial Code).

This Membership Certificate and the limited liability company interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

THE MEMBER INTERESTS EVIDENCED HEREBY ARE SUBJECT TO A PLEDGE AGREEMENT WHICH CONTAINS A GRANT OF IRREVOCABLE PROXY. BY ACCEPTING ANY INTEREST IN SUCH MEMBER INTERESTS THE PERSON HOLDING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID PLEDGE AGREEMENT.

IN WITNESS WHEREOF, the Company has caused this Membership Certificate to be executed as of the date set forth below.

Dated: October ___, 2013

GT ADVANCED EQUIPMENT HOLDING LLC,
a Delaware limited liability company

By: GTAT CORPORATION,
a Delaware corporation,
its sole member

By:______________________
[Name], [Title]

**ASSIGNMENT OF INTEREST**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto ________________ ("**Transferee**") the following specified percentage of limited liability company interests in GT ADVANCED EQUIPMENT HOLDING LLC (the "**Company**"): 100%, as evidenced by that certain Membership Certificate, Certificate Number 001, to which this Assignment is attached; and the undersigned irrevocably constitutes and appoints Transferee and its authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

Dated: ____________________

GTAT CORPORATION, a Delaware corporation

By: ____________________
[Name], [Title]

BLANK PAGE

**EXHIBIT 10.3**

**FACILITY LEASE AGREEMENT**

This Facility Lease Agreement (this "**Lease**") is entered into by **Platypus Development LLC**, a Delaware limited liability company ("**Landlord**") and **GTAT Corporation**, a Delaware corporation ("**Tenant**"), effective as of October 31, 2013 (the "**Effective Date**"). Any capitalized terms used in this Lease shall have the meanings assigned to them in the Glossary attached as **Exhibit A**, or if not defined in **Exhibit A**, those assigned to them in the Collateral Agreements.

In consideration of the mutual covenants and agreements contained in this Lease, the receipt and sufficiency of which is acknowledged, Landlord and Tenant agree as follows.

**ARTICLE 1**
**LEASE OF PREMISES AND LEASE TERM**

**1.1** **Premises.** Landlord leases to Tenant and Tenant leases from Landlord, all of Landlord's right, title and interest in and to: (a) the entire industrial building commonly known as [***], Mesa, Arizona, containing approximately [***] rentable square feet, as such building is, or will be, improved by the Landlord Work in accordance with the terms of this Lease (the "**Building**"), together with the land (the "**Land**") on which the Building is located as more fully described in **Exhibit B** (collectively, the "**Premises**"), and (b) all fixtures, equipment and other improvements located at or within the Premises, including, without limitation, the fixtures and equipment to be installed by Landlord at its sole cost and expense as part of the Landlord Work. The Premises includes the exterior surfaces of the Building (including the structural walls, roof and roof membrane), as well as the interior and other portions and components of the Building, and related improvements (including any loading dock areas, equipment pads, [***] and other Exterior Areas) (collectively, the "**Improvements**"); provided that, the Premises shall in no event include, and Landlord reserves for its sole and exclusive use to provide electrical services to the Premises: (i) the Roof Solar Array; (ii) the Solar Basin; (iii) the Fuel Cell (if any); and (iv) the Electrical Substation (which shall be owned and operated by a utility provider) and the portion of the Land upon which any such Electrical Substation is located. Landlord further reserves a right of entry as reasonably necessary to maintain, repair, operate and monitor (or to cause the applicable utility provider to do the same) the Roof Solar Array, the Solar Basin, the Fuel Cell, and the Electrical Substation and portion of Land upon which the Electrical Substation is located, which right of entry shall be subject to the terms of Section 9.1, Section 9.5 and Section 9.6. The location and dimensions of the Building and the Land, as they exist as of the Effective Date, are depicted on the plan attached as **Exhibit B-1** as "Phase 1". The parties agree that the depiction of the Premises, the Building and the Land on **Exhibit B-1**, and any reference to square footage or dimensions do not constitute a representation, covenant or warranty of any kind by Landlord.

**1.1.1** The parties' obligations under this Lease are conditioned upon and subject to Landlord acquiring fee title to the Building, Premises and Land ("**Landlord's Acquisition**"). Landlord represents and warrants that as of the date hereof, an agent for Landlord (the "**Buyer Agent**") has entered into a binding agreement (the "**P&S**") to purchase the Premises from the current owner of the Premises (the "**Seller**"). Landlord agrees to inform Tenant of the progress of Landlord's Acquisition (including, without limitation, promptly notifying Tenant in writing of the consummation of Landlord's Acquisition), and to respond to all reasonable requests of Tenant concerning the status of the same. If Landlord does not acquire fee simple title in and to the Premises, subject only to those liens and encumbrances set forth in the Title Commitment which have not been removed by Landlord or Seller on or before the Outside Closing Date (including, without limitation, any encumbrances that would prohibit the use of the Premises for the Permitted Use as reasonably determined by Landlord), then Landlord and Tenant shall each have the option to terminate this Lease by delivering written notice to the other party on or before the date that is seven (7) Business Days after the Outside Closing Date. Landlord confirms to Tenant that, upon the closing of the Landlord's Acquisition, Landlord will be the owner of the Premises and all of the fixtures, equipment and other improvements described in clause (b) of Section 1.1 then existing at or within the Premises.

