# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

------------------------------------------------------------x
                        :

In re:                     :         **Chapter 11**
                        :

**GT ADVANCED TECHNOLOGIES INC.,** *et al.,*  :      **Case No. 14-11916-HJB**
                        :

             **Debtors.**[1]    :        **Jointly Administered**
                        :
                        :
                        :
------------------------------------------------------------x

### DEBTORS' MOTION, PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363(b), AND 365 AND BANKRUPTCY RULE 9019, FOR ENTRY OF ORDER APPROVING TERMS OF, AND AUTHORIZING DEBTORS TO ENTER INTO, <u>SETTLEMENT AGREEMENT WITH MEYER BURGER</u>

GT Advanced Technologies Inc. ("<u>GT</u>") and its affiliated debtors as debtors in possession in the above-captioned chapter 11 cases (collectively, "<u>GTAT</u>" or the "<u>Debtors</u>") hereby submit this Motion (the "<u>Motion</u>"), pursuant to sections 105, 363(b), and 365 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for entry of an order approving the terms of, and authorizing GTAT to enter into, that certain Settlement Agreement, dated April 21, 2015 (the "<u>Settlement Agreement</u>"),[2] by and among (i) Meyer Burger AG ("<u>MB AG</u>"), Diamond Materials Tech, Inc. ("DMT"), and MBT Systems Ltd. ("<u>MBT</u>," and together with MB AG and DMT,

---

[1]    The Debtors, along with the last four digits of each debtor's tax identification number, as applicable, are:  GT Advanced Technologies Inc. (6749), GTAT Corporation (1760), GT Advanced Equipment Holding LLC (8329), GT Equipment Holdings, Inc. (0040), Lindbergh Acquisition Corp. (5073), GT Sapphire Systems Holding LLC (4417), GT Advanced Cz LLC (9815), GT Sapphire Systems Group LLC (5126), and GT Advanced Technologies Limited (1721).  The Debtors' corporate headquarters are located at 243 Daniel Webster Highway, Merrimack, NH 03054.

[2]    The summaries and descriptions of the Settlement Agreement contained in this Motion are qualified in their entirety by the terms of the Settlement Agreement and shall not in any way affect the meaning or interpretation of the Settlement Agreement.  Furthermore, the description of the benefits of the Settlement Agreement assumes that the Effective Date of such agreement will occur.  Capitalized terms used but not otherwise defined in this Motion shall have the meanings set forth in the Settlement Agreement.  A copy of the Settlement Agreement is attached hereto as <u>Exhibit A</u>.

"Meyer Burger")[3] and (ii) GTAT Corporation ("GTAT Corp.") and the other Debtors (together with the MB Parties, collectively, the "Parties").  In support of the Motion, GTAT respectfully represents:

## PRELIMINARY STATEMENT

1.      Prior to the Petition Date, Meyer Burger provided GTAT with several millions of dollars of machinery, equipment, parts, materials, consumables, products, accessories, tooling, diamond wire, and other items (collectively, the "MB Equipment"), which principally consisted of sapphire cutting tools and related parts and materials, including diamond wire.  The MB Equipment was deployed by GTAT in its sapphire growth project with Apple to cut and process sapphire boules grown in its advanced sapphire furnaces (the "ASF Furnaces") at the Mesa facility.

2.      As this Court is well aware, GTAT is now in the process of winding down its sapphire growth operations and marketing its ASF Furnaces for sale.  In connection with the wind-down process, GTAT is also seeking to monetize the various fabrication equipment and related materials that are of no further use to GTAT's remaining operations going forward, including the MB Equipment.  Meyer Burger has asserted, however, that certain of the MB Equipment, namely 18 units of Brickmaster BM 860s provided to GTAT (the "Brickmasters") (which Meyer Burger asserts have a value of almost $12 million), is property of Meyer Burger.

3.      After intensive, hard-fought negotiations, GTAT has reached a global settlement with Meyer Burger that, among other things, resolves—in GTAT Corp.'s favor—the ownership dispute with respect to the Brickmasters.  At the same time, Meyer Burger waives *all* reclamation demands against GTAT (with an aggregate amount in excess of $3.7 million) and *all*

---

[3]      MB AG is a corporation organized under the laws of Switzerland, having its principal place of business at Schorenstrasse 39, 3645 Gwatt (Thun), Switzerland.  MBT and DMT are U.S. subsidiaries of MB AG.

administrative expense claims against GTAT (with an aggregate amount in excess of $1.3 million).  Under the Settlement Agreement, Meyer Burger's sole remaining claim against the estates is an allowed general unsecured claim in the aggregate amount of approximately $34.8 million against GTAT Corp.—which represents a material reduction of the more than $48.6 million in claims asserted by Meyer Burger.

