# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

_____

In re:

       GT ADVANCED TECHNOLOGIES,
INC., *et al.*,

           Debtors[1]

_____

)
)
)
)
)
)
)
)
)

Chapter 11
Case No. 14-11916-HJB
Jointly Administered

## MEMORANDUM

Before the Court on remand from the United States District Court for the District of

New Hampshire (the "District Court") is the Debtors' Motion for Order, Pursuant to

Bankruptcy Code Sections 363(b) and 503(c) Approving Debtors' Key Employee

Incentive Plan and Key Employee Retention Plan (the "Motion to Approve"), filed by the

debtors in possession in these jointly administered Chapter 11 cases (the "Debtors,"

"GTAT"[2]).    After an evidentiary hearing, this Court ruled from the bench, denying the

Motion to Approve in its entirety (the "Denial Order").   The Debtors appealed the Denial

Order and the District Court, in turn, remanded the matter.    In its memorandum of opinion

---

[1]  The Debtors in these chapter 11 cases, now jointly administered, are GT Advanced
Technologies, Inc., case no. 14-11916; GT Equipment Holdings, Inc., case no. 14-11917; GTAT
Corporation, 14-11919; GT Advanced Technologies Limited, case no. 14-11920; Lindbergh
Acquisition Corp., case no. 14-11922; GT Sapphire Systems Group LLC, case no. 14-11923; GT
Sapphire Systems Holding LLC, case no. 14-11924; GT Advanced Cz LLC, case no. 14-11925;
GT Advanced Equipment Holding LLC, case no. 14-11929.

[2]  Debtor GT Advanced Technologies, Inc. is the direct and indirect parent of the seven other
jointly administered debtors as well as various affiliates who have not sought Chapter 11 relief.
For ease of reference, the Court will refer to all together as "GTAT."

accompanying the order of remand (together, the "Remand Order"), the District Court instructed this Court to elucidate additional facts and analysis of the Motion to Approve with specific reference to extant case law.   Having re-reviewed the evidentiary record, the testimony of witnesses, the submitted declarations, and the various legal arguments, the Court welcomes the opportunity to fill in the gaps identified by the District Court, but finds no reason to reach a conclusion different from its initial determination.

I.      THE BACKGROUND[3]

   For over 40 years, GTAT operated as a successful and diversified technology company producing advanced materials and equipment for the global consumer electronics, power electronics, solar, and light-emitting diode ("LED") industries.   Prior to 2013, GTAT's business lines included the sale of equipment and services employed in the production of high quality polysilicon; the production and sale of silicon casting furnaces to produce multicrystalline ingots used in the production of solar cells; and the design and sale of advanced sapphire crystallization furnaces used to produce sapphire

---

[3]  The background here described is in large part drawn from (a) the declarations of (1) Neil A. Augustine ("Augustine"), the Executive Vice Chairman of Rothschild, Inc., the Debtors' Financial Advisor and Investment Banker, Feb. 5, 2015, ECF No. 1206; (2) Brian L. Cumberland ("Cumberland"), National Managing Director of the Compensation & Benefits Practice at Alvarez & Marsal Taxand, LLC, the Debtors' Restructuring Advisor, Feb. 4, 2015, ECF No. 1192; (3) Andrew Pfeifer ("Pfeifer"), the Debtors' Senior Director of Corporate Compensation and Benefits, Feb. 4, 2015, ECF No. 1191; and (4) Richard E. Newsted ("Newsted"), a member of the Debtors' Board of Directors and Restructuring Committee, Feb. 4, 2015, ECF No. 1190 (together the "Declarations", the "Declarants") and; (b) testimony from each of the Declarants at the evidentiary hearing on the Motion to Approve (the "Hearing"); and (c) asseverations made by the Debtors in various documents filed in this case.   Although portions of this history are hotly contested by one or more of the parties in interest, this Court will accept the Debtors' version of the background as true for the purpose hereof, except where otherwise noted.

2

boules.   Sapphire is an exceptionally hard substance (second only to diamonds), which gives it certain advantages over strengthened glass or other materials used in the consumer electronics field.   It can be fabricated for use in both consumer and industrial applications, and GTAT had developed innovative technologies in connection with the manufacture of the furnaces used to grow sapphire boules. Before 2013, GTAT did not actually grow the boules; it supplied the equipment, service and knowhow for the growth of sapphire boules by others.

