# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

_____

In re:                                                   )
                                                         )
                                                         )        Chapter 11
        GT ADVANCED TECHNOLOGIES,         )        Case No. 14-11916-HJB
        INC., *et al.*,                                )        Jointly Administered
                                                         )
                Debtors[1]                           )
_____  )

## <u>MEMORANDUM OF DECISION</u>

Before the Court is the "Debtors' Motion for Summary Judgment on Administrative

Expense Claim of Tera Xtal Technology Corp." (the "Summary Judgment Motion"), filed

by the debtors-in-possession in these jointly administered Chapter 11 proceedings.  Tera

Xtal Technology Corp. ("TXT")[2] seeks administrative expense priority for a claim in excess

of $3.6 million in the debtors' cases based on alleged lost profits caused by one of the

affiliated debtors, GT Advanced Technologies Limited ("GTAT Ltd.").[3]  For the reasons

discussed herein, the Court will grant the Summary Judgment Motion and will deny TXT's

request for allowance of an administrative claim.

_____

[1] The Debtors in these chapter 11 cases, now jointly administered, are GT Advanced Technologies, Inc., case no. 14-11916; GT Equipment Holdings, Inc., case no. 14-11917; GTAT Corporation, 14-11919; GT Advanced Technologies Limited, case no. 14-11920; Lindbergh Acquisition Corp., case no. 14-11922; GT Sapphire Systems Group LLC, case no. 14-11923; GT Sapphire Systems Holding LLC, case no. 14-11924; GT Advanced Cz LLC, case no. 14-11925; GT Advanced Equipment Holding LLC, case no. 14-11929.

[2] TXT is a Taiwanese corporation with its principal place of business in Hsinchu, Taiwan.

[3] GTAT Ltd. is a Hong Kong corporation with its principal place of business in Merrimack, New Hampshire.

I.    FACTS AND POSITIONS OF THE PARTIES[4]

In early 2011, GTAT Ltd. entered into three agreements for the sale of a total of 98 advanced sapphire furnaces (the "Furnaces") to TXT (the "Supply Agreements").   The Furnaces are computer controlled machines used to create sapphire boules containing LED quality sapphire material that can be sold to manufacturers for use in a variety of applications.   The Furnaces contain pre-installed software which, like many types of software, requires an appropriate license code to be entered for activation.   Without the appropriate software license code, the Furnaces will not operate.

By early 2012, GTAT Ltd. had delivered 30 Furnaces to TXT (the "Delivered Furnaces").   After receipt of the Delivered Furnaces, however, a dispute arose between the parties, based, *inter alia*, on TXT's assertion that the Delivered Furnaces failed to meet the performance criteria set forth in the Supply Agreements.   The relationship between the parties soured and TXT eventually declined to purchase the undelivered Furnaces (the "Undelivered Furnaces").   GTAT Ltd., believing that TXT had wrongfully withheld payments and wrongfully terminated the contract, suspended the software licenses necessary for operation of the Delivered Furnaces.   And, in November 2012, GTAT Ltd. commenced an arbitration proceeding against TXT through the International Centre for Dispute Resolution (the "Tribunal"; the "Arbitration").   In the Arbitration, GTAT Ltd. asserted that TXT had wrongfully breached the Supply Agreements and accordingly sought full payment of the contractual balance due, including payment for the Undelivered Furnaces.   TXT counterclaimed, demanding a refund of the amounts paid for the underperforming Delivered Furnaces, a return of the Deposit made on the Undelivered

---

[4] The following background facts are largely undisputed.   A more thorough review of alleged disputes of material fact can be found in the Discussion section of this Memorandum.

Furnaces, and consequential damages.

In August 2014, the Tribunal issued a written decision, in turn accepting and rejecting various of the parties' claims against each other.  The Tribunal ultimately concluded that 10 of the 30 Delivered Furnaces did not meet performance criteria under the Supply Agreements (the "Non-Conforming Furnaces") and that TXT was not obligated to purchase the Undelivered Furnaces.  The Tribunal found, however, that the remaining 20 Delivered Furnaces had been accepted by TXT (the "Accepted Furnaces"). Accordingly, the Tribunal issued an award (the "Final Award") in which it ordered GTAT Ltd. to pay to TXT $20,967,450 plus interest, representing amounts previously paid by TXT on account of the 10 Non-Conforming Furnaces and the Undelivered Furnaces. Material to the present dispute before the Court, the Tribunal also ordered GTAT Ltd. to remove the 10 Non-Conforming Furnaces and "to deliver software licenses to TXT with respect to the 20 [Accepted Furnaces]."  Decl. of Henry (Chia-Heng) Lin, Ex. A, Final Award at 35, Feb. 16, 2016, ECF No. 3105; see also id. at 40 ("[GTAT Ltd.] must provide TXT with software licenses for the 20 [Accepted Furnaces] within 15 days of the date of this award.").

On August 30, 2014, the parties entered into a settlement agreement (the "Settlement Agreement") that provided for the payment of the monetary sums awarded by the Tribunal and for the performance of GTAT Ltd.'s other obligations under the Final Award.  Although the Final Award required only that GTAT Ltd. provide TXT with software licenses for the 20 Accepted Furnaces, the Settlement Agreement arguably imposed additional obligations on GTAT Ltd.  It required that GTAT Ltd. not only provide TXT with the software licenses, but further stated that "[e]ach software license shall be

automatically renewable on an annual basis and GT shall renew each software license each year," and "[i]n the event that the software ceases to function, GT agrees to provide whatever service is necessary to render the software operational."  Debtors' Stmt. Of Undisputed Material Facts, Ex. 2, Settlement Agreement at § 1.3, Feb. 16, 2016, ECF No. 3107.  The Settlement Agreement also provided that, to the extent it was inconsistent with the Final Award, the "Settlement Agreement is intended to supersede that Final Award in the relevant respects."  Id. at § 4.4.