**[***] Portions of this exhibit have been redacted pursuant to a confidential treatment request. An unredacted version of this exhibit has been filed separately with the Commission**

1.1.2 Subject to the terms of the P&S, Tenant shall have the right, at Tenant's sole cost and expense, to conduct or to cause to be conducted by reputable and qualified companies, at Tenant's sole cost and expense, such audits, assessments, reviews, investigations, inspections, tests, and studies of the Premises, the environmental condition of the Premises, the condition of all buildings, structures and equipment on or within the Premises, the title to the Premises (including so-called survey matters), the compliance of the Premises with applicable Laws, such other engineering, legal and other matters relating to or affecting the Premises and any other investigation or study of the Premises not specifically prohibited by the P&S as Tenant deems necessary or desirable in connection with its lease of the Premises (**"Studies"**). Tenant shall give Landlord reasonable (but in no event less than forty-eight (48) hours) prior notice of Tenant's intention to conduct any Studies of the Premises. Immediately upon the completion of any physical Study of the Premises, Tenant shall at its sole expense restore any area of the Premises disturbed by Tenant to as near its original condition as reasonably possible. Tenant shall use commercially reasonable efforts to conduct all such Studies in such manner as will minimize any inconvenience to Seller, Buyer's Agent and Landlord. Landlord shall reasonably cooperate with Tenant's Studies of the Premises and shall provide copies to Tenant of the Due Diligence Reports. Landlord makes no representations or warranties as to the truth, accuracy or completeness of any of the Due Diligence Reports. It is the parties' express understanding and agreement that all of the Due Diligence Reports and any other such materials are provided by Landlord solely for Tenant's convenience in making its own examination of the Premises, and, in making such examination, Tenant shall rely exclusively on its own independent investigation and evaluation of the Premises and not on the Due Diligence Reports or any other materials supplied by Landlord or Landlord's Agents. Any Studies undertaken by or on behalf of Tenant pursuant to this Section 1.1.2 shall be at Tenant's sole risk and expense. All information regarding or relating to the Premises obtained by Tenant during any Study of the Premises shall be subject to Section 18.21 and held, maintained and treated by Tenant as private, confidential and privileged information. Tenant shall promptly deliver to Landlord, at no cost to Landlord, all third party reports, of the same type as the Due Diligence Reports, prepared for Tenant in connection with any Studies of the Premises. Tenant will indemnify Landlord, Buyer Agent and Seller (each, a **"P&S Party"**) against, and hold each P&S Party harmless from, any claims, loss, injury, liability, or damages (including reasonable attorneys' fees) incurred by such P&S Party as a result of persons or firms entering the Premises on Tenant's behalf to complete any Study of the Premises as permitted under this Section 1.1.2.

1.1.3 Tenant hereby agrees that: (a) it has read, and (b) this Lease is subject to the following agreements to be entered into by Landlord prior to the closing of Landlord's Acquisition: (i) Basin Array Access Agreement; (ii) Reliability Center Access Agreement; and (iii) the Access Agreement (collectively, the **"Access Agreements"**); provided that, Tenant's obligations under this Lease shall not be materially increased, nor shall Tenant's rights under this Lease be materially diminished, as a result of the Access Agreements.

**1.2 Phased Delivery of Premises.**

1.2.1 **Phases.** Landlord anticipates that it will deliver possession of the Premises to Tenant in multiple phases as each phase of the Premises (each, a **"Phase"**) becomes ready for delivery to Tenant. As used in this Lease, the term **"Current Demised Premises"** shall mean, at any given time, the Premises or the Phase(s), and the portion of the Premises corresponding to such Phase(s), of which Tenant has accepted delivery in accordance with Section 1.4. **Exhibit C** describes each of the nine (9) Phases of the Premises. The Phases are designated on **Exhibit C** as **"Phase 1"**, **"Phase 2"**, **"Phase 3"**, **"Phase 4"**, **"Phase 5"**,**"Phase 6"**, **"Phase A"**, **"Phase B"** and **"Phase C"**. Except as expressly set forth in Sections 1.2.2, 1.3 and 1.4, Landlord shall deliver each Phase of the Premises to Tenant in its then "as-is" condition without any representations or warranties regarding condition.

1.2.2 **Landlord Work.** For each Phase, Landlord, at its sole expense, shall: (a) deliver the portion of the Premises for such Phase as contemplated in the Phasing Plan (for each Phase, the **"Applicable Phase Landlord Work"**, and collectively for all Phases, the **"Landlord Work"**) in compliance with: (i) the Phasing Plan, (ii) the Approved Construction Documents, and (iii) all Laws; (b) satisfy the

**[***] Portions of this exhibit have been redacted pursuant to a confidential treatment request. An unredacted version of this exhibit has been filed separately with the Commission**