4.      By resolving all ownership disputes with respect to the MB Equipment, the Settlement Agreement clears the path for GTAT to market and sell the MB Equipment.  The Settlement Agreement avoids the substantial costs and potentially lengthy litigation with Meyer Burger over the ownership of the Brickmasters (possibly in a Swiss court), during which time GTAT would effectively be precluded from selling the Brickmasters.  Moreover, there is no guarantee that GTAT would ultimately prevail and, if it did prevail in such litigation, of what damages would be.  By resolving this dispute consensually, the Settlement Agreement also frees senior management to focus its energy on selling ASF Furnaces and transitioning GTAT's business to the "new GTAT."

5.      While the Settlement Agreement provides Meyer Burger with a significant allowed general unsecured claim against GTAT Corp., that claim reflects, in substantial part, claims for equipment and materials that GTAT Corp. ordered and/or received (but did not fully pay for) and damages claims for equipment and materials in Meyer Burger's supply chain as a result of, in some instances, unfulfilled purchase orders and/or forecasts provided by GTAT Corp.  Absent the Settlement Agreement, GTAT would object to some or all of these and other claims; however, GTAT submits that the allowance of a general unsecured claim against GTAT Corp. in the above amount is fair and reasonable in light of the substantial benefits to be received under the Settlement Agreement—most importantly, the resolution of all ownership disputes

with respect to the MB Equipment and the elimination of all reclamation and administrative expense claims.

6.      Finally, while GTAT believes that it also has viable counterclaims against Meyer Burger, including for breach of contract and breach of warranty, the size of damages that would be awarded on account of such counterclaims is uncertain.  Therefore, GTAT believes that it is also appropriate to provide Meyer Burger with a global release under the Settlement Agreement.

7.      For all these reasons, and as further demonstrated below, the Settlement Agreement should be approved for the benefit of GTAT and all of its stakeholders.

## JURISDICTION, VENUE AND STATUTORY BASES

8.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory and rule bases for the relief requested herein are sections 105, 363(b), and 365 of the Bankruptcy Code and Bankruptcy Rule 9019.

## BACKGROUND

### GTAT's Chapter 11 Cases

10.      On October 6, 2014 (the "Petition Date"), GTAT commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Hampshire (the "Court").  GTAT continues to operate its business and manage its properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of an examiner has been made in these chapter 11 cases. A motion to appoint a trustee has been denied.

11.     These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b).

12.     On October 14, 2014, the Office of the United States Trustee for the District of New Hampshire appointed an official committee of unsecured creditors (the "Creditors' Committee") in these chapter 11 cases.

### GTAT's Prepetition Relationship with Meyer Burger

13.     In connection with the sapphire growth project with Apple, GTAT Corp. entered into various agreements with Meyer Burger (collectively, the "MB Contracts") for the purchase of sapphire cutting tools and related materials to cut and process the sapphire boules grown in GTAT's ASF Furnaces.  Specifically, MBT and GTAT Corp. entered into a Statement of Work Under the Master Equipment Purchase Agreement, effective as of December 5, 2013 (the "SOW"), pursuant to which MBT agreed to sell to GTAT Corp., among other things, cutting tools known as MCP 650s (the "650s") and CR 750s (the "750s") and related materials.[4]  In connection with the SOW, GTAT Corp. issued purchase orders to MBT for 650s and 750s, as well as other tools, spare parts, and related materials.  In addition, GTAT Corp. issued various purchase orders to DMT for the delivery of diamond wire (which is required to cut sapphire) and other related materials.

14.     Following the delivery of the 650s and the 750s in early 2014, GTAT Corp. informed Meyer Burger that the cutting tools did not conform to the performance specifications set forth in the SOW.  During the Spring of 2014, representatives of GTAT, Meyer Burger, and Apple met on several occasions, including on April 4, 2014, to discuss a resolution to these

---

[4]     The SOW was issued under the Master Equipment Purchase Agreement ("MEPA") between Apple and certain Meyer Burger entities, effective as of October 1, 2013.  The MEPA provides the framework under which an authorized purchaser for Apple may execute purchase orders with Meyer Burger.  The SOW was entered into under the MEPA and incorporates the terms and conditions of the MEPA.

issues.  Among other things, the parties agreed that Meyer Burger would provide replacement saws with superior performance metrics, namely the Brickmasters.  As further detailed below, Meyer Burger has asserted that, at that meeting, GTAT Corp. also agreed to purchase additional 650s.