All of that changed in the fall of 2013, when GTAT's management decided to go into business with Apple, Inc. ("Apple").   Apple was looking for a reliable supplier of sapphire boules that could adapt the boules for Apple's consumer products, and GTAT was delighted to be presented with an opportunity to develop a long-term business relationship with a customer of Apple's size, resources, and reputation.   After some negotiation, a deal was struck.   Said perhaps too simply, Apple agreed to advance GTAT up to $578 million dollars (the "Apple Loan"), which GTAT would use to buy materials to manufacture and install 2,036 sapphire furnaces in Mesa, Arizona (the "Mesa Facility"). But, in a divergence from past practice with its other customers, GTAT would not sell the furnaces to Apple, but would use the furnaces to actually grow the sapphire boules, which would then be sold to Apple at a below market cost.   It was anticipated that the payments received from Apple for the sapphire boules would be substantial enough to permit GTAT to not only repay the Apple loan, but earn a substantial profit.

It is said that all good things come to an end, but others do not even begin well. The relationship between GTAT and Apple broke down quickly, and GTAT and Apple

3

each place the blame for that breakdown on the other. GTAT says that Apple inappropriately inserted itself into GTAT's operations, bullied its employees, and caused GTAT to devote an inordinate amount of cash and corporate attention to the Mesa Facility, thereby sapping GTAT's resources from other areas of its business. GTAT claims that Apple's *de facto* takeover threatened the success of the project from the outset, with Apple embedding itself into the build-out of the Mesa facility, making unreasonable demands during the construction process, and insisting that GTAT use costly fabrication equipment that would doom the economic sustainability of the project and conclude in overwhelming long-term losses. The result was an inevitable liquidity crisis. According to GTAT, when approached with GTAT's concerns, Apple refused to negotiate changes or recognize its destructive conduct, while at the same time the GTAT-Apple agreements precluded GTAT from negotiating more advantageous agreements with others. GTAT posits that this impossible quagmire was Apple's design all along – that is, to suck the value out of GTAT and eventually take over GTAT's operations for its own. Indeed, according to GTAT, by the time of the filing of this bankruptcy case, it had suffered over $900 million in losses on account of its relationship with Apple.

Apple tells a different story. It says that it negotiated in good faith, but that GTAT proved not to be up to the task of meeting its obligations to Apple under their agreements. Apple contends that GTAT not only generally conducted itself poorly from a business perspective, but ultimately produced sapphire boules whose quality Apple found

4

completely lacking for their intended use.   Accordingly, Apple maintains that it had no option but to seek an alternative supply and demand repayment of the Apple Loan.[4]

In the midst of this dispute, with enormous losses accruing and without the substantial income anticipated from the Apple agreements, the Debtors commenced their voluntary cases under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code" or the "Code")[5] on October 6, 2014. At the time of filing, the Debtors claimed that their assets were valued at over one billion dollars and the total workforce approximated 1000 employees. Since the filing of this case and an eventual settlement with Apple, GTAT has reportedly suffered an additional 300 million dollars in losses and laid off over 800 employees (approximately 70 percent of its workforce). Almost all of the 700 employees in Mesa, Arizona have had their employment discontinued.

A determination of whose story – GTAT's or Apple's – is closer to the truth (or whether they are both substantially true) is not material to the issues before this Court. Nor is it likely that they will ever be the subject of a judicial determination, as, after some particularly heated court filings and negotiations, GTAT and Apple reached a settlement. Again described perhaps a bit too simply, GTAT and Apple agreed to divorce – the assets of their joint concern (the 2,036 sapphire furnaces) are to be disposed of by GTAT and the proceeds divided between Apple and GTAT in a manner not material here.   GTAT will abandon the Mesa Facility, which will be turned over to Apple.

---

[4] Apple also withheld remittance of the final $139 million installment of the $578 million loan.

[5] See 11 U.S.C. § 101 et seq.   All references to statutory sections are to the Bankruptcy Code unless otherwise specified.

GTAT's job is now two-fold.   First, it must dispose of the 2,036 furnaces in accordance with its settlement agreement with Apple.   Second, it must reorganize its business affairs under Chapter 11 of the Bankruptcy Code to reinvigorate its core legacy businesses in order to achieve some measure of the profitability that it enjoyed prior to its failed marriage with Apple.   Against this tableau, the Court considers GTAT's requests to provide what it calls incentive bonuses to its insiders and retention bonuses to certain other employees.

II.    THE KEY EMPLOYEE INCENTIVE PLAN

On December 29, 2014, the Debtors filed the Motion to Approve, seeking approval of both a Key Employee Incentive Program (the "KEIP") and a Key Employee Retention Program (the "KERP", discussed more fully in section III, below).    The KEIP, as modified, covers nine of the Debtors' insiders (the "Insiders"), providing bonuses based on varying levels of performance with regard to five specific metrics: (1) the value received for GTAT's used furnaces; (2) reductions in the cash operating expense run-rate; (3) the value received for non-furnace assets remaining in the Mesa Facility; (4) advancement of new technology – the so-called Merlin project; and (5) minimization of the costs of deinstalling and crating the furnaces at the Mesa Facility. For each of the metrics, the potential value of the bonuses varies from 19 to 83 percent of the Insiders' base compensation and is measured by the degree of performance within each category.    The KEIP sets forth three performance levels – the "threshold," "target," and "stretch" levels – the "threshold" level being the performance required to receive any bonus at all under the