GTAT Ltd. made the first payment due under the Settlement Agreement, but failed to pay the remaining amount due on the Final Award[5] and failed to remove the 10 Non-Conforming Furnaces.  And on October 6, 2014, GTAT Ltd. and several of its affiliates (together, the "Debtors") commenced voluntary Chapter 11 cases (now jointly administered) under the United States Bankruptcy Code.[6]

On May 20, 2015, TXT filed its motion asserting a total administrative claim of $3,789,963.00, which claim TXT argues is entitled to administrative priority pursuant to § 503(b)(1) of the Bankruptcy Code (the "Administrative Claim"; the "Administrative Claim Motion").  Of that sum, $189,963.00 was based on TXT's alleged postpetition storage and preservation costs related to the 10 Non-Conforming Furnaces that were not removed from its premises.  Pursuant to a stipulation approved by the Court on October 16, 2015,

---

[5] In addition to the Administrative Claim Motion at issue here, TXT also filed an adversary proceeding against GTAT Ltd. seeking a declaration that a portion of the monetary award was a secured claim against GTAT Ltd. or the Debtors.  This Court dismissed that adversary proceeding, essentially finding that the monetary award represented only a general unsecured claim.  See Tera Xtal Tech. Corp. v. GT Adv. Tech. Ltd. (In re GT Adv. Tech., Inc.), slip copy, 2015 WL 9581395, *4 (Bankr. D.N.H. Dec. 29, 2015).

[6] See 11 U.S.C. § 101 et seq. (the "Bankruptcy Code" or the "Code").  All statutory references are to the Bankruptcy Code unless otherwise indicated.

TXT has waived its claim for those storage costs.  The balance of the Administrative Claim ($3.6 million) is based on TXT's alleged lost profit damages incurred on account of GTAT Ltd.'s "post-petition and continuing failure to provide current and compatible software licenses for the 20 [Accepted Furnaces] and provide the service necessary to render the software operational."  Administrative Claim Motion at 5 ¶ 19, 9-10 ¶ 30, May 20, 2015, ECF No. 1837.[7]  According to TXT, "[w]ithout current and compatible software licenses, the 20 [Accepted Furnaces] are completely nonfunctional, and TXT is unable to use them for the production of sapphire, resulting in significant lost profits."  Id. at 4 ¶ 14.

Both the Debtors and the Official Committee of Unsecured Creditors (the "Creditors' Committee") objected to the Administrative Claim Motion on grounds that (1) GTAT Ltd. *had* provided the requisite software licenses to TXT; (2) to the extent that GTAT Ltd. was in breach of either the Final Award or the Settlement Agreement, any damages on account of that breach would constitute a general unsecured prepetition claim and not an administrative claim under § 503(b)(1); and (3) TXT had provided no factual basis for its claimed $3.6 million in lost profits.

As it appeared to the parties and to the Court that threshold factual issues related to the Administrative Claim Motion were in dispute (i.e. whether GTAT Ltd. provided the software licenses to TXT and/or whether the licenses were functional), the Court issued a pretrial order setting a discovery deadline (as later amended) of November 6, 2015, and setting a deadline for the parties to file dispositive motions.  See Amended Pretrial Order, Sept. 16, 2015, ECF No. 2302; Amended Pretrial Order, Nov. 16, 2015, ECF No. 2530. On December 15, 2015, the Debtors filed the Summary Judgment Motion.

---

[7] It is undisputed that TXT's dealings were solely with GTAT Ltd.  Accordingly, to the extent that TXT has a valid administrative claim in these cases, it is solely with respect to GTAT Ltd.'s estate.

The Debtors' Summary Judgment Motion revolves around four primary arguments. The first is factual.  According to the Debtors, GTAT Ltd. *did*, indeed, provide software licenses for the 20 Accepted Furnaces: (1) GTAT Ltd. provided the licenses to TXT prepetition, on September 30, 2014; (2) GTAT Ltd. employees visited TXT's facilities postpetition, on November 13, 2014, and demonstrated to TXT employees how to input the licenses on two Furnaces while TXT employees observed until they were comfortable with inputting the remaining licenses themselves; and (3) approximately one year later, on August 3, 2015, GTAT Ltd. provided TXT with lifetime licenses that would never expire and would not need annual renewal.  Therefore, the Debtors argue, the factual basis for the lost profits claim – that GTAT Ltd. failed to provide the appropriate software licenses – is indisputably incorrect.

Second, the Debtors maintain that, even *if* GTAT Ltd. had breached and/or remains in breach of the Final Award or Settlement Agreement (i.e., if there was some additional service obligation with respect to the Accepted Furnaces that GTAT Ltd. failed to perform), any damages on account thereof would only constitute a general unsecured prepetition claim.  The Debtors say that TXT's claim does not meet the requisite criteria for administrative expense priority under § 503(b)(1) because: (1) TXT's claim does not arise from a postpetition transaction with GTAT Ltd., but rather from obligations imposed under either the Final Award or the Settlement Agreement and (2) the consideration paid by TXT (i.e., the payments for the 20 Accepted Furnaces) did not benefit the Debtors' estates, as it was paid solely to GTAT Ltd. prepetition and the Debtors did not induce TXT to render any performance to the Debtors postpetition.

Third, the Debtors argue that the lost profits claim does not qualify as an

administrative expense under the "exception" for claims that arise from a debtor's postpetition tortious activity or violations of the law.  Reading First Circuit case law as permitting administrative priority for such claims (despite the debtor having received no benefit from the claimant) only when the claim arises in connection with a debtor's postpetition operation of its estate, the Debtors stress again that the obligations to TXT related to the Accepted Furnaces are rooted in the *prepetition* Final Award and Settlement Agreement and therefore cannot fall within that narrow exception.  The Debtors say that the Final Award required only that GTAT Ltd. provide the software licenses to TXT, which it did, and therefore TXT cannot argue that GTAT Ltd. is somehow in postpetition "contempt" of a prepetition "court order."  And, the Debtors argue, any obligation to provide further assistance to TXT with regard to the software or software licenses arises under the Settlement Agreement.  To the extent GTAT Ltd. is in postpetition breach of those obligations, the Debtors maintain, resulting damages would constitute only a general unsecured prepetition claim.  To hold otherwise, in the Debtors' view, would elevate *every* prepetition breach of contract claim to an administrative claim if a debtor failed to cure the breach postpetition.