Acceptance Criteria (as described in the Phasing Plan) for such Phase; (c) deliver possession of the applicable Phase to Tenant free and clear of all tenants and other occupants and in good order, condition and repair, and with all Building Systems serving such Phase in the condition required of such Phase by the Phasing Plan; and (d) deliver to Tenant the Evidence of Completion with respect to such Phase (the requirements set forth in the foregoing clauses (a) through (d), inclusive, are referred to herein as the "**Delivery Conditions**"). Notwithstanding the foregoing, if a permanent certificate of occupancy is not available by the Applicable Delivery Date for a Phase due to Landlord Work remaining in subsequent Phases, then, in lieu of a permanent certificate of occupancy, Landlord may provide: (i) all required sign-offs and approvals from Governmental Authorities for: (A) Tenant to lawfully occupy and use the applicable Phase for the purpose contemplated by the Phasing Plan for such Phase (the "**Applicable Phase Purpose**"), and (B) issuance of a permanent certificate of occupancy in due course for such Phase, and (ii) a certificate from Landlord's architect certifying to Tenant that all work for such Phase has been completed (other than Punch List items) in a manner that will allow for issuance of a permanent certificate of occupancy for such Phase for the Applicable Phase Purpose in due course. Landlord shall remain responsible for delivering a permanent certificate of occupancy for such Phase for the Applicable Phase Purpose once the required work in subsequent Phases is complete. Landlord shall undertake the Landlord Work in a good and workmanlike manner, employing materials of good quality, and in compliance with applicable Laws. Unless otherwise specified in the Phasing Plan or the Approved Construction Documents, Landlord shall undertake the Landlord Work in the manner and utilizing the practices and procedures, and using materials, finishes and construction techniques, that are selected by Landlord in its reasonable discretion, in consultation with Tenant, in furtherance of the preparation of the Premises for Tenant's engagement in the manufacturing purposes contemplated under Section 4.1 of this Lease and the Collateral Agreements.

**1.2.3 Preparation of Base Building Plans and Specifications.**

**1.2.3.1** Landlord's architects and engineers shall prepare the Base Building Plans and Specifications consistent with all applicable Laws and the Phasing Plan. The parties acknowledge that Tenant shall have a significant role in the preparation of the Base Building Plans and Specifications and has special expertise with respect to the improvements required for Tenant's Permitted Use. Landlord and Tenant shall work cooperatively and in good faith to develop and finalize the Base Building Plans and Specifications as expeditiously as reasonably practicable, in a manner designed to achieve simultaneous design review and input from both parties. To that end: (a) during preparation and review of the Base Building Plans and Specifications: (i) Tenant and its designated representatives and Landlord and Landlord's architects and engineers shall meet or conference on a weekly basis to discuss the status of the Base Building Plans and Specifications; and (ii) Landlord will use good faith efforts to notify Tenant, and permit Tenant to join, any scheduled working meetings between Landlord and its architects and/or engineers, during which Landlord anticipates the parties, in discussing the Base Building Plans and Specs, will primarily focus on the operation of the Furnaces and/or Tenant's fabrication equipment; and (b) during construction of the Landlord Work: (i) Tenant and its designated representatives and Landlord and Landlord's contractor shall meet or conference on a weekly basis to discuss the status of the construction of the Landlord Work; and (ii) Landlord will use good faith efforts to notify Tenant, and permit Tenant to join, any scheduled working meetings between Landlord and its general contractor, during which Landlord anticipates the parties, in discussing the construction of the Landlord Work, will primarily focus on the operation of the Furnaces and/or Tenant's fabrication equipment. During weekly meetings/conferences or any other meeting/conference attended by Tenant as permitted under this Section, Tenant agrees to: (A) provide Tenant's operational perspective as to all issues discussed with respect to the Base Building Plans and Specifications; (B) pro-actively raise any concerns that the development of the Base Building Plans and Specifications may be inconsistent with the Phasing Plan, and propose reasonable resolutions to the same; and (C) otherwise participate in good faith in all such meetings/conferences in order to further the expeditious development of the Base Building Plans and Specifications and construction of the Landlord Work. Upon Tenant's reasonable request, Landlord shall provide (or shall cause its contractors to provide) to Tenant copies of current plans, drawings and specifications for the Landlord Work (collectively, the "**Progress Plans**") for Tenant's review; provided, however, Landlord shall not be held liable to any Tenant Party if Landlord, absent bad

**[***] Portions of this exhibit have been redacted pursuant to a confidential treatment request. An unredacted version of this exhibit has been filed separately with the Commission**

faith, inadvertently delivers to Tenant an incomplete or outdated version of any such Progress Plan, or fails to deliver any particular Progress Plan. Tenant agrees that Tenant shall provide any insight, concerns, issues, proposals and suggestions with respect to the Base Building Plans and Specifications and Progress Plans (**"Tenant Feedback"**) directly to Landlord, and shall only discuss Tenant Feedback with Landlord's contractors if Landlord is present at such time and involved in such discussion.

**1.2.3.2** Prior to submitting the Base Building Plans and Specifications to the applicable Government Authorities to obtain a building permit for the Landlord Work, Landlord shall furnish to Tenant a copy of the Base Building Plans and Specifications for Tenant's review and approval; provided that, Tenant shall not withhold its approval of the Base Building Plans and Specifications so long as the Base Building Plans and Specifications comply with all Laws and are not materially inconsistent with the Phasing Plan. Tenant shall advise Landlord of Tenant's approval or disapproval of the Base Building Plans and Specifications within three (3) Business Days after Landlord submits the Base Building Plans and Specifications to Tenant. If Tenant fails to respond within such three (3) Business Day period, Tenant will be deemed to have approved the Base Building Plans and Specifications submitted to Tenant for approval. If Tenant notifies Landlord of its reasonable objections, together with Tenant's recommendation of modifications reasonably required to make the Base Building Plans and Specifications acceptable to Tenant within such three (3) Business Day Period, Landlord will revise the Base Building Plans and Specifications to meet Tenant's reasonable objections, and resubmit the Base Building Plans and Specifications to Tenant for its review and approval. Tenant shall advise Landlord of Tenant's approval or disapproval of the revised Base Building Plans and Specifications within three (3) Business Days after Landlord submits the same, and such process shall continue until Tenant approves (or is deemed to have approved) the Base Building Plans and Specifications. If Tenant objects to the Base Building Plans and Specifications for the reason that the Base Building Plans and Specifications are materially inconsistent with the Phasing Plan, and Landlord disputes Tenant's claim that such inconsistency between the Base Building Plans and Specifications and the Phasing Plan is material, then, either party may immediately submit the dispute to Expedited Arbitration.