15.     During the Spring and Summer of 2014, Meyer Burger provided the 18 Brickmasters to GTAT pursuant to a series of evaluation agreements (the "Evaluation Agreements") between GTAT Corp. and MB AG.  The Evaluation Agreements generally provided that MB AG would "loan" the Brickmasters to GTAT Corp. for a period of 90 days, at the end of which period the parties would agree on further steps, including giving GTAT Corp. the option to purchase the machines at a mutually agreed upon price.  The Evaluation Agreements also provided that MB AG would retain ownership of the Brickmasters during that 90 day lending period and until they have been fully paid.  The Evaluation Agreements provide that they are governed by Swiss law and that any dispute arising thereunder must be brought in the Swiss courts.

16.     During and following the evaluation period for the Brickmasters, the parties attempted to negotiate a replacement agreement to formalize the terms pursuant to which the 650s would be replaced by the Brickmasters.  While the parties exchanged drafts of a replacement agreement during August 2014, that agreement was not finalized or executed prior to the Petition Date.  As further detailed below, Meyer Burger has asserted that it remains the owner of the Brickmasters.

### Meyer Burger's Claims

17. On January 26, 2015, Meyer Burger filed three proofs of claims against GTAT Corp. for alleged breaches of contract (collectively, the "MB Claims").[5]

18. <u>MB AG Claim</u>. MB AG filed proof of claim No. 884 asserting a general unsecured claim against GTAT Corp. in the amount of $6,608,500 (the "MB AG Claim"). The MB AG Claim asserts a claim for the value of 10 additional Brickmaster BM 860s (*i.e.*, in addition to the 18 Brickmasters that Meyer Burger provided to GTAT Corp. under the Evaluation Agreements) currently in MB AG's possession in Switzerland. MB AG asserts that GTAT Corp. demanded these additional units at the April 4, 2014 meeting.

19. <u>MBT Claim</u>. MBT filed proof of claim No. 871 asserting claims against GTAT Corp. in the aggregate amount of $18,226,675.74 (the "MBT Claim"). The MBT Claim asserts numerous claims against GTAT Corp., including:

    a. an administrative expense claim under section 503(b)(9) of the Bankruptcy Code in the amount of $203,179.58 for goods received by GTAT Corp. during the 20-day period before the Petition Date;

    b. a claim in the amount of $3,208,748.07 for open accounts receivables (in addition to the section 503(b)(9) administrative expense claim);

    c. a claim in the amount of $4,945,093.40 for unpaid amounts in respect of cutting tools (including the 650s and 750s) delivered to GTAT Corp. between January 2014 and June 2014;

    d. a claim in the amount of $2,252,510.12 for materials in MBT's supply chain at the time of the Petition Date (related to various purchase orders with GTAT Corp.);

    e. a claim in the amount of $1,685,1787 for the value of additional 650s built and delivered to GTAT Corp.;

---

[5] GTAT Corp. reserves all its rights to disputes the validity, amount, and priority of the MB Claims in the event that the Settlement Agreement is not approved by the Court.

   f. a claim in the amount of $4,750,480.18 for the value of equipment acquired by MBT for 30 additional 650s that MBT asserted were demanded by GTAT Corp. at the April 4, 2014 meeting; and

   g. a claim in the amount of $1,181,486.39 for the value of conversion kits that would allow GTAT Corp. to convert the 650s into 750s.

20. <u>DMT Claim</u>. DMT filed proof of claim No. 868 asserting claims against GTAT Corp. in the aggregate amount of $11,943,334.92 (the "<u>DMT Claim</u>"), including:

   a. an administrative expense claim under section 503(b)(9) of the Bankruptcy Code in the amount of $1,139,394.32 for goods received by GTAT Corp. during the 20-day period before the Petition Date;

   b. a claim in the amount of $1,717,164.20 for open accounts receivables (in addition to the section 503(b)(9) administrative expense claim);

   c. a claim in the amount of $7,863,562.49 for finished goods and raw/process materials in DMT's supply chain at the time of the Petition Date to fulfill a purchase order and GTAT Corp.'s 6-month forecast;

   d. a claim in the amount of $577,784.91 for certain spools in the possession of GTAT Corp. as of the Petition Date (which DMT asserts are property of DMT); and

   e. a claim in the amount of $645,429.00 for certain services DMT asserts it provided to GTAT Corp. for three weeks after the Petition Date.