6

KEIP, the "stretch" level representing the highest level of performance and the maximum bonus that could be received, and the "target" level being performance more than "threshold" and less than "stretch."   The total cost of the KEIP to be paid to these Insiders if all "threshold" levels are reached amounts to $728,001 and, if the "stretch" level is achieved in all categories, the total cost would rise to $2,160,000

On February 5, 2015, the Court held an evidentiary hearing on the Motion to Approve.   In support of the KEIP, the Debtors submitted the various Declarations. The Court also heard testimony from each of the Declarants.

At the conclusion of the Hearing, the Court denied the Motion to Approve.   With regard to the KEIP, the Court stated:

> . . . what I heard every time I inquired with respect to the KEIP was how problematic it would be if the executive team . . . left the company.   It was critical to retain them.
>
> Well, in the absence of a statutory prohibition I could be persuaded to go along with that, but Congress has spoken very clearly on retention agreements [for insiders].   This is a disguised retention agreement.   I do not believe that Mr. Gutierrez or his so-called lieutenants are going to work any less diligently if I don't approve the agreement or any more diligently if I do approve the KEIP agreement.   They will leave the company or stay with the company based on their expectation that the company will survive and how well it will do in its reorganized form.
>
> Retention agreements [for insiders] . . . have been made extraordinarily difficult . . . by section 503(c) of the Bankruptcy Code and the elements of 503(c)(1) . . . have simply not been met and so I cannot approve the KEIP agreement.

Feb. 5, 2015 Hr'g Transcript 165:25-166:21.

7

### A.    The KEIP on Remand

In its Remand Order, the District Court held that this Court erred by focusing its remarks largely on the testimony regarding the critical nature of the Insiders' various roles at GTAT.  GT Advanced Tech., Inc. v. Harrington, Civil No. 15-cv-069-LM, 2015 WL 4459502, *5 (D.N.H. July 21, 2015). The District Court noted that this Court did not opine on whether or not the performance metrics under the KEIP were "difficult to achieve," and instructed on remand that this Court "determine whether the proposed KEIP has sufficiently stringent metrics to qualify as an incentive plan for the purposes of § 503(c)." Id.

### B.    The KEIP: Discussion

In 2005, Congress added Section 503(c)(1)[6] to the Bankruptcy Code in order to deal with what was thought to be an abuse in the administration of Chapter 11 cases

---

[6] Section 503(c)(1) provides, in relevant part:

(c)        . . . there shall neither be allowed, nor paid –

    (1)        a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that --

        (A)        the transfer or obligation is essential to the retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

        (B)        the services provided by the person are essential to the survival of the business; and

        (C)        either –

            (i)        the amount of the transfer . . . is not greater than an amount equal to 10 times the amount of the mean transfer for obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation incurred; or

            (ii)        if no such similar transfers were made to, or obligations were incurred for

8

when insiders received substantial postpetition compensation bonuses.[7]  Section 503(c) distinguishes between those employees who are "insiders" and those who are not. Under § 503(c)(1), bonuses offered to retain the employment of insiders are prohibited unless the debtor is able to meet the strict requirements set forth in § 503(c)(1).   Those requirements are extremely difficult to achieve, and it is undisputed that GTAT cannot do so here.   Section 503(c)(3) relaxes those requirements with respect to non-insiders, requiring only that the proposed retention payments be "justified by the facts and circumstances of the case."

However, some courts have held that if a debtor can establish, by a preponderance of the evidence, that the purpose of a program that provides bonuses to insiders "is primarily incentivizing and not primarily retentive," then § 503(c)(1) does not prohibit the payment of such bonuses, as "the more permissive section of 503(c)(3) applies."   In re Residential Capital, LLC, 475 B.R. 154, 170 (Bankr. S.D.N.Y. 2012) ("Residential I").[8] Of course, it would be a bit too easy for a debtor to just call a retention plan an incentive

---

the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

11 U.S.C. § 503(c)(1).

[7] For a comprehensive overview of the legislative and political history of § 503(c)(1), see Melissa C. King, Are KERPS Alive in Essence? The Viability of Executive Incentive Bonus Plans After 11 U.S.C. § 503(c)(1), 82 St. John's L. Rev. no. 4, art. 5, 2008, at 1509.

[8] More specifically, § 503(c)(3) prohibits "other transfers or obligations that are outside the ordinary course of business and not just by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition."   11 U.S.C. § 503(c)(3).

plan in an effort to focus a court's analysis on subsection (c)(3) rather than (c)(1). Accordingly, courts have held that "[a] debtor's label of a plan as incentivizing to avoid the strictures of section 503(c)(1) must be viewed with skepticism; the circumstances under which the proposal is made and the structure of the compensation package control." Residential I, 475 B.R. at 170.