Finally, the Debtors say that even if TXT could successfully demonstrate that GTAT Ltd. breached any of its obligations with respect to TXT, the lost profits claim fails as a matter of law as TXT has produced no evidence that would allow a determination of such damages with reasonable certainty.  Based on materials provided during discovery, the Debtors argue that the assumptions underlying TXT's damage calculation are unsupported and any measure of lost profits based on those materials would be unduly speculative and unreliable.

In its opposition to the Summary Judgment Motion (the "Opposition"), TXT responds that its Administrative Claim is *not* based on GTAT Ltd.'s prepetition conduct. Rather, TXT asserts that "[o]n November 13, 2014, after the Petition Date . . .  [GTAT Ltd.] negligently performed certain actions causing substantial damage to the [Accepted Furnaces] owned by TXT."  Opposition at 1, Feb. 16, 2016, ECF No. 3104.  According to TXT, when GTAT Ltd. employees visited TXT's facilities to demonstrate installation of the software licenses on the Accepted Furnaces, the GTAT Ltd. employees must have performed the installation negligently, because when TXT employees attempted to turn some of the machines on, "the control boards on these units failed or they were damaged."  Id. at 3.  For fear that the same might happen to the remaining Furnaces, TXT has since attempted to operate only one machine (which also failed).  Essentially, the machines lay dormant and, apparently, inoperable.

In addition, TXT argues that TXT employees were never informed by any GTAT Ltd. employee that the Furnaces may be inoperable without additional maintenance after being idle for over two years.  According to TXT, GTAT Ltd. "had a duty to notify TXT that trying to operate the idled [Furnaces] without additional maintenance could result in damage to the machines."  Opposition at 8-9.  Accordingly, TXT says, its claim for lost profits is based on a postpetition tort – namely, GTAT Ltd.'s "post-petition negligence in failing to exercise reasonable care in fulfilling its duties," id. at 9 – and it is therefore entitled to administrative expense priority under § 503(b)(1)(A) and Reading Co. v. Brown, 391 U.S. 471 (1968).

And while TXT appears to admit in its Opposition that software licenses were provided by GTAT Ltd. on September 30, 2014, TXT claims that those licenses "pertained

to the software which never properly enabled operation of the [Furnaces]" and complained that GTAT Ltd. did not upgrade or improve the "defective software."   Opposition at 9. Accordingly, TXT reiterates its assertion that GTAT Ltd. has failed to provide "compatible software licenses and the service necessary to render the software operational." Id.[8] And since, in TXT's view, the Settlement Agreement was entered into to effectuate the Final Award, GTAT Ltd.'s *postpetition* failure to adequately perform as required under the Final Award is entitled to administrative priority for the same reason that a debtor's failure to comply postpetition with prepetition orders and injunctions gave rise to administrative claims in Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.), 755 F.2d 200 (1st Cir. 1985), and Munce's Superior Petroleum Prods., Inc. v. N.H. Dept. of Envtl. Servs. (In re Munce's Superior Petroleum Prods., Inc.), 736 F.3d 567 (1st Cir. 2013).  At the very least, TXT says, the question of GTAT Ltd.'s negligence remains a disputed fact that cannot be resolved in the context of a summary judgment motion.

Finally, with regard to its lost profits calculation, TXT argues that its damages then exceeded $4 million dollars and continue to increase.  In response to the Debtors' claim that the damages are supported only by speculation and unwarranted assumptions, TXT asserts that the amount of damages is an issue of material fact to be resolved at trial and not determined though summary judgment.

---

[8] TXT also asserts in the Opposition that it is entitled to, and never received, a copy of the Furnaces' standard operating procedures from GTAT Ltd.  However, the Opposition does not address a document, *produced by TXT*, attached to the Debtors' Summary Judgment Motion which appears to be a step-by-step guide with full visuals explaining how to use the Furnaces. (Given the sensitive commercial nature of that document, the Court has allowed it to remain filed under seal.)  Given that TXT has not disputed that this document is what the Debtors purport it to be; nor has TXT disputed that it was produced *by* TXT during discovery, the Court must conclude that TXT's allegation that it needed, and never received, a copy of the operating procedures is not supported by the record.

At the hearing on the Summary Judgment Motion (the "Hearing"), the Debtors raised a vehement objection to TXT's assertion that the Administrative Claim, as originally pled, was based on allegations of GTAT Ltd.'s postpetition negligence.  In the Debtors' view, TXT never claimed in the Administrative Claim Motion that its damages derived from any postpetition negligence – instead, the Administrative Claim Motion asserted only that the software licenses and necessary services to operate the Furnaces were not provided. The Debtors maintain that, under First Circuit law, this new theory of liability cannot be raised for the first time in an objection to summary judgment.   And even if the Administrative Claim Motion *did* preserve an argument based on postpetition negligence, the Debtors say that no evidence of such negligence has been produced and summary judgment should therefore be granted based on the arguments raised in its Summary Judgment Motion.

At the Hearing, TXT's counsel argued that a postpetition negligence claim *was* raised in the Administrative Claim Motion because the motion stated that TXT's claim was entitled to administrative priority "pursuant to § 503(b)(1)(A) of the Bankruptcy Code, as well as pursuant to the doctrine set forth in <u>Reading Co. v. Brown</u>, 391 U.S. 471 (1968)." Administrative Claim Motion at 6 ¶ 21.  In <u>Reading</u>, the Supreme Court held that damages caused by the postpetition negligence of a bankruptcy receiver while operating the debtor's business were entitled to administrative expense priority.  TXT maintains that this reference to <u>Reading</u> made it clear that TXT was basing its claim on postpetition negligence.  In fact, TXT's counsel asserted at the Hearing that the claim "is not in any way tied to the prepetition settlement agreement."  Feb. 4, 2016 Hr'g Transcript (the "Hearing Transcript") 16:16-17.