**1.2.3.3** Tenant's authorized representative (who shall have an appropriate level of expertise with respect to the Landlord Work contemplated in the Phasing Plan) shall be available promptly upon Landlord's request, and at Tenant's cost, to consult and confer with Landlord about the Landlord Work, the Base Building Plans and Specifications and the Approved Construction Documents. Tenant acknowledges that this may require the authorized representative to be on-site during all or part of the construction period.

**1.2.4 Change Orders.**

**1.2.4.1** Landlord may make changes to the Approved Construction Documents in accordance with the provisions of this Section 1.2.4.1. If Landlord desires to make a change to the Approved Construction Documents, Landlord shall deliver notice of the proposed change to Tenant, together with any material drawings, specifications and other documents necessary to show or describe the proposed change (**"Change Order Documents"**) (provided, however, Landlord shall not be held liable to any Tenant Party if Landlord, absent bad faith, inadvertently delivers to Tenant incomplete or Change Order Documents in connection with such change). If Landlord's proposed change is a material change to the Approved Construction Documents, Landlord shall deliver a copy to Tenant of the Change Order Documents. As used herein, the term "material change" means a change to the Approved Construction Documents that: (a) directly and materially affects Tenant's ability to grow and process sapphire boules in the Premises in accordance with the delivery schedule set forth in the MDSA SOW; or (b) requires the movement of manufacturing materials or Goods (as defined in the MDSA) in the Premises in an manner which would interrupt Tenant's sapphire manufacturing process. If, within three (3) Business Days after the delivery of such Change Order Documents showing or describing the proposed material change to the Approved Construction Documents, Tenant gives notice to Landlord that Tenant objects to such change, which notice shall be accompanied by Tenant's recommendation of any modifications reasonably required to make the change acceptable to Tenant, then Landlord shall either withdraw the proposed change or modify the same in accordance with Tenant's recommendation. If Tenant fails to

**[***] Portions of this exhibit have been redacted pursuant to a confidential treatment request. An unredacted version of this exhibit has been filed separately with the Commission**

respond to Landlord within three (3) Business Days after Landlord delivers the Change Order Documents, Tenant will be deemed to have approved such Change Order Documents.

1.2.4.2 Tenant may require Landlord to make changes to the Approved Construction Documents if: (a) absent such changes to the Approved Construction Documents: (i) Tenant's ability to grow and process sapphire boules in the Premises in accordance with the delivery schedule set forth in the MDSA SOW would be directly and materially affected; or (ii) Tenant is required to move manufacturing materials or Goods in the Premises in a manner which would interrupt Tenant's sapphire manufacturing process; (b) such changes comply with all Laws; (c) such changes are consistent with design review requirements of the Master Developer and Governmental Authorities pursuant to applicable Law; (d) such changes are not inconsistent with any express provision of the Phasing Plan; (e) such changes do not materially reduce the quality of the Landlord Work, as determined by Landlord in its reasonable discretion; and (f) Tenant is responsible for all costs and expenses and all delays resulting from such change, including without limitation costs or expenses relating to: (1) any additional architectural or engineering services and related design expenses, (2) any changes to materials in process of fabrication, (3) cancellation or modification of supply or fabricating contracts, (4) removal or alteration of work or plans completed or in process, and (5) delay claims made by any subcontractor (collectively, the "**Cost and Delay Liability**"). Tenant may not require Landlord to make any other change to the Approved Construction Documents without Landlord's prior written approval, which approval may be granted or withheld in Landlord's sole and absolute discretion. Tenant shall be responsible for all Cost and Delay Liability as a result of any such change approved by Landlord.

1.2.5 **Delivery Schedule.** Landlord shall deliver each Phase of the Premises to Tenant, with each of the Delivery Conditions satisfied, not later than the Outside Delivery Date specified for such Phase in the schedule attached as **Exhibit C**. If for any reason whatsoever Landlord cannot deliver possession of a specific Phase to Tenant, with each of the Delivery Conditions satisfied, on or before the Outside Delivery Date for such Phase, then this Lease shall not be void or voidable, nor shall Landlord, or Landlord's Agents be liable to Tenant for any loss or damage resulting therefrom; provided that, Tenant shall not be obligated to pay Base Rent until the Commencement Date and Tenant shall not be obligated to pay Additional Rent for a particular Phase until Tenant has accepted such Phase pursuant to a Handover and Acceptance Certificate.

1.2.6 **Tenant's Access to Phases Prior to Applicable Phase Delivery Date.** To the extent reasonably possible, taking into consideration the optimal schedule for installation of the Furnaces in the Premises and the Goods delivery schedule under the MDSA SOW, Landlord will grant Tenant access to each Phase prior to its Applicable Phase Delivery Date as reasonably required for Tenant to perform work within such Phase relating to Tenant's installation of Tenant's Property (the "**Tenant's Early Access Work**"). Landlord and Tenant will coordinate the performance of Tenant's Early Access Work with the performance of any ongoing Landlord Work so that each of Tenant's Early Access Work and the Landlord Work can proceed without material interference from the other and to maintain harmonious labor relations.