21. In addition to the foregoing claims, MB AG has also asserted, by letter dated November 19, 2014, that it holds an ownership interest in the 18 Brickmasters delivered to GTAT pursuant to the Evaluation Agreements. Meyer Burger has asserted that the Evaluation Agreements provide that (a) they are not purchase and sale agreements and (b) the Brickmasters are property of Meyer Burger. Meyer Burger asserts that the Brickmasters have a total value of $11,895,300.

22. Meyer Burger has also asserted reclamation demands with respect to goods received by GTAT Corp. during the 45-day period prior to the Petition Date. Specifically, on October 25, 2014, MBT submitted a reclamation demand seeking to reclaim from GTAT Corp.

goods with an invoiced value of $1,547,507.59 (the "MBT Reclamation Demand"), and DMT submitted a reclamation demand seeking to reclaim from GTAT Corp. goods with an invoiced value of $2,225,308.52 (the "DMT Reclamation Demand" and, together with the MBT Reclamation Demand, the "MB Reclamation Demands").[6]

23.     GTAT Corp. granted the MB Reclamation Demands by notice dated February 6, 2015 [Docket No. 1229] (the "Reclamation Notice"), subject to the terms and limitations set forth in the Reclamation Notice.  On February 26, 2015, MBT and DMT each filed objections to the Reclamation Notice as it relates to their Reclamation Demands [Docket Nos. 1348 and 1349] (the "Reclamation Objections").[7]

### GTAT's Potential Counterclaims Against Meyer Burger

24.     GTAT believes that it has viable counterclaims against Meyer Burger in connection with the sapphire cutting tools and related materials sold to it under the MB Contracts, including for breach of contract and breach of warranty.  Among other things, GTAT believes that it incurred consequential and incidental damages because the 650s and 750s did not conform to the specifications set forth in the SOW.  These damages include (a) the cost of additional equipment and materials that needed to be purchased from other third parties, (b) the value of sapphire material that had to be discarded, and (c) the cost of retraining employees for the replacement tools.  However, while GTAT believes it has viable counterclaims, the size of damages that would ultimately be awarded on account of such claims is uncertain.

---

[6]    The MBT Reclamation Demand and the DMT Reclamation Demand include the goods at issue in the 503(b)(9) portion of the MBT Claim and the DMT Claim, respectively.

[7]    GTAT Corp. reserves all its rights in regard to the Reclamation Objections in the event the Settlement Agreement is not approved by the Court.

## Settlement Agreement With Meyer Burger

25.     GTAT and Meyer Burger have engaged in significant good faith, arm's-length negotiations regarding a possible consensual resolution to their various disputes with respect to the MB Contracts, the MB Equipment, the MB Claims, and the business relationship between the parties more generally.  As a result of these negotiations, on April 21, 2015, Meyer Burger and GTAT entered into the Settlement Agreement pursuant to which, among other things, GTAT will retain ownership of **all** MB Equipment provided by Meyer Burger (including, without limitation, the Brickmasters), Meyer Burger waives **all** reclamation demands and administrative expense claims against GTAT, and Meyer Burger's sole remaining claim will be a general unsecured claim in the aggregate amount of approximately $34.8 million, which represents a substantial reduction of the more than $48.6 million in aggregate claims asserted by Meyer Burger.  The parties also agreed to global mutual releases.

26.     The key terms of Settlement Agreement are summarized as follows:

| Ownership of MB Equipment | The Approval Order shall find and declare that Meyer Burger has sold and transferred all right, title, and interest whatsoever in and to any and all MB Equipment to GTAT Corp. and that GTAT Corp. is the owner of any and all the MB Equipment, including, without limitation, the Brickmasters, free and clear of any liens, claims, encumbrances, or interests.  For the avoidance of doubt, the GTAT Parties shall have no right to any parts and equipment in the possession of Meyer Burger as of the Effective Date.  Meyer Burger shall provide GTAT, at no cost, with any keys, codes, or passwords, including any updates thereof and related written instructions, required to operate the MB Equipment. |
|---|---|
| Resolution of Meyer Burger's Claims | <u>MB Reclamation Demands</u>.  Meyer Burger waives and withdraws any and all reclamation demands for any and all goods received by GTAT, including, without limitation, the MB Reclamation Demands.<br><br><u>Administrative Expense Claims</u>.  Meyer Burger waives and withdraws any and all administrative expense claims against GTAT, including, without limitation, any administrative expense claims |