"To determine whether a payment constitutes an incentive payment, the plan must present targets that are difficult to achieve, forcing the executives to work hard to achieve their bonuses." In re Residential Capital, LLC, 491 B.R. 73, 86 (Bankr. S.D.N.Y. 2013) ("Residental II") (noting that debtors carried their burden by explaining in detail why the targeted metrics were challenging and difficult to achieve).   "Whether incentive targets require management to 'stretch' to meet performance goals is fundamentally a factual question."   In re Velo Holdings, Inc., 472 B.R. 201, 207 (Bankr. S.D.N.Y. 2012).

The District Court instructed this Court to determine, based on evidence already submitted, "whether the proposed KEIP has sufficiently stringent metrics to qualify as an incentive plan for the purposes of § 503(c)." GTAT, 2015 WL 4459502 at *6. The short answer is that this Court has no idea, because beyond conclusory opinion, the Debtors provided little information as to how it would achieve its goals and even less on how stringent was the task of moving from "threshold" to "target" to "stretch" levels. The longer answer is that – in addition to the lack of any detailed evidence from which this Court could reasonably determine whether the various performance matrices would be difficult to achieve or how difficult it would be to move from one level to another – the Debtors

have failed, for at least two reasons, to demonstrate that the KEIP is primarily incentivizing and not retentive in purpose.

First, the KEIP, as described by Augustine, contains "target" performance metrics that align with estimates and projections contained in the business plan developed by the Debtors after the resolution of the settlement with Apple and intended to provide a foundation for the Debtors' future success, DIP financing, and ultimately, the plan of reorganization.[9]    See Debtor's Omnibus Reply 17-19, Feb. 3, 2015, ECF No. 1189; Augustine Decl. 9-12; Hr'g Transcript 92:13-16; 96:13-14; 98:12-15; 125:22-24.   This means that the KEIP is designed to provide these nine Insiders with some performance bonuses in addition to their base salaries *even if* their performance meets only the "threshold" level, a level below that provided for in the Debtors' Business Plan.

Furthermore, there is, to this Court, a substantial disconnect between the rewards to which the Insiders may feel entitled by virtue of their proposed postpetition performance and the history of this case. Whether or not the Insiders can be fairly criticized for taking the risks entailed in entering into the business relationship with Apple, the fact remains that they voluntarily chose to do so.   Now, in essence, the Insiders seek bonus compensation for doing a job they are already obligated to do – to right the ship – and even for performing below those levels characterized in the Business Plan as necessary

---

[9] In fact, it has recently come to light that the Debtor's Business Plan has required substantial changes since the date of the Motion to Approve.   In addition, the Debtors' Chief Executive Officer has resigned and has been replaced by another insider.   In light of these seemingly significant changes in the trajectory of the Debtors' business, the Court inquired of Debtors' counsel at a recent hearing as to whether the Debtors wished to withdraw the Motion to Approve.   Debtors' counsel declined, and so the Court is obligated to consider the Motion to Approve based on the only evidentiary record before it.

to the Debtors' ultimate success.   See, e.g. In re Hawker Beechcraft, Inc., 479 B.R. 308, 315 (Bankr. S.D.N.Y. 2012) (where minimum target level matched business plan projections, plan was not incentivizing, but retentive in nature).

Specifics tell the story better.   Set forth below are the salaries earned by the top 5 executives in 2013, their current base salaries, and the bonuses to which they would be entitled under the KEIP (total compensation in parentheses).

| Name | Annualized Fiscal 2013 | Fiscal 2014 Base Salary under KEIP | Threshold Bonus under KEIP | Target Bonus under KEIP | Stretch Bonus under KEIP |
|---|---|---|---|---|---|
| Thomas Gutuierrez, Chief Executive Officer | $725,000, plus annual cash bonuses of $1,250,000 and additional stock bonuses | $725,000 | $242,667 ($967,667) | $400,000 ($1,125,000) | $720,000 ($1,445,000) |
| Daniel Squiller Exec. VP, GT Med. & Indus. Systems Grp. | $515,000, plus annual cash bonuses of $772,500 and additional stock bonuses | $515,000 | $60,667 ($575,667) | $100,000 ($615,000) | $180,000 ($695,000) |
| Hoil Kim VP, Chief Admin. Officer, Gen. Counsel & Secretary | $386,250, plus annual cash bonuses of $386,250 and additional stock bonuses | $386,250 | $151,667 ($537,917) | $250,000 ($636,250) | $450,000 ($836,250) |
| David Keck, Exec. VP/Gen. Manager, Poly & PV Equip. Grp. | $386,250, plus annual cash bonuses of $639,404 and additional stock bonuses | $386,250 | $121,333 ($507,583) | $200,000 ($586,250) | $360,000 ($746,250) |
| Kanwardev Bal, VP & Chief Financial Officer | N/A (employed January 2014) | $300,000 | $151,667 ($451,667) | $250,000 ($550,000) | $450,000 ($750,000) |