As to evidence of GTAT Ltd.'s negligence, TXT's argument at the Hearing relied primarily on the deposition testimony of Hoil Kim, one of GTAT Ltd.'s directors, who stated in his deposition that GTAT Ltd. engineers installed "software" on the Furnaces when they visited TXT's facilities in November 2014.  TXT's counsel argued that this statement reveals that GTAT Ltd. employees did not simply enter an authorization code into the Furnaces, but actually installed new software on the Furnaces – software which "led necessarily to the damage to the[ ] machines," "damaged the machines completely," and "caused the machines to basically self-destruct."  Hearing Transcript 20:14-15; 23:1-2; 21:2-3.  And while GTAT Ltd. disputes this conclusion, TXT says that an evidentiary hearing is required to resolve the factual dispute.

At the conclusion of the Hearing, the Court took the matter under advisement.


II.    DISCUSSION

Pursuant to 11 U.S.C. § 503(b)(1)(A), "actual, necessary costs and expenses of preserving the estate" may be entitled to allowance as an administrative claim – giving the claimant priority in payment over, *inter alia*, the prepetition general unsecured creditors of the bankruptcy estate.  See 11 U.S.C. § 507(a)(2).  "The traditional presumption favoring ratable distribution among all holders of unsecured claims counsels strict construction of the Bankruptcy Code provisions governing requests for priority payment of administrative expenses."  Woburn Assocs., Inc. v. Kahn (In re Hemingway Transp., Inc.), 954 F.2d 1, 4-5 (1st Cir. 1992).

Under First Circuit precedent, a claim is entitled to administrative priority under § 503(b)(1)(A) "if: 1) the right to payment arose from a postpetition transaction with the

estate; and 2) the consideration supporting the claimed right to payment was beneficial to the estate." In re PYXSYS Corp., 288 B.R. 309, 317 (Bankr. D. Mass. 2003).  It is the claimant's burden to establish each of the elements that would entitle its claim to administrative treatment, Hemingway, 954 F.2d at 5, and "[a]s these requirements are presented in the conjunctive, if one is not met, the administrative claimant will not be entitled to the priority."  In re Hopkinton Indep. Sch., Inc., 499 B.R. 158, 162 (Bankr. D.N.H. 2013).

Administrative priority is not granted to all claims in which the right to payment arises postpetition.  Rather, "[i]t is only when the debtor-in-possession's actions themselves . . . give rise to a legal liability that the claimant is entitled to the priority of a cost and expense of administration." Cramer v. Mammonth Mart, Inc. (In re Mammoth Mart, Inc.), 536 F.2d 950, 955 (1st Cir. 1976).  In other words, "where there is a pre-petition contract or lease, and the consideration supporting the claim is supplied pre-petition, courts have determined that those claims are not entitled to administrative priority, even if the right to payment arises post-petition." In re Old Carco LLC, 424 B.R. 650, 657 (Bankr. S.D.N.Y. 2010), aff'd 2010 WL 4455648 (S.D.N.Y. Nov. 2, 2010); see also, Hemingway, 954 F.2d at 5 n.4 ("[a] right to payment predicated on an executed prepetition contract is not entitled to priority payment as an administrative expense.").

"The rule does, however, extend further . . . ." Mass. Div. of Employment & Training v. Boston Reg'l Med. Ctr., Inc. (In re Boston Reg'l Med. Ctr., Inc.), 291 F.3d 111 (1st Cir. 2002).  The First Circuit has "recognized a special category of expense entitled to administrative priority status, based on considerations of fundamental fairness, see Reading Co., 391 U.S. at 477, 88 S.Ct. at 1763, consisting of amounts due entities 'injured

12

by the debtor-in-possession's operation of the business even though their claims did not arise from transactions that were necessary to preserve or rehabilitate the estate.' *In re Mammoth Mart*, 536 F.2d at 954." Hemingway, 954 F.2d at 5.

In Reading, the Supreme Court held that a claim for damages caused by the negligence of a receiver operating a Chapter XI debtor's business was entitled to administrative priority. 391 U.S. at 485. Even though the debtor estate did not receive any benefit from the claimant postpetition, the Court reasoned that "it is theoretically sounder . . . to treat tort claims arising during an arrangement as actual and necessary expenses of the arrangement rather than debts of the bankrupt." Id. at 483. In essence, the Court concluded that "'actual and necessary' costs should include costs ordinarily incident to the operation of a business," such as liabilities arising "from the negligence of a receiver acting within the scope of his authority as receiver." Id. at 485.

The First Circuit, relying on the underlying reasoning in Reading, has extended its rationale beyond the tort context and has held that other types of postpetition injuries and expenses are entitled to administrative priority, despite no benefit having been conferred upon the debtor's estate, when those injuries are *caused* or expenses incurred by the postpetition operation of the debtor's estate. For example, the court has held administrative priority status should be granted to civil compensatory fines for postpetition injunction violations, Charlesbank, 755 F.2d 200, and for fines and penalties incurred for postpetition failures to comply with environmental regulations, Munce's, 736 F.3d 567; Cumberland Farms, Inc. v. Fla. Dept. of Envtl. Prot., 116 F.3d 16 (1st Cir. 1997). In those cases, however, the court took care to emphasize that the administrative priority attached *only* on account of postpetition actions or failures to act in accordance with the debtors'

*postpetition* obligations, and not merely on the debtors' continuation of any prepetition conduct.  See, e.g., Munce's, 736 F.3d at 571; Cumberland, 446 F.3d at 20-21; Charlesbank, 755 F.2d at 201-02.

As this Court noted at the Hearing on the Administrative Claim Motion and reiterates here, all of the duties owed to TXT by GTAT Ltd. under the Supply Agreements, the Final Award, and the Settlement Agreement are prepetition responsibilities rooted in prepetition agreements.  The obligations imposed by the Final Award, to the extent those obligations went unfulfilled, were prepetition obligations imposed to remedy contract violations.  As with any other prepetition judgment against a debtor, the obligations under the Final Award, if not complied with, formed the basis only for a prepetition claim.  In contrast, in the cases discussed above, the debtors all engaged in postpetition behavior that violated obligations imposed upon them postpetition.  Here, TXT's claims based on GTAT Ltd.'s alleged failure to provide appropriate licenses, software, service, or support all stem from its prepetition contractual relationship with GTAT Ltd. and accordingly do not qualify for administrative priority as "continuing" or "ongoing" postpetition failures to comply with GTAT Ltd.'s postpetition obligations.