1.3 **Punch-List Inspection.** Approximately ten (10) days prior to Landlord's delivery of possession of a Phase (s) to Tenant, Landlord and Tenant shall make an inspection of such Phase(s) (the "**Punch List Inspection**"). During the Punch List Inspection, the parties shall: (a) determine whether the construction and installation of the Applicable Phase Landlord Work for such Phase(s) has been completed, subject to Punch List items, in accordance with the terms of this Lease; and (b) prepare a list of minor work requiring correction or completion by Landlord that will not materially interfere with Tenant using the Phase(s) for the Applicable Phase Purpose (the "**Punch List**"). Subject to a Force Majeure Event, Tenant Delay, and Tenant's compliance with the Logistics Plan, Landlord agrees to use reasonable efforts to complete all Punch List items and correct all defects or incomplete items with respect to a delivered Phase, within sixty (60) days after the Applicable Phase Delivery Date.

1.4 **Acceptance.** Except as otherwise expressly provided herein, by accepting delivery of a Phase(s), evidenced by Tenant's execution of a Handover and Acceptance Certificate with respect to

**[***] Portions of this exhibit have been redacted pursuant to a confidential treatment request. An unredacted version of this exhibit has been filed separately with the Commission**

such Phase(s), Tenant shall be deemed to have accepted such Phase as: (a) suitable for the Applicable Phase Purpose; (b) in good and sanitary operating order, condition and repair with the Applicable Phase Landlord Work complete, subject to any Punch List items; (c) AS-IS, WHERE IS and WITH ALL FAULTS, and (d) without representation or warranty by Landlord as to the condition, use or occupancy which may be made thereof; provided, however, that: (i) Landlord shall, at its sole cost and expense, repair and replace any Construction Defects of which Tenant has notified Landlord in writing within twelve (12) months after the final Applicable Phase Delivery Date for the Premises; (ii) Landlord shall, at no cost to Landlord, assign to Tenant all Transferrable Warranties as the applicable Landlord Work is completed or as soon as is reasonably feasible, and (iii) the foregoing shall not release Landlord from any of its express obligations under this Lease. Tenant acknowledges that: (A) it has been advised by Landlord to satisfy itself with respect to the condition of the Premises and each Phase thereof (including, without limitation, the structural components of the Building and the Building Systems located therein, and the security and environmental aspects thereof) and the present and future suitability of the Premises for the Permitted Use; (B) Tenant has made such inspection and investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to Tenant's use and occupancy of the Premises; and (C) neither Landlord nor any of Landlord's Agents has made any oral or written representations or warranties with respect to the condition, suitability or fitness of the Premises other than as specifically set forth in this Lease. Further, Tenant expressly disclaims any implied warranty that the Premises are suited for the Permitted Use.

**1.5 Handover and Acceptance Certificate.** Landlord shall complete and deliver to Tenant for Tenant's execution: (a) upon the Commencement Date, a certificate in the form attached as **Exhibit D** to confirm, among other things, the Commencement Date, the Phase(s) (and approximate rentable square feet thereof) delivered on the Commencement Date, the anticipated Expiration Date, and Tenant's acceptance of the Phase(s) delivered on the Commencement Date; and (b) upon each Applicable Phase Delivery Date, a certificate in the form attached as **Exhibit D-1** to confirm, among other things, the Applicable Delivery Date of the Phase(s) delivered pursuant to such certificate, the Phase(s) (and actual number of rentable square feet thereof) delivered on such Applicable Phase Delivery Date, the Current Demised Premises as of such date, and Tenant's acceptance of the Phase(s) delivered on such Applicable Phase Delivery Date (each such certificate, a "**Handover and Acceptance Certificate**"). Tenant may reject handover and acceptance of a delivered Phase(s) only if: (i) Tenant can reasonably demonstrate that Landlord has failed to complete (subject to the Punch List items) such Phase(s) in accordance with the terms of this Lease; and (ii) such failure will materially interfere with the Applicable Phase Purpose for such Phase.

**1.6 Construction and Dual Occupancy Logistics Plan.** The parties acknowledge that Landlord's undertaking of the Landlord Work in multiple Phases may occur concurrently with Tenant's possession of, and operations in, one or more of the Phases of the Premises. In order to enable Landlord to substantially complete the Landlord Work in the Premises in accordance with the Phasing Plan, and to enable Tenant to operate in the Current Demised Premises for the Permitted Use, the parties agree to consult in good faith to establish a construction and dual occupancy logistics plan (the "**Logistics Plan**") which shall set forth protocols and procedures for the parties during any such dual occupancy period to minimize interruption and interference of the parties' respective work or operations. The Logistics Plan shall include, without limitation, protocols with respect to utilities shutoff notifications, access and security procedures, location of laydown areas, mitigation of construction noise and dust, onsite monitoring and feedback by Tenant's authorized representatives with respect to the Landlord Work and a right of entry for Landlord to complete Punch List items. The parties shall use commercially reasonable efforts to negotiate, and mutually agree upon, an approved Logistics Plan on or before the Commencement Date. Once approved, the parties shall comply in good faith with the Logistics Plan.