| | arising under section 503(b)(9) of the Bankruptcy Code. |
|---|---|
| | Allowed General Unsecured Claims Against GTAT Corp. |
| | (a) MB AG shall have an allowed general unsecured claim in the amount of $6,252,993.82 against GTAT Corp.  The balance of the MB AG Claim is waived and extinguished.  The MB AG Claim is deemed amended accordingly. |
| | (b) MBT shall have an allowed general unsecured claim in the amount of $17,246,166.43 against GTAT Corp.  The balance of the MBT Claim is waived and extinguished.  The MBT Claim is deemed amended accordingly. |
| | (c) DMT shall have an allowed general unsecured claim in the amount of $11,300,839.75 against GTAT Corp.  The balance of the DMT Claim is waived and extinguished.  The DMT Claim is deemed amended accordingly. |
| **Intellectual Property** | Nothing contained in the Settlement Agreement constitutes a license, sale, or transfer of Meyer Burger's intellectual property to GTAT; provided, however, and notwithstanding the terms and conditions of any previous licenses, Meyer Burger grant to GTAT Corp. the right to use any software or other technology in connection with any and all MB Equipment.  For the avoidance of doubt, in connection with a sale of any MB Equipment by GTAT Corp. to a purchaser, GTAT Corp. may transfer the right to use such software or other technology to such purchaser. |
| **Servicing and Warranties** | Meyer Burger will have no obligations to service or honor any warranties on any and all MB Equipment; provided, however, that Meyer Burger agrees that any future purchaser of MB Equipment shall be entitled to purchase any support and/or maintenance that Meyer Burger offer generally to their customers at the standard list price for such support and/or maintenance. |
| **Rejection of MB Contracts** | The MB Contracts will be deemed rejected pursuant to section 365(a) of the Bankruptcy Code. |
| **Mutual Release of Claims** | In consideration of the foregoing, effective as of the Effective Date, (i) Meyer Burger releases, remises and forever discharges GTAT and its current and former officers, directors, agents, attorneys, employees, affiliates, advisors, consultants, attorneys, shareholders and members (collectively, "GTAT Releasees") of and from all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, claims, rights, damages, losses or liabilities of any kind or nature whatsoever, both |

| | |
|---|---|
| | at law or in equity, whether known or unknown which arose at any time prior to the Effective Date, or which hereafter could arise based on any act, fact, transaction, cause, matter or thing which occurred prior to the Effective Date related to the MB Contracts, the MB Equipment, or the business relationship between Meyer Burger and GTAT, and (ii) GTAT releases, remises and forever discharges Meyer Burger and its current and former officers, directors, agents, attorneys, employees, affiliates, advisors, consultants, attorneys, shareholders and members (collectively, "MB Releasees") of and from all debts, demands, actions, causes of action, avoidance actions, suits, accounts, covenants, contracts, agreements, claims, rights, damages, offsets, losses or liabilities of any kind or nature whatsoever, both at law or in equity, whether known or unknown which arose at any time prior to the Effective Date, or which hereafter could arise based on any act, fact, transaction, cause, matter or thing which occurred prior to the Effective Date related to the MB Contracts, the MB Equipment, or the business relationship between Meyer Burger and GTAT.  Notwithstanding the foregoing, no GTAT Releasee or MB Releasee is released in respect of any rights or claims arising under the express terms of the Settlement Agreement.  For the avoidance of doubt, upon entry of the Approval Order, (a) the Meyer Burger will have no reclamation claims for any goods received by any GT Party, (b) Meyer Burger will have no administrative expense claims against any GT Party, (c) the only claims of any MB Party surviving against any GT Party will be the general unsecured claims allowed under Section 4 of the Settlement Agreement, and (d) GTAT will have no claims against any MB Party. |
| **Effectiveness** | The Parties agree that the Settlement Agreement shall be conditioned upon (a) the entry of an order of the Bankruptcy Court approving this Settlement Agreement (the "Approval Order"), and (b) the Approval Order becoming final and no longer subject to any appeal (the "Effective Date"). |

## **RELIEF REQUESTED**

27.     GTAT seeks entry of an order, pursuant to sections 105, 363(b), and 365 of the

Bankruptcy Code and Bankruptcy Rule 9019, substantially in the form attached hereto as

Exhibit B, approving the terms of, and authorizing GTAT to enter into, the Settlement

Agreement, and granting such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF REQUESTED

### The Settlement Agreement Should Be Approved

28.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."