Interestingly, under the KEIP, the other four Insiders have the ability to earn bonuses that actually *exceed* their prepetition cash income.[10]   The Debtors have failed to justify why any of the Insiders should potentially be compensated for their work during this Chapter 11 case in an amount greater than then their prepetition remuneration. While the work of solving the Debtors' problems may be difficult, the mere fact that the Insiders' responsibilities anent the requirements of a Chapter 11 case have increased or changed is alone insufficient to justify increased compensation.   See Residential I, 478 B.R. at 168.

Furthermore, assuming Cumberland is correct in his declaration and testimony that the compensation practices under the KEIP are commensurate with market practice, that fact alone is insufficient to warrant approval of the bonuses.   While such a finding of reasonableness in comparison to other incentive plans "may be a *necessary* requirement . . . it is not a *sufficient* requirement for approval" of a KEIP.   Residential I, 478 B.R. at 166.   Finally, Cumberland also implies that the proposed bonuses are justified because the Insiders are no longer receiving valuable stock bonuses.[11]   In so stating, Cumberland

---

[10]  The identification and salaries of those four Insiders are not listed here, as the Court authorized the Debtors to maintain the confidentiality of the remaining KEIP and all of the KERP participants by Order dated February 15, 2015.

[11]  The Court is referring specifically to the following two statements contained in Cumberland's declaration:

> In prior years, a significant portion of the Total Direct Compensation for Senior Managmeent Employees was in the form of time- and performance-based restricted stock units.   As a consequence of GTAT's recent financial difficulties and precipitous decline in the value of the stock of GT, (a) past equity incentive awards that are still held by the Senior Management Employees have lost substantially all of their value and (b) the grant of equity incentive awards during these bankruptcy cases would be likely to result in no value to the Senior Management Employees.   Without the cash bonus and equity incentive award

13

manages to overlook the insensitivity of his observations. Thousands of stockholders will likely incur significant losses – many in the pensions that they struggled to create, maintain and increase over their working lives – because of decisions made by the Insiders that turned out to be disastrous.   This Court is reasonably confident that the stockholders – the present and perhaps former owners of the company – have no interest in compensating the Insiders in whole or in part for their stock losses as a reward for fixing the problem to which they contributed.

Second, the Court again finds that the repeated statements of counsel and the Declarants regarding the importance of keeping these particular Insiders on board  weigh heavily in its conclusion that the KEIP is primarily designed to retain the Insiders and not to incentivize them. See also Hawker Beechcraft, 479 B.R. at 314 (noting that testimony regarding the critical nature of employees' services to company confirmed the retentive nature of a proposed incentive program); Residential I, 478 B.R. at 172 n.24 (noting that the debtor's argument as to the incentivizing nature of its incentive plan was belied by

---

components, the Total Direct Compensation of the Senior Management Employees for which comprehensive benchmarking has been performed is significantly below industry market levels . . . .

Cumberland Decl. 7 ¶16.

Even taking into account the proposed Modified KEIP, the Total Direct Compensation of the Senior Management Employees for which comprehensive benchmarking has been performed remains significantly below industry market levels . . . . This is due mainly to the proposed Modified KEIP replacing the pre-petition cash bonus program without any meaningful remuneration present to make up for equity incentive awards that were granted pre-petition but cannot be effectively utilized during these chapter 11 cases.

Cumberland Decl. 11 ¶ 23.

14

continual emphasis on "how difficult it would be to replace any of the KEIP Participants if

they were to leave.").

       Specific excerpts from the Hearing testimony are instructive:

| | |
|---|---|
| Court: | And what if I don't approve this?   Does Mr. Gutierrez and Squiller and Kim and Keck and Bal, do they not try to maximize sales and minimize costs? |
| Mr. Despin (Debtors' Counsel) | Look, that's a very – that's a good question.   For some reason I had the feeling that you were going to ask that question, but -- and I – you know, I'm not going to proffer threats or imply threats of any kind. |
| | The point is this.   Their view is [ ] is that if they're are not wanted in this process . . [ ]. . . .  [I]t's a highly technical business and they are highly sought after. |
| | . . .   as debtors' counsel, I would – really would not like to have these people leave.   Have they told me, if he doesn't approve this, I'm leaving?   No. First of all, that would be foolish of them to say that and it would be foolish of me to tell you that because, you know, that's not the case.   But, you know, it's not a signal to them as to whether the Committee and the creditors believe they're the people to maximize value.   And their response, if we're not, just tell us. . . . |
| | I don't know what they would do.   I just wouldn't want to take that chance. I think that maybe the question can be asked of Mr. Augustine, who is our financial advisor, who deals with them on a daily basis.   He may have a better answer than me. |

 Hr'g Transcript, 36:9-38:16.