Accordingly, as this Court stated at the conclusion of the Hearing, only three questions remain: (1) was the allegation of a postpetition tort appropriately raised in the Administrative Claim Motion? (2) if so, do any material factual disputes exist with regard to the postpetition tort allegation?; and (3) even if the first two are answered in the affirmative, are the alleged lost profits damages too speculative to survive a motion for summary judgment?

14

### A. Did TXT Adequately Raise Allegations of a Postpetition Tort in the Administrative Claim Motion?

As recently reaffirmed by the First Circuit, it is well established that

> [p]laintiffs may not "raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment," *Calvi v. Knox Cty.*, 470 F.3d 422, 431 (1st Cir. 2006).  Allowing a plaintiff to proceed on new, unpled theories after the close of discovery would prejudice defendants, who would have focused their discovery efforts on theories actually pled.

Miranda-Rivera v. Toledo-Davila, -- F.3d –, 2016 WL 563070, *9 (1st Cir. Feb. 12, 2016).

And an "implicit" inclusion of a claim or a mere "hint of a possible additional claim" is insufficient.  Torres-Rios v. LPS Labs., Inc., 152 F.3d 11, 16 (1st Cir. 1998).  Rather, there must be some explicit development of the claim prior to the summary judgment stage sufficient to put the defending party on notice that the claim is being asserted against them.  Id.; see also Enzo Biochem, Inc. v. Amersham PLC, 981 F.Supp.2d 217, 224 (S.D.N.Y. 2013) ("A plaintiff may not pivot from its stated claims to new ones at the summary judgment stage simply because it inserted a few vague catch-all phrases into its pleadings.").

Here, TXT did not explicitly allege any postpetition negligence in its Administrative Claim Motion.  Rather, TXT initially argued that the software licenses were not "current and compatible," Administrative Claim Motion at 4 ¶ 14, and that GTAT Ltd. had not provided "the service necessary to render the software operational," id. at 16.[9]

---

[9] See also Administrative Claim Motion at 5 ¶ 18 ("[D]ue to [GTAT Ltd.]'s continuing obligation to provide, and its subsequent failure to provide, *current and compatible software licenses for the [Accepted Furnaces] and the service necessary* to render the software operational, TXT has suffered post-petition lost profits . . . ."); 5 ¶ 19 ("TXT has been damaged due to [GTAT Ltd.]'s post-petition and continuing *failure to provide current and compatible software licenses for the [Accepted Furnaces] and provide the service necessary* to render the software operational."); 9 ¶ 30 ("TXT has been damaged due to [GTAT Ltd.]'s continuing *failure to provide current and*

Nor does TXT's reference to the <u>Reading</u> case indicate in the Administrative Claim Motion that TXT was alleging postpetition negligence.  TXT's references to <u>Reading</u> are not aimed at providing an analogy to any alleged postpetition negligence in this case. Rather, TXT discusses the <u>Reading</u> case in the context of providing background for its discussion of subsequent First Circuit case law which established broader exceptions to the general test for administrative priority for claims based on injuries caused by a debtors' postpetition operation of its business.  <u>See</u> Administrative Claim Motion at 8 ¶ 27-28.  The purpose of the <u>Reading</u> reference is not to establish TXT's entitlement to an administrative claim on grounds that GTAT Ltd. was negligent postpetition.  Instead, TXT uses <u>Reading</u>, and subsequent First Circuit cases that rely on the reasoning articulated in <u>Reading</u>, to argue that "where a debtor continues to breach an order post-petition, the affected creditor may be entitled to an administrative priority on account thereof."  Id. at 9 ¶ 29.  And it is *this* argument that explicitly underlies TXT's Administrative Claim Motion – i.e., that GTAT Ltd.'s failure to comply with its obligations under the Final Award and the Settlement Agreement constitute "continuing" postpetition violations of an order that give rise to an administrative claim.  <u>See</u> Id. at 4 ¶ 16 (alleging that GTAT Ltd. "continues to breach the [Final] Award and Settlement Agreement post-petition"); 5 ¶ 18 (referring to GTAT Ltd.'s "continuing obligation to provide, and its subsequent failure to provide" appropriate software licenses and service); 5 ¶ 19 (same); 9-10 ¶ 30 (same).[10]

Again at the preliminary hearing on the Administrative Claim Motion, TXT's counsel

---

*compatible software licenses for the [Accepted Furnaces] and provide the service necessary* to render the software operational.") (emphasis supplied).

[10] As previously noted, this argument does not carry the day; any damages based on GTAT Ltd.'s failure to abide by the terms of the Final Award or Settlement Agreement constitute a prepetition general unsecured claim.

referred only to factual disputes related to whether GTAT Ltd. had provided TXT with the appropriate software licenses and service.  In discussing the need for discovery, TXT's counsel never mentioned a possible claim of postpetition negligence.  Instead, he indicated only that "[the Debtors] have alleged that they have provided software licenses. We would dispute that, but those software licenses are non-functional and the furnaces are currently non-functional, so I believe that we would need to do some factual findings on that."  June 11, 2015 Hr'g Transcript 27:24-28:3.  And in the stipulation resolving TXT's asserted administrative claim for postpetition storage charges, TXT again failed to refer to any alleged postpetition negligence by GTAT Ltd.  Instead, it specifically "reserve[d] all its rights to seek the allowance and payment of its purported claims for lost profits resulting from [GTAT Ltd.]'s alleged *failure to provide current and compatible software licenses for the [Accepted Furnaces] . . . and provide the service necessary to render the software operational*, as detailed in the Administrative Expense Motion."  Stipulation at 5 ¶ 9, Oct. 16, 2015, ECF No. 2440 (emphasis supplied).