**1.7 Commencement and Expiration of Term.** This Lease shall be in full force and effect from the Effective Date. The term of the Lease ("**Term**") shall commence on the Commencement Date and shall end on the Expiration Date, unless otherwise extended or earlier terminated in accordance with the terms of this Lease; provided that, with respect to any Phase of the Premises which is not delivered on the Commencement Date (other than the Phase 1 Premises), the Term of the Lease for such Phase

**[***] Portions of this exhibit have been redacted pursuant to a confidential treatment request. An unredacted version of this exhibit has been filed separately with the Commission**

shall commence on such Phase's Applicable Phase Delivery Date. For purposes of this Lease, the **"Commencement Date"** shall mean the Applicable Phase Delivery Date for the Phase 1 Premises. The term **"Expiration Date"** means the last day of the term of the MDSA SOW.

## ARTICLE 2
## RENTAL AND OTHER PAYMENTS

2.1 **Base Rent.** Tenant will pay Base Rent to Landlord each Lease Year in the amount of [***], in advance, without demand, deduction or offset commencing on the Commencement Date and thereafter on the first (1st) day of each Lease Year during the Term. Tenant shall make all Base Rent payments to the Rent Payment Address or at such other address as Landlord may from time to time designate in writing, or, alternatively at Landlord's election, via electronic funds transfer as directed by Landlord. Tenant shall make all Base Rent payments without Landlord's previous demand, invoice or notice for payment. The term **"Lease Year"** means: (a) for the first Lease Year, the period commencing on the Commencement Date and ending on the last day of the twelfth (12th) full calendar month following the Commencement Date; and (b) thereafter, each period of twelve (12) consecutive months. Notwithstanding that Landlord may deliver possession of the Premises in Phases, the amount of annual Base Rent for each Lease Year during the Term shall be [***] and such amount shall not be affected by adjustments in the square footage of the Premises based on Phased delivery of the Premises.

2.2 **Rent Tax.** Landlord shall pay all Rent Tax due in connection with this Lease or the payment of Rent hereunder.

2.3 **Additional Rent.** Tenant shall make all payments of Additional Rent without demand, deduction or offset except as expressly provided in this Lease. Tenant shall pay all Additional Rent described in this Lease that is not payable with Base Rent within fifteen (15) Business Days after receiving Landlord's invoice for such Additional Rent. Tenant shall make all Additional Rent payments to the same location and, except as described in the previous sentence, in the same manner as Tenant's Base Rent payments. All Additional Rent calculated based on the rentable square footage of the Premises shall be calculated based upon the rentable square footage of the Current Demised Premises for the period in which the invoice for such charges relate.

2.4 **Late Payments.** If either Landlord or Tenant does not pay any amount due from such party under this Lease within ten (10) Business Days after notice from the other party that the payment is past due, then the defaulting party shall pay to the other party interest on the delinquent payment calculated at the Default Rate from the date when the payment is due through the date the payment is made.

2.5 **Net Lease.** Except as otherwise expressly provided in this Lease, the Base Rent payable under this Lease shall be net to Landlord of all costs and obligations of every kind and nature whatsoever relating to the use or occupancy of the Premises, including all Impositions (except to the extent of Landlord's obligations under this Lease), which shall be performed and paid by Tenant pursuant to this Lease. Tenant shall perform its obligations under this Lease at its sole cost and expense.

2.6 **Independent Obligations.** Tenant's covenant and obligation to pay Rent is independent from any of Landlord's covenants, obligations, warranties or representations in this Lease.

## ARTICLE 3
## PROPERTY TAXES

3.1 **Payment of Taxes by Landlord.** Except to the extent payable by Tenant pursuant to Section 3.2, Landlord shall pay, prior to delinquency, all Property Taxes for the Premises.

3.2 **Payment of Taxes by Tenant.** Tenant shall pay, prior to delinquency: (a) all taxes, charges, license fees and or similar fees imposed by reason of the use of the Premises by Tenant,

**[***] Portions of this exhibit have been redacted pursuant to a confidential treatment request. An unredacted version of this exhibit has been filed separately with the Commission**

including all applicable sales tax; and (b) all taxes charged against Tenant's trade fixtures and other personal property (including without limitation the Furnaces and other Tenant's Property). If any of Tenant's trade fixtures and other personal property is taxed with the Premises, Tenant shall pay the taxes attributable to Tenant's trade fixtures and other personal property to the taxing authority.

3.3 **Tax Incentive Programs.** With respect to any taxes payable by Tenant under this Lease, Tenant shall be permitted to seek, and to receive and retain all benefits from, any and all tax increment financing or other tax incentives or beneficial tax arrangements from Governmental Authorities. Landlord, as the owner of the underlying fee simple interest in the Premises, shall, at no cost to it, cooperate with Tenant to obtain such incentives or arrangements.

## ARTICLE 4
## USE AND OCCUPANCY

4.1 **Permitted Use.** The Premises shall be used solely for the purpose of manufacturing the Goods for Landlord pursuant to the MDSA SOW [***]; and such other uses permitted by the terms of the MDSA SOW, and for no other purpose.