29.     Settlements are an important and routine part of the bankruptcy process and are favored over litigation.[8]  "Settlements are favored because they serve to minimize litigation, provide a means for efficient resolution of disputes, and help to expedite the administration of the bankruptcy estate."[9]

30.     The approval of a settlement is within the sound discretion of the bankruptcy judge.[10]  Importantly, "the responsibility of the bankruptcy judge . . . is not to decide the numerous questions of law and fact raised . . . but rather to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."[11]  Thus, a court should defer to the debtor's determination and not substitute its own judgment for that of the

---

[8]     *See LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 212 F.3d 632, 635 (1st Cir.2000) (quoting *Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45, 50 n.5 (1st Cir. 1998)); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson ("TMT Trailer Ferry")*, 390 U.S. 414, 424 (1968) ("Compromises are a normal part of the process of reorganization.") (internal quotations omitted)); *City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 91 (1st Cir. 2011) ("[S]ettlements are looked upon with favor in bankruptcy proceedings."); *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) ("To minimize litigation and expedite the administration of a bankruptcy estate, 'compromises are favored in bankruptcy.'").

[9]     *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 619 (Bankr. D. Del. 2001) (internal citations omitted).

[10]    *Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995).

[11]    *Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45,  51 (1st Cir. 1998) (quoting *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir.1983)) (internal citations omitted); *see also In re Am. Cartage*, 656 F.3d 82, 91 (1st Cir. 2011); *ARS Brook, LLC v. Jalbert (In re ServiSense.com, Inc.)*, 382 F.3d 68, 71-72 (1st Cir. 2004); *In re Integrated Health Servs., Inc.*, No. 00-389, 2001 WL 1820426, at *2 (Bankr. D. Del. Jan. 3, 2001); *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

debtor.[12]  The examination of a settlement does not require a "mini-trial" of the claims being settled or a full, independent investigation.[13]

31.     A settlement should be approved if it is fair, equitable and in the best interests of the estate.[14]  In deciding whether to approve a settlement, courts typically consider the following factors:  (a) the probability of success in litigation being compromised; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.[15]

32.     As demonstrated below, these factors weigh heavily in favor of approving the proposed compromise with Meyer Burger and authorizing GTAT to enter into the Settlement Agreement.

**A.     The Settlement Agreement Resolves the Ownership Dispute With Respect to the Brickmasters in GTAT Corp's Favor**

33.     In light of the wind-down of GTAT's sapphire growth operations, GTAT has no further use for the MB Equipment, and therefore believes that it is in the best interest of its estates to market and sell the MB Equipment to interested purchasers.  By resolving all ownership disputes with respect to the MB Equipment in favor of GTAT Corp., the Settlement Agreement clears the path for this sale process and greatly enhances the marketability of the MB Equipment.

---

[12]  *Healthco Int'l*, 136 F.3d at 50 n.5.

[13]  *See Drexel Burnham*, 134 B.R. at 505; *see also W.T. Grant*, 699 F.2d at 608.

[14]  *TMT Trailer Ferry*, 390 U.S. at 424; *Jeremiah v. Richardson*, 148 F.3d 17, 23 (1st Cir. 1998); *Drexel Burnham*, 134 B.R. at 505.

[15]  *See Jeremiah*, 148 F.3d at 23 (citing *Jeffrey v. Desmond*, 70 F.3d at 185)); *see also In re Martin*, 91 F.3d at 393.

34.     As noted above, Meyer Burger has asserted that MB AG is the owner of the Brickmasters pursuant to the express terms of the Evaluation Agreements.  While GTAT disagrees with that position—because, among other things, GTAT believes that the Evaluation Agreements form a single contract together with the SOW and the Brickmasters were intended to replace the 650s purchased under the SOW—it is uncertain whether GTAT would succeed if this matter were litigated, especially given the conflicting contractual provisions in the SOW and the Evaluation Agreements, the complexity of the subject matter, and the possibility that this dispute would have to be litigated in a Swiss court.

35.     Even if GTAT were successful on the merits, litigation with Meyer Burger (including any appeals) would likely impose substantial costs on these estates, especially because the Evaluation Agreements purport to require the parties to bring any dispute arising thereunder in the Swiss courts.[16]  Litigating this ownership dispute in a foreign jurisdiction would also present a significant distraction to GTAT's senior management at a critical stage in these chapter 11 cases, when it must focus on selling ASF Furnaces and transition GTAT's business to the "new GTAT."  Moreover, during the pendency of any such litigation (which could be protracted), the cloud over the ownership of the Brickmasters would effectively preclude GTAT Corp. from selling them.[17]

36.     Further enhancing the marketability of **all** MB Equipment, Meyer Burger agrees under the Settlement Agreement that (a) any future purchaser of MB Equipment is entitled to purchase any support and/or maintenance that Meyer Burger generally offers to its customers at

---

[16]  GTAT reserves its right to argue, in the event the Settlement Agreement is not approved by the Court, that the Swiss choice of law and forum selection clauses in the Evaluation Agreements do not control given the precedence of the SOW.