       And so this Court turns to the testimony of Mr. Augustine.   With regard to the

same question, Augustine testified:

       I've had conversations with members within the KEIP and I'm not saying
       that if Your Honor decided not to approve the KEIP and the KERP that

> senior executives would leave [en masse] and leave their offices . . . tonight
> and not come back tomorrow.   . . . I do believe that people will begin taking
> phone calls that they've been getting and thinking about them more
> seriously.   I do, too, within that nine in particular, I think, will seriously start
> to look . . . ."

Hr'g Transcript 101:14-22. And later in the Hearing, Augustine again testified to the

perceived importance of these specific Insiders:

> The importance of the management team is they have long-standing
> relationships with buyers.   They have a reputation in the Asian
> marketplace that's very relationship dependent.   It's unlike any business
> that I've ever seen that these relationships are driving . . . these business
> deals and that's ultimately how I believe we're going to be successful is
> because of this management team and those relationships . . . .

Hr'g Transcript 123:23-124:6.

This Court finds and rules that the Debtors have failed, by a preponderance of the

evidence, to demonstrate that the KEIP is an incentive program.   It is primarily a

disguised retention plan for these Insiders, and, because all agree that GTAT cannot meet

the requirements of § 503(c)(1), the Motion to Approve, with respect to the KEIP, must be

denied.


III.    THE KEY EMPLOYEE RETENTION PLAN

The proposed KERP provides retention bonuses to 26 employees so long as they

remain with the company until the company emerges from bankruptcy or is sold

(whichever is earlier).   Bonuses under the KERP range from 8 to 48 percent of the

participating employees' (the "Participants") base salary.   In addition, the KERP

establishes a $300,000 discretionary fund that can be used to provide bonuses (not to

exceed $50,000 per individual) to other employees at the discretion of the chief executive

officer and with the consent of the unsecured creditors' committee (the "Creditors' Committee"). The total cost of the KERP, assuming all proposed payments (including discretionary payments) are made, amounts to $1,550,000.

> At the conclusion of the Hearing, this Court denied approval of the KERP, stating:
>
> . . . [T]hose are individuals who have a very difficult decision to make. They need to decide whether they will stay with the company or not. To stay with the company means that they are investing in the company's success and if they decide to leave, then the amount of money that's being offered to them is dramatically lower than the risk that they're trying to avoid. If, in fact, they think that the company will fail – and I've every expectation that they're still there because they anticipated success – but if they change their mind[s] and decide that the company may fail and they get themselves another job offer, then it seems to me that the . . . retention payment . . . .is not going to keep them at the company's premises. They're going to leave in order to protect themselves and their families. . . .
>
> Accordingly, I find [and] I rule . . . that . . . the KERP falls below the the business judgment standard.

Hr'g Transcript 166:22-167:21.

### A. The KERP on Remand

In its Remand Order, the District Court rejected the Debtors' contention that "the rule of decision comes from 11 U.S.C. § 363(b)(1), which governs the use, sale or lease of property of the bankruptcy estate 'other than in the ordinary course of business.'" GTAT, 2015 WL 4459502 at *6. Instead, the court held that "the rule of decision comes from 11 U.S.C. § 503(c)(3), which governs administrative expenses, including 'other transfers or obligations that are outside the ordinary course of business.'" Id. The District Court went further, however, and parted company with those courts that equate the § 503(c)(3) standard with the business judgment standard, agreeing instead with the

17

formulation of the "facts and circumstances test" articulated in <u>In re Pilgrim's Pride Corp.</u>,

401 B.R. 229 (Bankr. N.D. Tex. 2009):

> In applying the simple business judgment test, courts are adjured to defer to the debtor in possession or the trustee; if a valid business reason is shown for a transaction, the transaction is presumed appropriate.   <u>See</u> 7 Collier on Bankruptcy ¶ 1108.06 (15th ed. rev. 2006).
>
> The court concludes that section 503(c)(3) is intended to give the judge a greater role: even if a good business reason can be articulated for a transaction, the court must still determine that the proposed transfer or obligation is justified in the case before it.   The court reads this requirement as meaning that the court must make its own determination that the transaction will serve the interests of creditors and the debtor's estate.