It is was not until the filing of its Opposition to the Summary Judgment Motion that TXT raised the allegation that "after the Petition Date, [GTAT Ltd.] negligently performed certain actions causing substantial damage to the [Accepted Furnaces] owned by TXT." Opposition at 1.  TXT also alleged for the first time that GTAT Ltd. was "negligen[t] in failing to exercise reasonable care in fulfilling its duties," id. at 9, including by "failing to exercise reasonable care in installing the software," and "failing to inform TXT of the harm in attempting to operate furnaces that had been idled for two years," id.

Because these allegations of GTAT Ltd.'s postpetition negligence, as opposed to its alleged postpetition failure to comply with obligations imposed by the Final Award or

Settlement Agreement, were asserted for the first time in response to the Summary Judgment Motion and after the close of discovery, this de facto "amendment" to its claim comes too late. And because the Court has previously determined that the basis for administrative priority status as originally asserted in the Administrative Claim Motion fails as a matter of law, summary judgment must be granted in favor of the Debtors.

### B. Do Genuine Issues of Material Fact Preclude Summary Judgment?

Even if a claim of postpetition negligence were appropriately asserted in the Administrative Claim Motion, the Court concludes that TXT has failed to raise any disputed issues of material fact that would support such a negligence claim. Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (made applicable to this contested matter by Fed. R. Bankr. P. 7056 & 9014(c)). While the court should "view[ ] the facts and draw[ ] all reasonable inferences in favor of the nonmoving party," Opthalmic Surgeons, Ltd. v. Paychex, Inc., 632 F.3d 31, 35 (1st Cir. 2011), "[t]he party resisting summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" Colantuoni v. Alfred Cacagni & Sons, Inc., 44 F.3d 1, 6 (1st Cir. 1994) (quoting Fed. R. Civ. P. 56(e)). "There is no trialworthy issue unless there is sufficient competent evidence to enable a finding favorable to the opposing party," id., and the Court should "afford no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative," Topigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (quoting Rogan v. City of Boston, 267 F.3d 24,

27 (1st Cir. 2001)).

Here, TXT's negligence claims fail because (1) TXT has not raised any genuine issues of material fact (i.e., it fails to present sufficient competent evidence of its negligence claims) and (2) the negligence claims are otherwise precluded by operation of law.  TXT has raised various factual and legal arguments in connection with GTAT Ltd.'s alleged postpetition negligence.  The Court addresses each in turn:

It is undisputed that GTAT Ltd. provided TXT with annual software licenses related to the Accepted Furnaces on September 30, 2014, Decl. of Robert Keach, Ex. 2, Oct. 30, 2015 Deposition of Peggy Hsu 28:20-22, Feb. 16, 2016, ECF No. 3106, and ultimately provided TXT with perpetual licenses related to the Furnaces on August 3, 2015, Hsu Dep. 42:22-43:9.  It is further undisputed that on November 13, 2014, GTAT Ltd. employees went to TXT's facilities, *at TXT's request*, to demonstrate the installation of the license codes.  GTAT Ltd. employees demonstrated how to input the license codes on 2 of the 20 Accepted Furnaces, and TXT employees installed the license codes on the remaining machines.  Hsu Dep. 41: 13-22 ("[O]ur company requested them to assist us in installing the software licenses.  Q: And did GT respond to the request for assistance? A: Yes.  Q: And did GT engineers assist TXT with installing the software licenses?  A. Yes."); 52:10-12 ("GTAT performed the installation of two licenses, and we hoped to install the licenses for the remaining 18 tools."); 34:8-10 (Q: Were the software licenses installed for all 20 of the machines?  A. They were.").

The installed license codes appear to have been, and remain, appropriate for their purpose – i.e., they provide the necessary *permission* to allow the machines to operate. While TXT's witness at first equivocated with regard to whether the software licenses

themselves were faulty, see Hsu Dep. 35:11-12 (stating that she was "not sure if there was any issue with the software licenses"), she later admitted that TXT employees *did* determine that the software licenses were successfully installed: "[w]e saw on the tools that the licenses installed on the tools were still valid."  Hsu Dep. 55:19-20.  TXT has simply provided no evidence that would indicate that the licenses were themselves faulty, nor has it alleged any facts to indicate how the installation of software *licenses* on the Furnaces could result in damage to the machines on start-up.

In its Opposition, TXT makes two additional assertions regarding the software licenses in support of its negligence claim, neither of which constitute competent evidence to allow an inference that GTAT Ltd. employees were negligent in their installation.  First, TXT complains that the software licenses provided pertain to an "older" version of software installed on the Furnaces.  Opposition at 9.  This statement is irrelevant to the question of whether GTAT employees were negligent when they demonstrated how to input the software licenses.  The licenses provided to TXT pertained to a 2011 version of the Furnace software, because *that is the software that is installed* on those machines. See, e.g., Hsu Dep. At 44:14-15 (noting that the software on the Accepted Furnaces "is still the version that was installed in 2011.").

TXT also implies that the licenses were somehow faulty because they "pertained to software that never properly enabled operation of the [Accepted Furnaces]." Opposition at 9.  This statement is contradicted by TXT's own witness testimony – the Accepted Furnaces *did* operate at one time, using the originally-installed (and still existing) version of the software.  Hsu Dep. 59:3-8.  While the Furnaces had not been operated since the fall of 2012, and failed to operate when TXT employees attempted to

20

turn on the machines in 2014 and 2015, it appears that the installed software *was* initially sufficient to allow the operation of the machines.

While having an appropriate software license was *necessary* to operate the Furnaces, however, it might not have alone been *sufficient* for their operation. Many factors could have caused the Furnaces to fail to operate, a fact which TXT employees well knew, Hsu Dep. 29:10; 33:8-12; 34:2-7; 39:12-15. It is unclear from the record exactly why the Furnaces are not operating for TXT's purposes. But there is simply *no* evidence that the machines have failed to operate because they do not have the correct license codes installed. And there is no evidence that GTAT Ltd. employees damaged the Furnaces on November 13, 2014 when they inputted the license codes onto two machines. Nor does the subsequent failure of the Furnaces indicate GTAT Ltd. employees' negligence constituted the proximate cause of that failure. Indeed, TXT testified that it attempted to operate *all* of the Accepted Furnaces after the successful installation of the license codes, and *none* of the machines worked, including those for which TXT employees, and not GTAT Ltd. employees, had entered the licenses. Simply put, there is no competent evidence that the installation of the licenses by GTAT Ltd. employees was in any way responsible for the failure of the Accepted Furnaces to operate.