4.2 **Compliance with Law and Covenants or Restrictions of Record.** Tenant and Tenant's Agents shall, at Tenant's expense, faithfully observe and comply with: (a) all applicable Laws pertaining to Tenant's use of the Premises and Tenant's obligations under this Lease; and (b) all Private Restrictions pertaining to the Premises or Tenant's use of the Premises; provided that, Tenant's obligations under this Lease shall not be materially increased, nor shall Tenant's rights under this Lease be materially diminished, as a result of the Private Restrictions. Subject to Landlord's obligations under Section 1.2.2, Tenant will be responsible for obtaining and maintaining all permits required for the lease, operation and maintenance of the Current Demised Premises by Tenant.

4.3 **Nuisance or Waste.** Tenant will not suffer or permit on the Premises any nuisance. Tenant will not permit or commit any waste of the Premises. Tenant will use the Premises in a careful, safe and proper manner and will not overload the floor or structure of the Premises or subject the Premises to use that would damage the Premises. Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise, or vibrations to emanate from the Premises, or take any other action that would unreasonably endanger Landlord or the Premises. Outside storage, including without limitation, storage of trucks and other vehicles, is prohibited without Landlord's prior written consent, except in the ordinary course of Tenant's operations at the Premises. Tenant will not use or permit the Premises to be used for any purpose or in any manner that would void Tenant's or Landlord's insurance. If any increase in the cost of any insurance on the Premises is caused by Tenant's use or occupation of the Premises, or because Tenant vacates the Premises, then Tenant shall pay the amount of such increase to Landlord. If Tenant occupies the Premises prior to the Commencement Date, such occupancy shall be subject to all obligations of Tenant under this Lease, other than the obligation to pay Rent.

4.4 **Signs.** Tenant will not place or permit to be placed in, upon, or about the Premises, the Building or the Land any exterior lights, decorations, flags, pennants, banners, advertisements or notices, or erect or install any signs, windows or door lettering, placards, decorations, or advertising media of any type which can be viewed from the exterior the Premises without obtaining Landlord's prior written consent, which Landlord may grant or withhold in Landlord's sole discretion. Any signage shall comply with all applicable Laws.

4.5 **OFAC Certification.** Each party certifies that it is not: (a) acting directly or indirectly for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department, through its Office of Foreign Assets Control ("**OFAC**") or otherwise, as a terrorist, "Specially Designated Nation," "Blocked Person," or other banned or blocked person, entity, nation, or

**[***] Portions of this exhibit have been redacted pursuant to a confidential treatment request. An unredacted version of this exhibit has been filed separately with the Commission**

transaction pursuant to any law, order, rule or regulation that is enforced or administered by OFAC or another department of the United States government; and (b) engaged in this transaction (directly or indirectly) on behalf of, or instigating or facilitating this transaction (directly or indirectly) on behalf of, any such person, group, entity or nation. Landlord and Tenant each shall, to the fullest extent allowable under applicable Laws, indemnify, defend, and hold harmless the other party from and against any Claims in any manner related to or arising out of any breach of this certification.

**4.6 Anti-Money Laundering Laws**. Tenant has reviewed and understands Landlord's policies with respect to ethical business conduct and agrees to fully comply with all such policies. Tenant will comply with all applicable Laws and regulations enacted to combat bribery and corruption, including the United States Foreign Corrupt Practices Act, the principles of the OECD Convention on Combating Bribery of Foreign Public Officials and any corresponding Laws of all countries where business or services will be conducted or performed pursuant to this Lease (collectively, the "**Anti-Corruption Laws**"). Tenant and, to the best of Tenant's knowledge, its subsidiaries and affiliates, have conducted their businesses in compliance with the Anti-Corruption Laws. Tenant will not knowingly in violation of Law or any Landlord policy of which Tenant has been notified, directly or indirectly pay, offer, promise, or give anything of value (including any amounts paid or credited by Landlord to Tenant) to any person or party, to influence any act or decision by such person or party for the purpose of obtaining, retaining, or directing business to Landlord.

**4.7** [***]Landlord intends to pursue [***]for the benefit of the Premises. Tenant agrees to cooperate with Landlord and Landlord's Agents in this pursuit. If requested by Landlord, Tenant will file and diligently pursue (as the applicant/operator) approval of [***]and any supplemental application or forms[***]Tenant will cooperate with Landlord, Landlord's Agents and the applicable Governmental Authorities in promptly providing all requisite information in Tenant's possession in connection with the [***]Tenant shall comply with all Laws applicable to the [***]and maintain all licenses and permits as may be required in connection with it.

**4.8 Permitted Contests**. Notwithstanding any provision of this Lease to the contrary, Tenant shall not be required to pay, discharge or remove any tax, assessment, levy, fee, rent, charge, lien or encumbrance applicable to the Premises or the use thereof, so long as Tenant is contesting, at its sole cost and expense, the existence, amount or validity thereof, provided that any such contest shall: (a) be by appropriate proceedings conducted in accordance with applicable Law; (b) prevent the collection of or other realization upon the tax, assessment, levy, fee, rent, charge, lien or encumbrance so contested; (c) prevent the sale, forfeiture or loss of the Premises; and (d) not subject Landlord to the risk of any criminal liability or civil penalty, and provided further that any such contest may be conducted only for so long as Tenant, during the pendency of such contest, shall take any and all necessary action to prevent any deterioration or worsening of the condition giving rise to the contest that may result in any personal injury or property damage or cause any of the conditions set forth in the foregoing clauses (a) through (d), inclusive, to no longer be satisfied. Tenant shall indemnify Landlord against any liability or penalty assessed against Landlord by reason of such nonpayment. Upon the termination (after final appeal) of any proceeding relating to any contest by Tenant pursuant to this Section 4.8, Tenant shall immediately pay any amount determined in such proceeding to be due or take any action ordered, and in the event Tenant fails to make such payment or take the action, Landlord shall have the right to make any such payment or take the action on behalf of Tenant and charge Tenant therefor, which shall be due and payable upon Tenant's receipt of written demand from Landlord.