[17]  In addition to the Brickmasters, the Settlement Agreement also resolves—in GTAT Corp.'s favor—the ownership of certain other MB Equipment, including the goods subject to Meyer Burger's reclamation demands and the spools.

the standard list price for such support and/or maintenance and (b) GTAT Corp. may use any software or other technology in connection with any and all MB Equipment and, in connection with the sale of any MB Equipment by GTAT Corp. to a purchaser, GTAT may transfer its right to use such software or other technology to such purchaser.

37.     For all these reasons, the Settlement Agreement clears the path for GTAT to market and sell the MB Equipment to interested purchasers.

**B.      The Settlement Agreement Substantially Reduces Meyer Burger's Claims and Eliminates All Administrative Expense Claims and Reclamation Demands**

38.     The second important feature of the Settlement Agreement is the resolution of Meyer Burger's various claims against these estates.  First, under the Settlement Agreement, Meyer Burger agrees to waive and withdraw *any* administrative expense claims (including the approximately $1.3 million in 503(b)(9) claims asserted in the MBT Claim and the DMT Claim) and *any* reclamation claims (including the approximately $3.7 million Reclamation Demands).[18]

39.     Second, under the Settlement Agreement, Meyer Burger receives an allowed general unsecured claim against GTAT Corp. in the aggregate amount of $34.8 million, representing a substantial reduction in the more than $48 million in claims asserted by Meyer Burger against GTAT Corp.  A substantial portion of the remaining claims reflect claims for equipment and materials that GTAT Corp. ordered and/or received (but did not fully pay for) and damages claims for equipment and materials in Meyer Burger's supply chain as a result of unfulfilled purchase orders and/or forecasts provided to it by GTAT Corp.

40.     Of course, absent the Settlement Agreement, GTAT would object to some or all of Meyer Burger's claims, including on the grounds that (a) certain of the goods that form the

---

[18]     As noted above, the MBT Reclamation Demand and the DMT Reclamation Demand include the goods at issue in the 503(b)(9) portion of the MBT Claim and the DMT Claim, respectively.

basis of Meyer Burger's claims are not subject to a valid purchase order or other sale contract and (b) Meyer Burger has not shown that it has mitigated its damages.  However, litigation over the allowance of these claims would likely be expensive and time-consuming, including because it would involve discovery in Switzerland.  GTAT also expects that Meyer Burger would vigorously oppose any attempt to disallow its claims against GTAT Corp.  Nor is GTAT able to guarantee that it would ultimately succeed in any such litigation.

41.     On balance, GTAT believes that the allowance of general unsecured claims in the aggregate amount of $34.8 million against GTAT Corp. is fair and reasonable in light of the material benefits to be received under the Settlement Agreement—most importantly, the resolution of all ownership disputes with respect to the MB Equipment and the elimination of all reclamation and administrative expense claims.

**C.**     **While the Estates May Have Viable Counterclaims Against Meyer Burger, the Release of Any Such Counterclaims Is Justified in Light of the Overall Benefits of the Settlement Agreement to the Estates**

42.     GTAT believes that its estates have viable counterclaims against Meyer Burger, including for breach of contract and breach of warranty, in connection with the sale of 650s and 750s that did not conform to the specifications set forth in the SOW.  As a result of the non-conforming cutting tools, GTAT incurred significant consequential and incidental damages, including (a) the cost of purchasing of additional grinding and polishing tools, (b) value of sapphire material that had to be discarded, and (c) additional labor costs.

43.     While GTAT believes that its claims are viable, it is uncertain what the amount of damages ultimately awarded on account of such counterclaims would be.  In any event, pursuing litigation against Meyer Burger would necessarily involve an extensive investigation and consume substantial resources of these estates.  Additionally, such litigation could delay GTAT's emergence from chapter 11, as it would present a major distraction to GTAT's management at a

time when it must focus its attention on the restructuring of GTAT's operations and on selling ASF Furnaces.

44. Accordingly, GTAT believes that, in light of the substantial benefits it stands to gain under the Settlement Agreement, it is appropriate to release any and all claims it may have against Meyer Burger.