<u>GTAT</u>, 2015 WL 4459502 at *7 (quoting <u>Pilgrim's Pride</u>, 401 B.R. at 237).   Accordingly,

the District Court concluded that "§ 503(c)(3) directs courts to give plans such as the

KERP in this case more scrutiny than is required by the § 363(b)(1) business judgment

test."   <u>Id.</u>   In its Remand Order, the District Court noted that this Court referred to the

"business judgment standard," but found that it was "not clear whether [this Court] applied

the highly deferential § 363(b)(1) test or the less deferential test from <u>Pilgrim's Pride</u>,"

precluding the District Court from "undertak[ing] a meaningful review."   <u>Id.</u> at *8.

Having determined the applicable statutory framework, the District Court then

"turn[ed] to a more straightforward issue, *i.e.*, the substantive framework for a bankruptcy

court's review of a compensation plan under § 503(c)(3)."   <u>Id.</u>   In this regard, the District

Court found this Court's Denial Order lacking in that it failed to articulate an analysis of

the KERP with regard to "what have come to be known as the <u>Dana</u> factors":

> -- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a

performance incentive, is the plan calculated to achieve the desired
performance?

-- Is the cost of the plan reasonable in the context of the debtor's assets,
liabilities and earning potential?

-- Is the scope of the plan fair and reasonable; does it apply to all
employees; does it discriminate unfairly?

-- Is the plan or proposal consistent with industry standards?

-- What were the due diligence efforts of the debtor in investigating the need
for a plan; analyzing which key employees need to be incentivized; what is
available; what is generally applicable in a particular industry?

-- Did the debtor receive independent counsel in performing due diligence
and in creating and authorizing the incentive compensation?

Id. (quoting In re Patriot Coal Corp., 492 B.R. 518, 536 (Bankr. E.D. Mo. 2013); In re Dana

Corp., 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006)).

Accordingly, in its Remand Order, the District Court instructed this Court to: "(1)

analyze the proposed KERP in terms of the Dana factors; and (2) do so with the level of

scrutiny described in Pilgrim's Pride."    Id at *8.

**B.     The KERP: Discussion**

The higher scrutiny to be applied when analyzing a non-insider retention plan

under § 503(c)(3) requires this Court to determine whether the KERP is justified in this

case and "will serve the interests of creditors and the debtor's estate," regardless of

whether the Debtors have articulated a good business reason for the KERP.    Pilgrim's

Pride, 401 B.R. at 237.    With that standard in mind, the Court turns to the Dana factors.

To begin with, the Court finds that the Debtors, at least at the time the Motion to

Approve was filed, were properly concerned about the retention of their employees, a

19

valid concern given the difficulty of finding equally skilled replacements and the potential lure of more stable employment.[12]  The Debtors were thorough and careful in paring down an initial group of key employees to the 26 deemed "most crucial to GTAT's operations" and ultimately, the Debtors' successful reorganization.  Newstead Decl. 4. The KERP went through multiple revisions and was ultimately the product of the Debtors' work with two professional consultants, senior management, Debtors' counsel and the Creditors' Committee, and so clearly also satisfies the Debtors' due diligence duties in that regard.  See, e.g., Residential II, 491 B.R. at 86; Velo, 472 B.R. at 213; In re Global Aviation Holdings Inc., 478 B.R. 142, 153, 154 (Bankr. E.D.N.Y. 2012).

But the Court cannot conclude from the record here that the design of the KERP is reasonably related to the results the Debtor is seeking to obtain, that the scope of the plan is fair and reasonable and does not discriminate unfairly, or that the plan is consistent with industry standards.  At the Hearing, the Court's remarks in denying approval of the KERP focused on the fact that the proposed retention payments did not appear significant

---

[12]  In fact, as Pfeifer noted in his declaration, four employees who would have been included in the KERP resigned before the Motion to Approve was filed, and one more resigned by the time the declaration was drafted. Indeed, on March 13, 2015, the Debtors filed an emergency motion seeking authority to make a one-time special retention payment to a key employee that received a competing job offer.  The Court granted that motion by order dated March 20, 2015.  Although the Debtors represented in that Motion that they expected additional employees selected as Participants would leave the company after this Court's denial of the KERP, the Court has not received another special retention payment motion relative to any other Participants.  The Court *did* approve severance payments to a large number of non-insider employees in Hong Kong.  See Order Pursuant to Bankruptcy Code Sections 363(b) and 503(c)(3) Approving Supplemental Severance Payments to Non-Insider Employees of GT Advanced Technologies Limited, August 27, 2015, ECF No. 2234.  Those employees, unlike the KERP Participants, were to be terminated on a date certain as part of the Debtors' further workforce reduction.  In addition to statutorily-required severance payments under Hong Kong law, the Court authorized the payment of supplemental severance payments to those employees who remained until their scheduled date of termination.  Unlike the KERP Participants, the terminated Hong Kong employees were certain they would have no long-term employment with the Debtors and, absent the incentive payments, simply had no reason to remain with the Debtors in the event they received an alternative employment offer.

enough to tip the balance toward a Participant's remaining in the Debtors' employ should he or she receive a competing employment offer.   The Court reaffirms that conclusion with regard to those employees at the bottom of the KERP payment spectrum.   The lowest amounts proposed to be paid under the KERP are roughly equal to the payment the Participant could expect to receive under the Debtors' generally applicable bonus plan – the "MIP."[13] For those employees, it seems unlikely that their inclusion in the KERP, which would result in their exclusion from participation in the MIP, will do much, if anything, to sway them from accepting a competing employment offer if they were otherwise so inclined.