At the Hearing, TXT's counsel went further, asserting that, during the November 2014 visit to TXT's facilities, GTAT Ltd. employees did not simply demonstrate how to input the software license codes, but instead actually installed *new software* on the Furnaces that damaged the machines on start-up. See Hearing Transcript at 19:2-7 ("THE COURT: . . . So, again, was there software that was installed or was an

21

authorization code simply keyed in . . . ?  MR. KEACH: Our client's view of the world, Your Honor, is that *software was installed* because of the long period of time that these machines had been . . . inoperable.") (emphasis supplied); 20:24-21:3 (MR. KEACH: "What exactly did they do when they did the installation? We have testimony from them that they installed software.  That's our understanding.  We have testimony from our people that the software caused the machines to basically self-destruct.").

TXT's counsel based this assertion on a quote from the deposition of the Debtors' witness in which the witness stated that "[o]n November 13th of 2014, our engineers installed the software on units numbered 28 and 29 at the TXT plant."  Decl. of Robert Keach, Ex. 1, Oct. 27, 2015 Deposition of Hoil Kim 56:15-17.  But it is obvious from the preceding deposition testimony that the witness was *not* actually indicating that additional software was installed on the Furnaces.  It is clear when read in context that he used the term "software" in his answer as shorthand for the software license codes which were installed by GTAT Ltd. employees on that date.  In fact, TXT's own witness clearly differentiated between the installation of the software *licenses* and the installation of new *software* and acknowledged that "[i]n November 2014 GT only sent people to install the software licenses.  They did not demonstrate the software."  Hsu Dep. 46:22-24.

In fact, GTAT Ltd.'s *failure* to provide any upgraded software appears to be one of TXT's primary concerns.  TXT's witness testified that the version of the software on the Furnaces "is still the version that was installed in 2011," Hsu Dep. 44:14-15, and that TXT employees "were not sure if the software could turn the machine on," id. at 46:5-6; see also id. at 52:10-14 ("GTAT performed the installation of two licenses . . . .  But what mattered to us was still that the software could operate."); 45:18-24 ("We wanted to

22

confirm if there had been any upgrade or updates of the version of the software.  The version that was installed was from 2011 . . . . We wanted to see if there has been any updated version of the software for the machines to work with in order to operate.").  Not only is there no evidence that would indicate that GTAT Ltd. employees negligently installed software on the Furnaces, but there is simply no evidence that GTAT Ltd. employees installed software on the Furnaces *at all*.  See also Opposition at 9 (GTAT Ltd. "did not upgrade, modify, or improve the defective software.").[11]

And even if TXT *could* demonstrate that GTAT Ltd. employees were negligent in installing the software licenses or any additional software in November 2014 or were negligent in failing to warn TXT employees of the risks associated with powering-up the machines after having been idle for so long, or were somehow negligent in failing to assist TXT employees with determining the root cause of the Furnaces' failure, TXT's claim to administrative priority on account of that negligence would still fail as a matter of law.

TXT does not credibly dispute that any actions performed by GTAT Ltd. employees postpetition were undertaken (negligently or not) in association with its prepetition contractual relationship with TXT.  See, e.g., Opposition at 8 (alluding to the Final Award and quoting from the Settlement Agreement, TXT avers that GTAT Ltd. "had a duty to provide the software licenses and 'to provide whatever service was necessary to render

---

[11] In addition to TXT's negligence claims with regard to the software license installation, TXT has also alleged in the Opposition that GTAT Ltd. acted negligently in "failing to provide the necessary standard operating procedures and checklist to reoperate the [Accepted Furnaces]" and "by failing to inform TXT of the harm in attempting to operate furnaces that had been idled for two years." Opposition at 9.  Even if TXT were never given a standard operating procedure checklist (which it appears they *did* have in their possession, see fn. 8) and even if TXT was unaware of the risks associated with operating the Furnaces after a period of non-operation (which they clearly *were*), TXT has not alleged any duty owed by GTAT Ltd. to TXT to provide either of those pieces of information.

the software operational.'").  GTAT Ltd. and TXT have not entered into new postpetition contracts or other commercial dealings; the *only* reason GTAT Ltd. employees were present at TXT's facilities on November 13, 2014 was to demonstrate how to input the software license codes for the Accepted Furnaces, licenses which were provided to TXT *only* on account of obligations created by the Final Award and the Settlement Agreement.

Under New York law, which governs the relationship between these parties,[12] "when a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual; attempts to repackage them as sounding in fraud, conversion, *and other torts*, . . . are generally precluded, unless based on a duty independent of the contract."  Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy, 449 Fed. Appx. 57, 59 (2d Cir. 2011) (emphasis supplied).  "Merely charging a breach of a 'duty of due care', employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim."  Megaris Furs, Inc. v. Gimbel Bros., Inc., 172 A.D.2d 209, 211 (N.Y. App. Div. 1991) (quoting Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co., 516 N.E.2d 190, 194 (N.Y. 1987)).  Here, TXT has not alleged a separate duty owed by GTAT Ltd. apart from its obligations under the Final Award or

---

[12] This Court has previously ruled that New York applies to the contractual disputes between TXT and GTAT Ltd.:

> The Supply Agreements provided that the legal relations between the parties would be governed by New York law, the Tribunal applied New York law in the Arbitration proceedings (which were conducted in New York), and the Settlement Agreement also provided that New York law would govern its interpretation and enforcement.  . . . The parties have conducted all their transactions under the auspices of New York law by including choice-of-law provisions in their agreements and by physically conducting the Arbitration in New York.  And neither party has argued that New York law poses a serious conflict with any public policy. Accordingly, the Court finds that the parties' choice of law should be enforced . . . .

In re GT Adv., 2015 WL 9581395 at *4 (citations omitted).