## ARTICLE 5
## HAZARDOUS MATERIALS

**5.1 Hazardous Materials Disclosure Certificate**. Prior to executing this Lease, Tenant has completed, executed and delivered to Landlord a Hazardous Materials Disclosure Certificate in the form attached as **Exhibit E** ("**Initial Disclosure Certificate**"). Tenant covenants, represents and warrants to Landlord that the information on the Initial Disclosure Certificate is true and correct in all material respects and accurately describes, in all material respects, the Hazardous Materials which will be manufactured,

**[***] Portions of this exhibit have been redacted pursuant to a confidential treatment request. An unredacted version of this exhibit has been filed separately with the Commission**

treated, used or stored on or about the Premises by Tenant or Tenant's Agents. Tenant shall, on each anniversary of the Commencement Date, execute and deliver to Landlord an updated Disclosure Certificate (each, an "**Updated Disclosure Certificate**") in the form of **Exhibit E** or in such updated format as Landlord may require.

5.2 **Definitions.** The term "**Hazardous Materials**" shall mean and include any substance that is or contains: (a) any "hazardous substance" as now or hereafter defined in § 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("**CERCLA**") (42 U.S.C. § 9601 *et seq.*) or any regulations promulgated under CERCLA; (b) any "hazardous waste" as now or hereafter defined in the Resource Conservation and Recovery Act, as amended ("**RCRA**") (42 U.S.C. § 6901 *et seq.*) or any regulations promulgated under RCRA; (c) any substance now or hereafter regulated by the Toxic Substances Control Act, as amended ("**TSCA**") (15 U.S.C. § 2601 *et seq.*) or any regulations promulgated under TSCA; (d) petroleum, petroleum by-products, gasoline, diesel fuel, or other petroleum hydrocarbons; (e) asbestos and asbestos-containing material, in any form, whether friable or non-friable; (f) polychlorinated biphenyls; (g) lead and lead-containing materials; or (h) any additional substance, material or waste: (i) the presence of which on or about the Premises requires reporting, investigation or remediation under any Environmental Laws; (ii) which causes or threatens to cause a nuisance on the Premises or any adjacent area or property or poses or threatens to pose a hazard to the health or safety of persons on the Premises or any adjacent area or property; (iii) which, if it emanated or migrated from the Premises, could constitute a trespass, or (iv) which is now or is later classified or considered to be hazardous or toxic under any Environmental Laws. As used in this Lease, the term "**Environmental Laws**" shall mean and include: (A) CERCLA, RCRA and TSCA; and (B) any other federal, state or local laws, ordinances, statutes, codes, rules, regulations, orders or decrees now or later in effect relating to (1) pollution, (2) the protection or regulation of human health, natural resources or the environment, (3) the treatment, storage or disposal of Hazardous Materials, or (4) the emission, discharge, release or threatened release of Hazardous Materials into the environment.

5.3 **Environmental Covenants.** During its use and occupancy of the Premises, Tenant will: (a) not release, discharge or dispose of any Hazardous Materials on, in, at, under, or emanating from, the Premises in violation of any Environmental Law; (b) not permit Hazardous Materials to be present on or about the Premises except: (i) in a manner and quantity necessary for the ordinary performance of Tenant's business; or (ii) to the extent of Migratory Releases; (c) comply with all Environmental Laws relating to its use of Hazardous Materials on or about the Premises and not engage in or permit others to engage in any activity (other than a Migratory Release) at the Premises in violation of any Environmental Laws; and (d) upon obtaining knowledge thereof, immediately notify Landlord of: (i) any inquiry, test, investigation or enforcement proceeding by any Governmental Authority against Tenant, Landlord as the owner of the Premises, or the Premises or Land relating to any Hazardous Materials or under any Environmental Laws; or (ii) the occurrence of any event or existence of any condition that would cause a breach of any of the covenants set forth in this Article 5. The term "**Migratory Release**" means a release of Hazardous Materials on, in or under the Premises caused by the migration or leaching of Hazardous Materials from an area outside of the Premises that is not caused or exacerbated by an act or omission of Tenant. Without limitation of the foregoing, Tenant acknowledges the Premises are subject to, and Tenant will comply with, [***].

5.4 **Remediation.** If Tenant's use of Hazardous Materials on or about the Premises results in a release, discharge or disposal of Hazardous Materials on, in, at, under, or emanating from, the Premises in violation of any Environmental Law, Tenant agrees to investigate, clean up, remove or remediate such Hazardous Materials in full compliance with the requirements of: (a) all Environmental Laws; and (b) any Governmental Authority responsible for the enforcement of any Environmental Laws.

5.5 **Right of Entry and Inspection by Landlord.** Subject to the terms of Sections 9.5 and 9.6, upon at least twenty-four (24) hours' prior written notice to Tenant (except for emergencies for which no notice is required), Landlord will have the right, but not the obligation, to inspect the Premises and

**[***] Portions of this exhibit have been redacted pursuant to a confidential treatment request. An unredacted version of this exhibit has been filed separately with the Commission**