## Rejection of MB Contracts Should Be Approved

45. As noted above, under the Settlement Agreement, the MB Contracts will be deemed rejected under section 365(a) of the Bankruptcy Code. Section 365(a) of the Bankruptcy Code provides that a debtor in possession "may assume or reject any executory contract or unexpired lease of the debtor" subject to the court's approval. The decision to assume or reject an executory contract or unexpired lease is a matter within the "business judgment" of the debtor.[19] Rejection of an executory contract or an unexpired lease is appropriate where such rejection would benefit the estate.[20] The business judgment standard mandates that a court approve a debtor's business decision, unless the decision "is the product of bad faith, or whim, or caprice."[21] Upon finding that a debtor has exercised its sound business judgment in determining that rejection of certain

---

[19] *See, e.g.*, *In re Malden Brooks Farm LLC*, 435 B.R. 81, 83 (Bankr. D. Mass. 2010) ("In this circuit the test governing motions to assume or reject . . . is the business judgment rule . . . . The rule accords a debtor's decision to assume or reject an executory contract or unexpired lease the defense mandated by the sound business judgment rule as generally applied by courts to discretionary actions or decisions of corporate directors." (citations omitted)); *Nat'l Labor Relations Bd. v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test.").

[20] *See In re Trans World Airlines*, 261 B.R. 103, 121 (Bankr. D. Del. 2003) ("debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of tad faith, or whim or caprice.") (quoting *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 849-50 (Bankr. W.D. Pa. 1987); *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098-99 (2d Cir. 1993).

[21] *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) (internal citations omitted).

contracts or leases is in the best interests of its creditors and all parties in interest, a court should approve the rejection under section 365(a) of the Bankruptcy Code.[22]

46.     Here, rejection of the MB Contracts, as part of the Settlement Agreement, is in the best interest of GTAT's estates, because (a) GTAT is no longer in the business of growing sapphire and hence has no further use for sapphire cutting equipment and (b) the Settlement Agreement fully resolves the business relationship between GTAT and Meyer Burger, including all claims arising under or in connection with the MB Contracts.  GTAT submits that the Court should approve the rejection of the MB Contracts.

* * *

47.     For all these reasons, the Settlement Agreement is in the best interests of GTAT and its stakeholders and should be approved under sections 105, 363(b), and 365 of the Bankruptcy Code and Bankruptcy Rule 9019.

## NOTICE

48.     Notice of this Motion has been provided by email, facsimile, or overnight courier to: (a) the Office of the United States Trustee for Region 1, 1000 Elm Street, Suite 605 Manchester, NH 03101, Attn: Geraldine L. Karonis; (b) Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178, Attn: James S. Carr, Esq., counsel to the Creditors' Committee; (c) the Internal Revenue Service, 1000 Elm St., 9th Floor Manchester, NH 03101, Attn: District and Regional Directors; (d) U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549; (e) counsel to Meyer Burger; and (f) those parties who have formally filed requests for notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.

---

[22]   *In re Federal Mogul Global, Inc,*. 293 B.R. 124, 126 (D. Del. 2003); *In re Bradlees Stores, Inc.*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996). *appeal dismissed*, 210 B.R. 506 (S.D.N.Y. 1997).

## NO PRIOR REQUEST

49.     No previous request for the relief sought herein has been made by GTAT to this or any other court.

## WAIVER OF MEMORANDUM OF LAW

50.     GTAT requests that the Court waive and dispense with the requirement set forth in Local Rule 7102(b)(2) that any motion filed shall have an accompanying memorandum of law.  The legal authorities upon which GTAT relies are set forth in the Motion.  Accordingly, GTAT submits that a waiver of the Local Rule 7102(b)(2) requirement is appropriate under these circumstances.

*[remainder of page intentionally left blank]*

WHEREFORE, GTAT respectfully requests that the Court enter an order, substantially in

the form attached hereto as Exhibit B, granting the relief requested herein and granting GTAT

such other and further relief as the Court deems just and proper.

Dated: April 22, 2015

/s/ G. Alexander Bongartz
Luc A. Despins, Esq.
Andrew V. Tenzer, Esq.
James T. Grogan, Esq. (BNH07394)
G. Alexander Bongartz, Esq. (BNH07449)
PAUL HASTINGS LLP
Park Avenue Tower
75 East 55th Street, First Floor
New York, New York 10022
Telephone: (212) 318-6000
Facsimile: (212) 319-4090

- and –

Daniel W. Sklar, Esq.
Holly J. Barcroft, Esq.
NIXON PEABODY LLP
900 Elm Street
Manchester, NH 03101-2031
Telephone: (603) 628-4000
Facsimile: (603) 628-4040

Co-Counsel for the Debtors and Debtors in Possession