What the Court did *not* address in its Denial Order was the other end of the spectrum – i.e., those Participants who would receive the largest (either by salary percentage or total payment amount) bonuses under the KERP.   Several employees are slated under the KERP to receive very sizeable retention bonuses.   But as to those payments, the Court cannot determine from the record whether such large bonuses are reasonable or in line with industry or market standards.   Evidence was presented that the *average* compensation of the KERP equates to approximately 27 percent of the Participants' base salaries – an average that is line with KERP plans approved in other Chapter 11 cases.   But a comparison of KERP averages does little to inform the Court as to whether the larger bonuses, either as to amount or as to base salary percentage, are reasonable from a market perspective.   Perhaps such a determination would have

---

[13] The MIP – management incentive plan – is the Debtors' prepetition incentive program and covers approximately 175 employees. According to Pfeifer, the average payout under the MIP in 2013 was $10,000 and is anticipated to be commensurate with that amount in the future.   No payments under the MIP were made for 2014.

been aided by additional data or other evidence as to whether the KERP Participants' base salaries were above, below, or at market norms – but such evidence was not provided. Accordingly, the Court finds that the Debtors have not adequately demonstrated that the KERP payments are more likely to motivate the Participants to remain with GTAT or, for the largest KERP bonuses, are not excessive under the facts and circumstances of this case.

As to whether the scope of the KERP is fair and reasonable or unfairly discriminatory, the Court is not troubled by the fact that a small number of the Debtors' workforce were identified as KERP Participants. But as to the differential payments (from $10,000 to $100,000) and base salary percentages (from 8 to 48 percent) contained within the KERP, such differential treatment between KERP Participants seems at face value to be unfair and discriminatory without far more information as to what informs the differences. While other Courts have held that differential payments to employees under a retention plan are not *per se* unreasonable or discriminatory, see, e.g., Global Aviation, 478 B.R. at 152, the variances between amounts and percentages of base pay in the KERP here appears more dramatic than that found in other cases. See, e.g., In re Borders Group, Inc., 453 B.R. 459, 467 (Bankr. S.D.N.Y. 2011) (critical employees would receive approximately 30 percent of base salary under retention plan, amounts ranged from $28,000 to $53,000). In addition, such variances may be expected in larger plans that contain a range of upper-, mid-, and/or low-ranking employees, where one would expect that more critical employees would receive more substantial retention payments. But in this case, the Debtors have argued that the KERP covers only those employees

22

that are *crucial* to GTAT's success.   In light of that representation, the Court is hard-pressed to see the rationale behind providing the Participants such dramatically disparate treatment under the KERP.

And, finally, the Court cannot conclude based on this record that the cost of the KERP is reasonable in the context of the Debtors' assets, liabilities, and earning potential. The Debtors did not provide any specific evidence on that question.   The Court notes that, despite the millions of dollars in losses the Debtors have incurred and are continuing to incur each month, Cumberland's summary comparison of the KERP with other approved retention plans reveals that the aggregate amount of the payout falls at the 75th percentile. Ultimately, however, the Debtors failed to demonstrate the reasonableness of the KERP's cost.   Compare, e.g., Global Aviation, 478 B.R. at 152 (debtor's evidence demonstrated that total cost of retention plan constituted less than 0.014 percent of debtor's reported revenue); Borders, 453 B.R. at 475 (total cost of both retention and incentive plans represented only 0.17% of previous year's revenue, and only 0.26% of the Debtor's projected revenue after emergence).

In sum, the Court finds that the Debtors have not demonstrated that the KERP is justified under the facts and circumstances of this case or will serve the interests of the creditors and the estate.   Accordingly, the Motion to Approve with regard to the KERP must also be denied.

III.    CONCLUSION

Because the Court finds that that the KEIP is primarily designed to be retentive, and not as incentive in nature, it cannot be approved because it fails to meet the

23

requirements of § 503(c)(1).    And the Court finds and rules that the KERP, as currently

formulated, is not justified under the facts and circumstances of this case, the standard

required by § 503(c)(3).    Accordingly, the Motion to Approve must again be denied in its

entirety.    An order in conformity with this Memorandum shall issue forthwith.

By the Court,

Dated:  September 30, 2015            _____
                                     Henry J. Boroff
                                     United States Bankruptcy Judge