24

Settlement Agreement.  And TXT seeks redress only on grounds that it still has not received the benefit of its bargain.

Even if GTAT Ltd. employees somehow "negligently performed" in connection with the parties' contractual relationship, TXT could not assert an independent tort claim under New York law.  New York law does not recognize any sort of "claim for negligent performance of contract," Med. Research Assocs., P.C. v. Medcon. Fin. Servs., Inc., 253 F.Supp.2d 643 (S.D.N.Y. 2003); such claims remain under the rubric of "breach of contract."  And, as previously discussed, TXT's breach of contract claims are prepetition general unsecured claims, not administrative claims in the Debtors' case.  Accordingly, summary judgment in favor of the Debtors must be granted.

## C.    Damages

Even if TXT were able to establish both that it properly asserted a postpetition tort claim in its Administrative Claim Motion and that GTAT Ltd. had acted negligently postpetition in connection with a duty independent of the parties' contractual relationship, summary judgment still must be granted in favor of the Debtors because TXT's lost profits claim fails as a matter of law.

TXT has argued that the issue of damages is one of fact – i.e., the Court must reserve for trial whether TXT has suffered damage at the hands of GTAT Ltd. and the amount, if any, of those damages.  While it is true that damage calculations are often an issue of fact, claims for lost profits will not survive summary judgment in the absence of some showing that the lost profits can be proven with "reasonable certainty."  A.I.A. Holdings, S.A. v. Lehman Bros., Inc., 2002 W.L. 1334809, *3 (S.D.N.Y. 2002).  "In other words, the damages may not be merely speculative, possible or imaginary, but must be

reasonably certain . . . ."  Kenford Co., Inc. v. County of Erie, 493 N.E.2d 234, 235 (N.Y. 1986).  "Although lost profits need not be proven with 'mathematical precision,' they must be 'capable of measurement based upon known reliable factors without undue speculation.'"  Shonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000) (quoting Ashland Mgt. Inc. v. Janien, 624 N.E. 2d 1007, 1010 (N.Y. 1993)).

New York courts have granted summary judgment against lost profits claims on grounds of undue speculation or reliance on unsupported assumptions even in cases where the claimant has adduced evidence based on business plans, projections, and analyses compiled by knowledgeable and expert witnesses.  See, e.g., Schonfeld, 218 F.3d at 171; Kenford Co., 493 N.E.2d at 236 ("[D]espite the massive quantity of expert proof submitted . . . the ultimate conclusions are still projections . . . the multitude of assumptions required to establish projections of profitability over the life of this contract require speculation and conjecture, making it beyond the capability of even the most sophisticated procedures to satisfy the legal requirements of proof with reasonable certainty.").

Here, not only has TXT failed to produce evidence to demonstrate its lost profits claims with reasonable certainty, it has entirely failed to produce *any evidence* at all.  In the Administrative Claim Motion, TXT asserted only the amount of its claimed damages based on lost profits and provided no evidence in support of its calculation.  It provided no additional documentation in support of those damages in its Opposition to the Summary Judgment Motion.  In fact, the *only* evidence produced in support of TXT's lost profits was attached to the *Debtors'* motion – which evidence, as the Debtors rightly argue, is too paltry to pass muster.

TXT's witness testified at deposition that she was responsible for calculating TXT's lost profits, which calculations were not performed with any assistance of outside professionals, Hsu Dep. 61:12-17, and her deposition testimony with regard to the calculation of those damages is altogether vague and nearly incomprehensible.  See, e.g., Hsu Dep. 20:11-23:14; 63:1-76:17.  Despite alleging in the Opposition that "TXT was unable to fulfill its purchase order" as a result of the inoperable Furnaces, Opposition at 9, TXT did not attach any purchase orders or contracts to substantiate this assertion.  And it appears that the internal calculation of lost profits damages (again, based on documents provided to the Court by the Debtors, and not TXT itself) is based primarily on (1) a journal article discussing an unrelated Chinese company, (2) an article from 2013 referencing a value for sapphire boules posited by a GTAT Ltd. employee, and (3) an email from one supplier indicating a drop in the market price for sapphire boules.  TXT has not attempted to demonstrate how these seemingly random and unassociated pieces of information (even if verified) relate to *its* business and *its* lost profits.  As no credible evidence (indeed, no evidence whatsoever) was produced in the Opposition to the Summary Judgment Motion that demonstrates a likelihood that TXT could establish a lost profits claim with reasonable certainty, summary judgment must be granted in favor of the Debtors.

Finally, even if TXT had produced sufficient evidence regarding the reasonable certainty of its lost profits calculations, this Court agrees with the Creditors' Committee that lost profits damages are unavailable as a postpetition administrative expense in any event.  As of the petition date, the Accepted Furnaces were not operating.  TXT's claims with regard to the inoperability of the furnaces, whether for lost profits or otherwise, were, on that date, prepetition general unsecured claims.  Even if GTAT Ltd. employees had

acted negligently postpetition, that negligence would have done no more than to leave TXT in the exact same position it was in at the commencement of the case – the owner of 20 inoperable Furnaces.  Accordingly, TXT cannot argue that it lost any *more* profits postpetition than it would have if GTAT Ltd. employees had done *nothing* postpetition. Accordingly, the lost profits damages claim fails as a matter of law, and summary judgment must be granted in favor of the Debtors.

III.  <u>CONCLUSION</u>

For all the foregoing reasons, the Court rules that TXT failed to (1) adequately raise a claim for postpetition negligence in its Administrative Claim Motion (and cannot now raise a new theory of liability in its Opposition to the Debtors' Summary Judgment Motion); (2) demonstrate that, as either a factual or legal matter, any claim for postpetition negligence against GTAT Ltd. could be established; and (3) demonstrate, as either a factual or legal matter, that it would be entitled to damages for lost profits.  Accordingly, the Court will GRANT the Debtors' Summary Judgment Motion and will DENY TXT's Administrative Claim Motion.  Orders in conformity with this Memorandum shall issue forthwith.

DATED: March 1, 2016                  By the Court,

                                      _____
                                      Henry J. Boroff
                                      United States Bankruptcy Judge